UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA *et al.*,

Plaintiffs,

v.

MAURA HEALEY, in her official capacity as
Attorney General of the Commonwealth of
Massachusetts; and THOMAS TURCO, in his
official capacity as Secretary of Executive Office of
Public Safety and Security of the Commonwealth of
Massachusetts,

Defendants.

CIVIL ACTION
NO. 1:21-cv-10960

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

MAURA HEALEY
ATTORNEY GENERAL

Phoebe Fischer-Groban (BBO No. 687068)
Grace Gohlke (BBO No. 704218)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2589
Phoebe.Fischer-Groban@mass.gov
Grace.Gohlke@mass.gov

Dated: August 20, 2021

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATUTORY AND REGULATORY BACKGROUND..............................................1

    I.      Massachusetts Handgun Safety Regulations ......................................... 1

          A.     Origination of Attorney General's Regulations........................... 2

          B.     Codification of Section 123 and Approved Firearms Roster..................... 5

FACTUAL AND PROCEDURAL BACKGROUND........................................................6

    I.      Individual Plaintiffs ......................................................................... 6

    II.     Retailer and Organizational Plaintiffs.................................................. 8

ARGUMENT ............................................................................................................8

    I.      The Handgun Safety Regulations Do Not Implicate the Second
         Amendment....................................................................................... 8

          A.     The Handgun Safety Regulations Do Not Burden Conduct Falling
               Within the Scope of the Second Amendment. ........................... 9

               1.     The Handgun Safety Regulations are Presumptively Lawful
                     Under *Heller.* ................................................................ 9

               2.     The Handgun Safety Regulations Do Not Burden Conduct
                     Within the Scope of the Second Amendment. ............................. 12

          B.     The Handgun Safety Regulations Easily Withstand Heightened
               Scrutiny. ..................................................................................... 13

               1.     No More Than Intermediate Scrutiny is Appropriate. ................. 13

                2.     The Handgun Safety Regulations Satisfy Intermediate
                       Scrutiny. .................................................................... 16

CONCLUSION..........................................................................................................20

## INTRODUCTION

Massachusetts law protects consumers from the sale of unsafe handguns that are prone to malfunction or accidental discharge during normal use or are not equipped with basic safety features. Together, the statutory requirements for the commercial sale of handguns established by Mass. Gen. Laws ch. 140, § 123, and the Attorney General's handgun sales regulations codified at 940 Code Mass. Regs. ("CMR") §§ 16.00 *et seq.* (together, the "handgun safety regulations"), ensure that handguns sold in the Commonwealth are not defective and protect handgun users and their families against accidental injury or death. In this case, Plaintiffs claim that Massachusetts' handgun safety regulations infringe their Second Amendment rights because, even though there are hundreds of handgun models that Plaintiffs can lawfully buy in Massachusetts, the handgun safety regulations prevent Plaintiffs from buying additional handguns that are not compliant with the Commonwealth's handgun safety regulations. In effect, Plaintiffs claim that they have "a right to keep and carry any weapon whatsoever," in contravention of *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

The Court should dismiss Plaintiffs' Complaint because it fails to state a claim upon which relief can be granted for three independent reasons. First, the challenged handgun safety regulations are valid because they are conditions and qualifications on the commercial sale of arms that are presumptively lawful under *Heller*. Second, the handgun safety regulations are valid because they do not burden conduct falling within the scope of the Second Amendment. Third, even assuming that the handgun safety regulations touch upon Second Amendment rights, they do not impose a substantial burden on those rights and easily survive intermediate scrutiny.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Massachusetts Handgun Safety Regulations

To protect Massachusetts consumers and their families, two sets of safety requirements

establish minimum standards for handguns sold by licensed retailers in the Commonwealth: (1) regulations promulgated pursuant to the Attorney General's authority under Mass. Gen. Laws ch. 93A, § 2(c), and codified at 940 CMR §§ 16.00 *et seq.*, and (2) statutory requirements at Mass. Gen. Laws ch. 140, § 123, that form the basis for the Approved Firearms Roster.

### A.    Origination of Attorney General's Regulations

Under Mass. Gen. Laws ch. 93A, § 2(c), the Attorney General has the authority to "prevent the deceptive or unfair sale or transfer of defective products which do not perform as warranted." *See Am. Shooting Sports Council, Inc. v. Attorney Gen.*, 429 Mass. 871, 875 (1999). Pursuant to this authority, in October 1997, the Attorney General of Massachusetts promulgated a set of regulations to ensure that handguns transferred[1] within the Commonwealth by retailers meet minimum safety and performance standards. 940 CMR §§ 16.00 *et seq.* (the "Attorney General's regulations"); *see also* Enforcement Notice: Attorney General's Handgun Safety Regulations.[2] The Attorney General's regulations "are intended to protect responsible gun owners and their families from firearms[3] that are unsafe by design or manufacture." July 16, 2004 Consumer Advisory on Glock Handguns ("Consumer Advisory").[4]

The Attorney General's regulations came in the wake of national research on preventing fatalities from accidental firearm discharges. In 1991, the United States General Accounting Office ("GAO") conducted a study at the request of Congress that found two basic safety features—child

---

[1] "Transfer" is defined as "sell, rent, or lease" and excludes sales to firearm wholesalers who do not intend to sell the handguns to Massachusetts retailers or consumers. 940 CMR § 16.01.

