## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **STEFANO GRANATA;** | : | Civil Rights Complaint |
| **JUDSON THOMAS,** | : | 42 U.S.C. § 1983 |
| **COLBY CANNIZZARO;** | : | |
| **CAMERON PROSPERI;** | : | |
| **THE GUN RUNNER, LLC;** | : | |
| and **FIREARMS POLICY** | : | |
| **COALITION, INC.** | : | |
| Plaintiffs | : | CIVIL ACTION NO. |
| | : | 1:21-CV-10960-RWZ |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MAURA HEALEY**, in her official | : | |
| capacity as Attorney General of the | : | |
| Commonwealth of Massachusetts; and | : | |
| **THOMAS TURCO**, in his official | : | |
| capacity as Secretary of Executive | : | |
| Office of Public Safety and Security | : | |
| of the Commonwealth of | : | |
| Massachusetts, | : | |
| Defendants | : | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Richard@chamberslawoffice.com

*Attorneys for Plaintiffs*

## INTRODUCTION

The Second Amendment "individual right to possess and carry weapons in case of confrontation" extends to all arms "in common use at the time for lawful purposes like self-defense"—and it certainly applies to common handguns, "the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller*, 554 U.S. 570, 592, 624, 629 (2008) (quotation marks omitted). Yet Defendants have limited the right to keep and bear arms to an arbitrary, abbreviated list of "approved" firearms that excludes the vast majority of common, commercially available handguns. The Commonwealth asserts that the restrictions in question— its "Approved Firearm List" and associated handgun design and manufacturing requirements—are necessary to ensure its residents do not select "unsafe" handguns (with "unsafe" defined in a way that excludes all but a small fraction of commercially available and commonly owned handguns nationwide for lawful purposes. Complaint ¶ 36 (June 8, 2021), Doc. 1 ("Compl.")). But under the Second Amendment, it is up to *the People*—not Government bureaucrats—to choose, after weighing the "many reasons" to prefer one type of firearm over another, *Heller*, 554 U.S. at 692, which model is best suited to their particular lawful purposes. This Court would not sanction a government list dictating which medium of communication its citizens may use to express their political views—including Facebook and radio ads, say, as "approved" media, but excluding Twitter and yard signs. Under the Second Amendment, the Court can no more bless Defendants' attempt to dictate which common arms the People are allowed to keep and bear.

The Commonwealth has not shown that its restrictions pass constitutional muster under the "two-step approach" to Second Amendment challenges adopted by the First Circuit, and its motion to dismiss must be denied. *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018). The Second Amendment right to keep and bear arms plainly must encompass a right to *acquire those arms in*

1

*the first place*. And *Heller* itself makes clear that this right extends to all arms "in common use at the time for lawful purposes like self-defense." 554 U.S. at 624 (quotation marks omitted). Because Plaintiffs have alleged that the firearms at issue in this case—handguns that they wish to acquire but are barred from doing so by the Commonwealth's challenged restrictions—are in common use for lawful purposes, there can simply be no dispute, especially at the motion-to-dismiss stage, that the challenged restrictions "burden[ ] conduct that falls within the scope of the Second Amendment's guarantee." *Gould*, 907 F.3d at 668–69. The Commonwealth invokes *Heller*'s dicta indicating that "conditions and qualifications on the commercial sale of arms" may be "presumptively lawful," *Heller*, 554 U.S. at 627 & n.26, but the restrictions challenged here are not "conditions and qualifications," they are a *de facto ban* on the sale of the handguns at issue. Nor does the Commonwealth's meager historical evidence—consisting of a single Maine law enacted 30 years after the Second Amendment's ratification—suffice to show any Founding-Era historical tradition of accepting draconian restrictions like the ones at issue here.

Because the challenged restrictions severely burden the Second Amendment "right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635— by virtually banning them from *even acquiring* common, constitutionally protected handguns for constitutionally protected purposes—the "appropriate level of scrutiny," *Gould*, 907 F.3d at 670, is strict scrutiny. But even if this Court concludes otherwise, the challenged restrictions cannot survive intermediate scrutiny, either. Massachusetts has not shown that its handgun design and manufacturing requirements actually advance its claimed interest in gun safety. Indeed, its principal piece of evidence—a 1991 report by the Government Accountability Office—actually concludes that the safety measures at issue would *at best* be effective in *less than a third* of accidental firearm deaths. And the same report also repeatedly explains there are other means of

2

advancing this interest—such as improving firearm safety education and training and increasing the use of other safety devices such as gun safes and trigger locks. The Commonwealth has not even come close to showing these alternative measures—less burdensome to the Second Amendment interests at stake—are not sufficient to advance its safety interests.

