UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 1:21-CV-10960-RWZ

STEFANO GRANATA, JUDSON THOMAS, COLBY CANNIZZARO, CAMERON
PROSPERI, THE GUNRUNNER, LLC, and FIREARMS POLICY COALITION, INC.

v.

MAURA HEALY, in her official capacity as Attorney General of the Commonwealth of
Massachusetts, and THOMAS TURCO, in his official capacity as Secretary of the
Executive Office of Public Safety and Security of the Commonwealth of Massachusetts

MEMORANDUM & ORDER

May 19, 2022

ZOBEL, S.D.J.

Plaintiffs brought this action to challenge enforcement of the handgun regulatory

scheme established by Mass. Gen. Laws ch. 140, § 123, together with the regulations

promulgated by the Massachusetts Attorney General and codified at 940 C.M.R.

§§ 16.00 *et seq.*  The challenged scheme sets forth safety requirements for handguns

sold within the Commonwealth, to prevent unnecessary death and injury from unsafe

and defective handguns, particularly in the hands of children.  Plaintiffs assert that they

violate the Second Amendment to the Constitution by effectively banning the sale of

eighteen makes and models of handguns that are in common use and sold in other

states.  Defendants move to dismiss the complaint for failing to state a claim.  The

motion is allowed.

## I.    Background

### A.    The Challenged Handgun Safety Regulations

In 1997, the Attorney General of Massachusetts promulgated regulations applicable to "transfers" of handguns by "handgun purveyors" to customers in Massachusetts,[1] codified at 940 C.M.R. § 16.00 *et seq.*, pursuant to his authority under the Massachusetts Consumer Protection Act, Gen. Laws Ch. 93A, § 2(c).  They followed national research and recognition of the need for additional safety restrictions on firearms, especially to protect children.  U.S. Gov't Accountability Office, Report to the Chairman, Subcomm. on Antitrust, Monopolies, and Business Rights, Comm. on the Judiciary, U.S. Senate, Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could Be Prevented (1991) ("GAO Report").

The regulations make it "an unfair or deceptive practice for any handgun-purveyor" to transfer to a consumer in the Commonwealth a handgun that does not comply with the minimum safety requirements and performance standards set forth. 940 C.M.R. § 16.02.  Their purpose is "to protect responsible gun owners and their families from firearms that are unsafe by design or manufacture."  Massachusetts Attorney General, July 16, 2004 Consumer Advisory on Glock Handguns at 8.  They do not apply to private sellers, defined as someone who transfers fewer than five handguns per year.  940 C.M.R. § 16.01.  The majority of the regulations also do not apply to

---

[1] "Transfer" means "sell, lease, or rent" and excludes sales to firearm wholesalers who cannot resell the firearm to a retailer or consumer in the Commonwealth.  940 C.M.R. § 16.01.  "Handgun purveyor" means "any person or entity that transfers handguns to a customer located within the Commonwealth" and excludes any entity that transfers fewer than five handguns per year; transfers for the purpose of supplying law enforcement, military personnel, museums, and other educational collectors; transfers of handguns considered antiques; and transfers of handguns designed and sold specifically for formal target shooting.  Id.

transfers of handguns manufactured on or before October 21, 1998.  Enforcement

Notice #2: Attorney General's Handgun Safety Regulations at 3.

In 1998, soon after the Attorney General's regulations were promulgated, the

Massachusetts Legislature codified certain handgun safety requirements at Mass. Gen.

Laws ch. 140, § 123, cl. 18-21, making it unlawful for a retailer to sell within the

Commonwealth a handgun that does not meet the prescribed safety features.  Mass.

Gen. Laws ch. 140, § 128.  Several of these features overlap with those promulgated by

the Attorney General.  Like the former, the statutory requirements exempt private

sellers, and apply only to "firearm dealer[s] in Massachusetts" as defined at 501 C.M.R.

§ 7.02.  They also do not apply to the sale of firearms that were lawfully owned or

possessed on or before October 21, 1998.  Mass. Gen. Laws ch. 140, § 123.

