UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA; CAMERON PROSPERI;
THE GUN RUNNER, LLC; and FIREARMS
POLICY COALITION, INC.,

                    Plaintiffs,                    CIVIL ACTION
                                                   NO. 1:21-cv-10960-DJC
          v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
of Massachusetts; and TERRENCE M. REIDY, in
his official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                    Defendants.

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

   I.     Procedural History ............................................................................................ 2

   II.    Regulatory Scheme .......................................................................................... 3

   III.   Effect on Plaintiffs .......................................................................................... 5

ARGUMENT ....................................................................................................................... 7

   I.     Standard of Review .......................................................................................... 7

   II.    The Handgun Ban is Unconstitutional as a Matter of Law. .......................... 8

        A.     The Second Amendment's Plain Text Extends to Acquiring Handguns. ................ 8

        B.     The Handgun Ban is Inconsistent with the Nation's History of Firearms Regulation. ...................................................................... 10

             1. Arms in Common Use Cannot Be Banned. ..................................... 10

             2. No Other Historical Principle Could Support the Handgun Ban. .................... 14

CONCLUSION .................................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Andrews v. State*,
    50 Tenn. 165 (1871) ...................................................................................................9

*Boland v. Bonta*,
    662 F.Supp.3d 1077 (S.D. Cal. 2023) ...................................................................12, 18

*Granata v. Campbell*,
    No. 22-1478, 2023 WL 4145911 (1st Cir. Apr. 7, 2023) ....................................2

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ...............................................................................11, 12, 13

*Carey v. Population Servs. Int'l*,
    431 U.S. 678 (1977) ...................................................................................................9

*DeNovellis v. Shalala*,
    124 F.3d 298 (1st Cir. 1997) ....................................................................................7

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ...........................................1, 2, 8, 9, 10, 11, 12, 14, 15, 16

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ..................................................................................12

*Gamble v. United States*,
    139 S. Ct. 1960 (2019) ............................................................................................17

*Ill. Ass'n of Firearms Retailers v. City of Chicago*,
    961 F. Supp. 2d 928 (N.D. Ill. 2014) ......................................................................8

*Lara v. Comm'r Pa. State Police*,
    91 F. 4th 122 (3d Cir. 2024) ...................................................................................15

*Luis v. United States*,
    578 U.S. 5 (2016) ...............................................................................................9, 10

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................................................8, 12

*Mesnick v. General Elec. Co.*,
    950 F.2d 816 (1st Cir. 1991) ....................................................................................7

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*,
    460 U.S. 575 (1983) ...................................................................................................9

*Moore v. Madigan*,
    702 F.3d 933 (7th Cir. 2012) ..................................................................................15

*Ocean State Tactical, LLC v. Rhode Island*,
    95 F.4th 38 (1st Cir. 2024) .....................................................................................14

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    590 U.S. 336 (2020) ...................................................................................................9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022).................................................. 1, 2, 8, 10, 11, 12, 14, 15, 16, 17

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007) ......................................................13

*Renna v. Bonta*,
   667 F. Supp. 3d 1048 (S.D. Cal. 2023) ...........................................1, 12, 13, 18

*Richmond Newspapers, Inc. v. Virginia*,
   448 U.S. 555 (1980).......................................................................9

*Rodríguez-Cardi v. MMM Holdings, Inc.*,
   936 F.3d 40 (1st Cir. 2019) .............................................................7

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ..........................................................8

*Tony Kole & Ghost Indus., LLC v. Vill. of Norridge*,
   No. 11 C 3871, 2017 WL 5128989 (N.D. Ill. 2017) ...........................8, 9

*United States v. Daniels*,
   77 F.4th 337 (5th Cir. 2023) ......................................................... 15

*United States v. Rahimi*,
   602 U.S. 680 (2024)................................................................10, 15

*Worth v. Jacobson*,
   108 F.4th 677 (8th Cir. 2024) ........................................................17

**Statutes and Laws**

18 U.S.C.
   § 922(a)(3) ...............................................................................5
   § 922(a)(5) ...............................................................................5

501 CMR 7.02 - 7.07 ..........................................................................4

940 C.M.R.
   § 16.00.....................................................................................
   § 16.01.....................................................................................3
   § 16.03.....................................................................................3
   § 16.04(1).................................................................................3
   § 16.05(1).................................................................................3
   § 16.05(2).................................................................................3, 4
   § 16.05(3).................................................................................4

M.G.L. c. 269
   § 10(a) ....................................................................................3

M.G.L. c. 140
   § 121........................................................................................3
   § 123........................................................................................4
   § 123(o)....................................................................................4

