UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, CAMERON PROSPERI,
THE GUN RUNNER, LLC, AND FIREARMS
POLICY COALITION, INC.,

                          Plaintiffs,

                 v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF THE
COMMONWEALTH OF MASSACHUSETTS,
AND TERRENCE M. REIDY, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE
EXECUTIVE OFFICE OF PUBLIC SAFETY
AND SECURITY OF THE COMMONWEALTH
OF MASSACHUSETTS,

                          Defendants.

CIVIL ACTION
NO. 1:21-cv-10960-DJC

LEAVE TO FILE UNDREDACTED
VERSION UNDER SEAL
GRANTED ON FEB. 3, 2025

LEAVE TO FILE 28-PAGE BRIEF
GRANTED ON FEB. 5, 2025

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

ANDREA JOY CAMPBELL
ATTORNEY GENERAL

Phoebe Fischer-Groban, BBO No. 687068
Grace Gohlke, BBO No. 704218
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2589
phoebe.fischer-groban@mass.gov
grace.gohlke@mass.gov

Dated: February 5, 2025

## <u>TABLE OF CONTENTS</u>

BACKGROUND ....................................................................................................... 1

    I.      Statutory and Regulatory Background ................................................. 1

           A.      The Attorney General's Regulations ........................................... 2

           B.      Codification of Section 123 and the Approved Firearms Roster ............... 3

    II.     Factual Background ........................................................................... 5

           A.      The Massachusetts Handgun Market ........................................... 5

           B.      Plaintiffs Stefano Granata, Cameron Prosperi, and The Gunrunner, LLC ...................................................................................... 6

           C.      Procedural History .................................................................. 7

ARGUMENT ........................................................................................................... 8

    I.      The Second Amendment Framework ................................................. 8

    II.     The Plaintiffs' Proposed Conduct Does Not Fall Within the Plain Text of the Second Amendment. ................................................................. 10

           A.      The Handgun Safety Regulations Do Not Infringe on the Plaintiffs' Individual Right to Keep and Bear Arms in Case of Confrontation and are Presumptively Lawful Conditions and Qualifications on the Sale of Arms........................................................................ 10

           B.      The Handgun Safety Regulations Are Not a "Ban" on a "Class of Arms" and "Common Use" Is Not the Governing Test........................... 13

    III.    The Handgun Safety Regulations Are Consistent with the Historical Tradition of Regulating Firearms for Public Safety. ........................... 16

           A.      Laws and Governmental Practices Requiring the Inspection or "Proving" of Firearms and Ammunition Are Relevantly Similar to the Handgun Safety Regulations.............................................. 17

           B.      Firearms and Gunpowder Safe Storage Laws Further Support the Constitutionality of the Handgun Safety Regulations. ..................... 23

           C.      Trap Gun Restrictions Are Yet Another Example of a Relevantly Similar Historical Tradition. ................................................... 25

           D.      Law Protecting Minors From the Dangers of Firearms Have a Long Historical Pedigree. ....................................................... 26

CONCLUSION ................................................................................................................28

CERTIFICATE OF SERVICE ........................................................................................30

## **TABLE OF AUTHORITIES**

No table of authorities entries found.

### **Statutes**

1763-1775 N.J. Laws 346, ch. 540, § 10 .............................................................. 25

1771-72 Mass. Province Laws 167, ch. 9 .............................................................. 24

1776 R.I. Pub. Laws 25 (Oct. Sess.) .................................................................... 20

1776-77 N.J. Laws 6-7, ch. 6 ............................................................................. 20

1794 Pa. Laws 764, ch. 337 .............................................................................. 20

1804 Mass. Acts. 111, ch. 81 ...................................................................... 18, 21n

1808 Mass. Acts 444, ch. 52 ....................................................................... 20, 21n

1820 N.H. Laws 274, ch. 25 .............................................................................. 20

1821 Me. Laws 546, ch. 162 .............................................................................. 18

1884 Mass. Acts. 57, ch. 76 .............................................................................. 26

Mass. Gen. Laws. ch. 93A, § 2(c) ........................................................................ 2

Mass. Gen. Laws. ch. 140, § 123 ............................................................. 1, 3, 4, 4n, 5

Mass. Gen. Laws ch. 140, § 123(o) ..................................................................... 2, 4

Mass. Gen. Laws ch. 140, § 123(o)(i) ..................................................................... 4

Mass. Gen. Laws ch. 140, § 123(o)(ii) .................................................................... 4

Mass. Gen. Laws ch. 140, § 123(o)(iii) ................................................................... 4

Mass. Gen. Laws ch. 140, § 128A .......................................................................... 5

Mass. Gen. Laws ch. 140, § 128B .......................................................................... 5

Mass. Gen. Laws ch. 140, 131¾ ........................................................................... 4n

Mass. Gen. Laws ch. 140, § 131¾(a) ...................................................................... 4

Mass. Gen. Laws. c. 140, § 131K ............................................................... 3, 3n, 4n

Records of the Colony of New Plymouth in New England: Laws, 1623-1682 ........................... 25

Resolution of the Maryland Council of Safety (Aug. 29, 1775,
    Archives of Maryland, 11:75) .................................................................................................. 18

Resolutions of the Pennsylvania Committee of Safety
    (Oct. 27, 1775, Col. Rec. Penn. 10:383) .............................................................................. 18

## **Regulations**

501 Mass. Code Regs. § 7.01 ..................................................................................................... 4

501 Mass. Code Regs. § 7.03(1) ............................................................................................... 4n

940 Mass. Code Regs. § 16.01 ................................................................... 1, 2, 2n, 3, 3n

940 Mass. Code Regs. § 16.03 ................................................................................................... 3

940 Mass. Code Regs. § 16.04 ................................................................................................... 5

940 Mass. Code Regs. 16.04(1) ................................................................................................. 2

940 Mass. Code Regs. 16.04(2) ................................................................................................. 2

940 Mass. Code Regs. 16.04(3) ................................................................................................. 2

940 Mass. Code Regs. § 16.05 ................................................................................................. 28

940 Mass. Code Regs. § 16.05(1) ............................................................................................... 3

940 Mass. Code Regs. § 16.05(2) ............................................................................................... 3

940 Mass. Code Regs. § 16.05(3) ............................................................................................... 3

940 Mass. Code Regs. 16.05(4) ................................................................................................. 3

940 Mass. Code Regs. § 16.06(1)-(3) ....................................................................................... 3n

## **Constitutional Provisions**

U.S. Const. amend. II ................................................................................................................. 8

## **Other Authorities**

Enforcement Notice #3: Attorney General's Handgun Sales Regulations
(940 CMR 16.00), February 2002 ................................................................. 5n

Jason E. Goldstick, Ph.D., Rebecca M. Cunningham, M.D., Patrick M. Carter, M.D.,
"Current Causes of Death in Children and Adolescents in the United States,"
N. Engl. J. Med. Vol. 386, No. 20 (Apr. 20, 2022) ................................................. 28n

National Archives, Washington's Sentiments on a Peace Establishment (May 1, 1783) ............. 19

U.S. General Accounting Office, *Accidental Shootings: Many Deaths
and Injuries Caused by Firearms Could be Prevented* 3 (1991) ............................................ 2n

Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW,
*"I didn't know the gun was loaded": an examination of two safety devices that
can reduce the risk of unintentional firearm injuries*, Journal of Public Health
Policy 20(4):427-440, 1999 ......................................................................... 23n

## INTRODUCTION

Together, the requirements for the commercial sale of handguns codified at Mass. Gen. Laws ch. 140, § 123, and the Attorney General's regulations, 940 Mass. Code Regs. §§ 16.01 *et seq.* (together, the "handgun safety regulations"), protect handgun users, their families, and other bystanders against accidental injury or death. Plaintiffs claim the handgun safety regulations violate the Second Amendment because the individual Plaintiffs cannot commercially purchase in Massachusetts every single handgun model available for sale elsewhere in the United States, even though each Plaintiff ███████████████████████████, could buy hundreds of models from dealers like the retailer Plaintiff, and could purchase additional models in a private sale.

