# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, JUDSON THOMAS,
COLBY CANNIZZARO, CAMERON PROSPERI,
THE GUNRUNNER, LLC, and FIREARMS
POLICY COALITION, INC.,

                Plaintiffs,

                v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
Of Massachusetts, TERRENCE REIDY, in his
official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

                Defendants.

CIVIL ACTION
NO. 1:21-CV-10960-DJC

**EXPERT REPORT OF LINDSAY SCHAKENBACH REGELE**

1.     I have been asked by the Office of the Attorney General of the State of

Massachusetts to prepare an expert report on safety standards and regulations of firearms before

the Civil War. This supplemental expert report and declaration ("Report") is based on my own

personal knowledge and experience, and, if I am called as a witness, I could and would testify

competently to the truth of the matters discussed in this Report.

2.     I have been retained by Office of the Attorney General for the Commonwealth of

Massachusetts to render expert opinions in this case. I am being compensated at a rate of $350

per hour.

3.     I am an associate professor of history at Miami University. I received my B.A.

from Connecticut College in 2006, my M.A. in history from Tufts University, and my Ph.D. in

history from Brown University in 2015. After receiving my Ph.D., I joined the faculty at Miami

1

University in Oxford, Ohio (I also took a postdoctoral fellowship after my first semester at Miami).  I have taught history at Miami ever since. I have not provided written testimony as an expert witness on any previous cases.

4.	My curriculum vitae is attached hereto as Exhibit A.

**Basis for Opinion and Materials Considered**

5.      The opinion I provide in this report is based on my review of the First Circuit brief of *Granata, et al. v. Healey, et al.* and the amended complaint filed in this lawsuit; my review of the Approved Firearms Roster and the Attorney General's regulations, which require additional safety features; my research in the history of American firearms manufacturing and regulation. Additionally, my conclusions draw on a detailed review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report. For this report, I relied on firsthand knowledge I have gained over the past 15 years researching and writing three books (two published, one in progress) that all have to do with the production, sale, and use of firearms in the late eighteenth and first half of the nineteenth century. The first involved years of readings letters, business records, congressional debates and laws, at multiple branches of the National Archives (including all of the correspondence exchanged between the Springfield Armory and private gun contractors from the 1810s through the 1830s) and state and local historical societies.

6.      These documents, along with published historical scholarship on weapon manufacturing, warfare, and political economy have enabled me to recognize historical analogues in the case at hand. I cannot, however, be exhaustive in the primary sources I cite, because there is no single repository for information on gun manufacturing, regulations, and sales. Information is scattered throughout dozens of different archives, government publications, media, etc. New documentation and details regularly come to light, providing more accurate perspectives on historical gun access and production.

**Introduction**

7.      The following report first summarizes my opinion that the testing and standards required by Massachusetts law to appear on the Firearms Roster and the Attorney General's regulations have precedent in the regulatory standards and testing required by the federal government for firearms used by the U.S. military and state militia. It then gives a brief history of gun ownership, manufacture, and sales, followed by a description of the types of testing and their regularity. It concludes with a section that explains how, because of quality standards, the United States produced a robust surplus of guns and was considered the international leader in firearms production by the middle of the nineteenth century.

**Summary of Opinion**

8.      The plaintiffs argue that the Firearms Roster and the Attorney General's regulations violate their Second Amendment rights; yet, the sorts of testing these regulations require are in many ways similar to the testing that the Ordnance Department, a branch of the War Department established in 1812 to acquire and produce weapons for the military, required of all weapons that were produced at the national armories and the armories of private contractors in the decades after the Second Amendment was ratified.[1] There is no historical precedent for the claim that safety regulations should not prevent weapons from reaching the hands of consumers. The majority of firearms in the early national United States were produced at the federal armories set up by the government in Springfield, Massachusetts and Harpers Ferry, Virginia, and the factories of government contractors, and all underwent regular inspection. This included proofing, a stress test that involves firing a deliberately over-

---

[1] "An Act for the better regulation of the Ordnance Department", February 8, 1815, 13th Cong., 3rd Sess., Ch.38, in Richard Peters, *United States Statutes at Large, Vol. 3* (U.S. Government Printing Office, 1846), 203-4.

pressurized round through a firearm to ensure it is not defective and will not cause harm by exploding. The process is similar to the handgun drop test and handgun performance test required by Massachusetts law. Armory superintendents received notices from the federal government announcing that the ordnance officers would "regulate the proof they shall undergo…either in person or by substitute visit to check regulations."[2]

9.      Rather than an unconstitutional hindrance to gun use, compliance with government regulations was considered normal, as evidenced by hundreds of letters exchanged between manufacturers and government employees. In some instances, the passage of inspections was specifically seen as a marker of quality. (For example, during the Latin American independence wars in the 1810s, purchasing agents for patriot forces noted a preference for, and paid more for, guns that bore the Springfield stamp, which indicated that it had been proved by an inspector appointed by the Ordnance Department. [3]) Inspections led to improvements in safety and quality which ultimately helped American gun manufacturers innovate and become the international leader in firearms production by the middle of the nineteenth century.

**A brief history of gun ownership and production in the early United States**

10.      Originally, gun use for common defense in the United States owed more to Article 1, Section 8 of the Constitution--which gave Congress the power to support armies and

---

[2]"The Duties of the Officers of the Ordnance Department in relations to the national armories," Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[3] John Morton, Ordnance Department, to Roswell Lee, July 24, 1816, Box 1, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

provide arms for the militia--than it did to the Second Amendment. [4]  In accordance with its constitutional obligation, the federal government subsidized and improved arms manufacturing and expanded the market for guns. The Militia Act of 1792 required militia members to provide themselves with a musket, but many struggled to arm themselves in the face of post-war shortages.  To redress the shortages, Congress constructed two federal armories, and began to invest in private gun factories to supplement the armories' output.

11.     An Act of Congress in 1792 gave the president power to select two sites for the nation's federal armories. George Washington chose Springfield, Massachusetts and Harpers Ferry, Virginia. Production began at Springfield in 1795. Workers, under the oversight of a superintendent and two master armorers, repaired old arms and manufactured the nation's first public musket, known as the Model 1795 musket.[5] This .69 caliber flintlock was modeled after

---

[4] Most court cases regarding gun rights today focus on the Second Amendment, even though "the right to bear arms" was rarely invoked in the century after its passage. Not until 1846 did a court overturn a gun regulation based on the Second Amendment, Nunn v. State, 1 Ga. (1 Kel.) 243 (1846), and not until 1857 did the Amendment undergo debate in the Supreme Court, when the Court observed that if black men were citizens they would have the constitutional right to bear arms. Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857). Jurisdictional and scholarly contentiousness around the Second Amendment did not emerge until the 1960s, when an increase in gun violence, compounded by the assassinations of President John F. Kennedy, Martin Luther King, Jr., and Robert Kennedy, provided impetus for the passage of the Gun Control Act of 1968.  Following the original proposal of this legislation in 1963, the National Rifle Association lobbied for its defeat and the *American Bar Association Journal* published an essay on "The Lost Amendment," which advocated an expanded interpretation of the Second Amendment as an individual right. Since then, legal scholars, historians, and political commentators have debated whether the Amendment confers an individual, collective or civic right. Bliss v. Commonwealth of Kentucky 12 Littell 90 Ky. 1822. For most of the Amendment's history, however, the right to bear arms was considered as a collective militia right, rather than an individual one. STUART R. HAYS, "The Right to Bear Arms, A Study in Judicial Misinterpretation," 2 WILLIAM & MARY LAW REVIEW,1959, at 381-406. ROBERT A. SPRECHER, *The Lost Amendment,* AMERICAN BAR ASSOCIATION JOURNAL, 1965, at 665-69. This essay won the 1964 Samuel Pool Weaver Constitutional Law Essay Competition. For an overview of the Second Amendment and constitutional law, see Carl T. Bogus, *Symposium on the Second Amendment: Fresh Looks*, 76 CHICAGO-KENT LAW REVIEW, 3-6 (2000), 3-6. Don Higginbotham, *The Federalized Militia Debate: A Neglected Aspect of Second Amendment Scholarship,* 55 THE WILLIAM AND MARY QUARTERLY, Jan. 1998, at 40. See also, SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2008), and MICHAEL WALDMAN, THE SECOND AMENDMENT: A BIOGRAPHY (2015).

[5] "ASP, Military Force, Arsenal, and Stores," December 15, 1795, Military Affairs, Vol. 1, no. 25: 108; JAMES B. WHISKER, THE UNITED STATES ARMORY AT SPRINGFIELD, 1795-1865 19 (1997).

the French Charleville, which became the standard U.S. musket until the War of 1812.  Federal official realized it was important to establish some degree of standardization for weapons used by the military, and because many American soldiers were already familiar with the Charleville, and US officials considered it superior to other European guns, it seemed logical to make it the standard for newly manufactured arms.