[2] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 1-2. The Attorney General's Enforcement Notices, as well as other sources cited in this section, are "official public records" that the Court may properly consider on a motion to dismiss. *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

[3] Massachusetts law defines the term "firearm" such that it encompasses all handguns. *See* Mass. Gen. Laws ch. 140, § 121.

[4] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 8.

proofing and a load indicator—could prevent one third of all accidental gun deaths in the United States. *See* U.S. General Accounting Office, Report to the Chairman, Subcommittee on Antitrust, Monopolies, and Business Rights, Committee on the Judiciary, U.S. Senate, ACCIDENTAL SHOOTINGS: MANY DEATHS AND INJURIES CAUSED BY FIREARMS COULD BE PREVENTED 3 (1991) ("GAO Report").[5] The report noted that the two studied features would not prevent deaths caused by a gun that "discharge[d] when it [was] accidentally dropped or [fell] from its storage location[.]" *Id.* at 4. At the time, firearms were the fourth leading cause of accidental deaths among children aged 5 to 14 and third among 15- to 24-year-olds. *Id.* at 2. The GAO Report recommended that "all possible efforts be made to reduce the number of accidental shootings" in light of the devastating "human, economic, and public health costs of these shootings to the victims, their families, and society[.]" *Id.* at 5.

The Attorney General's regulations make it an unfair and deceptive practice, and therefore a violation of state law, for a retailer to sell a handgun that is defective or lacks certain safety features. First, handguns sold by retailers cannot be "made from inferior materials." 940 CMR § 16.04. To satisfy this requirement, a handgun must be made of materials that meet a specified minimum melting point, tensile strength, and density, or the gun must pass a performance test to show it can be fired repeatedly with only a limited number of malfunctions and without breaking. *Id.* §§ 16.01; 16.04(1), (3). Next, the handgun must not be "prone" to either repeated firing upon a single trigger pull or explosion upon firing. *Id.* § 16.04(2). The handgun must also pass a "drop test" to show it is not "prone to accidental discharge." *Id.* §§ 16.01; 16.04(2). Further, the handgun must have a "safety device," as defined by statute, that prevents unauthorized use of the gun, i.e., an approved lock. *Id.* § 16.05(1) (citing Mass. Gen. Laws ch. 140, § 131K). The handgun must

---

[5] *See* http://www.gao.gov/assets/160/150353.pdf.

also have a form of childproofing, defined as any mechanism that "effectively precludes an average five year old child from operating the handgun when it is ready to fire." *Id.* § 16.05(2). Examples of adequate child-proofing mechanisms include a ten-pound trigger pull or a firing mechanism that cannot be operated by the smaller hands of an average five-year-old. *Id.* A "hammer deactivation device" also meets the child-proofing requirement. *Id.* § 16.05(4). For semi-automatic handguns, the regulations further require either a load indicator or a magazine safety disconnect. *Id.* §§ 16.05(3); 16.05(4). Finally, handguns must have a tamper resistant serial number. *Id.* § 16.03.[6]

The Attorney General's regulations do not apply to all handgun sales in Massachusetts. The regulations apply only to transfers by "handgun-purveyors."[7] *See generally* 940 CMR § 16.00. A "handgun-purveyor" is defined as "any person or entity that transfers handguns to a customer located within the Commonwealth of Massachusetts," subject to a list of exceptions. *Id.* § 16.01. Among the exceptions are sellers who transfer fewer than five handguns per year. *Id.* These private sales are therefore not subject to the Attorney General's regulations.[8] Furthermore, most of the regulations do not apply to handguns that were manufactured on or before October 21, 1998. *Id.* § 16.07; Enforcement Notice #2: Attorney General's Handgun Safety Regulations.[9]

---

[6] In addition to these safety features, the Attorney General's regulations also require licensed retailers to make certain safety disclosures at the time of sale. First, retailers must include a provided written safety warning to customers about certain risks associated with owning a handgun. 940 CMR § 16.06(1). Next, retailers must explain to customers how to load, unload, and store the handgun, explain how to operate all safety devices, and note whether the handgun has a load indicator, magazine safety disconnect, or internal safety. *Id.* § 16.06(2). Finally, for short-barreled handguns, retailers must disclose specific test data regarding the handgun's accuracy. *Id.* § 16.06(3).

[7] Because Plaintiffs use the term "licensed retailer" in their Complaint, this motion uses that term interchangeably with "handgun-purveyor," as well as "dealer," another term commonly used in guidance related to these regulations.

[8] The regulations also do not apply to handgun sales to law enforcement or military personnel for their official duties, sales to museums or educational collectors, sale of antique firearms, and sale of handguns designed specifically for formal target shooting competition. 940 CMR § 16.01.

[9] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 3-4.