## BACKGROUND

### I.     Massachusetts's Ban on Common Handguns.

Massachusetts strictly regulates the purchase and acquisition of handguns in the Commonwealth. With minor exceptions not applicable here, all handgun sales in the Commonwealth must go through a licensed dealer (or "handgun-purveyor," *id.*), who is governed by a variety of stringent requirements. Two sets of requirements are relevant to this challenge.

#### A.     The Approved Firearms Roster.

First, all handguns sold or transferred in Massachusetts must be listed on the Commonwealth's "Approved Firearms Roster." *See* M.G.L. c. 140, § 123; 501 C.M.R. § 7.05 (except for a small number of grandfathered firearms owned by a licensed dealer before 1998, *id.* § 7.05(a)). The Roster is compiled and published by the Executive Office of Public Safety and Security and includes only those firearms that have been shown by "an approved independent testing laboratory," 501 CMR § 7.03(1), to meet a variety of onerous statutory requirements establishing, in granular detail, the metal that may be used to manufacture the firearm, the design of the handgun, and the types of quality-control tests that must be conducted during the manufacturing process, *see* M.G.L. c. 140, § 123, cl. 18–21. The roster includes around 1,000 handgun makes and models by twenty-nine manufacturers.[1] That is a small fraction of available models, Compl. ¶ 36, and it does not include any handguns at all from such well-known

---

[1] Executive Office of Public Safety & Security, *Approved Firearms Roster* (June 2021), https://bit.ly/3tG257M.

manufacturers as Colt, Nighthawk, and Armalite.

**B.     The Attorney General's Regulations.**

Second, and ironically, even if a handgun appears on the Commonwealth's "approved firearms roster," that does not mean it is approved for sale. Instead, a handgun must *also* comply with a separate set of regulatory requirements established by the Attorney General. 940 C.M.R. ch. 16.00. These regulations require handguns to include, for example, a child-safety mechanism such as a "trigger resistance [of] at least a ten pound pull" or a design that "require[es] a series of multiple motions in order to fire the handgun." *Id.* § 16.05(2). Defendant's regulations also require any magazine-fed handgun to include either a "magazine safety disconnect," which prevents the handgun from being fired when the magazine is detached, or a "load indicator" that "plainly indicates that a cartridge is in the firing chamber." *Id.* §§ 16.05(3), 16.01.

Taken together, the combined effect of the Attorney General's regulations and the approved firearms roster requirement is to foreclose virtually any sale, within Massachusetts, of the vast majority of commercially available handguns—including many makes and models that are lawfully sold and commonly owned throughout the United States. Compl. ¶ 36.

**II.     The Impact on Plaintiffs.**

Because of these restrictions banning the sale of most common handguns, Plaintiffs have been unable to purchase (or sell) handguns that the Second Amendment entitles them, and all similarly situated individuals, to keep and to bear. Individual Plaintiffs Granata, Thomas, Cannizzaro, and Prosperi are all law-abiding citizens qualified to purchase firearms, and they all wish to purchase common handguns that do not meet one or both of the restrictions just described. Compl. ¶¶ 47–50. They cannot do so because of the challenged restrictions. *Id.* ¶¶ 61, 69–72. Many other members of associational Plaintiff Firearm Policy Coalition likewise wish to purchase common handguns that do not meet one or both of the challenged sets of restrictions. *Id.* ¶¶ 12,

52–54. Finally, retailer Plaintiff The Gunrunner, LLC, wishes to sell to its qualified customers common, commercially available handguns that do not meet one or both of the challenged restrictions and would do so were those restrictions not in force. *Id.* ¶¶ 51.

## ARGUMENT

When deciding a motion to dismiss under Rule 12(b)(6), a court must "construe all factual allegations in the light most favorable to the non-moving party to determine if there exists a plausible claim upon which relief may be granted." *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 70 (1st Cir. 2020). The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. This provision "guarantee[s] the individual right to possess and carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, a right that applies to Massachusetts via the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion). The First Circuit has adopted a "two-step approach" to Second Amendment challenges, asking first "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee," and second "what level of scrutiny is appropriate and . . . whether the challenged law survives that level of scrutiny." *Gould v*, 907 F.3d at 668–69.

I. **Massachusetts's ban on common handguns restricts rights within the scope of the Second Amendment.**

A. **The Second Amendment protects the right to acquire all handguns in common use.**

Defendants' challenged restrictions "burden[ ] conduct that falls within the scope of the Second Amendment's guarantee." *Gould*, 907 F.3d at 669. That conclusion inescapably follows from two propositions: the Second Amendment protects a right to acquire firearms, and that right extends to all firearms that are in common use by Americans for lawful purposes.