Taken together, the Attorney General's regulations and § 123 require that

handguns lawfully sold within the Commonwealth:

- Not be made of "inferior materials," they must be made of materials that meet specified minimum melting points, tensile strength, and density; or pass a make and model performance test (940 C.M.R. §§ 16.01, 16.04(1) and (3); Mass. Gen. Laws ch. 140, § 123, cl. 18);

- Not be prone to either repeated firing from a single trigger pull or explosion upon firing (940 C.M.R. § 16.04(2); Mass. Gen. Laws ch. 140, § 123, cl. 20);

- Not be prone to accidental discharge (940 C.M.R. §§ 16.01, 16.04(2); Mass. Gen. Laws ch. 140, § 123, cl.19);

- Have a "safety device" that prevents unauthorized use of the firearm (940 C.M.R. § 16.05(1));

- Have a mechanism that "effectively precludes an average five-year-old child from operating the handgun when it is ready to fire" (i.e., a form a childproofing), "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun" (940 C.M.R. § 16.05(2));

- Have a tamper-resistant serial number (940 C.M.R. § 16.03); and

- For semi-automatic handguns, have either "a load indicator or a magazine safety disconnect" (940 C.M.R. § 16.05(3) and (4)).[2]

In conjunction with Mass. Gen. Laws ch. 140, § 123, the Legislature directed the Secretary of the Executive Office of Public Safety and Security to "compile and publish a roster" of handguns that meet the § 123 requirements, known as the "Approved Firearms Roster" (the "Roster"). Mass. Gen. Laws ch. 140, § 131-3/4; 501 C.M.R. § 7.00; see also Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5. To be listed on the Roster, the Secretary must receive a final test report from an approved testing laboratory certifying that the handgun satisfies the § 123 requirements. 501 C.M.R. § 7.03(1). As of June 2021, the Roster listed over 1,000 handgun models from twenty-nine manufacturers, often with multiple models for each manufacturer. Approved Firearms Roster: 06/2021. It is unlawful for a retailer to sell a firearm that is not so listed. 501 C.M.R. § 7.05; see also Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5.

The Roster lists firearms that meet the statutory requirements of § 123 but not necessarily the Attorney General's regulations on childproofing, load indicators, and tamper-resistant serial numbers. See Enforcement Notice #3: Attorney General's Handgun Safety Regulations at 5-6. Nonetheless, to be legally sold by a retailer in Massachusetts, a handgun must appear on the Roster and comply with the Attorney General's regulations. Id.

---

[2] The Attorney General's regulations also include certain safety warnings and disclosure requirements at the time of sale. See 940 C.M.R. § 16.006. Because Plaintiffs do not allege any injuries related to these requirements, they will not be addressed.

4

### B.    The Complaint

Plaintiffs challenge both the Attorney General's regulations and the § 123 statutory requirements (collectively, the "Handgun Safety Regulations"). They are: four individuals, all of whom claim to have a valid Massachusetts license that allows them to purchase handguns and carry them in public (Docket # 1 ¶¶ 47-50); one retail seller, The Gunrunner, LLC, who is alleged to be a licensed handgun purveyor (id. ¶ 51); and one organization, the Firearms Policy Coalition, Inc. ("FPC"), which includes as members the four individual plaintiffs (id. ¶ 52). The two defendants, Maura Healey and Thomas Turco, are both sued in their official capacities, as Attorney General of Massachusetts and Secretary of the Executive Office of Public Safety and Security of Massachusetts, respectively.

The complaint asserts a single cause of action under 42 U.S.C. § 1983 and the United States Constitution that the Handgun Safety Regulations infringe Plaintiffs' Second Amendment right "to keep and bear arms." Docket # 1 ¶¶ 56-73. The individual plaintiffs specifically object to the limitations on handguns incorporated into the roster. They assert that they would purchase eighteen specific models of handguns, "new from a licensed retailer[] for self-defense and other lawful purposes," but for the challenged Handgun Safety Regulations. Id. ¶¶ 47-50. The Gunrunner, the retailer, asserts for itself and "on behalf of all similarly situated licensed retailers," that it would "make available for sale to all of its law-abiding customers all commercially available handguns in common use for self-defense and other lawful purposes that are widely sold and possessed outside of Massachusetts" but for the challenged Handgun Safety

Regulations.[3]  Id. ¶ 51.  FPC, the organization, asserts, on behalf of its members and
similarly situated members of the public, that they "have been adversely and directly
harmed by Defendants' enforcement" of these challenged regulations.  Id. ¶¶ 52-55.
Plaintiffs do not dispute that individual licensed consumers within Massachusetts can
still purchase or possess an operational handgun for self-defense or other lawful
purposes.

       Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss Plaintiffs' complaint
for failing to state a claim.  Docket # 14.  They contend that the challenged Handgun
Safety Regulations are constitutional and thus enforceable because they do not burden
conduct falling within the scope of the Second Amendment, but, even if they did, they
easily withstand heightened scrutiny.  Id.; Docket # 15.

## II.    Discussion

### A.    Legal Standard

       To survive a motion to dismiss, a complaint must contain "sufficient factual
matter" to "state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S.
662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
The Court must accept all factual allegations in the complaint as true and draw all
reasonable inferences in the plaintiff's favor.  Langadinos v. Am. Airlines, Inc., 199 F.3d
68, 69 (1st Cir. 2000).  It need not however, accept legal conclusions as true.  Ashcroft
v. Iqbal, 556 U.S. 662, 678 (2009).

---

[3] Defendants argue that "there is no textual or historical basis upon which to suggest that the Second
Amendment protects a right to *sell* firearms," thus "any claim that the challenged regulations impinge
upon a purported right of dealers to *sell* firearms must be rejected."  Docket # 15 at 8 n.15 (emphasis in
original).  Whether there is a right to sell firearms does not impact the analysis, wherefore the Court
declines to weigh in on this question.

**B.     Second Amendment Legal Framework**

The Second Amendment states: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  The U.S. Supreme Court has held that the Second Amendment protects an individual's right "to keep and bear arms (unconnected to service in the militia)" and the protection applies to the states through the Fourteenth Amendment.  Gould v. Morgan, 907 F.3d 659, 667 (1st Cir. 2018); see also McDonald v. City of Chicago, 561 U.S. 742, 750 (2010); District of Columbia v. Heller, 554 U.S. 570, 592 (2008).  The law challenged in District of Columbia v. Heller constituted an "absolute prohibition of handguns held and used for self-defense in the home," which the Court determined does violate the Second Amendment.  554 U.S. at 635-36. Although it has not yet examined "the full scope of the Second Amendment" right, it made clear in Heller that the right "is not unlimited."  Id. at 626.  Certain "longstanding prohibitions" are "presumptively lawful," including "laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-27.  The Second Amendment does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id.

The First Circuit has adopted a two-step approach for analyzing Second Amendment claims.  Gould, 907 F.3d at 668-69.  At the first step, the court asks "whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee."  Id.  "This is a backward-looking inquiry, which seeks to determine whether the regulated conduct was understood to be within the scope of the right at the time of ratification . . ."  Id.  If the challenged law imposes no such burden, it is valid.  "If, however, it burdens conduct falling within the scope of the Second

Amendment," the court moves to the next step at which it determines the appropriate level of scrutiny and whether the challenged law survives that determination.  Id.

## C.    Scope of the Second Amendment Right

The Supreme Court recognizes that "laws imposing conditions and qualifications on the commercial sale of arms" are a category of regulations that are "presumptively lawful."  Heller, 554 U.S. at 626-27.  However, neither the First Circuit nor the Supreme Court has interpreted the full confines of the phrases "presumptively lawful" or "conditions and qualifications on the commercial sale of arms."  Accordingly, courts have been inclined to assume without deciding that a regulation burdens conduct protected by the Second Amendment for purposes of analysis, rather than delving into the question whether the regulation falls into the exception of "conditions and qualifications on the commercial sale of arms."  See, e.g., Pena v. Lindley, 898 F.3d 969, 976 (9th Cir. 2018) ("The opaqueness of the presumption of legality for 'conditions and qualifications on the commercial sale of arms' likely explains why we and other courts often have assumed without deciding that a regulation does burden conduct protected by the Second Amendment rather than parse whether the law falls into that exception. . . .  We, too, follow this well-trodden and 'judicious course.'"); see also Worman v. Healey, 922 F.3d 26, 35 (1st Cir. 2019) (deciding case at second rather than first step of inquiry, explaining that "courts should not rush to decide unsettled issues when the exigencies of a particular case do not require such definitive measures").