§ 128........................................................................................................3
§ 131........................................................................................................3
§ 131 ¾....................................................................................................4

LAWS OF THE STATE OF MAINE 546 (Calvin Spaulding ed., 1822).................................17

**<u>Other Authorities</u>**

1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ..........................9

1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773)..............................9

*Approved Firearms Roster*, COMMONWEALTH OF MASS., https://bit.ly/43blrla (last visited Jan. 4,
2024) ......................................................................................................4

*Enforcement Notice: Attorney General's Handgun Safety Regulation* at 6, THE COMMONWEALTH
OF MASS. OFF. OF ATT'Y GEN., https://bit.ly/46KlfN0
(last visited Jan. 4, 2024) ..........................................................................4, 5

*Formal Target Shooting Firearms Roster*, COMMONWEALTH OF MASS. EXECUTIVE OFF. OF PUB.
SAFETY & SEC. (June 2024), https://bit.ly/402KkQv. ...........................................4

Guy J. Sagi, *Glock G19: A Top-Selling Pistol in 2020*, AM. RIFLEMAN (Jan. 21, 2021),
https://bit.ly/4gEnLJe .........................................................................13, 14

Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*,
HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD.............16

Mark W. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have
Defied* Heller *In Arms-Ban Cases—Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sept.
27, 2023), https://tinyurl.com/2mn2mznc.................................................................11

*Firearms Examiner Training*, NAT'L INST. OF JUSTICE, https://bit.ly/4gT4eEy (last visited Jan. 4,
2024) ......................................................................................................6

## INTRODUCTION

The Supreme Court has repeatedly explained that handguns are "arms" that "are indisputably in 'common use' for self-defense today [and] are, in fact, 'the quintessential self-defense weapon.' " *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). As such, ordinary semiautomatic handguns and revolvers are categorically protected and cannot be banned. In direct defiance of this precedent, Massachusetts has closed its borders to large portions of the modern handgun market, banning as "unsafe" many of the firearms that are most trusted by the American people across the country, substituting its judgment for theirs. That it cannot do. As *Heller* explained clearly, it is the choices of "the American people" that matter in deciding what is, and what is not, "in common use," and therefore, protected.

While the Commonwealth is sure to argue that it has not banned *all* handguns, and so its restrictions should not be deemed to burden the Second Amendment right, "[t]he Amendment does not parse between types, makes and models of arms." *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1061 (S.D. Cal. 2023). As the Supreme Court has made clear, "[i]t is no answer to say … that it is permissible to ban the possession of [some firearms] so long as the possession of other firearms" is allowed. *Heller*, 554 U.S. at 629. And even if the subset of handguns banned by Massachusetts is examined on its own, it still easily clears any "common use" threshold, because Massachusetts bans some of the most popular handguns in the country, like the Glock 19.

There is, therefore, no need to do any original historical analysis to resolve this case—it can be resolved on binding Supreme Court precedent alone. To the extent that this Court reviews additional historical evidence that the Commonwealth may present, the result is the same. *Heller* already reviewed the relevant historical landscape and reduced it to an easily applicable principle:

arms in common use cannot be banned. The Commonwealth will not be able to turn up any historical tradition that would contravene that principle.

## BACKGROUND

### I.    Procedural History

Plaintiffs filed this case on June 8, 2021, challenging Massachusetts laws and regulations that ban the commercial sale of handguns that are otherwise in common use around the country and seeking to enjoin Defendants' enforcement of those laws and regulations. Doc. 1. On May 19, 2022, the Court granted Defendants' motion to dismiss for failure to state a claim under then-prevailing First Circuit precedent. Docs. 24 & 25. Plaintiffs timely appealed and, while the appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). *Bruen* rejected the "means-end scrutiny" approach that the First Circuit previously employed as inconsistent with *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen*, 597 U.S. 19 n.4 (abrogating, for example, *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019).

On April 7, 2023, the First Circuit vacated the dismissal and remanded the matter for further proceedings in light of *Bruen*. *Granata v. Campbell*, No. 22-1478, 2023 WL 4145911 (1st Cir. Apr. 7, 2023). On remand, Plaintiffs filed the operative first amended complaint ("FAC") on September 21, 2023. Doc. 34. Defendants filed an answer on November 20, 2023. Doc. 38. Thereafter, the case was reassigned to this Honorable Court, Doc. 42 (Dec. 7, 2023), which entered scheduling orders that provided for a period of discovery followed by cross-motions for summary judgment, Docs. 48–50. The instant motion now follows.