The Court should enter summary judgment for Defendants on Plaintiffs' Second Amendment claim for all of three independent reasons. *First*, Plaintiffs' claim fails at step one of the test laid out in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), because the handgun safety regulations do not infringe their Second Amendment right to keep and bear arms in case of confrontation, and because the regulations are presumptively lawful conditions and qualifications on the commercial sale of arms. *Second*, Plaintiffs' proposed "common use" test has no application here, where the regulations do not "ban" an entire "class of arms." *Third*, even if the Court reaches *Bruen*'s second step, the handgun safety regulations are consistent with the Nation's historical tradition of firearms regulation, which includes robust governmental efforts since the Founding to test weapons for quality and safety, among other analogous traditions.

## BACKGROUND

### I.     Statutory and Regulatory Background

Two sets of requirements establish minimum safety standards for handguns sold by licensed retailers in the Commonwealth: (1) regulations promulgated by the Attorney General and

codified at 940 Mass. Code Regs. §§ 16.01 *et seq.*; and (2) statutory requirements at Mass. Gen.

Laws ch. 140, § 123(o), that form the basis for the Approved Firearms Roster.

A.    **The Attorney General's Regulations**

In 1997, pursuant to her authority under Mass. Gen. Laws ch. 93A, § 2(c), to "prevent the

deceptive or unfair sale or transfer of defective products which do not perform as warranted,"

*American Shooting Sports Council, Inc. v. Att'y Gen.*, 429 Mass. 871, 875, 711 N.E.2d 899, 902

(1999), the Attorney General promulgated a set of regulations deeming it an unfair or deceptive

trade practice for a "handgun-purveyor"[1] to "transfer"[2] a handgun within the Commonwealth that

is defective or lacks certain safety features. 940 Mass. Code Regs. §§ 16.01 *et seq.* (the "Attorney

General's regulations").[3]

First, handguns sold by retailers cannot be "made from inferior materials," meaning they

either must be made of materials that meet specified standards or must pass a performance test to

show the gun can be fired repeatedly with a limited number of malfunctions and without breaking.

*Id.* §§ 16.01; 16.04(1), (3). Next, the handgun must not be "prone" to repeated firing upon a single

trigger pull or to explosion. *Id.* § 16.04(2). The handgun must also pass a "drop test" to show it is

not "prone to accidental discharge." *Id.* §§ 16.01; 16.04(2). Further, the retailer must sell the

handgun with a "safety device" that when installed prevents the firing of the gun by an

---

[1] This memorandum uses the terms "handgun-purveyor," "retailer," and "dealer" interchangeably.

[2] "Transfer" is defined as "sell, rent, or lease" and excludes sales to firearm wholesalers who do not intend to sell the handguns to Massachusetts retailers or consumers. 940 Mass. Code Regs. § 16.01.

[3] The Attorney General's regulations came in the wake of a 1991 report by the United States General Accounting Office which found that two basic safety features—child proofing and a load indicator—could prevent one third of all accidental gun deaths in the United States. *See* U.S. General Accounting Office, *Accidental Shootings: Many Deaths and Injuries Caused by Firearms Could be Prevented* 3 (1991), https://www.gao.gov/assets/pemd-91-9.pdf.

unauthorized user. *Id.* § 16.05(1) (citing Mass. Gen. Laws ch. 140, § 131K).[4] The handgun must also have a form of childproofing, defined as any mechanism that "effectively precludes an average five year old child from operating the handgun when it is ready to fire." *Id.* § 16.05(2). For semi-automatic handguns, the regulations further require either a load indicator or a magazine safety disconnect. *Id.* §§ 16.05(3); 16.05(4).[5] Finally, handguns must have a tamper resistant serial number. *Id.* § 16.03.[6, 7]

The Attorney General's regulations do not apply to sellers who transfer fewer than five handguns per year, nor do they apply to transfers to "supply law enforcement officials … with handguns for their official duties." *Id.* § 16.01.

## B.    Codification of Section 123 and the Approved Firearms Roster

In 1998, the Legislature codified several overlapping provisions at Mass. Gen. Laws ch. 140, § 123, cl. 18-21, which were amended in 2024 and codified at Mass. Gen. Laws ch. 140,

---

[4] A list of safety devices approved by the Colonel of the Department of State Police as complying with § 131K is available at https://www.mass.gov/doc/approved-firearm-safetylocking-devices-11-14-2022/download. The seller is not required to install the device so long as the device is provided along with the firearm. Plaintiffs make no legal argument related to the "safety device" requirement and the Court should not consider that provision to be at issue.

[5] A "load indicator" is a "device which plainly indicates that a cartridge is in the firing chamber within the handgun." 940 Mass. Code Regs. § 16.01. A "magazine safety disconnect" is a "device that prevents the firing of the handgun when the magazine is detached from the handgun." *Id.*

[6] Plaintiffs make no legal argument related to tamper-resistant serial numbers and the Court should not consider that provision to be at issue. In any case, several federal courts have held firearms with obliterated serial numbers are not protected by the Second Amendment. *See, e.g.*, *United States v. Price,* 111 F.4th 392, 408 (4th Cir. 2024)*, petition for cert. pending* No. 24-5937; *United States v. Serrano*, 651 F. Supp. 3d 1192, 1210 (S.D. Cal. 2023) ("A law requiring that firearms have serial numbers simply does not infringe a law-abiding citizen's right to keep and bear arms[.]").

[7] In addition to these safety features, the regulations also require retailers to make certain disclosures at the time of sale. 940 Mass. Code Regs. § 16.06(1)-(3). Those disclosure provisions are not challenged in the Amended Complaint or Plaintiffs' summary judgment motion.

§ 123(o) ("Section 123").[8] Section 123 also prohibits retailers from selling certain handguns based on: the handgun's material composition or its ability to pass a firing test, *id.* § 123(o)(i); whether the handgun is prone to accidental discharge, as shown through a drop test, *id.* § 123(o)(ii); and whether the handgun is prone to repeated firing or explosion, *id.* § 123(o)(iii).

The Legislature directed the Secretary of the Executive Office of Public Safety and Security ("Secretary") to "compile and publish a roster" of handguns that meet Section 123's requirements. Mass. Gen. Laws ch. 140, § 131¾(a) (effective Oct. 2, 2024). This roster is known as the "Approved Firearms Roster." 501 Mass. Code Regs. §§ 7.01 *et seq.* As of its September 2024 update, the Approved Firearms Roster listed over 1,000 handgun models that meet Section 123's requirements.[9] *See* Ex. A to Dunne Decl. ("September 2024 Roster").[10] The September 2024 Roster includes handguns from 35 manufacturers, often with multiple models for each one. Between 2019 and 2024, approximately 113 firearms have been added to the Approved Firearms Roster. Defendants' Statement of Undisputed Material Facts ("DSMF") 1.[11]

---

[8] For the Court's convenience, copies of Mass. Gen. Laws ch. 140, §§ 123, 131¾, and 131K are included in the Addendum to this brief to reflect the October 2, 2024 amendments, which are not yet reflected on the website of the General Court of Massachusetts.