12.    Because production was slow at first—fewer than one thousand annually in the 1790s—the federal government subsidized production in private armories to supplement the federal armories in Massachusetts and Virginia.[6] But first, it had to develop an arms industry beyond its then-current existence as a small-scale craft industry. According to military histories, at the start of the American Revolution, the majority of guns in use were Brown Bess muskets from the British. The colonies produced some gunpowder and muskets, but had to rely on imports for the majority of their ordnance and ordnance stores. Congress preferred the musket to the rifle because few men were skilled in using or manufacturing the rifle, and the musket could fire more quickly and accommodate a bayonet. As the war progressed, the Continental Army had to rely on imported arms, especially the French Charleville Musket. [7]

13.    Following the war, many weapons were in disrepair, and private producers had little incentive to increase output for a limited civilian market. Guns were not yet a collectible commodity; rather, households might own one gun for hunting and protection. Gun ownership was more common in rural areas among men with the means to purchase them (guns were

---

[6] ASP, "Armory at Springfield," Communicated to the Senate January 7, 1800, Military Affairs, Vol. 1, No. 37:130.

[7] Erna Risch, *Supplying Washington's Army* (Washington, D.C.: Center of Military History, 1981), 25, 347

Ronald, Hoffman and Albert, Peter J., eds. *Arms and Independence: The Military Character of the American Revolution* (Charlottesville: University of Virginia Press, 1984).

expensive items). The very fact that the Militia Acts of 1792 mandated that men in the militia be armed as part of their civic duty indicates that it was not a given that all able-bodied men owned guns.

14.    At that time, guns were generally handcrafted by skilled gunsmiths in small shops. While throughout the eighteenth and early nineteenth centuries the most established of these gunsmiths worked in Pennsylvania, some of today's biggest gun companies—Colt's Manufacturing Company LLC (Hartford, CT), Smith and Wesson (Springfield, MA), and Sturm, Ruger & Co., Inc., (Southport, CT)—have their roots in private armories in the Connecticut River Valley in New England where the government played an essential role in shaping arms development because of its proximity to the federal armory at Springfield, Massachusetts.

15.    Beginning in the 1790s, the government contracted with new manufacturers seeking to enter the industry. Eli Whitney, for example, had failed to profit from his cotton gin patent, but convinced several acquaintances in the executive branch that he could successfully manufacture arms and received a contract for 10,000 muskets, which included a cash advance, and funding for several storehouses on his property in New Haven, CT.[8] As Purveyor of Public Supplies Tench Coxe recognized, only advance-sum contracts could "excite and promote the small arms manufacturing and bring the business to settled form."[9] Money for these contracts became standardized under the Militia Act of 1808, which mandated thatCongress appropriate

---

[8] Henry Dearborn to Eli Whitney, February 25, 1803, Order Book, Letters Sent Regarding Procurements, Records of the Office of the Secretary of War, RG107, National Archives, Washington, D.C. Oliver Wolcott to Daniel Gilbert, September 8, 1798, National Archives and Record Administration: Post-Revolutionary War Papers, Record Group 45.

[9] [Tench Coxe?] Rough Draft of Letter to Secretary of War, November 5, 1807, Coxe Irvine Papers - Philadelphia Supply Agencies: Correspondence, Reports, Returns, Bill Accounts, Receipts, Vouchers and Contracts 1794-1842, Box 136, Records of the Office of the Quartermaster General, Record Group 92, Entry 2118, National Archives Building, Washington, D.C.

$200,000 annually "for the purpose of providing arms and military equipments for the whole body of the militia of the United States, either by purchase or manufacture, by and on account of the United States".

16. It is clear that government officials worried seriously about the nation producing enough weapons for the military. The Militia Act of 1808 repealed a prior regulation that restricted the number of workers at the armories to one hundred men. The same fears about a strong national military apparatus that motivated the Second Amendment's protection of militia rights motivated the federal government to earmark federal monies to arm state militia to ramp up production capacity of the national armies for the same purpose.

17. For the three decades following the War of 1812, the War Department issued five-year renewable contracts that came with 10-20 percent cash advances, as well as a slate of requirements. All gun parts had to conform to federal standards and pass regular inspections. When the Ordnance Department became an independent bureau within the War Department during the War of 1812, its civilian purveyors were replaced with military officers who worked to standardize and improve weapon production.[10] An 1815 congressional act expanded the size and powers of the Ordnance Department. The armories maintained their civilian superintendent but were subordinate to the orders of the ordnance chief, who had autonomy in establishing military depots, appointing master armors, coordinating supply, and overseeing the inspection of

---

[10] American State Papers, "Extension of the Ordnance Department," June 19, 1813, Military Affairs, 13th Congress, 1st Session, Vol. 1, No. 121: 336. Jerry Mashaw, *Creating the Administrative Constitution: The Lost One Hundred Years of American Administrative Law* (New Haven: Yale University Press, 2012). Raphael P. Thian, *Legislative History of the General Staff of the Army of the United States from 1775 to 1901* (Washington, D.C.: Government Printing Office, 1901), 579-81. Merritt Roe Smith, "Army Ordnance and the "American System" of Manufacturing, 1815-1861" in Merritt Roe Smith, ed., *Military Enterprise and Technological Change: Perspectives on the American Experience* (London: MIT Press, 1985).

all arms provided for the army and militia.[11] The system for distributing weapons to the militia varied by states, and most weapons became state property.[12] Ordnance officers took seriously their regulation and distribution of weapons for the military. In 1821, when "An Act to reduce and fix the military peace establishment of the United States" became law, and the Ordnance Department was merged into the Artillery Department, Ordnance officers protested that "the Controul [sic] exercised over the Army by this Department… is essentially necessary."[13] The congressional attempts to reduce personnel and administrative officers did little to diminish the autonomy with which the now-subordinate lieutenant colonel of ordnance carried out ordnance duties (the Ordnance Department was reestablished as a separate department in 1832).

18.    Following the War of 1812, ordnance officials instructed the superintendent of the Springfield Armory to figure out the "best means to be devised and adopted for bringing the manufacture of arms to a uniform standard and pattern in all of their parts." They requested that, "muskets given out as patterns from the armories be strictly alike…in order that the conditions of the contracts now entered into by this department be made conformably thereto."[14] The Ordnance Department mandated that all contract arms be examined by a government proof-

---

[11] "An Act for the better regulation of the Ordnance Department", February 8, 1815, 13th Cong., 3rd Sess., Ch.38, in Richard Peters, *United States Statutes at Large, Vol. 3* (U.S. Government Printing Office, 1846), 203-4.

[12] In accordance with the Militia Act of 1808: "all the arms procured in virtue of this act, shall be transmitted to the several states composing this Union, and territories thereof, to each state and territory respectively, in proportion to the number of the effective militia in each state and territory, and by each state and territory to be distributed, to the militia in such state and territory, under such rules and regulations as shall be by law prescribed by the legislature of each state and territory."

[13] Decius Wadsworth, "critique of Senate bill to combine Ordnance and Artillery departments," ca. 1821

[14] John Morton to Roswell Lee, November 14, 1817, Box 1, Target #2, Letters Received from Officials and Officers of the War and Treasury Departments, Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA (hereafter SA-LRO); John Morton to Roswell Lee, July 24, 1816, Box 1, Folder 7, SA-LRM.

master, who would verify that all "contractors' arms be equal to those produced at the national armories."[15]

## Historical Examples of Safety Regulations

19.    The first head of the Ordnance Department, Decius Wadsworth, established a coordinated set of standards for the federal armories and its arms contractors. He designed a timeline for achieving weapon uniformity, requiring the national armories to produce pattern muskets by 1815 and begin full-scale production of the "Model 1816" the following year.[16] Eventually, all armories machine-produced identical gun parts, a manufacturing characteristic known as "interchangeability."[17] Historians of technology have demonstrated that a factory needed to produce at least 1,000 guns per year to make interchangeable parts production worthwhile.[18] In the early nineteenth century, only the federal government was willing and able to devote the resources to this. Private makers frequently modified the models they made, which

---

[15] John Morton to Roswell Lee, March 4, 1818, Box 1, Target #2; George Bomford to Roswell Lee, June 1, 1823, Box 2, SA-LRO.

[16] The Springfield Armory complied successfully with this order; Harper's Ferry did not. Merritt Roe Smith, *Army Ordnance and the 'American System' of Manufacturing, 1815-1861*, in Merritt Roe Smith, ed. MILITARY ENTERPRISE AND TECHNOLOGICAL CHANGE: PERSPECTIVES ON THE AMERICAN EXPERIENCE  53 (1985).