**B.      Codification of Section 123 and Approved Firearms Roster**

In 1998, soon after the Attorney General's regulations were promulgated, the Legislature codified several overlapping provisions at Mass. Gen. Laws ch. 140, § 123, cl. 18-21 ("Section 123"). Specifically, the Attorney General's regulations and Section 123 share minimum safety standards relating to: the material composition of the handgun, Mass. Gen. Laws ch. 140, § 123, cl. 18; whether the handgun is prone to accidental discharge, *id.* § 123, cl. 19; and whether the handgun is prone to repeated firing or explosion, *id.* § 123, cl. 20. Both the Attorney General's regulations and Section 123 additionally require that, for short-barreled handguns, the seller must disclose the gun's accuracy. *Id.* § 123, cl. 21. It is unlawful for a retailer to sell a handgun that does not comply with Section 123's safety requirements. Mass. Gen. Laws ch. 140, § 128.

In conjunction with Section 123, the Legislature directed the Secretary of the Executive Office of Public Safety and Security (the "Secretary") to "compile and publish a roster" of handguns that meet Section 123's requirements. Mass. Gen. Laws ch. 140, § 131 3/4. This roster is known as the "Approved Firearms Roster." 501 CMR § 7.00; *see also* Enforcement Notice #3: Attorney General's Handgun Sales Regulations (940 CMR 16.00), February 2002.[10]

As of its June 2021 update, the Approved Firearms Roster lists over one thousand handgun models that have been shown by independent testing[11] to meet Section 123's requirements. *See* Approved Firearms Roster: 06/2021 ("June 2021 Roster").[12] The roster includes handguns from twenty-nine manufacturers, often with multiple models for each manufacturer. *See id.* For

---

[10] *See* https://www.mass.gov/doc/attorney-generals-handgun-regulation-enforcement-notices/download, at 5-7.

[11] A handgun may be placed on the Approved Firearms Roster "only after the Secretary has received a final test report from an approved independent testing laboratory" certifying that the handgun make and model meets the requirements of Section 123. 501 CMR § 7.03(1). To have a particular handgun placed on the roster, a manufacturer or other entity can submit the handgun for testing at an approved laboratory and then send the final test report to the Secretary and the Gun Control Advisory Board. *Id.* § 7.04(1).

[12] *See* https://www.mass.gov/doc/approved-firearms-roster-7/download.

example, sixty-six Sig Arms models appear on the roster, representing numerous styles across six different calibers. *See id.* at 10-12.

Like the Attorney General's regulations, Section 123 does not regulate private sales. Only "firearms dealer[s] licensed in Massachusetts" are prohibited from selling handguns that do not appear on the Approved Firearms Roster. 501 CMR § 7.02. In addition, licensed retailers may sell handguns that do not appear on the Approved Firearms Roster if the gun was lawfully owned or possessed in Massachusetts prior to October 21, 1998. *Id.* § 7.05.[13]

The Attorney General's regulations related to childproofing, load indicators, and tamper-resistant serial numbers have not been codified at Section 123 and so are not tested for inclusion on the Approved Firearms Roster. To be sold by a retailer in Massachusetts, a handgun that appears on the roster also must comply with the Attorney General's regulations.

## FACTUAL AND PROCEDURAL BACKGROUND

The present complaint was filed on June 8, 2021, by four individuals, one gun retailer, and one organization. Plaintiffs bring a single claim under 42 U.S.C. § 1983 and the United States Constitution, alleging that Massachusetts' handgun safety regulations deprive them of their right to keep and bear arms under the Second Amendment. Compl. ¶¶ 56-73.

### I.    Individual Plaintiffs

All four individual plaintiffs allege that they have a valid license to carry ("LTC"). Compl. ¶¶ 47-50. Among other things, an LTC authorizes the holder to purchase handguns and carry handguns in public. Mass. Gen. Laws ch. 269, § 10(a); Mass. Gen. Laws ch. 140, §§ 131, 131E(b), 131F. These four plaintiffs together identify eighteen models of handguns they would purchase "new from a licensed retailer" but for Massachusetts' handgun safety regulations. Compl. ¶¶ 47-

---

[13] A separate roster lists handguns that may be sold for formal target shooting and that are subject to a separate set of requirements. *Id.* §§ 7.12-7.15.

50.[14] The Complaint does not deny that the individual plaintiffs own handguns, nor does it indicate what handguns, if any, they already own pursuant to their LTCs.

Of the eighteen models the individual plaintiffs seek to purchase, two of the models—both manufactured by Glock—appear on the Approved Firearms Roster. *See* Compl. ¶¶ 47-48; June 2021 Roster, *supra*. Those models nonetheless cannot be sold by retailers in Massachusetts because they fail to comply with the Attorney General's regulation that requires either a load indicator or magazine safety disconnect on semi-automatic handguns. *See* Consumer Advisory, *supra*; 940 CMR §§ 16.05(3), (4). In an earlier constitutional challenge, the First Circuit upheld the Attorney General's load indicator requirement as applied to Glock handguns. *See Draper v. Healey*, 827 F.3d 1, 5 (1st Cir. 2016).