The Second Amendment "protect[s] an individual right to use arms for self-defense,"

5

taking "off the table" any "absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 616, 636. As federal courts have repeatedly recognized, that unassailable "right to possess firearms for protection implies . . . corresponding right[s]" without which "the core right wouldn't mean much." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (addressing right to train with firearms). And the right to keep and bear arms would mean little indeed without the corresponding right *to acquire arms in the first place*. Indeed, "constitutional rights necessarily protect the prerequisites for their exercise" and "thus implicitly protect those closely related acts necessary to their exercise." *Luis v. U.S.*, 578 U.S. __, 136 S. Ct. 1083, 1097-98 (2016) (Thomas, J. concurring). So if the core right to possess a firearm "operable for the purpose of immediate self-defense," *Heller*, 554 U.S. at 635, is to have any meaning, it necessarily "must also include the right to *acquire* a firearm"—making the right of acquisition the "*most fundamental* prerequisite of legal gun ownership," *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930, 938 (N.D. Ill. 2014). It follows then that generally "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

These conclusions are consistent with the traditional understanding and practices of the People of this Nation, as "[t]he right to keep arms, necessarily involves the right to purchase them . . . and to purchase and provide ammunition suitable for such arms." *Andrews v. State*, 50 Tenn. 165, 178 (1871); *see also Heller*, 554 U.S. at 583 n.7 ("What law forbids the veriest pauper, if he can raise a sum sufficient for the purchase of it, from mounting his Gun on his Chimney Piece . . . ?" (quoting Some Considerations on the Game Laws 54 (1796))). There can thus be no doubt that the Second Amendment generally protects the right to purchase an operative firearm.

Nor can there be any doubt about what firearms this protection encompasses. *Heller* itself

answered that question, holding that while the Second Amendment does not protect "dangerous and unusual weapons," it *does* extend to any "arms in common use at the time for lawful purposes like self-defense," 554 U.S. at 624, 627 (quotation marks omitted). As the First Circuit held in *Worman v. Healey*, "the sorts of weapons protected" by the Second Amendment are "those in common use at the time." 922 F.3d 26, 34 (1st Cir. 2019) (quoting *Heller* at 627). And whatever other types of arms might fall within that category, the First Circuit has explained, "*Heller* made plain that handguns, which the Court described as 'the most popular weapon chosen by Americans for self-defense in the home,' are protected." *Id.* at 35 (quoting *Heller* at 629).

Defendants do not—and, under Rule 12(b)(6), *cannot*— dispute that the models of firearms Plaintiffs wish to purchase "are widely sold and possessed outside of Massachusetts" and "are in common use for self-defense and other lawful purposes." Compl. ¶ 47; *see also id.* ¶¶ 48–50. And they admit that the challenged restrictions ban their commercial sale within Massachusetts—with respect to two of the handgun models, because they do not include either a load indicator or magazine safety disconnect, Motion to Dismiss 7 (Aug. 20, 2021), Doc. 15 ("MTD") (citing 940 CMR § 16.05(3), (4)), and with respect to the remaining models, because they do not appear on the Approved Firearms Roster, *id.* It follows that the challenged restrictions burden conduct protected by the Second Amendment.

### B.    Massachusetts's restrictions are not presumptively constitutional.

Massachusetts resists this conclusion based on two arguments: that the challenged restrictions fall within a supposed historical exception to the Second Amendment's protections for "gun safety regulation," *id.* at 12, and that they are "presumptively lawful conditions and qualifications on the commercial sale of firearms," *id.* at 9–10. Neither argument has merit.

1.    Because the Second Amendment "codified a *pre-existing* right," its protections were "enshrined with the scope they were understood to have when the people adopted them."

7

*Heller*, 554 U.S. at 634–35. That means that the Second Amendment is subject to those "longstanding" "regulatory measures" that were "known to ordinary citizens in the founding generation." *Id.* at 577, 626, 627 n.26. Massachusetts asserts that the restrictions here pass muster under this reasoning because, it says, "gun safety regulation was commonplace in the colonies" when the Second Amendment was ratified in 1791. MTD 12. This argument fails.

The only Founding-Era regulations the Commonwealth actually points to are "safety laws regulating the storage of gun powder, laws keeping track of who in the community had guns, laws administering gun use in the context of militia service . . . , laws prohibiting the use of firearms on certain occasions and in certain places, and laws disarming certain groups and restricting sales to certain groups." *Id.* (quoting *NRA v. BATFE*, 700 F.3d 185, 200 (5th Cir. 2012)). None of these restrictions is remotely analogous to the ones at issue here. The challenged ban on purchasing common handguns does not concern "who in the community ha[s] guns," is not limited to "certain occasions," has nothing to do with "militia service," and does not target "certain groups." *Id.* Nor does it merely require gun owners to store their firearms in a particular place or manner. Rather, as discussed, it *virtually forecloses* citizens from *acquiring these common handguns at all*.