The same approach is taken here, by assuming, without deciding, that the challenged regulations touch on conduct protected by the Second Amendment.  "By making this assumption, [the court] bypass[es] the constitutional obstacle course of

defining the parameters of the Second Amendment's individual right in the context of commercial sales." Pena, 898 F.3d at 976.

### D.   Scrutiny

Because the challenged Handgun Safety Regulations are assumed to implicate Plaintiffs' Second Amendment rights, the analysis turns to the second step to determine the appropriate level of scrutiny and then to use it to assess the regulations. See Gould, 907 F.3d at 668-69.

#### 1.   Level of Scrutiny

Plaintiffs argue that strict scrutiny applies because the Handgun Safety Regulations implicate the core of the Second Amendment right, Docket # 18 at 11-12, while Defendants assert that only intermediate scrutiny is required, Docket # 15 at 13-15. Intermediate scrutiny is appropriate here.

"The appropriate level of scrutiny 'turn[s] on how closely a particular law or policy approaches the core of the Second Amendment right and how heavily it burdens that right.'" Worman, 922 F.3d at 36 (quoting Gould, 907 F.3d at 670-71). "[I]ntermediate scrutiny is appropriate as long as a challenged regulation either fails to implicate the core Second Amendment right or fails to impose a substantial burden on that right." Worman, 922 F.3d at 39 ("[I]ntermediate scrutiny is the appropriate level of scrutiny for evaluating a law . . . that arguably implicates the core Second Amendment right to self-defense in the home but places only a modest burden on that right.").

The First Circuit has established "that the core Second Amendment right is limited to self-defense in the home" by "responsible, law-abiding individuals." Id. (quoting Gould, 907 F.3d at 671). Plaintiffs here contend that the regulations do affect

their ability to defend themselves in their homes.  Assuming in Plaintiffs' favor that the

regulations implicate the core of the Second Amendment right, the inquiry then focuses

on "how heavily [they] burden[] that right."  Worman, 922 F.3d at 36 (quoting Gould, 907

F.3d at 671).

The Handgun Safety Regulations in this case place, at most, a modest burden on

the core Second Amendment right.  The regulations only require that handguns lawfully

sold within the Commonwealth meet certain safety requirements; they do not restrict the

possession of handguns by eligible individuals in the home or elsewhere.  See Draper v.

Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (finding that regulation prohibiting the

sale of handguns without a load indicator or magazine safety disconnect "does not

substantially burden the right to bear arms in self-defense in one's home" because it "in

no way prevents citizens from obtaining a wide array of firearms").  Even though the

Handgun Safety Regulations may limit the types of handguns with which individuals can

defend themselves, to only those that meet the safety requirements of the regulations—

unlike Heller, they do not result in a total prohibition against keeping a handgun for self-

defense within the home.  See Pena, 898 F.3d at 977-78; see also Worman, 922 F.3d

at 40 (finding Massachusetts law banning certain semiautomatic firearms passed

intermediate scrutiny because "the Act does not outlaw all semiautomatic firearms and

magazines[, n]or does it circumscribe in any way the fundamental right of law-abiding,

responsible citizens to possess handguns in their homes for self-defense").