## II.    Regulatory Scheme[1]

In Massachusetts, the sale, transfer, rental, and lease of all "firearms" is strictly regulated. A "firearm," includes, as relevant to this case, all handguns. M.G.L. c. 140, § 121. Subject to narrow exceptions, it is unlawful for any individual to purchase or possess a handgun without first applying for and being granted a license to carry. *See id.* § 131; *id.* c. 269, § 10(a). It is similarly generally unlawful for anyone to sell, rent, lease, or otherwise transfer a handgun to any person who does not possess such a license. *Id.* c. 140 § 128.

But even when an individual is appropriately licensed, there are many handguns that cannot be legally acquired in Massachusetts. First, Massachusetts's Attorney General regulates "transfers" of handguns by "handgun purveyors," where a transfer indicates any sale, rental, or lease, and where a "handgun purveyor" includes anyone who sells five or more handguns per year to customers located in Massachusetts. 940 C.M.R. § 16.01. The Attorney General's regulations make it "an unfair or deceptive practice for any handgun purveyor" to transfer a handgun if, among other things, it:

- lacks a tamper-resistant serial number, *Id.* § 16.03;

- is made of a metal that does not meet certain melting point, tensile strength, or density requirements, *Id.* § 16.04(1);

- lacks a safety device that prevents unauthorized use of the firearm, *Id.* § 16.05(1);

- lacks a mechanism to preclude an average five-year-old child from operating the handgun, including but not limited to a trigger resistance of at least a ten pound pull, an altered firing

---

[1] Since plaintiffs filed their FAC, Massachusetts has reorganized and altered some of its firearms laws, such that some of the citations here differ from those in the FAC. However, as relevant to this challenge, the Handgun Ban has not been materially changed since the filing of the FAC.

mechanism for which a five-year-old's hands would be too small to operate the handgun, or requiring a series of multiple motions to fire the handgun, *Id.* § 16.05(2); and

- lacks a load indicator or magazine safety disconnect, if it is a semiautomatic handgun, *Id.* § 16.05(3).

Separately, the Massachusetts legislature has imposed its own requirements on handgun sales by licensed dealers. These include requirements regarding the melting point, tensile strength, and density of metal firearm parts, whether the firearm has met certain testing requirements, and its barrel length. M.G.L. c. 140 § 123(o). The Commonwealth has established a "firearm control advisory board" that approves specific models of handguns for inclusion on the "Approved Firearms Roster" ("Handgun Roster") "using the parameters set forth in Section 123. M.G.L. c. 140, § 131 ¾; *see also*, 501 CMR 7.02–7.07; *Approved Firearms Roster*, COMMONWEALTH OF MASS., https://bit.ly/43blrla (last visited Jan. 4, 2024). Only firearms lawfully owned or possessed under a license issued before October 21, 1998, are exempt from complying with the requirements for inclusion on the Handgun Roster. M.G.L. c. 140, § 123.

Because of these distinct sets of regulations, even a firearm's inclusion on the roster does not necessarily mean it is permitted for sale. As the disclaimer on the Handgun Roster itself declares:

> Massachusetts licensed firearms dealers should note that the transfers of handguns are also subject to the Attorney General's Handgun Sales Regulations, 940 CMR 16.00, et seq. Firearms on this Approved Firearms Roster do not necessarily comply with the requirements of the Attorney General's Handgun Sales Regulations.

*Formal Target Shooting Firearms Roster*, COMMONWEALTH OF MASS. EXECUTIVE OFF. OF PUB. SAFETY & SEC. (June 2024), https://bit.ly/402KkQv. Enforcement Notice #3, from February 2002, featured on the Attorney General's website, further warns that "[i]f a handgun does not satisfy [its] three additional requirements," of including child-safety features, tamper-resistant serial numbers,

and (for semiautomatic handguns) a chamber load indicator, "then it is a violation of the regulations for a handgun purveyor to transfer that handgun even if the handgun is listed on the Approved Firearms Roster." *Enforcement Notice: Attorney General's Handgun Safety Regulation* at 6*, THE COMMONWEALTH OF MASS. OFF. OF ATT'Y GEN.*, https://bit.ly/46KlfN0 (last visited Jan. 4, 2024). This means that some popular firearms that are included on the Roster, like the Glock 19, are still illegal to sell in Massachusetts because they lack a chamber load indicator. *See id.* at 8 ("[T]he 'extractor indicator' device which [Glock] recently added to its handguns is not an effective load indicator and, therefore, does not comply with the handgun regulations.")