[9] A handgun may be placed on the Approved Firearms Roster "only after the Secretary has received a final test report from an approved independent testing laboratory" certifying that the handgun make and model meets the requirements of Section 123. 501 Mass. Code Regs. § 7.03(1). Thus, the fact that a particular handgun is not included on the roster could mean that it has failed the requisite testing, or it could mean that the requisite testing has never been performed or submitted to the Secretary.

[10] Also available at https://www.mass.gov/doc/approved-firearms-roster-92024/download.

[11] Handgun models that are the "functional design equivalent" of handguns that have already satisfactorily completed the testing requirements do not need to separately satisfy the testing requirements. 501 Mass. Code Regs. §§ 7.02, 7.03(1). Functional design equivalents are firearms "whose dimensions and material, as well as linkage and functioning of the magazine well, cylinder, barrel, chamber or any components of the firing mechanism" are the same, including larger or smaller calibers of the same model. *Id.* § 7.02.

Like the Attorney General's regulations, Section 123 does not regulate private sellers that transfer up to four guns per year, which are governed separately by Mass. Gen. Laws ch. 140, §§ 128A and 128B. The Attorney General's regulations related to childproofing, load indicators or magazine disconnect mechanisms, and tamper-resistant serial numbers have not been codified at Section 123 and so are not tested for inclusion on the Approved Firearms Roster.[12] But, to be sold by a retailer in Massachusetts, a handgun that appears on the roster also must comply with the Attorney General's regulations. 940 Mass. Code Regs. § 16.04. Of the models on the Approved Firearms Roster, over 500 handgun models (and likely more) also comply with the Attorney General's regulations. DSMF 2.

## II.    Factual Background

### A.    The Massachusetts Handgun Market

Massachusetts has a robust handgun market. In 2024, Massachusetts retailers reported 76,409 handgun sales. DSMF 3. In 2023, Massachusetts retailers reported 67,652 handgun sales. DSMF 4. In 2022, Massachusetts retailers reported 72,502 handgun sales. DSMF 5.

In addition to the commercial market, Massachusetts also has an active private market for handguns. In 2024, 16,051 private sales of handguns were reported in Massachusetts. DSMF 6. In 2023, 24,213 private sales of handguns were reported in Massachusetts. DSMF 7. In 2022, 20,813 private sales of handguns were reported. DSMF 8.

---

[12] *See* Enforcement Notice #3: Attorney General's Handgun Sales Regulations (940 CMR 16.00), February 2002, available at https://www.mass.gov/files/documents/2016/12/wg/ag-handgun-regulation-enforcement-notices.pdf, at 5-7.

### B.    Plaintiffs Stefano Granata, Cameron Prosperi, and The Gunrunner, LLC

The two individual Plaintiffs in this case, Stefano Granata and Cameron Prosperi, █████████

███████████████████████████████████████████████████████████████████

██████. DSMF 9-11.

████████████████████████████████████████████████████████████

██████████████████████████████████ DSMF 9. █████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████ DSMF 12. ██████████████████████

███████████████████████████████████████████████████████████████

DSMF 13. But for the handgun safety regulations, Granata would commercially purchase a Glock 19 Gen 5,  two Sig Sauer handgun models, possibly other Sig Sauer, CZ, and Smith & Wesson models, and also a Heckler & Koch handgun model, and a Walther handgun model. DSMF 14. Although the Glock would be his preferred carry weapon because it is compatible with a variety of parts, accessories, and holsters, he has not tried to purchase it in the private market. DSMF 15. Granata wishes to purchase the Sig Sauer models as collector's items; he does not intend to carry or shoot either gun. Granata Dep. 62-63.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████ [13] DSMF 10-11, 18. █████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[13] ████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████ DSMF 19-20. ███████████████████████████████

████████████████████████████████████████ DSMF 21.[14] ████████████

█████████████████████████████████████████████████████████████

█████ DSMF 24. But for the handgun safety regulations, Prosperi has identified at least eight additional handgun models from CZ, Beretta, and Atlas Gunworks, that he wishes to purchase from retailers in Massachusetts. DSMF 25.

In 2023 alone, Plaintiff The Gunrunner, LLC (the "Gunrunner"), a retailer located in Middleborough, sold 1,074 firearms, including about 700 handguns, spanning 15-30 different brands and multiple models across each brand. DSMF 26. The Gunrunner keeps about 300 handguns in stock at any given time, representing about 30-35 different model of handguns, from 15-20 brands. DSMF 27. "More often than not," customers who wish to purchase handgun models that cannot be sold by retailers instead purchase another handgun model that is authorized for commercial sale. DSMF 28. The Gunrunner sells handgun models to meet different self-defense related requirements, such as models more suited for individuals with different sized hands or with conditions like arthritis or neuropathy. DSMF 29.

### C.    Procedural History

Plaintiffs filed their initial complaint in June 2021. ECF No. 1. In May 2022, the Court allowed the Defendants' motion to dismiss under the then-prevailing interest-balancing approach for Second Amendment claims. ECF Nos. 24-25. Shortly after Plaintiffs filed their notice of appeal, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), which set forth the current framework for Second Amendment claims. After argument, the

---

[14] ███████████████████████████████████████████████████████

███████████████████████ DSMF 22-23.

U.S. Court of Appeals for the First Circuit vacated this Court's judgment, and remanded for this Court to apply *Bruen* in the first instance. ECF Nos. 32-33. Plaintiffs filed their First Amended Complaint in September 2023, ECF No. 34, and the parties completed fact and expert discovery in November 2024. Plaintiffs' motion for summary judgment followed. ECF Nos. 61-68.

## ARGUMENT

On cross-motions for summary judgment, the court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (citation omitted).

## I.    The Second Amendment Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held the Second Amendment protects an individual right "to possess and carry weapons in case of confrontation" and that a "ban on handgun possession in the home violates the Second Amendment[.]" *Id.* at 592, 635. Two years later, the Court ruled that the Second Amendment applies to the States, striking down ordinances that likewise banned handgun possession. *McDonald v. City of Chicago*, 561 U.S 742, 750 (2010).

*Heller* made clear, though, that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. "[N]othing in our opinion," the Court emphasized, "should be taken to cast doubt on … laws imposing conditions and qualifications on the commercial sale of arms," among other "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. The Court "repeat[ed] those assurances" in *McDonald*, 561 U.S. at 786 (plurality), and

favorably cited *Heller*'s reference to "presumptively lawful" measures more recently in *United States v. Rahimi*, 602 U.S. 680, 699 (2024).

Following *Bruen*, Second Amendment challenges now involve two inquiries. *Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38, 43 (1st Cir. 2024), *petition for cert. pending*, No. 24-131. First, courts ask whether the Second Amendment's "plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If it does not, "the regulated activity is categorically unprotected." *Id.* at 18. Second, if the conduct is covered by the plain text, courts ask if the government has met its burden to show the restriction nevertheless "is consistent with the principles that underpin our regulatory tradition" of firearms regulation. *Rahimi*, 602 U.S. at 692. To do so, courts reason by analogy to "ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Id.* (citing *Bruen*, 597 U.S. at 29). "[A]t least two metrics" are "*central* considerations" in analyzing whether historic and modern regulations are relevantly similar: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. The Court explained that in some cases, this inquiry would be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 26. By contrast, in cases involving "unprecedented societal concerns" or "dramatic technological changes," a "more nuanced approach" is appropriate. *Id.* at 27, 30.