[17] Older studies of small arms manufacturing offer exhaustive details about private and public gun production in early America.  In addition to MERRITT ROE SMITH, HARPER'S FERRY ARMORY AND THE NEW TECHNOLOGY: THE CHALLENGE OF CHANGE (1977). See FELICIA JOHNSON DEYRUP, ARMS MAKERS OF THE CONNECTICUT VALLEY: A REGIONAL STUDY OF THE ECONOMIC DEVELOPMENT OF THE SMALL ARMS INDUSTRY, 1798-1870 (1948); JAMES B. WHISKER, THE UNITED STATES ARMORY AT SPRINGFIELD, 1795-1865 (1997); JAMES B. WHISKER AND KEVIN SPIKER, THE ARMS MAKERS OF MASSACHUSETTS, 1610-1900 (2012).

[18] Joshua L. Rosenbloom, *Anglo-American Technological Differences in Small Arms Manufacturing*, 23 THE JOURNAL OF INTERDISCIPLINARY HISTORY 691 (1993). Also, U.S. troops used rifles and muskets, which were less precise and so could more easily be made by interchangeable manufacture. Robert A. Howard, *Interchangeable Parts Reexamined: The Private Sector of the American Arms Industry on the Eve of the Civil War*, 19 TECHNOLOGY AND CULTURE 649 (1978).

made interchangeability impractical.[19] Their civilian consumers had little desire for interchangeable guns because they were unlikely to have multiple identical guns from which to scavenge parts. Soldiers, on the other hand, needed to be able to change and repair defective parts quickly in the field.[20]  Members of Congress recognized their obligation to contribute to this objective. In his argument for the reestablishment of the Ordnance Department as an independent bureau, for example, Representative Wiley Thompson of Georgia noted that, "unparalleled gallantry would become an easy prey to a well equipped and well disciplined foe," if using weapons of "a variety of calibres."[21] Thompson's statement suggests that firearms management was a cooperative, rather than oppositional, undertaking between government officials and private producers, such as Whitney's armory, in the nineteenth century.

20.     The federal government not only subsidized and standardized the construction of firearms, it also regulated their safety. The frequency with which "inspection" and "proofing" appear in the correspondence that the superintendent of the Springfield Armory received from manufacturers speaks to the normality of these regulations. For example, from 1815 to 1830, the subject of inspection comes up over 400 times in 135 pages of transcribed documents. It was most frequently brought up in response to a manufacturer being ready for their arms to be inspected and proved. For just one example, on August 30, 1816, Eli Whitney (of cotton gin fame) wrote to the superintendent of the Springfield Armory, Roswell Lee, "I am instructed …to let you know when I have 500 muskets ready for inspection – that you would send a person

---

[19] Howard, Interchangeable Parts Reexamined, 645.

[20] Robert A. Howard argues that private arms makers were more responsible for innovation in interchangeable production than the federal armories. Howard, *Interchangeable Parts Reexamined*, 634, 646-648.

[21] UNITED STATES CONGRESS, Reports of Committees of the House of Representatives, 125-126 (1973).

immediately for this."[22] A letter from weapons inspector James Carrington in 1827 suggests that there were multiple rounds of inspections: he asked the superintendent if "condemned barrels" were "unfit to prove or have they proven defective in the course of inspection?"[23] Condemned barrels were considered unsafe and unreliable for military personnel to use and were discarded. Because the armories wanted to recoup losses, the discarded weapons might be sold for parts at auction, along with fully functioning firearms.

21.    Some of the guns that failed to meet military standards, but were still functional, were sold to individual merchants along with surplus inventory and often times these weapons and weapon parts were exported. In the early 1800s, the Napoleonic Wars created a shortage in international supply because the majority of the world's guns were still made in Western Europe. By 1810, the United States manufactured the vast majority of its own arms and was able to take advantage of this shortage. When Latin American colonies began declaring independence during the 1810s, imperialists and colonists alike turned to the United States, which now produced a surplus of gun parts every year, for weapon supply.[24] For example, soon after Venezuelan patriots established an independent junta in 1810, the Spanish Captaincy General of Venezuela gave a New York vessel the exclusive privilege of loading and shipping her cargo, which

---

[22] Eli Whitney to Roswell Lee, August 30, 1816, Folder 7, Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[23] James Carrington to J. Weatherhead, January 30, 1827, Folder 1, Box 13, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[24] Brian DeLay, "How Not to Arm a State: American Guns and the Crisis of Governance in Mexico, Nineteenth and Twenty-First Centuries," *Southern California Quarterly*, Vol. 95, No.1 (Spring 2013): 8-9. For surplus stock see John Morton, Ordnance Department, to Roswell Lee, Superintendent, Springfield Armory, July14, 1817. Box 2, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

included weapons for the royal army.[25] The independent junta in the viceroyalty Rio de la Plata (present-day Argentina, Bolivia, Uruguay and Paraguay) was particularly solicitous in its arms requests and expressed a preference for government-inspected guns.[26] In general, Americans preferred to contribute to the independent movements, so as not to support imperial rule. But although no international law prevented the United States from providing guns to rebel governments, the U.S. government could not directly sell weapons to "rebels" because the official military provisioning of Spain's colonies would hinder diplomacy with Spain.[27] Civilian merchants offered a way around this challenge, a solution Thomas Jefferson had anticipated in 1793 when he declared that private persons be permitted to export arms to belligerents.[28] Jefferson's pronouncement became U.S. policy for most of the nineteenth century, and New England arms that were manufactured and inspected under government patronage, either by the federal armories or by private contractors, made their way to Mexico and South America. Nathan Starr, the owner of the nation's oldest private arms manufactory in Middletown,

---

[25] Robert K. Lowry to Robert Smith. 1 October 1810, *Despatches from U.S. Consuls in La Guiara, 1810-1836*, RG59, National Archives. Washington: 1949. Microfilm, no. 84, roll 1.

[26] U.S. consul to Buenos Aires William Miller wrote to Secretary of State James Monroe in March of 1812 that the government in Buenos Aires wanted to ship a large amount of copper to Boston in exchange for arms. One year later, U.S. Consul Thomas Lloyd Halsey informed the Secretary of State of this government's desire to purchase 10,000 stands of arms Isaac Foster Coffin Journal 1820, Appleton Family Papers, Massachusetts Historical Society, Boston. William G. Miller to James Monroe, March 15, 1812, and Thomas Lloyd Halsey to James Monroe, May 3, 1813, U.S. Department of State, *Despatches from U.S. Consuls in Montevideo*, *1811-1837*, RG59, National Archives. Washington: 1944. Microfilm, no.M71, roll 1. John Morton, Ordnance Department, to Roswell Lee, July 24, 1816, Box 1, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[27] Elton Atwater describes the law of neutrality as a working set of agreements between nations regarding behavior toward belligerents, in *American Regulation of Arms Exports* (Washington, D.C.: Carnegie Endowment for International Peace, 1941), p.7, f.n.2. John Missall and Mary Lou Missall, *The Seminole Wars: America's Longest Indian Conflict* (Gainesville, FL: University Press, 2004), 52.

[28] In a note to British Minister at Washington George Hammond on May 15, 1793, Jefferson announced that the government would not prohibit the private sale of arms or contraband to belligerents. Atwater, *American Regulation of Arms Exports*, 8.

Connecticut, and contractor to Springfield Armory, for example, exported arms to Colombia following the War of 1812 to supplement his income.[29]

22.    One of the Springfield Armory's principal agents in Philadelphia was William Cramond, a merchant who had experience with South American commerce and ties to merchants in Buenos Aires and took advantage of the fact that surplus arms "were of little use to the United States" and that a "low price for them might induce a sale of the whole."[30] He was connected with Baltimore shipping firm D'Arcy and Didier, which dealt government arms both in Argentina and Mexico in 1815 and 1816.[31] In July 1815, Cramond received authorization from Captain John Morton of the Ordnance Department to negotiate a sale of arms with Lee. Cramond sent his agent George Hockley to purchase arms with a letter from the acting Secretary of War Alexander Dallas, who had approved the mode of payment so that "no delay in shipping

---

[29] Deyrup, *Arms Makers of the Connecticut Valley,* 46. Nathan Starr, Middletown, CT, to Roswell Lee, Superintendent, Springfield Armory, Washington, January 30, 1826. Box 12, Folder 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry 1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[30] Receipts, January 31, 1815 and August 16, 1814 William Cramond, *William Cramond receipt book 1814-1815*, Historical Society of Pennsylvania, Philadelphia, PA. D'Arcy and Didier did business with David Curtis De Forest who had established the first American commercial house in Buenos Aires in 1815. DeForest provided political cover and served as agent for privateering activities. Jeffrey Orenstein," Joseph Almeida: Portrait of a Privateer, Pirate & Plaintiff, Part II," *Green Bag 2d* 12 (2008): 36. William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, July 17, 1815. Box 1, Folder 9, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[31] "Memorial on Behalf of the Owners of the Schooner Highflier, Having a Claim on the Mexican Government Addressed to the Board of Commissioners under the Convention of the 11th of April, 1839 between the United States of America and the Mexican Republic," Case Number 24, Thomas Tenant, Case Files for Cases Heard, 08/25/1850-51, Record Group 76: Records of Boundary and Claims Commissions and Arbitrations, 1716-1994, National Archives, College Park, MD. Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

the arms may take place."[32] In a series of visits, Hockley negotiated with Lee for a fair price so that business could be done.[33]