The remaining sixteen models the individual plaintiffs desire to purchase do not appear on the Approved Firearms Roster. *See* Compl. ¶¶ 47-50; June 2021 Roster, *supra*. Plaintiffs make no factual allegations as to why these models are not on the roster. There are no allegations about whether, for example, the manufacturers have failed to submit the models for independent testing to ensure they meet the minimum safety and performance standards of Section 123. Conversely, there are no allegations that the models were submitted for testing but failed one or more of the required safety and performance tests. Further, the individual plaintiffs make no allegations about what features, if any, are unique to these sixteen models and cannot be found in one or more of the hundreds of models that do appear on the Approved Firearms Roster.

---

[14] The makes and models of these eighteen handguns are: Beretta 92X Performance (¶ 50), CZ-USA DW Kodiak 10mm (¶ 48), CZ-USA 75 Compact 9mm (¶ 48), CZ P-09 (¶ 49), CZ P-10F (¶ 50), CZ-USA P-10 9mm (¶ 48), CZ Tactical Sport (¶ 50), CZ Tactical Sport Orange (¶ 50), fifth generation Glock 19 (¶¶ 47-48) or 17 (¶ 48), Kimber Ultra carry II .45 (¶¶ 48-49), Kimber KHX custom .45 (¶ 48), Kimber Desert Warrior .45 (¶ 48), Magnum Research Desert Eagle XIX.50AE (¶ 48), Nighthawk Custom Heinie Signature Recon (¶ 48), Sig Arms Model 1911 "We the People" edition (¶ 47), Sig Arms Model 1911 "TacOps" edition (¶ 47), and Sig P365XL (¶ 49).

## II.      Retailer and Organizational Plaintiffs

The retailer plaintiff, The Gunrunner, LLC ("The Gunrunner"), alleges that but for Massachusetts' handgun sales regulations, it would "make available for sale to all of its law-abiding customers all the commercially available handguns in common use for self-defense and other lawful purposes that are widely sold and possessed outside of Massachusetts." Compl. ¶ 51. Beyond this general allegation, The Gunrunner makes no allegation of concrete harm to its business due to Massachusetts' handgun safety regulations. Neither does The Gunrunner allege that it is unable to sell operational handguns to properly licensed Massachusetts consumers.[15]

The organizational plaintiff, the Firearms Policy Coalition, Inc. ("FPC"), alleges harm to itself and on behalf of its members, which include the four individual plaintiffs. Compl. ¶ 52. FPC does not allege that any of its members who are properly licensed in Massachusetts are unable to purchase or possess an operational handgun for self-defense or other lawful purposes.

## ARGUMENT

## I.      The Handgun Safety Regulations Do Not Implicate the Second Amendment.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court struck down the District of Columbia's "near-complete ban on keeping operable handguns in the home," holding that "the Second Amendment protects the right of an individual to keep and bear arms (unconnected to service in the militia)." *Gould v. Morgan*, 907 F.3d 659, 667 (1st Cir. 2018) (citing *Heller*, 554

---

[15] In any case, there is no textual or historical basis upon which to suggest that the Second Amendment protects a right to *sell* firearms. *See Teixeira v. Cty. of Alameda*, 873 F.3d 670, 683-87 (9th Cir. 2017) (en banc) (conducting exhaustive textual and historical analysis of the Second Amendment). The Second Amendment guarantees only an "*individual* right to *possess* and *carry* weapons in case of confrontation." *Heller*, 554 U.S. at 592 (emphasis added). It "does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira*, 873 F.3d at 682; *accord United States v. Chafin*, 423 Fed. App'x 342, 344 (4th Cir. 2011). Thus, any claim that the challenged regulations impinge upon a purported right of dealers to *sell* firearms must be rejected.

U.S. at 592). The Second Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *McDonald v. Chicago*, 561 U.S. 742, 791 (2010).

But "the right secured by the Second Amendment is not unlimited," *Heller*, 554 U.S. at 626, and it "does not confer 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose,'" *Worman v. Healey*, 922 F.3d 26, 33 (1st Cir. 2019) (quoting *Heller*, 554 U.S. at 626). The First Circuit employs a two-step approach to evaluate a claim that a challenged law infringes Second Amendment rights. *Gould*, 907 F.3d at 668-69. First, the court asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Id.* at 668. This "backward-looking inquiry" "seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification." *Id.* at 669 (internal quotation marks omitted). If the challenged law does not burden such conduct, "it is valid." *Id.* If it does, "the court then must determine what level of scrutiny is appropriate and must proceed to decide whether the challenged law survives that level of scrutiny." *Id.*

### A. The Handgun Safety Regulations Do Not Burden Conduct Falling Within the Scope of the Second Amendment.

#### 1. The Handgun Safety Regulations are Presumptively Lawful Under *Heller*.

Plaintiffs' Second Amendment claim fails as a matter of law because the handgun safety regulations[16] are presumptively lawful conditions and qualifications on the commercial sale of