To be sure, viewed from the highest level of generality, all of these historical restrictions concerned "gun safety" in some way. MTD 12. But the government cannot justify a ban on common handguns merely by invoking an amorphous historical exception for "gun safety" regulations. If that trick worked, *every* gun-control measure would be automatically *exempt from constitutional scrutiny* under the purported Second Amendment exception for "gun safety" regulations. *Heller* disclaimed such an approach—and in fact *expressly held* that the very historical safety regulations relied upon by Massachusetts "provide no support for the severe restriction" at issue in that case, since "they do not remotely burden the right of self-defense as much as an

absolute ban on handguns." 554 U.S. at 632. That is the end of this argument.

Unable to find any serious Founding-Era support for its restrictions, Massachusetts points to an 1821 Maine law that required inspectors to "try the strength" of firearm barrels. MTD 13. That single law is far too slender a reed to support the Commonwealth's argument. For one, it comes too late: while *Heller* found post-ratification historical evidence "instructive," 554 U.S. at 614, that is only because it *confirmed* the Founding-Era evidence establishing what the Second Amendment meant in 1791. And the Court has since removed all doubt about this, clarifying that the value of post-ratification historical evidence is limited to "mere confirmation" of "the public understanding in 1791 of the right codified by the Second Amendment," *Gamble v. United States*, 139 S. Ct. 1960, 1975 (2019). The Commonwealth does not explain how the out-of-circuit cases looking to historical restrictions decades after the Founding—in some cases, dating back no further than the 20th century, MTD 13—can be squared with the Supreme Court's intervening clarification in *Gamble*. For another, the challenged laws do much more than "try the strength" of handguns—they ban the sale of numerous models that do not meet the Commonwealth's detailed specifications but which are nevertheless protected as arms in common use for lawful purposes. And in any event, even if post-Founding laws *could* be used to contradict the evidence from the Founding-Era itself concerning the scope of the Second Amendment, *one Maine law standing alone* obviously would not suffice. *See Heller*, 554 U.S. at 632.

2.      In *Heller*, the Supreme Court also identified a handful of "presumptively lawful regulatory measures" that, based on its reading of the Second Amendment's text and history, it took to be *prima facie* outside "the full scope of the Second Amendment." 554 U.S. at 626–27 & n.26. Those presumptive exceptions include "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. But whatever the scope of this category of presumptively

lawful regulations, it simply cannot create a blanket exception for "commercial"-type restrictions that a State may exploit by casting all manner of restrictions on the right to keep and bear arms as restrictions on their "commercial sale." After all, "[i]f there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Marzzarella*, 614 F.3d at 92 n.8; *see also Ill. Ass'n of Firearms Retailer*, 961 F. Supp. 2d at 930, 937.

For three separate reasons, this presumptively constitutional category cannot justify Massachusetts's ban. First, Massachusetts's restrictions, as applied to the common firearms at issue in this case, are not "condition[s]" or a "qualification[s]" on their sale, *Heller*, 554 U.S. at 627—*they effectively constitute a complete ban*. This "commercial" category might encompass such measures as mandating background checks at the point of sale or requiring firearm dealers to keep adequate records, but the Commonwealth cites no authority—apart from a non-precedential decision from another judge on this Court, *see Draper v. Healey*, 98 F. Supp. 3d 77 (D. Mass. 2015), *aff'd on other grounds*, 827 F.3d 1 (1st Cir. 2016)—for the proposition that the category extends to a *flat ban* on the purchase of common firearms. Second, *Heller*'s presumption applies only to "longstanding" laws. *See* 554 U.S. at 626–27. And as just shown, restrictive firearm design and testing requirements—that are so onerous that they outlaw the sale of all but a fraction of common, commercially available handguns—are not longstanding; they are novel and rare.

Third, even if the restrictions at issue *did* qualify under this category, that would not be the end of the analysis. Rather, as the Commonwealth concedes, a plaintiff may *rebut* the presumption of constitutionality that applies to a restriction in one of these categories by showing that "the regulation does have more than a de minimis effect upon his right." MTD 11 (quoting *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)). And contrary to

Defendants' arguments, the effect of Massachusetts's ban on the sale of common handguns is plainly not "de minimis." Plaintiffs, as shown above, clearly have a Second Amendment right to acquire the common handguns in question, but the challenged ban *all but forecloses* them from doing so. That is not "de minimis" by any conceivable measure.