Plaintiffs argue that by prohibiting the sale of handguns that do not meet the

safety requirements, the Handgun Safety Regulations in effect result in a total ban on

the sale and thus possession of those specific makes and models, thereby running afoul

of the Supreme Court's admonition in <u>Heller</u> that states cannot "ban the possession of handguns."  Docket # 18 at 13-14 (citing <u>Heller</u>, 554 U.S. at 629).  Plaintiffs' argument, however, stretches <u>Heller</u> beyond the plain meaning of its text without any authority for doing so.  Prohibiting the sale of specific makes and models of handguns for safety reasons is not the same as a total prohibition of the sale of handguns.  <u>See</u> <u>Pena</u>, 898 F.3d at 978 ("being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home"); <u>see also</u> <u>Heller</u>, 554 U.S. at 626 ("[T]he right secured by the Second Amendment is not unlimited. . . .  [It] was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Eligible individuals within Massachusetts can freely choose from over a thousand handguns listed on the June 2021 Roster that also meet the Attorney General safety regulations.  The fact that they cannot purchase every single handgun that may be in common use and available for purchase in other states, does not transform the regulations into a total ban on a category or class of firearms (i.e., handguns in this case).  To conclude otherwise would eviscerate <u>Heller</u>'s holding that some regulation of firearm possession is permissible.  <u>See</u> <u>Worman</u>, 922 F.3d at 32 n.2.

Two additional points reinforce the limited burden placed on individuals' ability to exercise their Second Amendment right:  First, the Handgun Safety Regulations carve out private sales of handguns from their safety requirements.  Second, Plaintiffs do not claim that the handguns available for purchase in Massachusetts are inadequate to exercise their core Second Amendment right.  Thus, there is no basis to conclude that the eighteen handguns specifically identified by Plaintiffs in their complaint, as well as

any other handguns in common use in other states, that allegedly are not available for purchase in the Commonwealth because of the regulations, would in some way enable or enhance an individual's exercise of their right to possess a handgun in their home for self-defense in a way not achievable by the handguns that are available.

Because the Handgun Safety Regulations do not impose a substantial burden on Plaintiffs' core Second Amendment right, intermediate scrutiny is appropriate to assess the enforceability of the regulations.  See e.g., Pena 898 F.3d at 979.

> 2.   Application of Intermediate Scrutiny

"To survive intermediate scrutiny, a statute 'must be substantially related to an important governmental objective.'"  Worman, 922 F.3d at 38 (quoting Gould, 907 F.3d at 672).  "To achieve this substantial relationship, there must be a 'reasonable fit' between the restrictions imposed by the law and the government's valid objectives, 'such that the law does not burden more conduct than is reasonably necessary.'"  Id. (quoting Gould, 907 F.3d at 674).  In its assessment, a court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law."  Pena, 898 F.3d at 979 (internal quotation marks omitted).  A court cannot substitute "its own appraisal of the facts for a reasonable appraisal made by the legislature."  Gould, 907 F.3d at 673.

Plaintiffs concede that the Commonwealth has important objectives in protecting "[p]ublic safety and preventing accidental firearm injuries," see Docket # 18 at 15, and the First Circuit has recently reiterated the Commonwealth's important objective in preventing crime, see Worman, 922 F.3d at 39 ("Massachusetts indubitably 'has compelling governmental interests in both public safety and crime prevention'").

Accordingly, the only remaining question is whether the regulations substantially relate to those interests. Id.

Both § 123 and the Attorney General's regulations, require that handguns sold commercially are (1) not made of inferior materials or, if they are, they nonetheless pass a performance test; (2) not prone to uncontrolled firing or exploding during normal use; and (3) not prone to discharging accidentally when dropped. 940 CMR § 16.04; Mass. Gen. Laws ch. 140, § 123, cls. 18-20. They allow purchasers of handguns to reasonably rely on the assumption that the handgun will not accidently fire, explode, or pose any other threat to their own safety and the safety others who may have access to the firearm, especially children.