These provisions, collectively the "Handgun Ban," absolutely preclude a licensed seller from transferring any handgun *not* included on the Handgun Roster *and* any other handgun Defendants decide to prohibit from being transferred to typical law-abiding individuals. To acquire such a handgun in Massachusetts, ordinary law-abiding citizens are relegated to a secondary market of non-licensed transferors who necessarily deal in limited supplies. SOUMF No. 3.  And Massachusetts residents cannot simply look outside the Commonwealth borders to purchase or acquire any of the banned handguns because federal law requires the use of an in-state licensed dealer to facilitate any purchase or delivery of a handgun from an out-of-state seller, 18 U.S.C. §§ 922(a)(3), (a)(5). And, of course, the in-state dealer must fully comply with the Handgun Ban.

### III.    Effect on Plaintiffs

The handguns available for commercial sale to ordinary law-abiding citizens in the Commonwealth represent a fraction of the total number of models of commercially available handguns available in the United States that are in common use for self-defense and other lawful purposes. SOUMF No. 4. Indeed, the whole point of Defendants' maintenance of the Handgun Roster and requiring one or more "features" for inclusion on the Roster (e.g., chamber load

indicators or "childproofing protection" features) is to keep out of the market the many handguns lacking those features that are nevertheless in common use for lawful purposes around the country. SOUMF No. 4. For instance, the "childproofing protection" one such "childproofing" feature is a minimum ten-pound trigger pull, but many handguns in common use are not manufactured with such a heavy trigger pull, because it can cause "functional and operational problems," thus making a handgun *more* difficult to operate effectively. *See Firearms Examiner Training*, NAT'L INST. OF JUSTICE, https://bit.ly/4gT4eEy (last visited Jan. 4, 2024); SOUMF No. 6.

Plaintiffs Stefano Granata and Cameron Prosperi both hold licenses to carry firearms, Decl. SOUMF No. 7 (Granata Decl. at ¶ 3; Prosperi Decl. at ¶ 3), which allow them to lawfully purchase, own, and publicly carry firearms, including handguns. They both wish to acquire and keep for self-defense several makes and models of handguns widely sold and commonly owned across the country but they are forbidden from commercially acquiring in Massachusetts and would do so were it not for the Handgun Ban. SOUMF No. 8 (Granata Decl. at ¶ 4; Prosperi Decl. at ¶ 4). But for the Handgun Ban, Plaintiff Gunrunner, LLC, would make available for sale and sell to law-abiding citizens, like the individual Plaintiffs in this case, several dozen specific makes and models of handguns that are widely sold and commonly owned throughout the country yet forbidden for sale or transfer by licensed dealers in Massachusetts. SOUMF No. 9 (Costa Dep. 24:12–16; 32:14–33:17). Plaintiff Gunrunner would do so based on its knowledge of the handguns otherwise popular and widely available to the public and which their customers wish to purchase notwithstanding the Ban. SOUMF No. 10 (Costa Dep. 38:17–39:9).

Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a nonprofit organization incorporated under the laws of Delaware, whose essential purposes include defending and promoting the People's rights, especially those rights protected by the Second Amendment. SOUMF No. 11

(Combs Decl. at ¶¶ 2–4). Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs. SOUMF No. 12 (Combs Decl. at ¶ 5). Plaintiff FPC has members in Massachusetts, including Plaintiffs Granata, Prosperi, and Gunrunner. SOUMF No. 13 (Combs Decl. at ¶ 7). Plaintiff FPC is suing on behalf of its members, like the Individual Plaintiffs, who wish to acquire one or more of the banned handguns from a licensed retailer, like Gunrunner. SOUMF No. 14 (Combs Decl. at ¶ 7).

## ARGUMENT

### I. Standard of Review

"Summary judgment may be granted only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rodríguez-Cardi v. MMM Holdings, Inc.*, 936 F.3d 40, 46 (1st Cir. 2019) (internal quotations and citations omitted). "The test is whether, as to each essential element," when "view[ing] the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor," "there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.' " *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir. 1997) (last quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991). " 'If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.' " *DeNovellis*, 124 F.3d at 306 (quoting *Anderson*, 477 U.S. at 249–50).

## II.    The Handgun Ban is Unconstitutional as a Matter of Law.

Following *Bruen*, this Court must begin by assessing whether the Plaintiffs' proposed conduct—here, possessing common handguns that Massachusetts has barred from sale—is conduct covered by the "plain text" of the Second Amendment. If it is, the Handgun Ban is presumptively unconstitutional and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Unless the Commonwealth succeeds in doing so, the Handgun Ban is unconstitutional as a matter of law and Plaintiffs are entitled to judgment in their favor.