This analysis does not demand a "historical twin" or a "dead ringer" to modern regulations. *Rahimi*, 602 U.S. at 692. Indeed, *Rahimi* cautioned that "some courts have misunderstood the methodology" laid out in *Bruen* by insisting on "a law trapped in amber." *Id.* at 691. Properly understood, the Second Amendment "permits more than just those regulations identical to ones" in our nation's early history. *Id; see also id.* at 740 (Barrett, J., concurring) ("[h]istorical regulations reveal a principle, not a mold"). And even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the

lawfulness of such prohibitions," a court can "assume it settled" that the restriction is "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30.

## II.    The Plaintiffs' Proposed Conduct Does Not Fall Within the Plain Text of the Second Amendment.

### A.    The Handgun Safety Regulations Do Not Infringe on the Plaintiffs' Individual Right to Keep and Bear Arms in Case of Confrontation and are Presumptively Lawful Conditions and Qualifications on the Sale of Arms.

Plaintiffs[15] have not demonstrated that "the Second Amendment's plain text covers" their proposed conduct, for two independently sufficient reasons. *Bruen*, 597 at 17. First, the handgun safety regulations do not infringe Plaintiffs' individual rights to own and bear arms in case of confrontation. *See Heller*, 554 U.S. at 592. Second, the handgun safety regulations are presumptively lawful "conditions and qualifications on the sale of arms" that do not meaningfully impair Plaintiffs' ability to access firearms. *Id.* at 626-27 & n.26.

The handgun safety regulations regulate conduct—which handgun models are commercially available for sale—that is only ancillary to, or one step removed from, the "individual right to possess and carry weapons in case of confrontation" protected by the plain text of the Second Amendment. *See id.* at 592; *see also Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) ("Second Amendment allows a 'variety' of gun regulations").[16] When looking at the

---

[15] Retailer the Gunrunner does not have its own rights under the Second Amendment. *See Teixeira v. County of Alameda*, 873 F.3d 670, 683-87 (9th Cir. 2017) (en banc). The Second Amendment "does not confer a freestanding right [upon retailers], wholly detached from any customer's ability to acquire firearms." *Id.* at 682. Although *Teixeira* is a pre-*Bruen* case, the Ninth Circuit recently affirmed that because its holding in *Teixeira* "was based on the type of text-and-history analysis mandated by the Supreme Court in *Heller*, and *Bruen*, it remains good law." *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 n.18 (9th Cir. 2024).

[16] The handgun safety regulations are further removed from the individual right guaranteed by the Second Amendment because they depend on firearm manufacturers submitting their firearms for testing and adding specific safety features. Many models may be excluded from what retailers may sell simply because the manufacturer has unilaterally decided not to

(footnote continued)

plain text of the Second Amendment under *Bruen*, the question is not "whether the regulation affects firearms in some way, but whether the regulation infringes the right to own and bear arms in case of confrontation." *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1196 (6th Cir. 2024), *cert. denied*, No. 24-178 (U.S. Nov. 25, 2024); *see also B & L Prods.*, 104 F.4th at 118 ("Ancillary rights are protected to the extent necessary to serve [self-defense] purposes; otherwise, the Second Amendment is not implicated by restraints on such rights.").

The plain text simply does not protect Plaintiffs' proposed course of conduct here, which is the ability to commercially purchase a dozen handgun models sold elsewhere in the United States, and that are also potentially available in the private market in Massachusetts.[17] The handgun safety regulations in no way regulate their ability to lawfully possess and carry any ██████ ████ handguns for self-defense in Massachusetts. █████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ *See supra* at pp.6-7. Plaintiffs have not shown that purchasing the additional weapons they desire, much less from retailers specifically, rather than in the private market, is "necessary to effectuate their Second Amendment rights" to carry a weapon in case of confrontation. *See Oakland Tactical*, 104 F.4th at 1198.[18] Nor have they shown that the

---

submit it for testing, or to add safety features, perhaps because Massachusetts is not an important sales market, or for other business-related reasons.

[17] The meaning of the plain text is also informed by the historical understanding of the Second Amendment, *see Bruen*, 554 U.S. at 20, and here, amassing a large collection of weapons would have been "deeply alien" in the colonial era, when only a very small percentage of gun owners owned multiple guns. Expert Report of Brian DeLay, Ex. D to Gohlke Decl. ("DeLay") ¶ 9. Those that owned more than five guns did so for a distinct utilitarian, and non-consumerist purpose. One study of probate records showed that over two-thirds of gun owners with more than five guns were slaveholders; all gun owners with more than ten guns ran vast slaveholding enterprises. DeLay ¶ 9.

[18] Indeed, Granata wishes to purchase two arms not for self-defense, but rather as collector's items that he does not intend to carry or shoot. Granata Dep. 62-63.

handgun safety regulations inhibit them from acquiring handguns at all; ████████████ ████████████████████████████████████████████████████████████ *See Teixeira*, 873 F.3d at 680 (firearm retailer failed to state claim that ordinance prohibiting firearm retailer in specific location "meaningfully inhibits residents from acquiring firearms within their jurisdiction"). Thus, Plaintiffs have failed to demonstrate their proposed conduct falls under the plain text of the Second Amendment.

The Plaintiffs' Second Amendment claim also fails at step one of the *Bruen* analysis because the handgun safety regulations are "presumptively lawful" "conditions and qualifications on the commercial sale of firearms." *See Heller*, 554 U.S. at 626-27 & n.26; *McDonald*, 561 U.S. at 786 (plurality opinion); *Bruen*, 554 U.S. at 80-81 (Kavanaugh, J., concurring). When assessing a condition or qualification on the sale of firearms at step one, courts should consider whether the state regulation "meaningfully impairs [the Plaintiffs'] ability to access firearms." *B & L Prods.*, 104 F.4th at 119. As other courts have explained, "'the Second Amendment does not elevate convenience and preference over all other considerations,' nor does it 'guarantee[] a certain type of retail experience.'" *Id.* (quoting *Teixeira*, 873 F.3d at 680 & n.13).

The handgun safety regulations are conditions and qualifications on the commercial sale of firearms: they require that handguns commercially sold in Massachusetts are not defective; are accompanied by safety mechanisms; have childproofing features; and have tamper-resistant serial numbers. They apply only to retailers, not to individuals who sell fewer than four firearms a year. And they do not prohibit or restrict possession or carrying of a handgun, including a handgun that may not be commercially sold in Massachusetts. *See* Section I of Background, above.

Plaintiffs have not identified any evidence to rebut the presumptive lawfulness of the handgun safety regulations. For example, they have not shown that the handgun safety regulations are being employed for "abusive ends," or that they result in a *de facto* ban on the sale of handguns

in Massachusetts. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 127-28 (10th Cir. 2024) (explaining that conditions and qualifications on commercial sale of firearms are presumptively outside Second Amendment unless put to "abusive ends"); *see also McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024) ("condition or qualification" resulting in 10-day wait to purchase firearm not lengthy enough to qualify as one "put towards abusive ends" or *de facto* prohibition on possession). Here, there are at least 500 handgun models that licensed retailers in Massachusetts may sell, and it is undisputed that, in fact, retailers sell tens of thousands of handguns each year, and that tens of thousands more handguns are available on the private market. ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ Thus, because the handgun safety regulations do not meaningfully constrain Plaintiffs' individual rights to keep and carry a firearm in the event of a confrontation, the handgun safety regulations are lawful conditions and qualifications on the sale of firearms, and the Court should allow summary judgment for the Defendants. *See Heller*, 554 U.S. at 626-27 & n.26; *Bruen*, 554 U.S. at 80-81 (Kavanaugh, J., concurring).