23.     From his agents, Lee received information about Latin American markets that would enable him to make the best possible decisions about arms exports to improve armory sales. He knew, for example, that the sale of additional arms to Argentina would be advantageous. Cramond informed Lee that one agent in Buenos Aires had received favorable reports from purchasers of old Springfield arms in 1816.[34] Lee also knew that shorter barreled muskets "were in very high demand in South America" and were in fact favored over long-barreled ones. But in order to sell these weapons at a profit, the selling agent needed from Lee specific guarantees that they had been properly inspected by the Armory's inspectors and were found to be of good quality, "though probably not of the first quality," and that they were being sold only on account of the size of the barrel. He sent one letter for example that "certified that the 6696 stands of arms with barrels of 33 in long purchased of the US by William Cramond of Philadelphia were in all respects good new arms having been inspected, proved, and approved at the armory."[35]

---

[32] William Cramond, Philadelphia, to Roswell Lee, Superintendent, Springfield Armory, July 15, 1815. Box 1, Folder 4, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[33] See for examples, William Cramond to Roswell Lee, Superintendent, July 17, September 2, September 25, September 28, 1815 Superintendent, Springfield Armory, April 11, 1817. Box 1, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[34] William Cramond, Philadelphia, to Roswell Lee, Superintendent, Springfield Armory, November 6, 1816. Box 1, Folder 9, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[35] Roswell Lee, "Subscriber, the Superintendent of the Springfield Armory hereby certifies…" November, 1816, Folder 9, Box 1, Letters Received Miscellaneous. Records of the

24.     Lee also had to inform the agent of the price difference between the two types, as short barrel muskets were not usually made for U.S. service.[36] This type of communication enabled Lee and his merchant to profitably dispose of muskets that had been made by accident by the armory's employees at the government's expense and could not be used domestically. Because selling agents alerted Lee to quality issues and preferences, and solicited production information for marketing purposes, government-inspected arms were received in Buenos Aires in "preference to others and at the highest price in the market."[37]

**Long-term impact of safety standards and regulations**

25.     New kinds of inspections began in the 1830s. In response to weapon innovation and the emergence of new patent manufacturers, like Samuel Colt, Congress reevaluated the balance between private and public production for the military. Lawmakers asked military officers to conduct a series of experiments to compare the safety and effectiveness of firearms

---

Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[36] William Cramond, Philadelphia, to Roswell Lee Superintendent, Springfield Armory, June 12, 1817. Box 2, Folder 7, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

[37] William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, November 6, 1816. Box 1, Folder 9, Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, and William Cramond, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, April 11, 1817. Box 2, Folder 6, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA; For quality issues, see Nixon Walker and George McCallmint, Philadelphia to Roswell Lee, Superintendent, Springfield Armory, September 20, 1816. Box 1, Folder 8, Letters Received Miscellaneous. Records of the Springfield Armory, MA, Record Group 156, Entry1362, NM-59, 94-066; National Archives Building, Waltham, MA.

manufactured at both the federal armories and those of private contractors. The government would not agree to purchase weapons from new armsmakers without testing them first. Samuel Colt, for example, solicited government patronage in the 1830s, after patenting his first revolvers in 1836, and had to undergo tests in 1837 relating to celerity of fire, simplicity in construction, and extent of recoil, among others. The officers deemed the revolver "as wholly unsuited to the wants and exigencies of the service in the field. The board is of the unanimous opinion, that from its complicated character, its liability to accidents (one having occurred in practice on the 21st June) in the hands of soldiers, and other reasons which may be found in this report, that this arm is entirely unsuited to the general purposes of the service."[38]  In regards to the repeating guns made by John Webster Cochran (who had recently patented a turet revolver, a type of percussion handgun designed to get around Colt's patent [39]), they ruled that,

> "the slightest defect in the metal of the receiver would render it highly dangerous both to the bearer and to others in contiguous positions; and that such defects would frequently exist will not be doubted by mechanics whose experience every day convinces them of the many circumstances that serve to prevent a perfect union of parts in similar constructions; and even admitting original perfection in this important limb, it is nevertheless liable, from the effects of constant and severe service, to receive fractures or other injuries sufficient to destroy its character for safety, and render it more dangerous to the ranks it is intended to support and defend than to those of the enemy."[40]

---

[38] United States Congress, Report from the Secretary of War, transmitting the report of a board of officers appointed to examine the improvements in fire-arms, made by Hall, Cochran, Colt, and the Baron Hackett; in compliance with a resolution of the Senate of the 27th January, 1837. Read, and ordered to be printed (Washington, D.C.: publisher not identified, 1837), 10.

[39] David B. Kopel and Joseph G.S. Greenlee, "THE HISTORY OF BANS ON TYPES OF ARMS BEFORE 1900," *Journal of Legislation*, Vol. 50, no. 2 (May 2024), 272

[40] United States Congress, Report from the Secretary of War, transmitting the report of a board of officers appointed to examine the improvements in fire-arms, made by Hall, Cochran, Colt, and the Baron Hackett; in compliance with a resolution of the Senate of the 27th January, 1837. Read, and ordered to be printed (Washington, D.C.: publisher not identified, 1837), 9.

Safety was valued over novelty of design and the officers determined that they preferred the standard U.S. musket; they decided that there was "risk to the national safety by adopting new inventions without being convinced of their superiority."[41]

26.     Several years later, in 1840, a board of dragoon[42] officers met at the Carlisle barracks in Pennsylvania specifically to test Colt's improved repeating carbines and waterproof ammunition. They compared them to government contractor John H. Hall's carbines, for which he had secured a patent several years prior. The board conducted 10 experiments, an example of which involved the carbines [short rifles] "slung to a man mounted, who galloped rapidly for a mile, the piece swinging against the side of the horse." Colt's carbines held up well to rough use by the experimenters and were faster than Hall's—firing 18 rounds in 2 minutes, 45 seconds, to Hall's 8 minutes. They were less accurate, however, because although smoothbore barrels increased speed, their loads did not fit as tightly, which could decrease accuracy beyond short distances. Hall's carbines hit the target 87 times, to Colt's 69. Although the officers were impressed with the guns, they expressed concern that they were impractical for field use and that several features of the new revolvers caused safety risks, namely "the possibility of two or more chambers going off at the same time" and the "deafening sharpness…which must injure the hearing of those who use them."[43] In response to government feedback, Colt improved the safety and practicality of his firearms. For example, he implemented a loading lever so that the hammer

---

[41] ASP, "Report of the President of a Board of Officers on Improvements in Fire-Arms by Hall, Colt, Cochran, Leavitt, and Baron Hackett, as Compared with the United States Musket," October 3, 1837, 25th Congress, 1st Session, no. 743, 525-529.

[42] Dragoons were soldiers who were trained to fight as both cavalry and infantry.

[43] ASP, "Report from the Secretary of War, transmitting the report of a board of dragoon officers appointed to witness an exhibition of the repeating fire-arms and water-proof ammunition invented by Samuel Colt," 16 December 1840, 26th Congress, 2nd Session, no.14, 3.

rested on a safety pin situated between two caps, rather than on the cap itself, to prevent the weapon from firing unintentionally. He also made changes to guns with ramrods, which many men dropped in the loading process (the time lost often led to fatality), and attached the rammers to the body of the weapon.[44] Colt received a government contract for his improved carbines in 1841 and, when military need ramped up in 1846 due to the Mexican-American War, Colt sold additional weapons to the United States.[45]

27.     In 1851, Colt showcased his guns on an international stage when London hosted the Great Exhibition of the Works of Industry of All Nations in 1851 (aka the Crystal Palace Exhibition). While the United States' 534 exhibitors won a greater share of prizes than any other nations', Colt received especially high praise from Britain's Board of Ordnance for his revolving pistols. He was invited to give a talk on machine production of guns to the Institute of Civil Engineers, and soon after opened his London Armory, the first American factory in England (and visited by Prince Albert).[46]

28.     Colt testified before Parliament's Select Committee on Small Arms and noted how much stricter US inspection was. He said, "our American inspectors are more strict than what I have yet seen in England; give one hundred arms to an American inspector, made at any place you choose by contract in England, and more would be condemned out of them, even if

---

[44] Henry Barnard, *Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial* (New York: Alvord, 1860)*,* 166-68. For soldiers' difficulties reloading their guns in Florida, see "Scraps Preserved by N.M. for H.W.M.," April 3, 1840, HM4020, Merrill Collection, Huntington Library, San Marino, CA, and Jacob Neff, *The Army and Navy of America: From the Period of the French and Indians Wars to the Close of the Florida War* (Philadelphia, 1845), 610.