---

[16] Plaintiffs allege no injuries related to the Massachusetts licensing scheme for handguns or the safety warnings and disclosures section of the Attorney General's regulations, 940 CMR § 16.06. *See* Compl. ¶¶ 47-50 (alleging that individual plaintiffs hold valid LTCs and but for the Approved Firearms Roster and the Attorney General's regulations would purchase eighteen specifically identified handgun makes and models); *id.* ¶ 51 (alleging that The Gunrunner would make available for sale to its "law-abiding customers" handguns that are not on the Approved Firearms Roster or do not satisfy the Attorney General's regulations). Because Plaintiffs have not alleged that they have been injured or will imminently be injured by the Massachusetts licensing scheme for handguns or the safety warnings and disclosures section of the Attorney General's regulations, Plaintiffs lack standing to challenge them. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (plaintiff must establish standing by showing it has suffered an "injury

(footnote continued)

firearms. *Heller* and *McDonald* "firmly disavowed any notion that an individual has a constitutional right 'to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Powell v. Tompkins*, 783 F.3d 332, 347 (1st Cir. 2015) (quoting *Heller*, 554 U.S. at 626); *see also McDonald*, 561 U.S. at 786 (*Heller* "does not imperil every law regulating firearms"). *Heller* set forth non-exhaustive categories of "presumptively lawful regulatory measures" that are "presumed to be consistent with the historical scope of the Second Amendment," *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018), such as "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26; *see also McDonald*, 561 U.S. at 786 (repeating the same passage).

The handgun safety regulations fall squarely within the category of "laws imposing conditions and qualifications on the commercial sale of arms" that *Heller* identified as "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 626-27 & n.26. *See also Gould*, 907 F.3d at 668 ("nothing in *Heller* impugn[s] legislative designs that comprise . . . public welfare regulations aimed at addressing perceived inherent dangers and risks surrounding the public possession of loaded, operable firearms") (alteration in original) (internal quotation marks omitted). Indeed, this Court (Gorton, J.) has already held that the requirement in 940 CMR § 16.05(3), that handguns transferred by handgun-purveyors contain load indicators or magazine safety disconnects, "fits comfortably among the categories of regulation that *Heller* suggested would be 'presumptively lawful' because it 'impos[es] conditions and qualifications on the

---

in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical") (citations and internal quotation marks omitted). Accordingly, Defendants will not address these aspects of the regulatory framework in this motion.

commercial sale of arms.'" *See Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015), *aff'd on other grounds*, 827 F.3d 1 (1st Cir. 2016) (alteration in original) (quoting *Heller*, 554 U.S. at 626-27). The other aspects of the handgun safety regulations Plaintiffs challenge fit equally comfortably within this presumptively lawful category, as they are consumer product regulations that require that firearms commercially sold in Massachusetts (1) are not defective; (2) contain safety mechanisms; (3) have childproofing features; and (4) have tamper-resistant serial numbers. And all of these requirements apply only to dealers offering firearms for sale in commerce, not to individual gun owners. 940 CMR § 16.01; Mass. Gen. Laws ch. 140, § 123. The regulations do not prohibit possession in any way. These handgun safety regulations are therefore "presumptively lawful" commercial regulations under *Heller*. *See Heller*, 554 U.S. at 626-27 & n.26.

This presumption of validity is not rebutted because the handgun safety regulations impose only a *de minimis* burden on any Second Amendment rights. *See Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011) ("*Heller II*") (plaintiff may rebut presumption of lawfulness of regulation "by showing the regulation does have more than a de minimis effect upon his right"). Plaintiffs attempt to characterize the handgun safety regulations as a "handgun ban," which is simply untrue. Plaintiffs identify no more than eighteen guns that they cannot purchase from dealers in Massachusetts because of the challenged handgun safety regulations. Compl. ¶¶ 47-51. But there are over one thousand models of handguns on the Approved Firearms Roster spanning twenty-nine different manufacturers. *See supra* pp. 5-6; *see also Draper*, 98 F. Supp. 3d at 84 (940 CMR § 16.05(3) "permits the purchase of a variety of handguns with appropriate safety devices"). If these makes and models also satisfy the Attorney General's additional requirements, they may be sold by any licensed retailer in Massachusetts. Plaintiffs do not—and cannot—allege that they cannot currently purchase or possess operable handguns in the Commonwealth. Indeed, Plaintiffs have their choice of a diverse range of hundreds of handguns that retailers may sell.

Nor are the handgun safety regulations a "blanket set of prohibitions against a class of protected arms." Compl. ¶ 41. In *Worman*, the First Circuit rejected any "suggestion that whatever group of weapons a regulation prohibits may be deemed a class" because "[b]y this logic—which we squarely reject—virtually any regulation could be considered an 'absolute prohibition' of a class of weapons." 922 F.3d at 32 n.2. And in contrast to the law at issue in *Worman*, which proscribed the sale, transfer, and possession of certain semi-automatic assault weapons and large-capacity magazines, the handgun safety regulations do not prohibit the sale of any particular type of weapon at all. So long as a handgun meets the safety requirements necessary for inclusion on the Approved Firearm Roster and satisfies the Attorney General's additional regulations, it can be sold in commerce in Massachusetts. Thus, the handgun safety regulations have, at most, a *de minimis* impact on Second Amendment rights and are valid conditions on the commercial sale of firearms. *See Heller*, 554 U.S. at 626-27 & n.26.