Citing *Worman*, the Commonwealth insists that the ban's effect is de minimis because the handguns in question do not make up a discrete "class of weapons." MTD 12. That is a non sequitur. *Worman* analyzed whether the restricted category of firearms (there, certain semi-automatic firearms and magazines) "may be deemed a class" *under the second prong* of this Circuit's two-step test, for purposes of determining whether the ban in that case should be struck down categorically, like the handgun ban in *Heller*, rather than analyzed under a form of means-ends scrutiny. 922 F.3d at 32 n.2. Plaintiffs believe *Worman* gave the wrong answer to that question, and reserve the right to argue, before a court empowered to revisit the decision, that *Heller* requires a categorical test, *see Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 688 (6th Cir. 2016) (Sutton, J., concurring in most of the judgment) (quoting *Heller*, 554 U.S. at 635) ("What determines the scope of the right to bear arms are the 'historical justifications' that gave birth to it. . . . Tiers of review have nothing to do with it."); *Heller II*, 670 F.3d at 1271–85 (Kavanaugh, J., dissenting). But whether or not the banned firearms make up a "class of weapons," *id.*, has no bearing on the question, under *prong one* of this two-step test, whether the challenged restriction has a more than de minimis effect on conduct protected by the Second Amendment. The handgun ban challenged in this case plainly does, so attempting to invoke *Heller*'s category of commercial conditions and qualifications simply does not suffice.

Defendants are not entitled to dismissal under the first part of the First Circuit's test.

## II.   Massachusetts's ban fails any level of heightened constitutional scrutiny.

Because the challenged ban on common handguns restricts conduct "understood to be

within the scope of the right at the time of ratification," *id.*, the Court must proceed to determine "the appropriate level of scrutiny," *Gould*, F. 3d at 670. Here, the challenged restrictions should be analyzed under strict scrutiny. And they cannot survive even intermediate scrutiny.

> ### A.    Strict scrutiny applies.

Under the approach adopted by the First Circuit, the appropriate level of scrutiny depends on "how closely [the challenged restriction] approaches the core of the Second Amendment right and how heavily it burdens that right." *Id.* at 670–71. The restrictions at issue in this case directly regulate the "core" of the Second Amendment as the First Circuit has defined it.

Neither the text or history of the Second Amendment nor the Supreme Court's decision in *Heller* divides the right to keep and bear arms, like an onion, into a "core" and various outer layers. The constitutional text simply provides that the "right of the people to keep and bear Arms, shall not be infringed"—full stop. U.S. CONST. amend. II. And while *Heller* explains that the "core lawful purpose" of the Second Amendment's protection is "self-defense," and that this interest is "most acute" in the home, 554 U.S. at 628, 630, it says nothing to establish any hierarchy or scale of Second Amendment rights. Nonetheless, the First Circuit has held that the Second Amendment does have a "core," and that this "core" protects "self-defense in the home on the part of responsible, law-abiding individuals." *Worman*, 922 F.3d at 36 (quotation marks omitted). Because the challenged restrictions effectively prevent law-abiding Massachusetts residents from using the handguns at issue for self-defense in the home—by barring them from *acquiring those handguns in the first place*—it directly impinges upon this core right.

The Commonwealth disputes this, arguing that the challenged limits "apply only to commercial sales, not to possession of handguns in the home." MTD 14. But it never explains how one can possess and use a handgun in the home if one is barred from *acquiring it in the first place*. *See Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second

Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." (quotation marks omitted)). The out-of-circuit precedents Defendants cite, MTD 14, likewise fail to come to grips with this obvious point. The challenged ban on purchasing common handguns thus "implicates the core of the Second Amendment right.".

The burden Defendants' limits inflict upon that core right is severe, since, as discussed above, they serve to virtually foreclose law-abiding citizens from obtaining the constitutionally protected firearms at issue. The Commonwealth advances two arguments attempting to diminish the severity of the impact, but neither is persuasive. First, the Commonwealth points out that neither the "Approved Firearm Roster" nor the Attorney General's handgun regulations "restrict, in any way, private sales of handguns, leaving open this channel for the lawful transfer of handguns." MTD 14. The exception for private sales does precious little to lessen the severity of the Commonwealth's general ban. Defendants admit that these private sellers are limited to *four sales each year*, *id.* at 4; *see* 940 C.M.R. § 16.01, making the private market a totally unviable alternative to the commercial market. Indeed, Plaintiffs' complaint alleges that the private market is plagued by "inherently limited supply" and principally consists of "used handguns having no manufacturer's warranty," leaving law-abiding citizens in Massachusetts with "little, if any, realistic means of lawfully acquiring any of the [banned] handguns." Compl. ¶¶ 37-38.