In addition, the Commonwealth's interest in public safety and the Attorney General's child-proofing requirements mutually support the regulations in issue. As Defendants noted, the GAO Report "found that all of the accidental firearm fatalities caused by children under the age of six could have been prevented had the firearm been equipped with childproofing features like those required by the regulations." Docket # 15 at 17-18 (citing GAO Report at 3, 34). The childproofing regulations are satisfied by any mechanism that "effectively precludes an average five-year old from operating a handgun when it is ready to fire," thus Plaintiffs' criticism of one such mechanism—a ten-pound trigger pull (see Docket # 18 at 18)—does not alter the analysis. See 940 CMR §§ 16.05(2), (4) ("such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average fire year old child's hands are too small to operate the handgun, or requiring a series of multiple motions in order to fire the handgun," as well

as a hammer deactivation device).  Similarly, the Attorney General's requirement that handguns be sold with a "safety device" that prevents unauthorized use, 940 CMR § 16.05(1), is supported by the GAO Report's finding that one in three accidental firearm deaths in 1988 and 1989 could have been prevented by the addition of a firearm safety device.  Docket #15 at 18 (citing GAO Report at 3, 36).

The requirement that handguns contain tamper-resistant serial numbers also reasonably supports the Commonwealth's interests in public safety and crime prevention.  See United States v. Marzzarella, 614 F.3d 85, 98 (3d Cir. 2010).  As the Third Circuit explained in an opinion upholding a law prohibiting the possession of a handgun with an obliterated serial number under intermediate scrutiny, "there would appear to be no compelling reason why a law-abiding citizen would prefer an unmarked firearm" which has "value primarily for persons seeking to use [it] for illicit purposes."  Id. at 95.  The requirement here, is thus also "properly designed to remedy the problem of untraceable firearms."  See id. at 101.

Finally, the requirement that semiautomatic pistols contain either a load indicator or magazine safety disconnect easily passes muster.  These exact measures have already been deemed constitutional within this jurisdiction and others.  See Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015 (Gorton, J.) (finding Attorney General's load indicator or magazine safety disconnect requirement enforceable under any level of heightened scrutiny); Pena, 898 F.3d at 980 (finding load indicator or magazine safety disconnect requirement "reasonably fit with California's interest in public safety").  These regulations are further supported by the GAO findings that twenty-three percent of accidental firearm fatalities occurred because individuals incorrectly believed the

14

firearms were unloaded and that those deaths could have been prevented by a load indicator.  Docket # 15 at 18-19 (citing GAO Report at 3).

Each individual safety requirement set forth in the regulations buttresses the important government interests identified; wherefore the requirement that handguns be pre-approved for sale and listed on the Roster fully passes scrutiny.

The existence of available alternatives that may promote public safety—e.g., "education, training, and public outreach regarding basic rules of firearm safety, storage, and use" identified by Plaintiffs (Docket # 1 ¶ 42)—do not alter the analysis.  Nor is the analysis altered by Plaintiffs' argument that the GAO Report is unsuitable to support the enforceability of the regulations because it showed that the studied safety requirements only prevented some, but not all or enough, accidental deaths.  Docket # 18 at 15-18. The means for accomplishing the important government interests need not be narrowly tailored nor is there any requirement that regulations prevent all deaths.  See Gould, 907 F.3d at 674 ("a legislature's chosen means need not be narrowly tailored to achieve its ends" when applying intermediate scrutiny); id. at 674-75 (finding requirements for obtaining a license to carry firearm in public passed intermediate scrutiny because states with more restrictive firearm licensing schemes have lower rates of gun-related deaths, even though not all deaths were prevented).  Nor should the Court substitute its own judgment for that of the Attorney General and Legislature in determining the appropriate means to pursue its important interests.  See Worman, 922 F.3d at 40 (it is "the legislature's prerogative . . . to weigh the evidence, choose among conflicting inferences, and make the necessary policy judgments," "[t]he role of a reviewing court is

limited to ensuring 'that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence'").

The Handgun Safety Regulations are well supported and reasonable, a conclusion reinforced by the fact that Massachusetts "consistently has one of the lowest rates of gun-related deaths in the nation." See Gould 907 F.3d at 674-75. The challenged regulations therefore pass intermediate scrutiny.

## III.    Conclusion

Defendants' Motion to Dismiss Plaintiffs' Complaint (Docket # 14) is ALLOWED.

_May 19, 2022_
DATE

_____
RYA W. ZOBEL
UNITED STATES DISTRICT JUDGE