### A.    The Second Amendment's Plain Text Extends to Acquiring Handguns.

In this case, applying *Bruen*'s textual analysis is straightforward. The Supreme Court has already explained that the "arms" protected by the Second Amendment include "all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582. Indeed, given that *Heller*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and *Bruen* all dealt with restrictions on handguns, it is inarguable that the handguns Plaintiffs wish to acquire are "arms" within the meaning of the Constitution's "plain text."

To be sure, this case involves the predicate step of acquiring a firearm, not the bare possession of a firearm itself. But that is a distinction without a difference. The Supreme Court has now definitively established that the Second Amendment right to "keep and bear" arms protects both *owning* and *carrying* firearms, and it is obvious that in order to own a firearm, the "right must also include the right to *acquire* a firearm." *Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (*en banc*) (noting that the "right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (quotations omitted)); *Tony Kole & Ghost Indus., LLC v. Vill. of Norridge*, No. 11 C 3871, 2017 WL 5128989, at *9 (N.D. Ill. 2017) (this right "necessarily

includes the right to acquire a firearm"). Indeed, *Heller* explained that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.' " 554 U.S. at 582. And the same dictionaries on which *Heller* relied make clear that "hav[ing] weapons" includes acquiring them. *Id.* Samuel Johnson defined "have" as, most relevantly, "[t]o obtain; to enjoy; to possess" and "[t]o take; to receive." 1 SAMUEL JOHNSON, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated). Webster defined it as "[t]o gain; to procure; to receive; to obtain; to purchase." 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). "The right to keep arms," therefore, "necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *Heller* thus establishes that the Second Amendment's plain text covers Plaintiffs' right to "have" the "weapons" being banned. Acquisition is inherent in "having" something.

Interpreting the Second Amendment to cover acquisition of firearms accords with the Supreme Court's treatment of other fundamental constitutional rights. Indeed, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980); *see, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Rev.*, 460 U.S. 575, 586 (1983) (First Amendment prohibited a tax on the use of ink and paper used by newspapers); *Carey v. Population Servs. Int'l*, 431 U.S. 678, 687–88 (1977) (a total prohibition against sale of contraceptives would not only "intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use," but also "might have an even more devastating effect upon the freedom to choose contraception"). The Second Amendment also protects activities that are "concomitant" to the right's exercise, *see N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 590 U.S. 336, 364 (2020) (Alito, J., dissenting), because "without protection for these closely related rights, the

9

Second Amendment would be toothless," *Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring). And the most necessary concomitant right is the simple right to acquire a firearm.

The Handgun Ban, by preventing acquisition of unlisted models of handguns, therefore impacts activity falling within the "plain text" of the Second Amendment, or at the very least, within the necessary implication of the "plain text." The Commonwealth therefore bears the burden of proving it is consistent with our Nation's history of firearm regulation. It cannot carry that burden.

**B.    The Handgun Ban is Inconsistent with the Nation's History of Firearms Regulation.**

**1. Arms in Common Use Cannot Be Banned.**

Ordinarily, assessing whether a law that implicates the Second Amendment's plain text is constitutional requires reviewing the " 'historical tradition of firearm regulation' to help delineate the contours of the right," and determining, based on that history, "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024) (quoting *Bruen*, 597 U.S. at 17). This would, ordinarily, require analogizing the Handgun Ban to historical regulations, with particular attention paid to both "how" and "why" those historical regulations burdened the Second Amendment right, as a means of deducing an applicable historical principle. Plaintiffs say ordinarily, because in this case, the historical work has already been done, and binding Supreme Court precedent requires invalidating the Handgun Ban.

"Drawing from" America's "historical tradition," *Heller*, which just like this case, dealt with a ban on handguns, held that "the Second Amendment protects" arms that are "'in common use at the time.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). This conclusion followed from two historical traditions. First, in the Founding era, "when called for militia service able-

bodied men were expected to appear bearing arms supplied by themselves and of the kind *in common use at the time*." *Heller*, 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets omitted) (emphasis added). And simultaneously, *Heller* recognized that there had long been a recognized "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " 554 U.S. at 627 (quoting 4 BLACKSTONE 148-49 (1769). Of course, arms that are "in common use" are necessarily not "dangerous and unusual." Therefore, "the pertinent Second Amendment inquiry is whether [the arms at issue] are commonly possessed by law-abiding citizens for lawful purposes today." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (emphasis omitted); *see also* Mark w. Smith, *What Part of "In Common Use" Don't You Understand?: How Courts Have Defied* Heller *In Arms-Ban Cases—Again*, HARV. J. L. & PUB. POL'Y PER CURIAM (Sept. 27, 2023), https://tinyurl.com/2mn2mznc.