**B.    The Handgun Safety Regulations Are Not a "Ban" on a "Class of Arms" and "Common Use" Is Not the Governing Test.**

Plaintiffs mistakenly urge this Court to apply an overly broad version of the "common use" test derived from *Heller* and circumvent any further analysis. Br.10-14. While the contours of the "common use" test are being tested in the lower courts, *see e.g.*, *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) ("Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms."), *petition for cert. pending sub nom. Snope v. Brown*, No. 24-203,[19] this Court need not wade into that analytical territory here. Where

---

[19] For further discussion of the historical flaws in the proposed "common use" test, as well as the related "dangerous and unusual" test, see Expert Report of Saul Cornell, Ex. C to

(footnote continued)

a regulation does not prohibit, either explicitly or in practice, the possession or use of "an entire class of 'arms,'" *see Heller*, 554 U.S. at 628, the "common use" inquiry does not apply.

*Heller* held that a government may not prohibit possession "of an entire class of 'arms' that is overwhelmingly chosen by American society for [the] lawful purpose [of self-defense]." *Id.* at 628. *Heller* relied in part on the historical fact that, during the colonial period, individuals called for militia service "were expected to appear bearing arms supplied by themselves and *of the kind* in common use at the time." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (emphasis added). *Heller*'s reference to "common use" thus distinguished some "kinds" of weapons, like handguns, from other "kinds" of arms, such as short-barreled shotguns or fully automatic rifles, that receive *no* Second Amendment protection. *Id.* at 624-25, 627. While *Heller* held that handguns, as "an entire class of 'arm,'" cannot be banned, it said nothing about lesser restrictions that may affect some handguns in some manner, explicitly noting that states retain "a variety of tools" for addressing concerns related to firearms, "including some measures regulating handguns." *Id.* at 628, 636.

The handgun safety regulations are distinguishable from the total possession ban in *Heller* on any number of grounds, most saliently: (1) the regulations do not restrict possession in any way, only commercial sale, *see supra* at pp.1-5; (2) handguns, as a "kind" of arm, remain widely available for commercial sale in Massachusetts, *see supra* at p.5; (3) even the models of handgun that may not be sold commercially can be sold on the private market, which is an active part of the

---

Gohlke Decl. ("Cornell"), ¶¶ 47-50. *Rahimi* correctly cited that historical sources often used the disjunctive "dangerous *or* unusual" formulation. *See* 602 U.S. at 681, 697. Sources that used the conjunctive "and" were employing a rhetorical structure that translates in modern grammar to "unusually dangerous." Cornell ¶¶ 45-46.

Massachusetts gun market, *see supra* at p.5;[20] and (4) the individual Plaintiffs here make no claim that they are unable to adequately arm themselves with handguns for self-defense, nor is the Gun Runner unable to sell handguns suitable for their customers' self-defense needs, *see supra* at pp.6-7. While a state regulation of handgun models could be so encompassing that it constitutes a *de facto* ban, *see* Br.11, 13, that is not the case here, where the record contains undisputed evidence of a robust handgun market in Massachusetts ████████████████████████████████████.

Finally, as an alternative to their primary argument that *Heller* categorically compels judgment in their favor, Plaintiffs argue this Court could rule in their favor because "[t]he specific handguns Massachusetts bans are among the most popular in the country." Br.13. This fails on multiple fronts. First, Plaintiffs fail to support that statement with an evidentiary showing—they point to only one handgun manufacturer, Glock, and cite to a single news article from 2020 about sales information, without any authentication of the underlying factual data. Br.14.[21] Second, the First Circuit has squarely rejected a "popularity test" approach to Second Amendment protection. *See OST*, 95 F.4th at 50-51 ("Despite plaintiffs' fixation on [] ownership rates . . ., such statistics are ancillary to the inquiry the Supreme Court has directed us to undertake.").[22] And, as other courts assessing "common use" arguments in various contexts have recognized, that proposed

---

[20] Plaintiffs characterize the private market as "necessarily" more expensive than the dealer market, but they make no citation to the record and so do not establish this fact. *See* Pls. SOUMF 17. Indeed, deposition testimony contradicts that blanket characterization. *See* DSMF 23 ████████████████ DSMF 12 (████████████████████████████

[21] In any case, the record contains undisputed evidence that Glocks are part of the Massachusetts handgun market. *See* DSMF 30. ████████████████████ DSMF 19, ████████████████████████████████████ DSMF 21.

[22] Plaintiffs also repeatedly cite Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411, 412-22 (2016), *see* Br.11, 12-13, but the First Circuit has rejected over-reliance on that same opinion, which is not "binding authority." *See OST*, 95 F.4th at 51.

approach would illogically allow manufacturers to control the scope of constitutional protection. *E.g., Bianchi*, 111 F.4th at 461 ("We decline to hold that arms manufacturers can secure constitutional immunity for their products so long as they distribute a sufficient quantity before legislatures can react."). Here, deference to manufacturers' sales numbers is particularly inappropriate because compliance with the handgun safety regulations is squarely within those same manufacturers' hands. Manufacturers should not be able to rely on their marketing success elsewhere to skirt basic and attainable safety regulations meant to protect handgun owners and their families in Massachusetts.

Where, as here, a state enacts a regulation that does not regulate possession and preserves the state's robust commercial and private handgun market, Plaintiffs cannot simply label the regulation a "handgun ban" to circumvent the full analysis required by *Heller, Bruen* and *Rahimi*.

## III.    The Handgun Safety Regulations Are Consistent with the Historical Tradition of Regulating Firearms for Public Safety.

Even if this Court were to conclude that the history-and-tradition inquiry is necessary here (and, for the reasons set forth above, it should not), the handgun safety regulations easily pass constitutional muster. Massachusetts, like many other states, has long had laws in place to reduce the dangers posed by firearms and ammunition. Below, Defendants summarize several categories of historical traditions analogous to the modern regulations. The first category of "proving" laws and practices alone provides robust evidence of a "relevantly similar" tradition to the modern handgun safety regulations. *Bruen*, 597 U.S. at 29. But if there were any doubt, additional categories of historic laws provide further "relevantly similar" analogs, including firearm and

gunpowder storage laws, laws banning "trap guns," and laws to reduce minors' access to dangerous weapons.[23]

### A.    Laws and Governmental Practices Requiring the Inspection or "Proving" of Firearms and Ammunition Are Relevantly Similar to the Handgun Safety Regulations.

For as long as firearms have existed, so too have governmental efforts to ensure quality control and safety in order to address the dangers of firearm accidents and to ensure their fitness for their intended purpose. Expert Report of Brennan Rivas, Ex. B to Gohlke Decl. ("Rivas") ¶ 13 (noting early modern English and French rules for "testing the strength of barrels"). Indeed, government-mandated safety testing in America was not only widely accepted, but it "ultimately helped American gun manufacturers innovate and become the international leader in firearms production by the middle of the nineteenth century." Expert Report of Lindsay Schakenbach Regele, Ex. A to Gohlke Decl. ("Regele") ¶ 9. While a "historical twin" is not required, *Rahimi*, 602 U.S. at 701, "proving" and inspection laws and practices at both the state and federal levels come remarkably close to a "twin" given the differences in technology and historical context.