[45] Herbert C. Houze, "The Paterson Era," Elizabeth Mankin Kornhauser, ed., *Samuel Colt: Arms, Art, and Invention* (New Haven: Yale University Press, 2006), 56.

[46] Doron Ben-Atar, Trade Secrets: Intellectual Piracy and the Origins of American Industrial Power (New Haven: Yale University Press, 2004), 210-21; Henry Barnard, Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial (New York: Alvord, 1860),310, 352.

made expressly, than if you took the arms made by machinery.[47] Although it is common today to equate regulation with manufacturer opposition, Colt was not necessarily opposed to strict government standards.

29.    After all, the improvements he had made during the Second Seminole War (war dates 1835-1842), when mounted regiments used his revolving cylinder percussion-ignition rifles, appealed to the Texas Rangers, who purchased them during the 1840s, as well as to the Ordnance Department, which purchased 2,000 during the Mexican American War after Ranger captain Samuel Walker heartily endorsed them.[48] The revolvers received glowing reports from the battlefront, which Colt used in gun advertisements in the 1850s. [49] And the United States' system of regulated standardization appealed to people in England, facilitating the popularity of his guns and other American manufactures overseas. Britain's Board of Ordnance even decided to model its new national armory on the Springfield Armory and to stock it with American-made machinery.[50]

### Long-term Consequences of Quality and Safety Standards

---

[47] Henry Barnard, Armsmear: The Home, the Arm, and the Armory of Samuel Colt: A Memorial (New York: Alvord, 1860), 367

[48] M.L. Brown, "Notes on U.S. Arsenals, Depots, and Martial Firearms of the Second Seminole War," *Florida Historical Quarterly,* Vol. 61, No. 4 (April, 1983), 447. ASP, "Petition of Samuel Colt," December 12, 1848, 30th Congress, 2nd Session, No. 3: 1-3.

[49] For example, D.E. Twiggs, Florida war veteran and commander under both General Zachary Taylor and General Winfield Scott, endorsed them to Congress. David E. Twiggs to Thomas Jefferson Rusk, 21 April 1848, Connecticut Historical Society, *Samuel Colt's Own Record of Transactions with Captain Walker and Eli Whitney, Jr., in 1847* (Hartford, 1949), 84-5. Richard A. Dillio, "Samuel Colt's Peacemaker: The Advertising that Scared the West," *History of Media Technology*, 9 Dec. 2017.

[50] Hounshell, From the American System to Mass Production, 16-25.

30.     By 1840, U.S. output rivaled that of Great Britain and France and by 1865, the Springfield Armory was the largest arsenal in the world.[51] Once the federal armories could fill both immediate and reserve needs, and the Ordnance Department had met its goals of standardization, the regular letting of large advance-sum government contracts to private arms manufacturers ceased because the government no longer needed to nurture the industry.[52] The technological advancements the original contractors made manifested in the guns made by the patent arms firms that replaced them (like Remington and Colt), even as the manufacturers that had risen to prominence under federal patronage and spearheaded innovation struggled to adapt to new business models. [53] These private manufacturers were individuals who, but for government patronage, would not make guns. According to arms contractor Asa Waters, "if the patronage of the government is not continued, our factories will be worth but little."[54]  They either ceased operations or downsized production and sold their guns to consumers elsewhere.[55]

---

[51] Paul A. C. Koistinen, Beating Plowshares into Swords: The Political Economy of American Warfare, 1606–1865 (Lawrence: University Press of Kansas, 1996), 76.

[52] Arms produced by the federal government were declared superior to solicitations from private firms. "Report of the President of a Board of Officers on Improvements in Fire-Arms by Hall, Colt, Cochran, Leavitt, and Baron Hackett, as Compared with the United States Musket," Communicated to the Senate October 3, 1837, 25th Congress, 1st Session, *American State Papers,* Military Affairs, Vol. 7, No. 743: 525.

[53] See for examples, Samuel Colt Contract for Furnishing Rifles, February 4, 1850 and E. Remington and Sons Contract for Rifles, November 21, 1851, Contracts for Ordnance and Ordnance Supplies, Volume 3, Records of the Chief of the Ordnance Department, Record Group 156, Entry 78, National Archives, Washington, D.C. For frustration with the cessation of contract payments, see Asa H. Waters to Eli Whitney, Jr., December 8, 1845, Octavo Volume 7, Letterbook 1837-65, Waters Family Papers, American Antiquarian Society.

[54] Memorial of Private Contractors to U.S. Congress, 1835?, Waters Family, Papers, 1749-1873, BoxW1, Folder 4 1835, AAS.

[55] Waters sold arms to Mexico in the 1840s. Asa H. Waters and Co. to Richard M. Jones, October 13, 1842, Octavo Volume 7, Letterbook 1837-65, Waters Family Papers, American Antiquarian Society.

31.     During the Civil War the U.S. military purchased weapons from gun companies that had benefited from the technological improvements that came out of the Ordnance Department's system of rigorous testing. Of the 8 firearms companies that the military purchased most of its weapons from, all except one were located within 100 miles of the Springfield Armory (Remington was located in Ilion, NY, 250 miles away), a reflection of the technological hub that had emerged from the inspection system, as manufacturers and inspectors moved around the region.

32.     Although the financial relationship between manufacturers and the federal government changed by the middle of the nineteenth century, the system of testing and inspection that the Ordnance Department had standardized in the 1810s continued during and after the Civil War. Inspectors were stationed at manufacturing plants and armories and firearms were subjected to proof testing. Guns that passed these safety and quality tests were given an inspector's mark, as proof that they could be used safely and reliably by soldiers and citizens.

33.     In sum,  the sorts of testing required by the Firearms Roster and the Attorney General's regulations are in many ways similar to the testing that the majority of firearms produced in the United States underwent during the nineteenth century. Rather than violate second amendment rights, the regulations come from the same logic: a desire for citizen-soldiers to have safe, effective, and plentiful guns. The firearms industry owes its existence to government oversight, and this oversight was compatible with the Second Amendment. The federal government established two federal armories, which drove firearms production; it also provided advance sum contracts to manufacturers to enable them to devote time and resources to producing firearms for the army and militia. These contracts came with expectations to meet quality and safety standards. Additionally, even iconic American armsmakers like Samuel Colt,

23

had their weapons subjected to safety tests, which ultimately influenced the type of arms produced and available for consumers.

September ＿＿16, 2024

Lindsay S. Regele

＿＿＿＿＿＿＿＿

Lindsay Schakenbach Regele

24

# EXHIBIT A

**LINDSAY SCHAKENBACH REGELE**
Miami University, History Department, Room 254, Upham Hall, 100 Bishop Circle, Oxford, OH
45056
(508-733-2377)
regelels@miamioh.edu

**EMPLOYMENT**
Associate Professor of History, Miami University, 2021-; Director of Graduate Studies 2023-
Robert H. and Nancy J. Blayney Assistant Professor of History, Miami University, 2019-2022
Assistant Professor of History, Miami University, 2015-2021
> Affiliate of Global and Intercultural Studies (American Studies)

**EDUCATION**
Ph.D. Brown University**,** May 2015
> Dissertation: "Manufacturing Advantage: War, the State, and the Origins of American Industrialization, 1790-1840"
> Committee: Seth Rockman (Chair), Michael Vorenberg, Harold Cook, Mark R. Wilson (UNC Charlotte)
> Fields: Early America (Seth Rockman), Colonial Latin America (Robert Douglas Cope),
Early    Modern Information Networks (Harold Cook)
M.A., Tufts University, United States History, May 2009
> Thesis: **"**Foreign Policy by Whom? United States Citizens, the Press, and the Leander Expedition (1805-1810)"
> Committee: Reed Ueda (Chair), Peter Winn, Steven P. Marrone
B.A., Connecticut College, May 2006, History, *summa cum laude*, Phi Beta Kappa, Brown-
Brooks        Award (Female Scholar-Athlete), History Department Prize for Excellence in
> Latin American History

**PRIZES**
Finalist, Herman E. Krooss Prize for Best Dissertation in Business History, 2015
Walter Muir Whitehill Prize in Early American History, Colonial Society, for "From
Discontented   Bostonians to Patriotic Industrialists: The Boston Associates and the
Transcontinental Treaty,       1790-1825," 2011

**BOOKS**
*Flowers, Guns, and Money: Joel Roberts Poinsett and the Paradoxes of American Patriotism*
(The    University of Chicago Press, 2023).
*Manufacturing Advantage: War, the State, and the Origins of American Industry, 1776-1848*
(Johns  Hopkins University Press, 2019).