**2.      The Handgun Safety Regulations Do Not Burden Conduct Within the Scope of the Second Amendment.**

Plaintiffs' Second Amendment claim also fails because the challenged handgun safety regulations do not burden conduct that "was understood to be within the scope of the right at the time of ratification." *Gould*, 907 F.3d at 669 (internal quotation marks omitted). "The historical record shows that gun safety regulation was commonplace in the colonies." *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012).

> [A]round the time of the founding, a variety of gun safety regulations were on the books; these included safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service (including laws requiring militia members to attend "musters," public gatherings where officials would inspect and account for guns), laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups.

*Id.* As the Fifth Circuit explained, "when the fledgling republic adopted the Second Amendment,

an expectation of sensible gun safety regulation was woven into the tapestry of the guarantee." *Id.*

*Heller* too discussed the historical tradition of safety laws regulating gunpowder storage, noting

that its analysis in that case did not "suggest the invalidity of laws regulating the storage of firearms

*to prevent accidents.*" 554 U.S. at 632 (emphasis added). *See also Kachalsky v. Cty. of Westchester*,

701 F.3d 81, 84 (2d Cir. 2012) ("By 1785, New York had enacted laws regulating when and where

firearms could be used, as well as restricting the storage of gun powder.").

In the early 19th century, some states required that firearms pass safety and quality

inspections. For example, an 1821 Maine law appointed a "prover of gun barrels," who would "try

the strength" of firearms and mark the firearms that passed inspection. 1821 Me. Laws 685, ch.

162, § 1. *See also Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation

can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."); *Silvester*

*v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, C.J., concurring) ("[t]he term 'longstanding'

is not restricted to the time of the founding of the Republic" because the categories of firearm

restrictions explicitly identified as "presumptively lawful" in *Heller* were not codified until the

20th century). Thus, the handgun safety regulations do not implicate the Second Amendment at

all, and Plaintiffs have failed to state a Second Amendment claim.

**B.    The Handgun Safety Regulations Easily Withstand Heightened Scrutiny.**

**1.    No More Than Intermediate Scrutiny is Appropriate.**

Should this Court nevertheless assume that the handgun safety regulations implicate

Second Amendment rights, it should uphold them under intermediate scrutiny. The "appropriate

level of scrutiny must turn on how closely a particular law or policy approaches the core of the

Second Amendment right and how heavily it burdens that right." *Gould*, 907 F.3d at 670-71.

"[I]ntermediate scrutiny is appropriate as long as a challenged regulation either fails to implicate

the core Second Amendment right or fails to impose a substantial burden on that right." *Worman*,

922 F.3d at 38.

The handgun safety regulations neither implicate the core Second Amendment right nor impose a substantial burden on the right. The core Second Amendment right "is limited to self-defense in the home." *Gould*, 907 F.3d at 671. The handgun safety regulations do not implicate this core Second Amendment right because they apply only to commercial sales, not to possession of handguns in the home. *See Pena*, 898 F.3d at 977 (applying intermediate scrutiny because California's similar handgun safety statute "does not restrict *possession* of handguns in the home or elsewhere"); *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 206-07 (applying intermediate scrutiny to federal law imposing age qualification on commercial firearm sales because the law is "[f]ar from a total prohibition on handgun possession and use"); *Heller II*, 670 F.3d at 1262 (applying intermediate scrutiny to the District of Columbia's "prohibition of semi-automatic rifles and large-capacity magazines" because it "does not effectively disarm individuals or substantially affect their ability to defend themselves"). The handgun sales regulations also do not restrict, in any way, private sales of handguns, leaving open this channel for the lawful transfer of handguns that cannot satisfy performance tests and do not contain basic safety features.

The handgun safety regulations also do not impose a substantial burden on the core Second Amendment right. *See Pena*, 898 F.3d at 979 (applying intermediate scrutiny to California's chamber load indicator and magazine detachment mechanism requirements because they do not substantially burden the core Second Amendment rights). The handgun safety regulations merely "regulate the manner in which individuals may exercise their Second Amendment right"; they do not prohibit firearm possession. *Id.* at 977-78; *see also Silvester*, 843 F.3d at 827 ("laws which regulate only the *manner* in which persons may exercise their Second Amendment rights are less burdensome than those which bar firearm possession completely" (internal quotation marks omitted)). And, while the individual Plaintiffs allege that they cannot buy eighteen particular guns