The Commonwealth also repeatedly claims that the challenged restrictions pose no "substantial burden" on the Second Amendment because Plaintiffs "can lawfully buy hundreds of other models of handguns that appear on the Approved Firearms Roster." MTD 15. *Heller* itself forecloses this line of attack. The Supreme Court could not have been clearer: "*It is no answer* to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed." *Id.* (emphasis added). The Commonwealth's attempt to

diminish the severity of its ban on most common handguns by pointing to the continued availability of the small fraction of handguns it *does* allow fails under the very same reasoning.

The logic behind the Supreme Court's rejection of this line of argument is obvious. For if a government could defend a ban on *one* type of firearm by pointing out that it does not extend to *other* types of firearms, it could ultimately eclipse the Second Amendment entirely by degrees. Moreover, the whole point of the Second Amendment is to *leave it to law-abiding citizens* to determine which of the common and available types of firearms they wish to keep and to bear. The courts would not countenance the Commonwealth's be-happy-with-what-we've-left-you type of reasoning in the context of any other Constitutional right. Massachusetts could not justify a ban on *televising* a particular political viewpoint by pointing to the continued availability of print and online media, nor could it ban certain speech on MSNBC and CNN so long as Fox and C-SPAN were left unrestricted. The argument is no more persuasive under the Second Amendment.

The same reasoning disposes of Defendants' contention that Plaintiffs have not alleged that the banned firearms at issue "are more effective for self-defense." MTD 15. Again, it was the judgment of those who framed and ratified the Second Amendment that *the People themselves*— not the Government—are in the best position to determine which firearms in common use best suit their lawful purposes. And again, this point would be too obvious to even require argument in the context of any other constitutional right. The advent of more efficient and effective media of communications, such as TV and the internet, does not mean that the Government may now ban other more cumbersome methods such as leafletting, radio broadcasting, or pamphleteering.

The Commonwealth's restrictions should be subjected to strict scrutiny.

**B.      The challenged restrictions fail even intermediate scrutiny.**

In any event, the challenged restrictions also fail intermediate scrutiny. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the

government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). A government defending a law challenged as a violation of the Second Amendment "must supply actual, reliable evidence to justify" the restriction, and it "cannot get away with shoddy data or reasoning." *Ezell*, 651 F.3d at 709 (7th Cir. 2011) (citations and quotation marks omitted). "The burden of justification is demanding, and it rests entirely on the State." *Virginia*, 518 U.S. at 533. Public safety and preventing accidental firearm injuries are important government interests, but the Commonwealth has failed to show the Complaint's allegations that the challenged restrictions do not substantially further that interest, Compl. ¶¶ 42–46, are so implausible that the Court may disregard them on a motion to dismiss. And they are not implausible.

Consider first the requirement that all magazine-fed handguns include "a load indicator or magazine safety disconnect." 940 CMR 16.05(3). Massachusetts has failed to show that this outlier requirement substantially advances its safety interests. It touts a 1991 study by the General Accounting Office, but it is hard to see why, since that study in fact concluded these design requirements would have had *no effect* on *over three-quarters* of accidental deaths. United States General Accounting Office, Accidental Shootings 17 (1991), https://bit.ly/3nyJ3zk ("1991 GAO Report"). And even as to the 23% of deaths that the GAO concluded *might* have been prevented, this conclusion was based *solely* on the GAO's assessment that "the shooter believed the weapon was unloaded," *id.* at 16—and the analysis simply *blindly assumed* that a load indicator would have prevented the accident. The 1991 GAO Report proves nothing.

Similar problems infect the 1997 opinion poll relied upon by Massachusetts. As the Commonwealth's own description of this poll shows, *only 13.7 %* of the respondents both (1) did not know that a firearm can be discharged with the magazine removed, and (2) actually lived in a household with a gun. MTD 19. The notion that this small minority of such individuals would be

effectively prevented from accidentally discharging a firearm by the presence of the required "load indicator" strains credulity; after all, as the GAO itself explained, load indicators have little value unless users are "educated to understand their use and to recognize the indication that the firearms [are] loaded." 1991 GAO Report at 35.

The Commonwealth's failure to justify its requirement is underscored by the fact that *only two States*—Massachusetts and California—have seen fit to mandate load indicators and/or safety disconnects. *See* Giffords Law Center, *Design Safety Standards*, https://bit.ly/3k8nCCR.[2] In the rest of the States—*96% of the States in the Union*—handguns need not include these unusual, outlier mechanisms. It is "hard to persuasively say that the government has an interest sufficiently weighty to justify a regulation that infringes constitutionally guaranteed Second Amendment rights if the Federal Government and the states have not traditionally imposed—and even now do not commonly impose—such a regulation." *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).