The Handgun Ban is straightforwardly unconstitutional under this principle. It is a *de facto* ban on the acquisition and possession of handguns that lack the required features. It is, therefore, in all relevant respects, the same type of restriction that was at issue in *Heller*. Residents of Massachusetts can only possibly acquire such handguns through unlicensed sellers, which effectively limits the market to secondhand firearms with no manufacturer's warranty and no safety guarantees that licensed dealers can offer. SOUMF No. 15. The secondary market also has an inherently limited selection of such firearms and the possibility that a specific desired firearm is actually available for purchase through an unlicensed seller is slim at best. SOUMF No. 16. And the scarcity of supply necessarily increases the purchase costs for any prohibited handguns that *might* be available on the secondary market. SOUMF No. 17.

The weapons banned are not "dangerous and unusual arms" which could be banned consistent with history. As the Supreme Court has now twice explained, "handguns . . . are

11

indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 629). Massachusetts should not be heard to argue that its ban is somehow different from the one at issue in *Heller* because it targets specific handguns instead of all of them, given that the Supreme Court has always assessed these arguments in categorical terms. For example, the *Heller* Court paid no special attention to the Colt Buntline nine-shot revolver that Dick Heller sought to possess in challenging the District of Columbia's handgun ban, and instead focused on the commonality of handguns *in general*. Similarly, in *McDonald*, the Court noted only that the plaintiffs "are Chicago residents who would like to keep handguns," without focusing on the *specific types* of handguns they may have sought. 561 U.S. at 750. And in *Bruen*, the Court cared only that the plaintiffs wanted to carry handguns, and that no "party dispute[s] that handguns are weapons 'in common use' today for self-defense." 597 U.S. at 32; *see also Renna*, 667 F.Supp.3d at 1061, *appeal pending*, 9th Cir. Case No. 23-55637 ("the arms at issue (semiautomatic pistols) are handguns, and handguns are 'indisputably in common use' today"); *accord Boland v. Bonta*, 662 F.Supp.3d 1077, 1084 (S.D. Cal. 2023), *appeal pending*, 9th Cir. Case No. 23-55276.

Because "handguns are the most popular weapon chosen by Americans" and therefore in common use, the *Heller* Court explained, "a complete prohibition of their use is invalid." 554 U.S. at 629. *McDonald* similarly invalidated a handgun ban when applying the Second Amendment to the states. Indeed, "*Heller* and *McDonald*" held "the handgun bans at issue in those cases . . . categorically unconstitutional." *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011). Justice Alito's concurrence in *Caetano* confirms this categorial approach to a ban on arms in common use. Concurring in the Court's *per curiam* opinion summarily reversing and remanding an opinion of the Massachusetts Supreme Judicial Court that upheld a ban on stun guns, Justice Alito reasoned

simply that "stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." *Caetano*, 577 U.S. at 420 (Alito, J., concurring).

Massachusetts should not be heard to argue that it bans only *some* handguns, rather than all of them. "The Amendment does not parse between types, makes and models of arms," *Renna*, 667 F.Supp.3d at 1061, and such an argument has no limiting principle—under such a rule, Massachusetts could restrict the sale of almost all firearms provided it leaves its residents certain State approved options. *Heller* emphatically rejected that reasoning when the District of Columbia suggested that its residents could still defend themselves with long guns, *see Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (noting that district "residents still have access to hundreds more" firearms that were not banned), because "the right to bear other weapons is 'no answer' to a ban on the possession of protected arms," *Caetano*, 577 U.S. at 421 (Alito, J., concurring) (quoting *Heller*, 554 U.S. at 629). California made this same argument in defending its roster-inclusion "safety" requirements, and the district court correctly rejected it. *Renna*, 667 F.Supp.3d at 1061–62 & n.8 (rejecting the State's argument that its roster "is not a categorical ban on *all* handguns like that in *Heller*, as Plaintiffs have available for purchase on the retail market hundreds of handguns on the roster," because that "runs headlong into *Heller's* admonition").