In 1805, fourteen years after the Second Amendment's ratification, Massachusetts enacted a law requiring the "proof," or satisfactory inspection, of all firearms manufactured within the Commonwealth before they could be sold. Rivas ¶ 14; Cornell ¶ 20. The law was enacted because, absent such legislation, "many [Firearms] may be introduced into use which are unsafe and thereby

---

[23] Although the Supreme Court has left open whether a court should "primarily" look to Founding-era or Reconstruction-era history, *Rahimi*, 602 U.S. at 692 n.1, lower courts have looked to both sources. *E.g.*, *Antonyuk v. James*, 120 F.4th 941, 972-74 (2d Cir. 2024) ("[T]he prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."). *Heller* and *Bruen* examined both eighteenth- and nineteenth-century statutes and case law, *see Heller*, 554 U.S. at 600-19; *Bruen*, 597 U.S. at 46-70, and *Heller* called post-ratification history a "critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605; *see also Rahimi*, 602 U.S. at 725 (Kavanaugh, J., concurring). The First Circuit has likewise held nineteenth- and even twentieth-century regulations can "provide insight as apt historical precursors" in Second Amendment cases. *OST*, 95 F.4th at 51-52.

the lives of the Citizens be exposed." 1804 Mass. Acts. 111, ch. 81, Add.41-43.[24] The law authorized the appointment of "provers of fire arms," "whose duty it shall be to prove all Musket Barrels and Pistol barrels[.]" *Id.* § 1, Add.41. The law specified in detail the manner in which provers were to test and inspect the weapons, and the stamp to be affixed if the weapons passed inspection. *Id.* Weapons that failed this inspection, such that they were "unfit for use," were returned to the owner, and they could not be sold in the Commonwealth. *Id.* §§ 1, 3, Add.41-42.[25] Maine passed a similar law in 1821. 1821 Me. Laws 546, ch. 162, Add.53.

These state laws mirrored a Revolutionary tradition of colonial governing bodies requiring the "proving" of militia weapons. *See, e.g.*, Resolution of the Maryland Council of Safety (Aug. 29, 1775, Archives of Maryland, 11:75), Add.25-26 (approving purchase of "proved" muskets); Resolutions of the Pennsylvania Committee of Safety (Oct. 27, 1775, Col. Rec. Penn. 10:383), Add.27-29 (directing commissary to "prove all the Muskets made in this City for the Provincial Service"). George Washington notably was concerned with the quality of arms brought by militia members, complaining in 1776 that "of Arms those brought in by the Soldiers are So very indifferent that I Cannot place Confidence in them." DeLay ¶ 18. And this concern persisted after the war—in a letter to Congress in 1783, Washington recommended that militia members be regularly mustered and trained, and "have their Arms and Accoutrements inspected at certain

---

[24] For the Court's convenience, the historical sources directly cited in this brief are included in an Addendum. The expert reports attached to the Affidavit of Grace Gohlke contain additional historical citations, incorporated here by reference. The court may take judicial notice of the existence and content of historical laws and cases. *See Berrios-Romero v. Estado Libre Asociado de Puerto Rico*, 641 F.3d 24, 27 (1st Cir. 2011) ("The law of any State of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof.") (citation omitted).

[25] This law was amended in 1814 to add additional requirements, 1814 Mass. Acts 464, ch. 192; Add.47-49; and then revised again in 1837 and 1859, Cornell ¶ 20 n.25.

appointed times, not less than once or twice in the course of every year." National Archives, Washington's Sentiments on a Peace Establishment (May 1, 1783).[26]

As the American government became more involved in promoting domestic gun manufacturing in the early to mid-nineteenth century, the federal government imposed "federal standards" requiring that all gun parts "pass regular inspection." Regele ¶ 17. These inspection regimes, which also form part of the American tradition of firearms regulation, applied directly to federal armories, as well as to private armories that supplied army and militia weapons. Regele ¶ 8. By 1818, the federal government's Ordnance Department "mandated that all contract arms be examined by a government proof-master, who would verify that all 'contractors' arms be equal to those produced at the national armories.'" Regele ¶ 18. And this inspection requirement was enforced—condemned barrels were "discarded" or might be auctioned for parts. Regele ¶ 20.

Federal quality and safety testing of firearms continued into the 1830s, when military officers rejected such arms as Samuel Colt's new revolver after testing in 1837 showed the weapon's "liability to accidents." Regele ¶ 25. Later testing of Colt's carbine (short rifle) models involved ten experiments designed to test the firearm's performance under various conditions, including when "slung to a man mounted, who galloped rapidly for a mile, the piece swinging against the side of the horse." Regele ¶ 26. When testing showed certain safety risks, such as "the possibility of two or more chambers going off at the same time," Colt "improved the safety and practicality of his firearms" and eventually secured government contracts for his improved carbines in 1841. Regele ¶ 26. It was thus well-accepted in colonial and early America that states

---

[26] https://founders.archives.gov/documents/Washington/99-01-02-11202.

and the federal government had the authority to ensure through a testing process that weapons would perform as intended and did not pose a heightened risk of accidental harm.[27]

Furthermore, state laws requiring the proving and inspection of gunpowder, which had a direct impact on the ability to use firearms,[28] were prevalent starting in the Founding era and "stretched across the country." Rivas ¶ 15. *See, e.g.,* 1776 R.I. Pub. Laws 25 (Oct. Sess.), Add.30-31; 1776-77 N.J. Laws 6-7, ch. 6, Add.32-34; 1820 N.H. Laws 274, ch. 25, Add.50-52. For example, a 1794 Pennsylvania law mandated a specific device for proving gunpowder. 1794 Pa. Laws 764, ch. 337, Add.35-40. The measure sought to protect "the purchaser and consumer" against "inferior" gunpowder, both "imported from abroad, and manufactured within this state," whose "defects" may not be "discovered until brought into actual use." *Id.* In Massachusetts, an 1809 law set requirements for the quality and composition of gunpowder; authorized appointed provers to mark as "condemned" gunpowder that failed inspection; and forbade the sale of condemned or uninspected gunpowder. 1808 Mass. Acts 444, ch. 52, Add.44-46.

These inspection laws and practices are "relevantly similar" to the handgun safety regulations in the "central" ways that matter under *Bruen*: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense," i.e. the "how," and "whether that burden is comparably justified," i.e. the "why." *Bruen*, 597 U.S. at 29. Starting with the "how," the court looks at "how a regulation actually burdens the right of armed self-defense, not how it might be imagined to impose such a burden." *OST*, 95 F.4th at 45. Like the historical

---

[27] To the extent Plaintiffs may argue federal patronage is distinguishable from the modern regulations because it addressed the military, rather than civilian, market, those distinctions were less meaningful in colonial and early America, when militias were comprised of civilians and weapons were not strictly divided by military or civilian use. Regele ¶ 10; DeLay ¶ 19.

[28] Until the mid-nineteenth century, "firearms had to be muzzle-loaded with gunpowder and ball before every shot[.]" DeLay ¶ 10.

laws, the modern regulations impose sales restrictions based on whether a weapon has passed particular safety tests, but do not limit residents' ability to keep and carry weapons for self-defense—the record reflects that Massachusetts residents have access to a broad array of handguns for self-defense, capable of serving gun owners with varied needs. *See supra* at pp.5-7. And the "why" is also relevantly similar: like the handgun safety regulations, the historical proving laws and governmental inspection practices aimed to eliminate the dangers of weapons and gunpowder that were unfit for their intended purpose and liable to cause preventable accidents. The handgun safety regulations reflect modern technology that addresses these same basic concerns that have existed since the Founding. *See Rahimi*, 602 U.S. at 692 (analogical reasoning applies "the balance struck by the founding generation to modern circumstances").[29]

Although not all States passed firearms proving laws like Massachusetts and Maine, *see* Br.17, it is not surprising that proving laws originated in Massachusetts, which was home to significant firearms manufacturing.[30] Massachusetts's Springfield Armory, which began production in 1795, was one of two official armories for the federal government. Regele ¶ 11. While the Springfield Armory was exempt from the Massachusetts law because it had its own exacting quality control requirements, its location was significant in the development of American firearms manufacturing. Cornell ¶¶ 19-20. To supplement the armories, the federal government

---

[29] Plaintiffs' argument that "proving" laws are not analogous because they "did not restrict access to or possession of any firearm whatever," Br.17, is incorrect. Like the modern regulations, several historic laws prevented the sale of weapons and ammunition deemed unsafe, *e.g.* 1804 Mass. Acts. 111, ch. 81 § 3 (Add.42); 1808 Mass. Acts 444, ch. 52, §§ 7-9 (Add.46), and to the extent the historic laws did not "restrict" possession, neither do the modern regulations. Plaintiffs' claim that "the essential objectives of such laws are now addressed by modern-day product liability," Br.17, is also wrong. The point of proving laws was to *avoid* harms caused by unsafe products, not to compensate victims of avoidable injuries after the fact.