**BOOK CHAPTERS**
"National Economies," invited chapter in *The Cambridge History of the American Revolution*,
eds.    Marjoleine Kars, Michael McDonnell, and Andrew M. Shocket (forthcoming with
Cambridge     University Press).

26

"United States Expansion and the Development of a National Firearms Industry," invited chapter in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law*, eds.    Darrell Miller, Jacob Charles, Joseph Blocher (Oxford University Press, 2023).

**JOURNAL ARTICLES**

"A Brief History of the History of Capitalism, and a New American Variety," and "A Response to the   Comments on Martial Capitalism," *Enterprise & Society*, Volume 25, No. 1 (March 2024): 2-26;    54-59.

Co-authored with Robert C. Ford, "When government is the solution: creating the arms industry in the   Connecticut River Valley in the 1800s," *Journal of Management History*, Vol. ahead-of-print No.        ahead-of-print (March 2024): 20pp. https://doi.org/10.1108/JMH-11-2023-0122

"Joel Roberts Poinsett and the Political Economy of the Nullification Crisis," *Journal of Southern        History*,         Vol. 89, No. 3 (August 2023): 453-482.

" 'Confidence': Private Correspondence in Daniel Parker's War Department, 1811-1846," *Journal of the  Early Republic* 41 (Spring 2021): 39-68.

"The Rise, Fall, and Rise of Exceptionalism: 250 Years of Bostonian Political Economy and Culture,"        *The New England Quarterly,* vol. 93, no. 2 (Jun. 2020): 238-245

"Guns for the Government: Ordnance, the Military 'Peacetime Establishment,' and Executive Governance in the Early Republic," *Studies in American Political Development,* Vol. 34, no. 1    (April 2020): 132-147.

*A New Constitutionality for Gun Regulation,* 46 Hastings Constitutional Law Quarterly 523, 530 (2019).

 "Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion," *Business        History Review* 92.1 (Spring 2018): 57–83.

 "The World's Best Carpets: Erastus Bigelow and the Financing of Antebellum Innovation," *Technology & Culture* 59, no. 1 (January 2018): 126-151.

"Manufacturing Advantage: War, the State, and the Origins of American Industry, 1790-1840," *Enterprise & Society*, Vol. 17, Issue 4 (December 2016): 721-733.

 "Schemers, Dreamers, and a Revolutionary Foreign Policy: New York City in the Era of Second Independence, 1805-1815," *New York History* 94/3-4 (Summer/Fall 2013): 267-282.

 "From Discontented Bostonians to Patriotic Industrialists: The Boston Associates and the Transcontinental Treaty, 1790-1825," *New England Quarterly* 84 (September 2011): 377-401.

**BOOK REVIEWS**

Andrew C. McKevitt, *Gun Country: Gun Capitalism, Culture, and Control in Cold War America* (Chapel        Hill: University of North Carolina Press, 2023), *Business History Review* (forthcoming).

Michael A. Blaakman et al, eds., *The Early Imperial Republic: From the American Revolution to the U. S.        -Mexican War*. (Philadelphia: University of Pennsylvania Press, 2023), *Journal of American        History* (forthcoming).

Sharon Ann Murphy, *Banking on Slavery: Financing Southern Expansion in the Antebellum United States* (Chicago and London: University of Chicago Press, 2023), *Journal of Southern History*,        Vol. XC, no. 3 (August 2024): 613-614.

Manuel Covo, *Entrepôt of Revolutions*: *Saint-Domingue, Commercial Sovereignty, and the French American Alliance* (New York: Oxford University Press, 2023), *The Americas* 80, no. 4 (Oct.   2023):636-638.

Edward P. Pompeian, *Sustaining Empire: Venezuela's Trade with the United States during the Age of Revolutions, 1797–1828* (Baltimore: Johns Hopkins University Press, 2022), *Business History        Review* (Winter 2023).

José Galindo, *Ethnic Entrepreneurs, Crony Capitalism, and the Making of the Franco-Mexican Elite*   (Tuscaloosa: University of Alabama Press, 2021) in *The Americas* Vol. 78, no. 4 (Dec. 2021): 18-      20.

Scott R. Huffard, *Engines of Redemption: Railroads and the Reconstruction of Capitalism in the New    South* (Chapel Hill: University of North Carolina Press, 2019), in *Business History Review* vol.    95, issue 3 (Mar. 2021): 582-584.

Priya Satia, *Empire of Guns: The British State, the Industrial Revolution, and the Conscience of a Quaker       Gun-Manufacturer* (New York: Penguin Random House, 2018), in *Business History Review*,        Vol. 94, no. 2 (2020): 436-439.

Emma Hart, *Trading Spaces: The Colonial Marketplace and the Foundations of American Capitalism*      (Chicago: University of Chicago Press, 2019) in *Enterprise & Society,* Vol. 22, no. 1 (March 2021):       285-288.

Manu Karuka, *Empire's Tracks: Indigenous Nations, Chinese Workers, and the Transcontinental        Railroad*        (Berkeley: University of California Press), in *Journal of Cultural Economy*, Vol. 13, no. 2  (2020):250-252.

Tyson Reeder, *Smugglers, Pirates, and Patriots: Free Trade in the Age of Revolution* (Philadelphia:  University of Pennsylvania Press, 2019), in *H-Net Reviews* (Jan. 2020).

Naomi R. Lamoureaux and John Joseph Wallis, *Organizations, Civil Society, and the Roots of Development*   (Chicago, University of Chicago Press, 2017), in *Journal of the Early Republic* 39, no. 4 (Winter   2019): 788-791.

Johan Mathew, *Margins of the Market: Trafficking and Capitalism Across the Arabian Sea* (Berkeley:       University of California Press, 2016), in *Enterprise & Society* 19.4 (Oct. 2018): 1-3.

Joanna Cohen, *Luxurious Citizens: The Politics of Consumption in Nineteenth-Century America*        (Philadelphia: University of Pennsylvania Press, 2017), in *Business History Review* 91.2 (2017):414-416.

Rowena Olegario, *The Engine of Enterprise: Credit in America* (Cambridge: Harvard University Press), in *History: Reviews of New Books, 45.3* (2017): 61–62.

James Traub, *John Quincy Adams: Militant Spirit* (New York: Basic Books, 2016) in *H-FedHist, H-Net  Reviews* (July 2017).

Katherine C. Epstein. *Torpedo: Inventing the Military-Industrial Complex in the United States and Great        Britain* (Cambridge, Ma: Harvard University Press, 2014) in *Enterprise & Society* 17.1 (March    2016): 227-229.

David F. Ericson, *Slavery in the American Republic: Developing the Federal Government, 1791-1861*   (Lawrence: University Press of Kansas, 2011) in *Journal of Interdisciplinary History* 43.3    (Winter 2013): 495-496.

Eliga H. Gould, *Among the Powers of the Earth: The American Revolution and the Making of a New    World Empire* (Cambridge: Harvard University Press, 2012) in *New England Quarterly* 85.4    (December 2012): 764-767.

**OTHER PUBLICATIONS**

"Joel Roberts Poinsett: Namesake of the poinsettia, enslaver, secret agent and perpetrator of the 'Trail of        Tears,'" *The Conversation* (19 December 2023).

"Poinsettia Day, the Monroe Doctrine, and U.S.-Mexican Relations," *Origins* (December 2023).

"Celebrate Constitution Day by reading the Constitution," *Cincinnati Enquirer* (17 September 2023).

"Entertaining and Revolting: Homosociality and Heterosexuality in War Department Correspondence,        1811–1846," *Panorama: Expansive Views from the Journal of the Early Republic* (8 March        2021).

"Top Ten Origins: Gun Regulation," *Origins* (8 February 2019).

"Print-your-own gun debate ignores how the US government long provided and regulated firearms," *The Conversation,* (1 August 2018) [reprinted in *The Chicago Tribune* and other newspapers]

"Regulations, Not Rights: The History of Government Gun Culture in the Early Republic," *The        Panorama: Expansive Views from the Journal of the Early Republic* (16 July 2018).

"Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion," *Cambridge        Core Blog*, (3 July 2018).

"Early National Bro Culture in Daniel Parker's War Department." *Common-place: the journal of early        American life* 17, no. 2 (Winter 2017).

"Guest Post: Lowell and the Executive," *The Junto: A Group Blog on Early American History*        (August 2014).

**INTERVIEWS**

"The Author's Corner with Lindsay Schakenbach Regele" *The Way of Improvement Leads Home: A blog  devoted to American history, religion, politics, and academic life* (3 January 2024).

"The checkered history of the poinsettia's namesake and the flower's origins get new attention," *The        Associated Press,* (20 December 2023) [reprinted in *The Washington Post* and others].