identified in their Complaint, they can lawfully buy hundreds of other models of handguns that appear on the Approved Firearms Roster and that meet the Attorney General's safety regulations. *See Draper*, 98 F. Supp. 3d at 85 (940 CMR § 16.05(3) "does not substantially burden the right to bear arms in self-defense in one's home" because the regulation "in no way prevents citizens from obtaining a wide array of firearms"). Thus, any burden the handgun safety regulations may impose on Second Amendment rights is insignificant, as "being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home." *Pena*, 898 F.3d at 978; *see Heller*, 554 U.S. at 626 ("[T]he right secured by the Second Amendment is not unlimited. . . . [T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Plaintiffs make no allegation that the eighteen identified handguns are more effective for self-defense than the hundreds of other handguns they could buy, or may already possess, for self-defense or other lawful purposes. *See Pena*, 898 F.3d at 978 (observing plaintiffs had "adduced little evidence that the handguns unavailable for purchase in California are materially more effective for self-defense than handguns currently for sale in the state."). Nor do Plaintiffs make any allegation that the hundreds of handguns available for purchase in Massachusetts are inadequate for self-defense at home. If anything, the firearms that may be sold by licensed dealers pursuant to the handgun safety regulations are *better* suited for self-defense because they are not defective and cannot be accidentally discharged by children and other unauthorized users. *See Pena*, 898 F.3d at 978 (observing that a load indicator and magazine safety disconnect requirement "not only prevents accidental discharges—which itself protects 'hearth and home'—but also informs the owner when the gun is loaded so that the weapon may be fired in self-defense"). Thus, the handgun sales regulations do not impose a substantial burden on the core of the Second Amendment right, and intermediate scrutiny is appropriate. *See id.* at 979.

15

## 2. The Handgun Safety Regulations Satisfy Intermediate Scrutiny.

The handgun sales regulations easily survive intermediate scrutiny. Intermediate scrutiny requires that the challenged regulation substantially relates to one or more important government objectives. *Worman*, 922 F.3d at 38. When considering the Legislature's and the Attorney General's justifications for the regulatory scheme, the Court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Pena*, 898 F.3d at 979 (internal quotation marks omitted).

Protecting handgun purchasers and their families from handguns that are defective, and preventing accidental firearm injuries and fatalities, are critically important governmental interests. Indeed, "[i]t cannot be gainsaid that Massachusetts has compelling governmental interests in both public safety and crime prevention. In point of fact, few interests are more central to a state government than protecting the safety and well-being of its citizens." *Gould*, 907 F.3d at 673 (citations omitted); *Worman*, 922 F.3d at 39 ("We have said before, and today reaffirm, that 'few interests are more central to a state government than protecting the safety and well-being of its citizens.'" (quoting *Gould*, 907 F.3d at 673)). As the First Circuit recognized in *Worman*, "Massachusetts indubitably 'has compelling governmental interests in both public safety and crime prevention.'" 922 F.3d at 39 (quoting *Gould*, 907 F.3d at 673). *See also Pena*, 898 F.3d at 980 ("There is no doubt that the governmental safety interests identified for the [load indicator] and [magazine safety disconnect] requirements are substantial."). And so "the only question that remains is whether [the challenged regulations are] substantially related to those interests. The answer to this question depends on whether the fit between those interests and the [challenged regulations] is reasonable." *Worman*, 922 F.3d at 39. A "reasonable" fit between the challenged law and the asserted governmental interests means that the law "does not burden more conduct than is reasonably necessary." *Gould*, 907 F.3d at 674 (internal quotation marks omitted).

There is a reasonable fit between the Commonwealth's interest in protecting gun purchasers from defective firearms and the regulation of the commercial sale of handguns that are not fit for ordinary use because they malfunction, break, or explode with ordinary use, or fire when dropped. Both Section 123 and the Attorney General's regulations require that firearms that are sold commercially (1) are not made of inferior materials or, alternatively, are made of inferior materials but nonetheless pass a performance test; (2) are not prone to uncontrolled firing or exploding during normal use; and (3) are not prone to discharging accidentally when dropped. 940 CMR § 16.04; Mass. Gen. Laws ch. 140, § 123, cls. 18-20. Plaintiffs explicitly acknowledge in their Complaint that these regulations are "designed to protect consumers against unfair and deceptive practices including the protections against the sale of defective or unsafe firearms." Compl. ¶ 37 (citing 940 CMR §§ 16.01 – 16.06).

*Especially* because consumers purchase and rely on handguns for their own safety and the safety of their families, it is essential that the handguns they purchase do not malfunction, fire erratically, or explode in ordinary use, particularly in a self-defense situation. And, similarly, consumers that purchase handguns for self-defense or other lawful purposes expect that the handguns they buy will not discharge if the handgun is accidentally dropped. Thus, there is a reasonable relationship between the important governmental interest in protecting firearm consumers from defective or avoidably unsafe firearms and the requirements in Section 123 and 940 CMR §16.04.