The Commonwealth invokes the earlier decision by another judge of this Court upholding the load-indicator requirement under intermediate scrutiny. MTD 18 (citing *Draper*, 98 F. Supp. 3d 77). That trial-court decision is not binding, so its only authority comes from whatever persuasive value it may have. It has little, since the entirety of *Draper*'s analysis of the issue consists of a single, conclusory sentence asserting that "defendant has demonstrated a strong showing of a 'substantial relationship' between the restrictions imposed by the regulation and the important government objective of protecting the safety of its citizens." 98 F. Supp. 3d at 85. Massachusetts claims that the First Circuit, on appeal, "upheld the Attorney General's load indicator requirement as applied to Glock handguns," MTD 7, but it neglects to mention that the

---

[2] New York, the only other state to mandate specific design features, requires only the inclusion of a "safety" switch. N.Y. Comp. Codes R. & Regs. tit. 9, § 482.5(f).

Court of Appeals only resolved a vagueness challenge to the requirement and *expressly declined to address* any Second Amendment claim on the merits, 827 F.3d at 4–5.

Defendants also point to the Ninth Circuit's decision in *Peña v. Lindley*, 898 F.3d 969 (9th Cir. 2018). That decision is not binding here, and it dealt with California's requirement of *both* a load indicator and magazine disconnect feature, so its conclusion that this dual requirement "reasonably fit with California's interest in public safety" does not entail a similar conclusion regarding Massachusetts's requirement of one feature or the other. *Id.* at 981. In all events, *Peña*'s abbreviated analysis has little more persuasive value than *Draper*'s. *Peña*'s discussion of the issue consists of merely a sentence describing how a load indicator "acts as a red flag for those handling the gun who may have forgotten that it was loaded" and a sentence explaining that a disconnect mechanism "prevents a firearm from shooting unless a magazine is inserted." *Id.* at 980. Simply *describing how the required features operate* cannot satisfy the judicial duty, under intermediate scrutiny, to ensure through "independent judgment of the facts" that the government "has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994).[3] *Peña* also adverts to unspecified "studies" purportedly supporting California's requirement and asserts that Plaintiffs "do not provide any reliable evidence that these studies are incorrect." 898 F.3d at 980. But the burden is on *the Government. Virginia*, 518 U.S. at 533.

Massachusetts has also failed to show that the required child-safety features substantially advance public safety. Here too it principally relies on the 1991 GAO report, but this report in fact concludes that requiring a child-safety device would *not* have prevented *fully 92%* of the accidental

---

[3]     The free speech cases, like *Turner* and *McCullen*, are proper analogues, as the Supreme Court itself has repeatedly analogized to the First Amendment in analyzing challenges under the Second Amendment. *Heller*, 554 U.S. at 582, 591, 595, 606, 625-26, 635; *McDonald*, 561 U.S. at 759, 779, 782; *Caetano v. Mass.*, 577 U.S. 411, 417-18 (Alito, J., concurring).

fatalities the GAO studied, given research indicating that available child-safety mechanisms "can be reasonably expected to prevent only children up to about age 6 from discharging a firearm." 1991 GAO Report at 16. As to the remaining eight percent, Massachusetts claims that the GAO "found that *all* of the accidental firearms fatalities caused by children under the age of six could have been prevented" by the required features. MTD 17-18. But once again, that was not a *finding* of the GAO's report, it was an *assumption* of its analysis. The GAO determined "the number of deaths that could have been prevented by a child-proof device" *solely* by looking at "the age of the child firing the weapon" and assuming that if they were under 6, the device would have been effective. 1991 GAO Report at 16.

Moreover, the Complaint credibly alleges that one of the Commonwealth's listed child-safety measures—requiring a 10-pound trigger pull—would in fact "make handguns so outfitted *more* difficult to operate effectively and thus *more* difficult to operate safely." Compl. ¶ 45. The Commonwealth must accept that allegation as true under 12(b)(6)—and plainly, a law that *frustrates* the safe operation of firearms is not properly tailored under intermediate scrutiny.

Finally, the Commonwealth fails to show that its roster of "approved" handgun models sufficiently furthers its interest to withstand heightened scrutiny. Defendants do not and cannot dispute that their list of approved firearms excludes all but a "small fraction" of available, commonly used handguns, Compl. ¶ 36, including the common and constitutionally protected handguns Plaintiffs wish to purchase, MTD 7. And once again, Massachusetts's use of a "roster" of pre-approved handguns is an extreme, outlier measure—only three States and the District of Columbia impose such a requirement, Giffords, *supra*, https://bit.ly/3k8nCCR, undermining any claim that it is somehow necessary or even effective in ensuring gun safety.