And even if this Court did analyze the Handgun Ban by looking only at the subset of handguns that have been proscribed (and to be clear, it should not do so), it would not make a difference. The specific handguns Massachusetts bans are among the most popular in the country. Take, for example, Glock handguns, mentioned above as specifically banned by Massachusetts for their lack of a chamber load indicator. Notwithstanding this point (and leaving aside that, in fact, many would disagree with Massachusetts' judgment that Glock handguns lack such an indicator),

Glocks are among the most popular firearms of any type in the country. *See* Guy J. Sagi, *Glock G19: A Top-Selling Pistol in 2020*, AM. RIFLEMAN (Jan. 21, 2021), https://bit.ly/4gEnLJe ("In 2020 the Glock G19 was the top-selling semi-auto pistol sold by FFLs using the services of GunBroker.com."); *see also Renna*, 667 F. Supp. 3d at 1063 (finding similar arms banned by California to be, as a group, in common use). They therefore cannot be banned, even if considered independently

Perhaps, it is theoretically possible that arms that lack the features that Massachusetts has identified could, one day, become obsolete and fall out of common use because people eventually choose the same firearms Massachusetts would prefer. *Cf. Bruen*, 597 U.S. at 47. But even if that were so, the critical point, which is clear from each of the Supreme Court's recent Second Amendment cases, is that Massachusetts has no authority to force some of the most popular firearms in the country into desuetude through legislation. Rather, it is the free choices of "the American people" that decide what is and is not constitutionally protected; Massachusetts does not even have a vote. *See Heller*, 554 U.S. at 629.

### 2. No Other Historical Principle Could Support the Handgun Ban.

Binding Supreme Court precedent therefore requires a finding that the Handgun Ban is unconstitutional. But even if Massachusetts attempts to demonstrate—in violation of *Heller* and *Bruen*—that some other historical tradition supports banning arms in common use, it will fail. To be sure, the First Circuit has recognized that history permits the banning of so-called "large capacity" magazines even though they are in common use, because, it concluded, "magazine capacity directly corresponds with lethality," *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024), and "banning them imposes no meaningful burden on the ability of Rhode Island's residents to defend themselves," *id.* at 45. But that reasoning—which was a preliminary

assessment of the legal merits of that case and not a final decision—has no applicability here, where the Supreme Court has already explained that handguns, including the popular handguns banned by Massachusetts, are the "quintessential self-defense weapon" and Massachusetts has no basis on which to claim the banned handguns are more susceptible to criminal misuse than non-banned firearms. *See Heller*, 554 U.S. at 629.

Assuming that the Commonwealth will nevertheless seek to find yet another historical tradition to support the Handgun Ban, the Court should note that in applying the historical analysis required by *Bruen* and *Heller*, the Supreme Court has provided guideposts for this Court to follow. First, while a "historical twin" is not required to find a modern law constitutional, the government must show the new law is "comparably justified" in both "how and why" it burdens the Second Amendment right. *Bruen*, 597 U.S. at 29; *Rahimi*, 602 at 692 (citing *Bruen*, 597 U.S. at 29). And that will be difficult, if not impossible to do, if the "challenged regulation addresses a general societal problem that has persisted since the 18th century" and the government cannot find a "distinctly" similar historical regulation addressing that problem." *Bruen*, 597 U.S. at 26. Second, when reviewing historical evidence, evidence from the Founding era, when the Second Amendment was ratified and applied to the federal government, controls. *See id.* at 34–35; *accord United States v. Daniels*, 77 F.4th 337, 348 (5th Cir. 2023) ("A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later."), *cert. granted, judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024); *Lara v. Comm'r Pa. State Police*, 91 F. 4th 122, 133–136 (3d Cir. 2024), *cert. granted, judgment vacated*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) (holding that 1791 is the most probative period when evaluating restrictions on carry by 18-to-20-year-olds); *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012) (calling 1791 the "critical year for determining the [Second] [A]mendment's historical meaning"). *Bruen*

was explicit that "not all history is created equal." 597 U.S. at 34; *see also id.* at 36–37 (Sources originating "'75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources.'" (quoting *Heller*, 554 U.S. at 614)). This is so because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them[.]" *Heller*, 554 U.S. at 634–35. The people adopted the Second Amendment in 1791, so the public understanding of the right around that time is crucial to understanding the content of the right. *Bruen*, 597 U.S. at 37; *see also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/3RRRSmD. Consequently, evidence that long pre- or post-dates 1791 is less probative, *Bruen*, 597 U.S. at 35–37, and laws from the 20th-century are categorically too late to matter. *Id.* at 66 n.28.