[30] Massachusetts was also more heavily armed than many other states. Cornell ¶ 26; DeLay ¶ 14 (New England more armed than other regions in colonial period). Massachusetts gun regulation is thus particularly instructive when looking at the early American period.

"subsidized production in private armories," many of which were located close to Springfield. Regele ¶¶ 12, 14. Gun manufacturing remained concentrated in this area for decades—seven of the eight companies from which the U.S. military purchased weapons during the Civil War were within 100 miles of the Springfield Armory. Regele ¶ 31. And because the federal government was the most significant patron of early American firearms, Regele ¶ 8, it is unsurprising that most regulation of quality control happened via federal patronage, rather than state law.

In any event, even where "the historical record yields relatively few" examples of a particular type of restriction, if there were "no disputes regarding the lawfulness of such prohibitions," then a court can "assume it settled" that the restriction could be imposed "consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. Defendants found no indication of any challenge to the lawfulness of these firearms or gunpowder proving laws, much less any court ruling deeming them to violate the right to keep and bear arms. This is unlike *Bruen*, where the Court held that a "single state statute" could not support New York's broad ban on public carry because that restriction had such a significant burden on individual self-defense and contradicted the weight of other evidence. *Id.* at 65-66; *see* Br.17-18. Here, by contrast, the burden on self-defense is *de minimis* and the regulations correspond directly with an unchallenged historical tradition of safety-oriented quality control approved by George Washington himself and exemplified across a wide variety of state laws and federal practice.

Finally, Plaintiffs argue the proving laws are not sufficiently analogous to the Attorney General's regulatory requirements mandating certain safety features, even if—as Plaintiffs appear to concede—the laws may be analogous to the modern regulations' testing requirements. Br.18.[31]

---

[31] The two California district court cases Plaintiffs cite, Br.18, should not guide this Court, for several reasons: first, those plaintiffs did not challenge California's similar testing requirements, *only* the additional safety features, *see Renna v. Bonta*, 667 F. Supp. 3d 1048, 1058 (footnote continued)

To the extent the Court undertakes a requirement-by-requirement assessment of the law, the historical "proving" tradition is also analogous to the Attorney General's regulations requiring specific safety features. Safety mechanisms such as chamber load indicators or magazine safety disconnects did not exist at the time of the Founding or Reconstruction, nor was there any need for them, as weapons were overwhelmingly single-shot devices that were typically kept unloaded to avoid corrosion. DeLay ¶ 10.[32] Under the "more nuanced approach" that applies where developments in technology make direct comparison impossible, the handgun safety regulations easily match the how and why of historic proving laws and practices. *See Bruen*, 597 U.S. at 27. The proving laws and practices aimed to reduce harm caused by accidental discharge of ammunition by banning the sale of particular weapons that carried a higher risk of causing such accidental injuries. The modern regulations similarly ensure that handguns sold on the commercial market are less likely to cause accidental injuries and death, while preserving access to handguns that meet the self-defense needs of the Commonwealth's residents. *Bruen* requires no more.

### B. Firearms and Gunpowder Safe Storage Laws Further Support the Constitutionality of the Handgun Safety Regulations.

Further, a host of laws from the colonial period through the end of the nineteenth century imposed requirements on the storage of weapons and gunpowder to minimize the risk of fire,

---

(S.D. Cal. 2023); *Boland v. Bonta*, 662 F. Supp. 3d 1077, 1080 (C.D. Cal. 2023); second, California imposes a "microstamping" requirement, which the district court in *Boland* found is "not technologically feasible and commercially practical" and has the effect of "restrict[ing]" California's roster to "models from over sixteen years ago," 662 F. Supp. 3d at 1080, whereas Massachusetts has no such requirement; and third, both decisions are currently on appeal. *Renna v. Bonta*, No. 23-55367 (9th Cir.); *Boland v. Bonta*, No. 23-55276 (9th Cir.).

[32] The first patent for a chamber load indicator was filed in 1888, and for a magazine safety disconnect in 1911. *See* Vernick JS, Meisel ZF, Teret SP, Milne JS, Hargarten SW, *"I didn't know the gun was loaded": an examination of two safety devices that can reduce the risk of unintentional firearm injuries*, Journal of Public Health Policy 20(4):427-440, 1999, as cited in Expert Report of Stephen Hargarten, Ex. E to Gohlke Decl. ("Hargarten") ¶ 29 n.13 and available at https://www.jstor.org/stable/pdf/3343129.pdf.

accidental discharge, and explosion. Rivas ¶¶ 15-16 (citing state and city regulations); Cornell ¶ 17, n.17 (citing storage statutes from five states ranging from 1771 to 1832). The First Circuit has recognized that "founding-era" governments "limited the quantity of gunpowder that a person could possess, and/or limited the amount that could be stored in a single container" in response to "risks posed" if that gunpowder were "ignited." *OST*, 95 F.4th at 49 & n.16 (citing statutes). *E.g.,* 1771-72 Mass. Province Laws 167, ch. 9, Add.22-24. These laws were considered valid exercises of the state police power by both federal and state high courts. Rivas ¶¶ 15-16 (discussing opinion by Justice Marshall in *Brown v. Maryland*, 25 U.S. 419, 443 (1827)); Cornell ¶ 40 (discussing *Brown* and *Commonwealth v. Alger*, 61 Mass. 53, 85 (1851)).

These laws are relevantly similar to the modern handgun safety regulation along *Bruen*'s "how" and "why" metrics. As to the "why," both sets of laws were intended to reduce what might be called the collateral dangers of firearms—*i.e.*, dangers separate and apart from the intended function of the weapons, such as fire, explosion, and accidental discharge. Indeed, laws about "the manufacture, storage, and use of gunpowder" were historically understood to be public health measures aimed at addressing "nuisances … which often occasion direct accidental injury or death" and that "should be so regulated as to not become dangerous to health and life." Rivas ¶ 56. The modern regulations are likewise consumer protection measures aimed to reduce "accidental injury or death." [33] And in terms of "how" the regulations burden the right to self-defense, the Court in *Heller* stated that "fire-safety" storage laws, and regulations intended to "prevent accidents," do not "remotely burden the right of self-defense," and thus are valid. 554 U.S. at 632.

---

[33] To the extent Plaintiffs argue these analogs were aimed specifically at fire suppression, rather than other forms of firearms accidents, that would constrain the required analogical reasoning too narrowly. *See Rahimi*, 602 U.S. at 691-92. Modern firearms and ammunition do not pose the same fire risk as Founding-era equivalents, so the proper analysis is that the historic laws aimed to prevent accidental ignition of ammunition, just like the modern regulations.

The same is true of the challenged regulations, which restrict commercial sales of handgun models that lack certain safety features or have not passed safety testing, but do not ban an "entire class of 'arms'" like the complete handgun ban in *Heller*. *Id.* at 628.