"Five Questions with Lindsay Schakenbach Regele, author of "Flowers, Guns, and Money: Joel Roberts        Poinsett and the Paradoxes of American Patriotism" *The University of Chicago Press Blog* (19 December 2023).

"Spectrum News 1 Special: Exploring American gun culture," *Spectrum News 1* (13 December 2023).

"Washington, DC Reborn" (TV interview), *If We Built It Today: Season 2, Episode 1* Science Channel,        (24 January 24 2021).

"Episode 298: Lindsay Schakenbach Regele, Origins of American Manufacturing," *Ben Franklin's        World- A Podcast about Early American History* https://benfranklinsworld.com/ (March 30,        2021).

"Episode 105: Manufacturing Advantage," Podcast, *Historically Speaking*,        https://historicallythinking.org/episode-105-manufacturing-advantage/ (3 April 2019).


**REFERENCE WORKS**

"Industrialization," "South America," "Mexico," "Singer Manufacturing Company," "Levi Strauss &        Co.," "Immigration Quotas," "Tariff," in *America in the World, 1776 to the Present: A        Supplement to the Dictionary of American History.* 2 vols., ed. Edward J. Blum (Farmington        Hills, MI: Charles Scribner's Sons, 2016).

Contributing Author and Research Assistant, *America's Changing Neighborhoods: An Exploration of Diversity Through Places*, ed. Reed Ueda (Santa Barbara, Calif.: ABC-Clio, 2017).

**FELLOWSHIPS AND GRANTS**

George Washington Presidential Library at Mount Vernon Fellowship, 2023-2024

Committee on Faculty Research (CFR), Faculty Research Grant, Miami University, 2023-2024

Richard & Mary Jo Marsh Fellowship, William L. Clements Library, 2023-2024

Kluge Fellowship, John W. Kluge Center of the Library of Congress, 2018-19, $12,600

Beveridge Travel Grant, American Historical Association, March, 2019, $800

Huntington Library, Robert L. Middlekauff Fellowship, 2017-2018

John E. and Winifred E. Dolibois Fund, Farmer School of Business, Miami University, 2017-2018, $2,500; 2016-2017, $2,800; 2015-2016, $2,000

Program in Early American Economy and Society Post-Doctoral Fellowship, Philadelphia, PA, January        2016-May 2016, $20,000

Hazeltine Fellowship for Graduate Research in Entrepreneurship, The C.V. Starr Program in Business,        Entrepreneurship and Organizations, Brown University, $5,000, 2014-2015

Karen B. and Hall J. Peterson Fellowship, American Antiquarian Society, $1,850, 2014-2015

A. Molho Graduate Travel Fund, History Department, Brown University, $750, 2014

Alfred D. Chandler Travel Grant, Business History Conference, $500, 2014

International Affairs Travel Fund Award, Graduate School, Brown University, $500, 2014

Program on the Study of Capitalism Research Fellowship, Institute for Global Law and Policy, Harvard University, $2,000, May-December, 2013

Marc Friedlaender Fellowship, Massachusetts Historical Society, $1,500, 2013-2014

John E. Rovensky Fellowship in U.S. Business or Economic History, $10,000, 2012-2013

Peter Green Doctoral Scholar Fellowship, Brown University, $4,000, 2011-2012

Colonial Dames of America Research Grant, $5,000, 2011

International Affairs Travel Grant, Office of Global Engagement, Brown University, $750 (for participation in        Rothschild Archive Summer School: The American Project, London, UK, Sept. 12-16, 2011)

Graduate Student Research Prize, Tufts University, $700, 2008

**CONFERENCES AND OTHER PRESENTATIONS**

"An Inauspicious Start to Putting the Monroe Doctrine into Practice: Joel Roberts Poinsett in Mexico, 1825-1830," at the annual meeting of the Society for Historians of American Foreign        Relations, University of Toronto, June 14, 2024

Invited presentation. "U.S. Interest in Mexico, 1820-1825," Center for the Study of American Democracy    at Kenyon College Political Economy Colloquium, March 27, 2024

"The Business of 19th Century Firearms: Roundtable," at the annual meeting of the Business History        Conference, Providence, RI, March 16, 2024

"Guns and Westward Expansion," invited presentation at the Current Perspectives on the History of Guns        and Society Conference, Wesleyan University Center for the Study of Guns and Society, Oct. 14,        2023

Discussant. Tracy Barnett, "Armed Patrols: Northeastern Industry and its Links to Southern Violence," Southern Historical Association Junior Scholars Workshop, September 2023.

"The Springfield Armory's Role in Creating the Tool and Die Industry," with Robert C. Ford (University    of Central Florida), Springfield Museums Lecture Series, Sept. 14, 2023

"A Reassessment of the Nullification Crisis," presentation at the annual meeting of Society of Historians    of the Early American Republic, Philadelphia, July 16, 2023

Chair and comment. "Politics and the State," Local Stories, National Narratives: A Conference in Honor  of John L. Brooke, The Ohio State University, June 3, 2023

"Joel Roberts Poinsett and Military Expenditures during "Indian Removal,"" invited presentation at    "Crafting Narratives of Empire:    Contesting Roots of Revolution in the Long 19th    Century,"    hybrid conference, The Institute for Thomas Paine Studies Iona University, September 24, 2022

"Race and Empire in the Executive: The Case of Joel Roberts Poinsett, Ambassador to Mexico, Secretary    of War, Enslaver, Land Speculator," invited panel presentation at the annual meeting of Society    of Historians of the Early American Republic, New Orleans, July 22, 2022

"The Disruption of the Nullification Crisis: A Reassessment," presentation on panel "Responding to    Shocks in the Pre-industrial World," at the annual meeting of the Business History Conference,    Mexico City, April 7, 2022

"Capitalism and the Militarization of Indian Removal," presentation on panel "Capitalism, Class, Race,   and Gender in the Second Seminole War," annual meeting of the Society of Historians of the    Early American Republic, virtual, July 16, 2021

"Federal Force, States' Rights and the National Good: Nullification Crisis, 1832-3 and Today," Ohio   Archives Month Lecture (Zoom), Oct. 1, 2020

"United States Expansion and the Development of a National Firearms Industry," invited participation in    Duke Historical Gun Law Conference, Duke Center for Firearms Law, virtual, June 19, 2020

""The U.S. Arms Trade in the Age of Latin American Revolutions, 1815-1825," with Andrew Fagal  (Princeton University), for panel: Strategic Responses to Geopolitical Conflict" annual meeting of    Business History Conference, March 13, 2020, Charlotte, NC, March 13, 2020 (presented in   absentia)

"Official Diplomacy and U.S. "Interest" in Mexico, 1825-1830" for panel: "Knowledge, Diplomacy, and    Laying the Groundwork for U.S. Commercial Empire in Mexico, 1821-1846" at annual meeting    for SECOLA (Southeastern Conference for Latin American Studies, March 5, 2010 Austin TX    (presented in absentia)

"United States Expansion and the Development of a National Firearms Industry," invited participation in    Firearms Law Works in Progress Workshop, Duke Center for Firearms Law, August 2, 2019

"Joel Roberts Poinsett and the Making of Martial Capitalism," Kluge Center, Library of Congress,    Washington, D.C., July 9, 2019

"Joel Roberts Poinsett and Martial Capitalism in the Early Republic United States," Society for Historians    of the Early American Republic Annual Meeting, Cambridge, MA, July 19, 2019.

"How the National Firearms Industry Helped Make an Early Republic Empire," at "Making a Republic    Imperial" Conference, Library Company of Philadelphia, March 28, 2019

"State Department Business: Joel Roberts Poinsett and Latin American Independence, 1811–1829," Business History Conference annual meeting, Cartagena, Colombia, March 15, 2019

"The Historical Scope of the Second Amendment," invited panelist, *Heller at 10: A Symposium on the  Last-and Next-Decade of the Modern Second Amendment*, Giffords Law Center and UC Hastings    College of the Law, San Francisco, CA, January 18, 2019

31

"A Surplus of Arms: The U.S. Ordnance Department and the South American Independence Wars," Society of Historians of American Foreign Relations Annual Meeting, Philadelphia, PA, June 21,      2018

Discussant. "Commodities and Finance" at the Business History Conference Annual Meeting, Baltimore,      MD, April 7, 2018

Business History Conference luncheon, American Historical Association Annual Meeting, invited presentation, Washington, D.C., January 6, 2018

 "Industrial Manifest Destiny?" Territorial Expansion and American Weapon Improvement," American      Historical Association Annual Meeting, Washington, D.C., January 5, 2018

"Industrial Manifest Destiny?" Territorial Expansion and American Weapon Improvement," Society for      Historians of Technology Annual Meeting, Philadelphia, PA, October 28, 2017