There is also a reasonable fit between the critically important governmental interest in protecting children from avoidable firearm fatalities and the Attorney General's childproofing requirements. The childproofing requirements are well supported by the GAO Report, which found that *all* of the accidental firearms fatalities caused by children under the age of six could have been prevented had the firearms been equipped with childproofing features like those required by the

Attorney General's regulations. GAO Report at 3, 34. Although Plaintiffs allege that equipping a firearm with a ten-pound trigger pull "makes handguns so outfitted *more* difficult to operate effectively and thus *more* difficult to operate safely," Compl. ¶ 45, the Attorney General's regulations do not require a ten-pound trigger pull. The childproofing requirement can be satisfied by any mechanism that "effectively precludes an average five-year old child from operating the handgun when it is ready to fire." 940 CMR § 16.05(2). And "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average fire year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun," as well as a hammer deactivation device. *Id.*; *id.* § 16.05(4). The Attorney General's requirement that handguns sold by handgun-purveyors contain safety devices, 940 CMR § 16.05(1), is also well supported by evidence that one in three of the accidental firearm deaths in 1988 and 1999 could have been prevented by the addition of a firearm safety device. GAO Report at 3, 36.

The requirement that semi-automatic pistols contain either a load indicator or a magazine safety disconnect, 940 CMR § 16.05(3), also fits reasonably with the Commonwealth's interest in public safety. This Court (Gorton, J.) held in *Draper* that the Attorney General's load indicator or magazine safety disconnect requirement "passes constitutional muster under any standard of scrutiny" because the Attorney General "has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens." *Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015). The Ninth Circuit has likewise concluded that California's load indicator and magazine safety disconnect requirements "reasonably fit with California's interest in public safety." *Pena*, 898 F.3d at 980. And the GAO Report found that 23% of the accidental firearms fatalities occurred because individuals shot themselves or others with firearms they incorrectly

believed were unloaded. GAO Report at 3. The Report concluded these deaths could have been prevented by a load indicator. *Id.* A 1997 report by the National Opinion Research Center found that only 65% of Americans knew that a pistol can fire when the magazine is removed because a round of ammunition can remain in the chamber; 35% incorrectly believed that the gun could not fire or said that they did not know either way. T. Smith, National Opinion Research Ctr., 1997-98 NATIONAL GUN POLICY SURVEY 17 (Sept. 1998).[17] Of those surveyed, 39% lived in a household with a gun. *Id.* at 28, Table 6. 940 CMR § 16.05(3) is designed to reduce injuries and fatalities caused by this potentially fatal misconception. *Id.*

Finally, the requirement that handguns have a tamper-resistant serial number, 940 CMR § 16.03, fits reasonably with the Commonwealth's "compelling governmental interests in both public safety and crime prevention." *Gould*, 907 F.3d at 673. Serial numbers serve "a law enforcement interest in enabling the tracing of weapons via their serial numbers." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010) (affirming Second Amendment challenge to conviction for possessing a handgun with an obliterated serial number in violation of federal law under intermediate scrutiny). And, "there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm" which "have value primarily for persons seeking to use them for illicit purposes." *Id.* at 95. Thus, 940 CMR § 16.03 is "properly designed to remedy the problem of untraceable firearms." *See id.* at 101.

Plaintiffs contend that the handgun safety regulations "sweep[] far too broadly," because the Commonwealth's "interest in handgun safety could be adequately achieved through readily available and easily implemented less restrictive alternatives, including producing, providing, and encouraging education, training, and public outreach regarding basic rules of firearm safety,

---

[17] *See* http://www.norc.org/PDFs/publications/SmithT_Nat_Gun_Policy_199798.pdf.

storage, and use." Compl. ¶ 42. But "education, training, and public outreach regarding basic rules of firearm safety, storage, and use" do not protect against the serious danger posed by defective firearms that malfunction, fire uncontrollably, or explode during normal use, or firearms that fire when accidentally dropped. Nor will education or training for handgun purchasers protect unauthorized users of firearms who have not received education and training on firearm safety, such as the family members of gun purchasers, or subsequent transferees or other third parties. And "proper education and training" is not an alternative to childproofing features because children under the age of five cannot understand or follow "basic rules of firearm safety, storage, and use." Compl. ¶¶ 42-43.

Ultimately, it is the Legislature and the Attorney General's "prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments." *Worman*, 922 F.3d at 40 (alteration in original) (internal quotation marks omitted). "The role of a reviewing court is limited to ensuring that in formulating its judgments," the Legislature or the Attorney General "has drawn reasonable inferences based on substantial evidence." *Id.* (internal quotation marks omitted). The handgun safety regulations are well supported and reasonable. And, the Legislature and the Attorney General's measures have worked: "Massachusetts consistently has one of the lowest rates of gun-related deaths in the nation." *Gould*, 907 F.3d at 674-75. Because the handgun safety regulations withstand intermediate scrutiny, the Court should dismiss Plaintiffs' Complaint.

## **CONCLUSION**

For these reasons, Defendants respectfully request that the Court dismiss the Plaintiffs' Complaint, ECF No. 1, with prejudice.

Respectfully submitted,

MAURA HEALEY, ATTORNEY GENERAL,
and SECRETARY THOMAS TURCO,

By their attorneys,

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban, BBO No. 687068
Grace Gohlke, BBO No. 704218
Assistant Attorneys General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2589
Dated: August 20, 2021          Phoebe.Fischer-Groban@mass.gov
Grace.Gohlke@mass.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 20, 2021.

*/s/ Phoebe Fischer-Groban*
Phoebe Fischer-Groban
Assistant Attorney General