The Commonwealth's only defense of this restrictive list is that *Plaintiffs* have not alleged

"why the[ ] models [at issue] are not on the roster." MTD 7. That gets the matter precisely backwards. Again, because Second Amendment rights are at stake, the "demanding" burden of showing that the Commonwealth's exclusion of these constitutionally protected firearms from its list furthers public safety "rests *entirely on the State*." *Virginia*, 518 U.S. at 533 (emphasis added). Massachusetts cannot meet that burden by (1) admitting that the firearms are in common use, (2) admitting that they are not on its "approved" list, and then (3) throwing up its hands and saying it *doesn't know why* these common, constitutionally protected handguns did not make the cut.

Massachusetts's failure to justify the challenged restrictions is all the more glaring in light of the readily available, less-restrictive alternatives. Even under intermediate scrutiny, a challenged restriction cannot burden substantially more constitutionally protected conduct than necessary to achieve the State's interest. *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). In *McCullen*, for example, the Supreme Court struck down a Massachusetts "buffer zone" law forbidding certain types of speech outside of abortion clinics, reasoning that the State had failed to show that measures substantially less restrictive than such an extreme prophylactic measure were not just as "capable of serving its interests." *Id.* at 494. Massachusetts's law, the Court noted, was "truly exceptional," and the State was able to "identify no other [ ] law" that was comparable, raising the "concern that the Commonwealth has too readily forgone options that could serve its interests just as well." *Id.* at 490. And even in the context of intermediate scrutiny, the Court concluded, the State must "show[ ] that it seriously undertook to address the problem with less intrusive tools readily available to it," or at the least, "that it considered different methods that other jurisdictions have found effective." *Id.* at 494. This requirement, the Court explained, "prevents the government from too readily sacrificing speech for efficiency." *Id.* (cleaned up).

*McCullen* dooms the restrictions challenged here. As the Complaint alleged—and, under

Rule 12(b)(6), the Court must presume—the Commonwealth's "interest in handgun safety could be adequately achieved through readily available and easily implemented less restrictive alternatives, including producing, providing, and encouraging education, training, and public outreach regarding basic rules of firearm safety, storage, and use." Compl. ¶ 42. Indeed, adequate safety training, the Complaint plausibly alleges, is *more* effective than the safety features at issue, which "are subject to failure." *Id.* ¶ 44. The keystone of the Commonwealth's attempt to justify the challenged restrictions—the 1991 GAO Report—in fact clinches the point. As the GAO repeatedly explained, "[o]ther options are available" to further gun safety, including "locking storage cases, trigger guards, combination locks that can be built into the weapon, and a variety of other mechanisms for securing firearms of different types," as well as "proper education in the use and handling of firearms." 1991 GAO Report at 35–36. The Commonwealth responds with the tautological assertion that gun-safety education does not protect those "who have not received education," MTD 20, but that is merely an argument in favor of a more robust public outreach and education program. Massachusetts also argues that education and training "is not an alternative to childproofing features," *id.*, but it utterly fails to address the availability of such alternative mechanisms as gun safes and trigger locks—not to mention "the simple expedient of keeping firearms unloaded, with ammunition stored separately." 1991 GAO Report at 35.

"In short, the Commonwealth has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it," *McCullen*, 573 U.S. at 494—so its onerous restrictions cannot pass intermediate scrutiny.

## CONCLUSION

The Commonwealth's motion to dismiss should be denied.

DATED: September 17, 2021

Respectfully submitted,

/s/ Richard C. Chambers, Jr., Esq.
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Richard@chamberslawoffice.com

Raymond M. DiGuiseppe
THE DIGUISEPPE LAW FIRM, P.C.
4320 Southport-Supply Road Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
Appearing *Pro Hac Vice*

Jason A. Guida (BBO# 667252)
PRINCIPE & STRASNICK, P.C.
17 Lark Avenue
Saugus, MA 01906
(617)383-4652
jason@lawguida.com

William Sack
FIREARMS POLICY COALITION
1215 K Street, 17th Floor
Sacramento, CA 95814
P: 916-596-3492
E: wsack@fpclaw.org
Appearing *Pro Hac Vice*

**<u>Certificate of Service</u>**

I certify that this document was served electronically to counsel for the Defendants September

17, 2021, as the ECF system is currently shut down for maintenance. It will be filed electronically

with the Court on Monday, September 20, 2021, if possible; otherwise, it will be filed with the

Court in person.

<u>/s/ Richard C. Chambers, Jr., Esq.</u>
Richard C. Chambers, Jr., Esq.