A "straightforward" application of the framework, focused on 1791 as the critical date, dispenses with any claim Massachusetts has to constitutional legitimacy. The Handgun Roster is putatively based in a desire to prevent the use of unsafe firearms in the Commonwealth (as judged by the Commonwealth and not her citizens), but accidents were well-known societal problems in the 18th century—including those involving children—and there is no evidence that anyone attempted to ban arms commonly chosen by law-abiding citizens in response. In fact, the only "safety" regulations to which Massachusetts has cited are "laws regulating the storage of gun powder," "laws keeping track of who in the community had guns," laws administering gun use in the context of militia service," "laws prohibiting the use of firearms on certain occasions and in certain places," and "laws disarming certain groups and restricting sales to certain groups." Mem. in Supp. of Defs.' Mot. to Dismiss, Doc. 15 at 12 (Aug. 20, 2021). Defendants will likely continue pushing these as relevantly similar analogues. On their face, however, none of them could be

considered remotely analogous to the Handgun Ban. To the extent such laws may bear any relation to the asserted public safety interests, this can only undermine any defense Massachusetts could mount because it is clear that the governments addressed those issues through materially different means and for materially different purposes.

Massachusetts has cited no other analogous law from the colonial or founding eras or any other evidence that governments addressed its claimed public safety interests in a materially similar way. The only other regulation it has cited is a single post-ratification law from 1821,[2] through which Maine required "any new, or unused musket, rifle or pistol barrel" to be "proved, marked, and certified" before being sold or offered for sale. LAWS OF THE STATE OF MAINE 546 (Calvin Spaulding ed., 1822). But again, nothing like that is analogous—much less "comparatively justified." Such "proving laws" did not restrict access to or possession of any firearm whatever, and the essential objectives of such laws are now addressed by modern-day product liability. *Bruen* held that "the historical record compiled by respondents d[id] not demonstrate a tradition," 597 U.S. at 38, where the respondents produced three colonial statutes, *id.* at 44–48, three late-18th-century and early-19th-century state laws that "parallel[] the colonial statutes," *id.* at 48–50, three additional 19th-century state laws, *id.* at 54–55, 64–65, five late-19th-century regulations from the Western Territories, *id.* at 66–67, and one late-19th-century Western State law, *id.* at 68–70. If *that* is not enough to establish a binding "tradition," surely a *single* post-ratification regulation cannot suffice—especially when it bears no resemblance to the law at issue.

---

[2] The Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37; *see also Gamble v. United States*, 139 S. Ct. 1960, 1975–76 (2019) (the relevant inquiry is "the public understanding in 1791 of the right codified by the Second Amendment," not 1868 when the Fourteenth Amendment was ratified); *see also Worth v. Jacobson*, 108 F.4th 677, 692–93 (8th Cir. 2024) ("*Bruen* strongly suggests that we should prioritize Founding-era history," i.e., when the Bill of Rights was adopted in 1791).

Even if the Commonwealth were to find additional examples of "proving laws," the clear lack of relevant similarity readily sets them aside. California proffered a handful of similar laws designed "to prevent 'introduct[ion] [of firearms] into use which are unsafe,' " in recently attempting to defend "safety" requirements for inclusion on its own handgun roster. *Renna*, 667 F.Supp.3d at 1067; *Boland*, 662 F.Supp.3d at 1086–87. However, as the district court in *Renna* observed, "[r]equiring the *testing* of firearms to ensure they fired safely without malfunctioning is significantly different from requiring manufacturers to *add* mechanical safety features to arms in common use that are indisputably safe and operate as designed for self-defense." *Renna*, 667 F.Supp.3d at 1067. And as the district court in *Boland* put it, "requiring each model of handgun to contain additional features to potentially help a user safely operate the handgun is completely different from ensuring that each firearm's basic features were adequately manufactured for safe operation." *Boland*, 662 F.Supp.3d at 1087. Both courts went on to hold that the plaintiffs were entitled to a preliminary injunction because California failed to show the roster criteria at issue (CLIs, MDMs, and microstamping) are consistent with the Nation's historical tradition of firearms regulations. *Renna*, 667 F.Supp.3d at 1055; *Boland*, 662 F.3d at 1092.

## CONCLUSION

Plaintiffs respectfully request this Court grant their motion for summary judgment.

Respectfully submitted,                     Dated: January 6, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
Email: Richard@chamberslawoffice.com

Jason A. Guida (BBO# 667252)
Principe & Strasnick, P.C.

Raymond M. DiGuiseppe (*Admitted Pro Hac Vice*)
The DiGuiseppe Law Firm, P.C.

David H. Thompson (*Pro Hac Vice Forthcoming*)
Peter A. Patterson (*Pro Hac Vice Forthcoming*)
William V. Bergstrom (*Pro Hac Vice Forthcoming*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

DATED: 1/6/25

<u>*/s/ Richard C. Chambers, Jr., Esq.*</u>
Richard C. Chambers, Jr., Esq.