**C.    Trap Gun Restrictions Are Yet Another Example of a Relevantly Similar Historical Tradition.**

A third type of analogous historical tradition involves restrictions on "trap guns" (also known as "spring guns" and "infernal machines"), which were firearms configured in a way to fire remotely, typically by rigging the firearm to be fired by a string or wire when tripped. Rivas ¶ 23. Colonial laws from Plymouth in 1670 and New Jersey in 1771 made it unlawful to set trap guns. Rivas ¶ 23; *see* Records of the Colony of New Plymouth in New England: Laws, 1623-1682, Add.14-16; 1763-1775 N.J. Laws 346, ch. 540, § 10, Add.17-21. Other states followed suit in later decades, including through the common law, either by prohibiting the practice directly or imposing criminal liability for injuries or deaths caused by trap guns. Rivas ¶¶ 24-27.

These laws were relevantly similar to the modern regulations in terms of both "how" and "why" they burden self-defense. These laws did not ban an entire class of weapons, but only targeted devices *configured* in a certain way that rendered them unusually dangerous. Citizens remained free to keep and carry a rifle or musket, but they were barred from setting those weapons so that they could be fired remotely because of the unacceptable risk of harm to others. Similarly, under the handgun safety regulations, Massachusetts residents remain free to keep and carry handguns, they are simply barred from purchasing through a retailer particular models that pose undue risk of collateral harm. Restrictions on trap guns protected "innocent people who might unsuspectingly trip the device," Rivas ¶ 25, just as the modern regulations protect innocent people who might unsuspectingly drop a handgun that then fires without a pull of the trigger, or unsuspectingly fire a bullet they did not realize was in the chamber. Again, a challenged regulation

need not "precisely match its historical precursors," so long as it "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692.

### D.    Law Protecting Minors From the Dangers of Firearms Have a Long Historical Pedigree.

The final category of analogous historical laws specifically aimed to protect children against the harms caused by firearms.[34] There exists "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns" dating back to at least the 1850s. *United States v. Rene E.*, 583 F.3d 8, 12-16 (1st Cir. 2009).[35] *See also* Cornell ¶ 72; *e.g.*, 1884 Mass. Acts. 57, ch. 76, Add.54 (banning sale or furnishing of firearms to children under 15 years old, except for militia service). Defendants have found no cases invalidating such laws—to the contrary, they were applied and approved by courts. *State v. Callicut*, 69 Tenn. 714, 716-17 (1878) (law preventing sale of pistols to minors "not only constitutional as tending to prevent crime but wise and salutary in all its provisions"); *Coleman v. State*, 32 Ala. 581, 582-53 (1858) (upholding indictment under 1856 law making it a crime to sell, give, or lend a pistol to a minor). *See also Rene E.*, 583 F.3d at 15-16 (describing "evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms").

Another source of historical support for the childproofing requirement is the regulation of toy pistols in the nineteenth century. While "ostensibly designed for childhood amusement," toy

---

[34] Because Plaintiffs launch a wholesale challenge on the regulations, without distinguishing by requirement, the Court may similarly compare the regulations as a whole with the previously discussed historical regulations, which provide plentiful analogs aimed at preventing accidental discharge of firearms, including by children. But even looking at the childproofing requirement in isolation, it is consistent with historical firearm regulation.

[35] Although *Rene E.* predated *Bruen*, it did not undertake the interest-balancing approach rejected in *Bruen* and instead engaged in historical reasoning consistent with the Supreme Court's recent precedent. *See Rene E.*, 583 F.3d at 12-16.

pistols "were essentially miniaturized guns." Rivas ¶ 20. Because they could accept "live rounds" and were "capable of shooting projectiles," toy pistols could turn quickly into "a deadly weapon." Rivas ¶¶ 20-21. In addition, the design of many toy pistols made them prone to "causing tetanus infections and deaths as a result of lockjaw." Rivas ¶ 21. Because of this dual risk to children— from projectiles and infection—at least fifteen states, plus additional municipalities, restricted sales and possession of toy pistols in the 1880s, with additional states later following. Rivas ¶ 22.

These two traditions together form historical principles that underpin the modern childproofing requirement. *See Rahimi*, 602 U.S. at 698 ("tak[ing] together" two strains of tradition). These historical laws are relevantly similar in their recognition that restrictions should be placed on the ability of children to fire guns. The toy pistol regulations also restricted sales of particular devices because they were dangerous due to their design and poor manufacture.[36] And both sets of regulations maintained the ability of adults to access weapons well-suited to self-defense. These analogs should be viewed through the "more nuanced approach" called for in "cases implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 597 U.S. at 27. Significant changes in technology have materially increased the risk of accidents involving use of firearms by children since the Founding era. In the Founding era, over ninety percent of guns were "long guns," which were "heavy and difficult to use." Cornell ¶ 68. In addition, guns were rarely kept loaded. DeLay ¶ 10. As a result, there was little concern that children would accidentally discharge a firearm and regulation logically did not respond to that

---

[36] Other historical traditions also support regulations that prohibit sales of particularly dangerous *subsets* of weaponry, including pistols, while leaving ample access to weapons suited to self-defense. *See* Rivas ¶¶ 18-19 (slung shots), ¶¶ 28-34 (Bowie knives), ¶¶ 35-39 (subsets of pistols). If anything, these historical regulations were more onerous. Under the modern regime, manufacturers can show their products do *not* pose inordinate risk through straightforward safety testing and the inclusion of basic safety features, whereas historical restrictions on slung shots, Bowie knives, and pistols were defined by the nature of the weapon.

concern. Cornell ¶ 68. *See also Rahimi*, 602 U.S. at 749-40 (Barrett, J., concurring) (assumption that "founding-era legislatures maximally exercised their power to regulate" is "flawed"). But concern about "accidents involving minors" increased following the Civil War, corresponding with both of the historical traditions discussed above. Cornell ¶¶ 69-70.

In stark contrast to earlier periods, firearms are now the leading cause of death among children, surpassing motor vehicle crashes for the first time in 2020.[37] And many fatal firearms injuries to children involve guns that were stored loaded, unlocked, or both, Hargarten ¶ 26—a factual circumstance that would have been virtually unknown at the Founding, DeLay ¶ 10. Among the modern risks are that the small size of pistols—which have become more prevalent—"allow[s] easier access and handling of these weapons," including by children "with smaller hands." Hargarten ¶ 25. There are now ways to protect children from the dangers of firearms, including such options as "altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun," or "requiring a series of multiple motions in order to fire the handgun." 940 C.M.R. § 16.05. The state can rely on prior historical traditions related to the safety of minors to devise new, but analogous, solutions to this unprecedented threat.

## CONCLUSION

Defendants respectfully request the Court grant this cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment, and enter judgment in favor of Defendants.

---

[37] *See* Jason E. Goldstick, Ph.D., Rebecca M. Cunningham, M.D., Patrick M. Carter, M.D., "Current Causes of Death in Children and Adolescents in the United States," N. Engl. J. Med. Vol. 386, No. 20 (Apr. 20, 2022), as cited in Hargarten ¶ 24 & n.9, available at https://www.nejm.org/doi/pdf/10.1056/NEJMc2201761.

February 5, 2025

Respectfully submitted,

ATTORNEY GENERAL ANDREA JOY
CAMPBELL, and SECRETARY
TERRENCE M. REIDY,

By their attorneys,

/s/ Phoebe Fischer-Groban
Phoebe Fischer-Groban, BBO No. 687068
Grace Gohlke, BBO No. 704218
Assistant Attorneys General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2589
Phoebe.Fischer-Groban@mass.gov
Grace.Gohlke@mass.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on February 5, 2025.

*/s/ Grace Gohlke*
Grace Gohlke
Assistant Attorney General