Discussant. "Everyday Economies," Omohundro Institute for Early American Culture and SocietyAnnual Meeting, Ann Arbor, MI, June 16, 2017

 "Industrial Manifest Destiny?: American Manufactures and Territorial Expansion, 1838-1850," Business      History Conference Annual Meeting, Denver, CO, March 31, 2017

"Secret Foreign Relations: The State, the People, and the Leander Expedition," Omohundro Institute for      Early American Culture and Society Annual Meeting, Worcester, MA, June 26, 2016

"Managing New Markets: A Reinterpretation of the Rise of American Industrial Capitalism," Business      History Conference Annual Meeting, Portland, OR, April 2, 2016

"A Readiness for Violence: War Preparations in the Early Republic United States," American Historical      Association Annual Meeting, Atlanta, GA, January 10, 2016

**"**Who Benefits from Innovation?: Winners and Losers in the Antebellum U.S. Patent System," Business History Conference Annual Meeting, Miami, FL, June 27, 2015

"Manufacturing Advantage: War, the State, and the Origins of American Industry 1790-1840," Histories      of American Capitalism Conference, Cornell University, Ithaca, NY, November 8, 2014

"Manufacturing Advantage: War, the State, and the Origins of American Industry 1790-1840," Fellows'      Talk, American Antiquarian Society, Worcester, Mass., August 5, 2014

"Anywhere where we have diplomatic powers we can affect regulation": Managing New Markets in an  Age of Latin American Revolutions, 1810-30," Society for Historians of the Early American      Republic Annual Meeting, Philadelphia, July 19, 2014

"The Origins of the Military-Industrial Complex?: The Federal Government, Diplomacy and American Industry, 1790-1840," Business History Conference, Frankfurt am Main, Germany, March 14, 2014

 "Manufacturing Advantage: Boston Merchant-Industrialists and the Federal Government, 1790-1840," Massachusetts Historical Society, September 18, 2013

"'Anywhere where we have diplomatic powers we can affect regulation': Managing New Markets in an   Age of Latin American Revolutions, 1810-30," Yale Early American Historians Seminar, April17, 2013.

"The Business of Diplomacy: The Boston Associates and the Transcontinental Treaty, 1795-1825," *Capitalism in Action*, conference hosted by the Political Economy of Modern Capitalism Workshop, Harvard University, March 3-5, 2011

**TEACHING**

32

Association of College and University Educators, Fostering a Culture of Belonging, Micro-credential, Oct. 29, 2023

Howe Center for Writing Excellence Faculty Fellow, 2017

Center for Teaching Excellence, New Faculty Teaching Excellence Program certificate: Fall, 2015

Courses Taught: HST111 Survey of American History; HST290 America and Global Capitalism (developed; taught cross-listed with both AMS and ITS); HST359 (Junior Honors Colloquium); HST362 Era of the American Revolution; HST363 History of the Early American Republic; HST400 Capstone: Histories of American Capitalism; HST4007 Honors Capstone; HST480 Independent Study-thesis writing); HST 604 Graduate Research Seminar II; HST670 Graduate Colloquium: Capitalism; HST677 Independent Study: Summer Thesis Research; Early America, The Early American State; Early American Naval History; America in the Age of Revolutions; Antebellum United States; American Liberalism; American Abolitionism and Social Reform; HST700 Thesis writing hours

PhD committee member:

Justin Chandler (English), "Imagined States: the rise of American Speculative Fiction," 2022

M.A. Theses advised:

Rachel Patterson, "The Haitian Revolution in the United States," ongoing

Elijah Walter, "The Federal Government and Early Ohio Development," ongoing

Haley Knuth, "Who Controls the Narrative? Newspapers and Cincinnati's Anti-Black Riots of 1829, 1836, and 1841," 2021

Heather Sommer, "Of Crimes and Calamities: Marie Antoinette in American Political Discourse," 2018

Daniel Melega, "From Suasion to Coercion: Temperance Reform and Prohibition in Antebellum Maine," 2017

M.A. Thesis committee member:

Zachary Cherry, "Inheritors of Struggle: Orienting German Schoolchildren to the Unrealities of War from 1933 to 1939," defended July 16, 2024

Laura Janosik, The History behind the Flying Pig: A Narrative of Urban and Rural Land in Nineteenth-century Ohio," defended April 12, 2023

Will Elgin, "The Itinerary of Jan Huygen van Linschoten: Knowledge, Commerce, and the Creation of the Dutch and English Trade Empires," 2021

Alessandra A. McLoughlin: "Love and Dishonor: Miami University and Slavery in the Antebellum Era," 2021

Amanda Lawson, "Development in the "Rights" Timing: The Carter Administration, Non-Government Organizations, and the United States' Latin American Foreign Policy," 2019

Edward Strong, "The Jaws of Mars are Traditionally Wide … and His Appetite is Insatiable": Truman, His Secretaries, and Interpreting National Security," 2019

Courtney Misich, "Social and Spatial Mobility in the British Empire: Reading and Mapping Lower Class Travel Accounts of the 1790's," 2017

Senior Honors Thesis advised:

Hope Nickel, "Cry 'Havoc!' and Let Slip die Hunde of War: The Fervor and Fight of German-Americans in the American Civil War," ongoing

Madison McQueen: "The Children Sang Freedom: Mothering and Childhood in the Antebellum South," 2023

33

Tim Bredemeier: "Foundations of Fortune: An Examination of the Many Trials and Tribulations of Procter & Gamble's Formative Years," 2023
Andrew Wettrich: "Seeing the Stars in the Stars and Stripes: The Role of Astronomy in Early Nineteenth Century American Identity, 2023"
Alexa Lawhorn: "My Call to Labor for Souls": The Rise and Fall of Jarena Lee's Ministry in the Antebellum United States," 2022
Cole Schroeder, "The Blurring of Domestic and Foreign Policy: The Effects of the French Revolution and Continental Liberalism on Great Britain in the Early Nineteenth Century," 2022
Karli Schivitz, "The Economics of Prostitution during the Early Republic," 2020
Katie Rogers, "Romanticism in the American Revolution and Late 18th Century Courtship," 2020
Samuel Lutz, "The American Predicament: Legitimizing Power over Native Americans in the Early American Republic Era," 2019
David McDevitt, "Captives of Revolution: Hessian Prisoners during the American War of Independence," 2016
Senior Honors Thesis reader: Lyndsey Case (April 2021): "Biopolitics of AIDs: Framing Disease & Challenging Homosexual Marielito's Relationship to the State through United States Immigration Law, 1980-1990;" Peyton Rayburn (April 2021): "The Interconnections of Native American Revitalization Efforts in the United States: Native American Policy, Red Power, and The Myaamia Center;" Gillian Davis (April 2021): "A Sexual Reward: The Gendered Experience of French Women in the Allied Media following the Nazi Occupation, 1944-1945" (April 2021); Alissa Johnson, "Nuances In Black Women's Welfare Reform: A Study Of Settlement House Developments in Cleveland and New York City, 1890-1930" May, 2018; Kaylie Schunk "Unification through Opposition: America and the Myaamiaki Following the Seven Years' War," May, 2018; Luke Noe, "Jefferson Davis was the President of the Confederate States of America during the Civil War," May, 2017; Hannah Blubaugh, "The History of Trade and Diplomacy Between the Creek Indians and the British, 1733-1770," May, 2016

**DEPARTMENT/UNIVERSITY SERVICE**
Graduate Studies (History) Director, 2023-
Graduate Studies Committee, 2015-2017, 2022-2023
History Department Chair Search Committee, Fall 2023-
Ohio Seminar in Early American History Co-organizer, 2023-
History Honors Program Mentor, 2022-2023
Societies, Politics, Economies Faculty Research Group Co-chair, 2017-
Advisory Committee (History Department), 2016-2017, 2018-2019, 2020, 2023
Undergraduate Studies Committee (History Department), 2019
Speakers, Outreach, and Alumni Relations Committee, 2018-
Shriver Chair Search Committee (History Department), 2016-2017
Curriculum Committee (College of Arts and Science), 2017-2019
Global Studies Committee (Miami University), 2015-2016

**PROFESSIONAL SERVICE**
Book Reviews Co-editor, *Journal of the Early Republic*, 2021-
Co-organizer, Ohio Seminar in Early American History and Culture, 2023

NEH-Hagley Fellowship Selection Committee, 2023
Springfield Armory National Historic Site Education Committee, 2021-
Kerr Prize Committee (Business History Conference), 2019-2021, Co-Chair 2020-2021
Manuscript Referee (*Journal of Management Studies, Journal of the Early Republic*


**LANGUAGE**
Reading and translation ability in Spanish

**PROFESSIONAL ORGANIZATIONS**
American Historical Association
Business History Conference
Organization of American Historians
Society for Historians of the Early American Republic

35