# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, JUDSON THOMAS,
COLBY CANNIZZARO, CAMERON PROSPERI,
THE GUNRUNNER, LLC, and FIREARMS
POLICY COALITION, INC.,

               Plaintiffs,

               v.

ANDREA JOY CAMPBELL, in her official
capacity as Attorney General of the Commonwealth
Of Massachusetts, TERRENCE REIDY, in his
official capacity as Secretary of the Executive
Office of Public Safety and Security of the
Commonwealth of Massachusetts,

               Defendants.

CIVIL ACTION
NO. 1:21-CV-10960-DJC

## EXPERT DECLARATION OF SAUL CORNELL

1.     I have been asked by the Office of the Attorney General for the State of Massachusetts to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.

2.     In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. 597 U.S. 1 (2022). This approach was elaborated and clarified by the Court in its recent decision in *United States v. Rahimi,* 144 S.Ct. 1889 (2024) where the Court recognized that the scope of permissible regulation under the Second Amendment was not frozen in amber but evolved in response to changing circumstances. *Rahimi* underscored that the proper historical

1

inquiry should search for the animating principles guiding past regulations, not a series of isolated data points or "historical twins."

3.      *Bruen* and *Rahimi's* modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past. My report explores these issues in some detail. Finally, I have been asked to evaluate the statutes at issue in this case, particularly regarding their connection to the traditions of firearms regulation in American legal history.

### Background and Qualifications

4.      I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

5.      My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2] In

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit A.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

addition, my writings have been cited over a hundred times by federal and state courts over the past five years. My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals. I now rank in the top one hundred legal scholars in America according to the most recent Hein-On-Line Scholar Rankings. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] I have authored two prize winning historical monographs and been nominated for a Pulitzer Prize twice. Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.); *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Platkin*, Nos. 3:18-cv-10507, 1:22-cv-4360, 3:22-cv-04397 (D.N.J.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Rhode Island v. Ortiz*, No. 19-0672AG (R.I. Super.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal.); *Capen v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.); *Nat'l. Assoc. for Gun Rights, et al. v. Lamont*, No. 3:22-cv-0118 (D. Conn.); *Sullivan v. Ferguson*, No.

---

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

22-cv-05403 (W.D. Wash.); *Nat'l. Assoc. for Gun Rights v. Lopez*, No. 1:22-cv-404 (D. Haw.);

*Herrera v. Raoul*, No. 23-cv-00532 (N.D. Ill.); *Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn.).

## Retention and Compensation

6.      I am being compensated for services performed in the above-entitled case at an

hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports;

$1000 per hour for depositions and court appearances; and an additional $100 per hour for travel

time. My compensation is not contingent on the results of my analysis or the substance of any

testimony.

## Basis For Opinion And Materials Considered

7.      The opinion I provide in this report is based on my review of the operative

complaint filed in this lawsuit, the various briefs filed by relevant parties, and my review of the

state laws at issue in this lawsuit, my education, expertise, and research in the field of legal

history. The opinions contained herein are made pursuant to a reasonable degree of professional

certainty.

## Summary Of Opinions

8.      Understanding text, history, and tradition requires a sophisticated grasp of

historical context. One must canvass the relevant primary sources, secondary literature, and

jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with

the Second Amendment.[4] At the time *Heller* was decided there was relatively little scholarship

on the history of gun regulation, but in the decade following the case a burgeoning body of

scholarship has uncovered a previously hidden history of arms regulation in the Anglo-American

---

[4] *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 US 742, 767–68 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 144 S.Ct. 1889 (2024).

legal tradition.[5] Much of this material was largely unavailable to the *Heller* court because the sources were difficult to identify, search, and collect. The creation of searchable digital "archives" has transformed this sub-field and facilitated a more sophisticated understanding of the scope of gun regulation under Anglo-American law.[6] Hundreds of laws were enacted in the era of the Second Amendment to address the problems early American governments confronted.

9.     The scope of permissible regulation, as *Rahimi* makes clear, was not identical to this body of statutory law for several reasons. Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[7]

10.     No jurisdiction uses their ample police power authority to the fullest extent when legislating. Instead states and localities respond to specific problems as they emerge and draw on their reservoir of police power in formulating an appropriate legislative response.[8]

11.     Secondly, in the small close-knit communities of early America the task of law enforcement and regulation was largely accomplished through common law means not statutes. Thus, to obtain a full picture of early American gun regulation courts must grapple with the Americanization of English common law in the early republic. The American Revolution marked a break with some features of this tradition, but important aspects of the common law were

---

[5] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[6] Dennis Baron, *Corpus Evidence Illuminates the Meaning of Bear Arms*, 46 HASTINGS CONST. L.Q. 509 (2019).

[7] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[8] WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH CENTURY AMERICA (1996).

absorbed into state law. Only those aspects of the common law consistent with America's new republican constitutions were thus incorporated.

12.     Understanding the relevant legal history to make sense of early American gun regulation also requires some understanding of other fields of American history, including social, cultural, economic, and military history. A history of gun regulation without an understanding of the evolving history of American gun cultures produces a distorted account of the past courts seek to reconstruct.

13.     In short, simply compiling a spread sheet of old laws and reading them with little regard for context offers an imperfect guide to understanding the history required by *Bruen* and *Rahimi*.[9]

14.     Finally, it is important to recognize that research is ongoing and continues to uncover new source materials relevant to the inquiries required by *Bruen* and *Rahimi*.

**The Arc of American Firearms Regulation: An Exercise of the Police Power**

15.     The ability to regulate firearms and gun powder is of ancient vintage and was central to the conception of ordered liberty that defined American law from its earliest days. At the very core of the early American understanding of the scope of liberty was the right of self-government and the right of the people themselves to regulate their internal police. Although modern law typically analyzes this concept in terms of the police power doctrine that emerged during the era of the Marshall Court, the Founding era understood this as a right, not a power.[10]

---

[9] Laura Edwards, *"The Peace," Domestic Violence, and Firearms in the New Republic*, 51 FORDHAM URB. L.J. 1 (2023); Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L.J. 25 (2023).

[10] John Phillip Reid, *The Authority of Rights at the American Founding*, in THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND 97 (Barry Alan Shain ed., 2007).

Thus, in keeping with *Heller's* observation that rights are entrenched with the scope they enjoyed at the Founding, it is vital that courts recognize the broad right of the people to regulate their own internal affairs and promote public safety.

16.     As this report discusses, regulation of arms and gun powder expanded after the adoption of the Second Amendment and various arms-bearing provisions in state constitutions. Both the number of states enacting laws and the type of laws enacted increased gradually over the course of the nineteenth century. As multiple scholars have demonstrated states and municipalities enacted hundreds of gun laws in the Founding era. [11] Gun regulation was a normal and unproblematic exercise of state police power. Apart from a few outlier cases in the slave South, most courts routinely upheld these regulations.[12]

### Early American Firearms Regulation: An Overview

17.     One can discern at least six broad categories of regulation in the Founding era that are key to evaluating the issues in this case. [13]

    i.     Manufacturing standards for arms and gun powder.[14]

    ii.     Regulation of the commercial sale of guns and gun powder. [15]

---

[11] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights* 80 LAW AND CONTEMP. PROBS 55 (2017) at 59–61 tbl. 1.

[12] On regional differences in the adjudication of gun regulations, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[13] For an alternative typology for this regulatory tradition, see Ambrose Graham, *Note, Gunmaking at the Founding,* 77 STAN. L. REV. (forthcoming 2025).

[14] *See, e.g.,* 1805 Mass. Acts 588, *infra,* note 25.

[15] *See, e.g.* 1794 Pa. Laws 764, ch. 337; An Act for the Inspection of Gunpowder, Manufactured within this State (1776) in Records of the State of Rhode Island And Providence Plantations In New England 18-19; An Act for the Inspection of Gunpowder, 1776-1777 N.J. Laws 6, ch. 6, § 1 ("That any Person who, from and after the Publication of this Act, shall offer any Gun-Powder for Sale, without being previously inspected and marked as is herein after directed, shall forfeit, for every such Offence, the
(continued…)

iii. Restrictions on dangerous and non-law abiding persons acquiring arms and gun powder.[16]

iv. Time, place, and manner restrictions on arms and gun powder, including storage,[17] carry[18] and discharge. [19]

v. Bans on unusually dangerous weapons. [20]

vi. Gun censuses and militia muster rolls[21]

18. Especially relevant here, is the recognition that the American firearms industry in its infancy was largely dependent on government contracts and subsidies. Thus, governments had

---

Sum of Five Shillings a Pound for every Pound weight so offered for Sale, and so in Proportion for greater or lesser quantity."); 1808 Mass. Acts 444, ch. 52; 1820 N.H. Laws 274, ch. 25.

[16] *See, e.g.,* Act of Feb. 16, ch. 6, 1787 Mass. Acts 555, 555-556.

[17] *See, e.g.,* 1771-72 Mass. Province Laws 167, ch. 9; 1782 Mass. Acts 119, ch. 46; 1882 Mass. Acts 212, ch. 269; 1772 N.Y. Laws 682, ch. 1549; 1821 Me. Laws 98, ch. 25; 1825 N.H. Laws 73, ch. 61; 1832 Conn. Acts 391, ch. 25.

[18] *See, e.g.,* Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218; Del. Const. of 1776, art. XXVIII ("To prevent any violence or force being used at the said elections, no persons shall come armed to any of them.")

[19] *See, e.g.,* An Act to prevent the Killing of Deer out of Season, and against Carrying of Guns and Hunting by Persons not qualified, Laws, and Acts of the General Assembly of His Majesties Province of Nova Caesarea or New-Jersey (1717) and *e.g.,* An Act To Prohibit Shooting Or Firing Off Guns Near The Road Or Highway On Boston Neck, chap. 6, § (1713) Acts and Resolves passed by the General Court; Act of May 28, 1746, ch. X, Acts and Laws of Mass. Bay; 1882 Ga. Laws 131, No. 378; 1878 Cal. Stat. 117, ch. 299; 1877 Ohio Laws 278, ch. 8, § 60.

[20] *See, e.g.,* Judge Edward Scott, 1 LAWS OF THE STATE OF TENNESSEE: INCLUDING THOSE OF NORTH CAROLINA NOW IN FORCE IN THIS STATE: FROM THE YEAR 1715 TO THE YEAR 1820, 710, 714 (1821); An Act for the Restraint of Idle and Disorderly Persons § 6. ("Be it enacted, That if any person or persons shall publicly ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law.")

[21] For a discussion of gun censuses and militia rolls, see Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, in A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

a vested interest in determining what types of weapons would be produced. Thus, it is not true that Founding era government simply let the market determine which firearms enjoyed heighted constitutional protections. Had the government adopted such an attitude America would have lost the American Revolution and there would be state constitutional tradition of protecting arms bearing and no federal constitution or Second Amendment to protect. History clearly shows that regulation was the necessary pre-condition for the preservation of the right to keep and bear arms: the exact opposite of the claim that market forces determined which guns were constitutionally protected. As discussed further below, most guns were regulated as private property, enjoying the protections all property were accorded in Anglo-American law and only a tiny subset of these guns were given the highest level of constitutional protection.[22]

19.      Government regulation of the firearms industry indisputably included the authority to inspect the manufacture of weapons and impose safety standards on the industry. As business historian Lindsay Schakenbach Regele notes, "By 1810, western Massachusetts produced more small arms than anywhere else in the Northeast."[23] Beginning in 1794 the federal armory in Springfield, Massachusetts served as a spur to technological innovation in the region. In the years following the War of 1812, the Armory served as an incubator for other local producers and gunsmiths, so much so that one Pittsfield gunsmith, Lemuel Pomeroy, praised the federal government for its actions which encouraged gunsmiths "to fabricate arms of the first quality."[24] The Springfield Armory's output accounted for most guns produced in the state.

---

[22] Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L.J. 25, 44-47 (2023).

[23] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[24] LINDSAY SCHAKENBACH REGELE, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 65-66.

20.    In 1805 Massachusetts enacted a law requiring all guns, before sale, to be inspected, marked, and stamped by an inspector. The state revised the proof statute two more times in the decades leading up to the Civil War. [25] These requirements ensured that the guns sold to the public were safe and suitable for use. Although the guns produced by the Springfield Armory were not subject to state law, because they were under federal control, they were nonetheless subjected to thorough testing and were stamped as well. Indeed, the fact that the arms produced by the Springfield Armory had undergone a rigorous testing and evaluation process became a major selling point that was advertised to increase their value and desirability as surplus military arms in the booming consumer market for guns that exploded in the decades after the War of 1812.[26]

21.    However, the starting point for any effort to properly contextualize early American gun regulation is the recognition that gun cultures and firearms technology were markedly different than the current situation America now faces. Understanding this basic fact is vital to constructing the type of historical analogies that *Bruen* and *Rahimi* requires.

22.    The specter of gun violence hovers over today's debate of the Second Amendment, but recent historical scholarship has demonstrated that this was not the case in the Founding era. Gun homicide, mass shootings, and suicide, the three forms of gun violence that dominate the modern gun debate, were simply not serious problems for those who enacted the

---

[25] 1805 Mass. Acts 588, An Act to Provide for the Proof of Fire Arms Manufactured Within This Commonwealth, Ch. 35. The law was revised in 1837 and later in 1859, see Chap 49, Sec. 27 (Firearms), General Statutes of the Commonwealth of Massachusetts: Revised by Commissioners Appointed under a Resolve of February 16, 1855, Amended by the Legislature, and Passed December 28, 1859 (1860). For a discussion of these regulations, see Graham, *supra* note 13.

[26] Lindsay Schakenbach Regele, *Guns for the Government: Ordnance, the Military 'Peacetime Establishment,' and Executive Governance in the Early Republic* 34 STUDIES IN AMERICAN POLITICAL DEVELOPMENT 132, 145 (2020).

Second Amendment or its many state analogues. [27] Historian Randy Roth's work on homicide in this period demonstrates that guns were not the weapon of choice for those with evil intent in the Founding era. Black powder, muzzle-loading weapons, were too unreliable and took too long to load to make them effective tools of homicide and most crimes of passion. Given this fact it is easy to understand why Founding era legislators did not attempt to solve a problem that did not exist yet.[28] At this time, very few households possessed more than one gun. Consumer preferences and the market economy favored light hunting muskets and fowling pieces, guns that were of most use in a rural and predominantly agrarian society.[29] At the time of the Second Amendment Americans wanted guns useful to life in an agrarian society where most families were farmers. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men, as the tragic fate of Alexander Hamilton so vividly illustrates.[30]

23.    Today America confronts a firearms market that is awash with guns whose rate of fire and accuracy would have amazed eighteenth century Americans. The few multi-shot weapons that existed at the time of the Second Amendment were curiosities, oddities that were so rare they were only viewable at museums, not routinely purchased by citizens.[31]

24.    Recognizing that the black powder muzzle loading weapons that predominated in the era of the Second Amendment shared few features with today's guns is the first step to

---

[27] Sweeney, s*upra* note 21.

[28] Randolph Roth, *Whys Guns are and are not the Problem: The Relationship Between Guns and Homicide in American in History* in A RIGHT TO BEAR ARMS (Tucker*,* ed.).

[29] *Id.*

[30] *See* Sweeney, *supra* note 21, at 61.

[31] Brian DeLay, *The Myth of Continuity in American Gun Culture,* 113 CALIF. L. REV. (forthcoming 2025).

reconstructing a historically accurate understanding of Founding era gun regulation.

25.     Although better armed than their British forebears, Americans in the Founding era also lived in an age of relative gun scarcity, particularly compared to the easy availability of guns today. Given these facts enacting laws limiting access to guns would have made little sense. The nature of the market meant that without vigorous government intervention to encourage manufacturing of arms the nation would never properly arm its militias. Put another way, public policy needed to encourage the production of arms and force Americans to purchase guns that reflected government preferences, not consumer preferences.[32]

26.     Although politicians, ministers, and other commentators praised the militia, the state faced a persistent problem of arming them sufficiently.[33] American reluctance to purchase the type of weapons needed to effectively arm their militias was a perennial problem in the Founding era.[34] Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by military tactics. A gun had to be able to receive a bayonet and serve as a bludgeon if necessary. The lightweight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin but were not well suited to eighteenth-century ground wars. When the U.S. government surveyed the state of the militia's preparedness shortly after Thomas

---

[32] Sweeney, *supra* note 21.

[33] In the Virginia ratification convention, Patrick Henry praised the militia, but remined his fellow delegates of the persistent problems of arming them: "we have learned, by experience, that, necessary as it is to have arms, and though our Assembly has, by a succession of laws for many years, endeavored to have the militia completely armed, it is still far from being the case," 3 Founders Constitution, Article 1, Section 8, Clause 12, Document 27
http://press-pubs.uchicago.edu/founders/documents/a1_8_12s27.html.

[34] For further discussion, see SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

Jefferson took office in 1800, the problem had not been solved. Although Massachusetts boasted above 80% of its militia properly armed, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[35]

27.      Government policy, both at the state and federal level, responded to these realities by requiring a subset of white citizens, those capable of bearing arms, to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities. Gun policy in the Founding era reflected these realities, and accordingly, one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogeneous industrial society capable of producing a bewildering assortment of firearms.[36] In short, laws created for a relatively sparsely populated rural society without much of a gun violence problem that were enacted at a time of relative gun scarcity, have limited value in illuminating the challenges Americans face today.

**A Well-Regulated Right: The Original Understanding of the Second Amendment within the Context of the Police Power**

28.      The language of rights is pervasive in modern American law and is familiar to both judges and lawyers.[37] Eighteenth-century rights talk drew on a range of intellectual traditions alien to most modern Americans, including most lawyers and jurists. Recovering the meaning of Founding era legal texts requires mastering a rich body of sources, including social contract theory (most notably Locke), common law, and Whig republicanism.[38] In modern law, liberty and power are typically cast as antithetical; accordingly, rights in contemporary law

---

[35] *Id.*

[36] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

[37] For a notable exception to this general silence, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW AND CONTEMP. PROBS. 31 (2020).

[38] Victoria Kahn *Early Modern Rights Talk* 13 YALE J.L. & HUMAN. (2001).

13

function as trumps, erecting strong barriers against government interference.[39] For many jurists

and lawyers in the Founding era, a properly structured legal system ensured that liberty and

power were complimentary concepts, not antagonistic ones.[40] Rather than limit rights, regulation

was the essential means of preserving rights.[41] In the legal traditions familiar to the Founding

generation, unrestrained liberty was a threat, not a guardian of liberty.[42] Members of the

Founding era described this dangerous form of liberty as licentiousness, a word that has virtually

disappeared from modern rights discourse.[43] The preservation of liberty—well-regulated

liberty—meant steering a course between arbitrary power and licentiousness.[44] In a speech to the

First Congress on North Carolina's adoption of the Constitution, President George Washington

reminded Congress that America's new experiment in republican government required its

citizens "to distinguish between oppression and the necessary exercise of lawful authority," and

"discriminate the spirit of liberty from that of licentiousness, cherishing the first, avoiding the

---

[39] Sanford Levinson, *United States: Assessing Heller*, 7 INT'L J. CONST. L. 316, 319 (2009).

[40] Jonathan Gienapp *Response: The Foreign Founding: Rights, Fixity, and the Original Constitution,* 97 TEXAS LAW REVIEW ONLINE 115 (2019).

[41] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights,* 3 CRITICAL ANALYSIS L. 221 (2016).

[42] *Id.*

[43] On the difference between liberty and licentiousness in constitutional discourse in this period, see Philip A. Hamburger, *Natural Rights, Natural Law, and American Constitutions*, 102 YALE L. J. 907 (1993). Philodemus [Thomas Tudor Tucker], *Conciliatory Hints, Attempting, by a Fair State of Matters, to Remove Party Prejudice, Charleston, 1784* reprinted in 1 AMERICAN POLITICAL WRITING DURING THE FOUNDING ERA, 1760-1815, at 628 (Donald S. Lutz & Charles S. Hyneman eds., 1983).

[44] Although Justice Scalia rejected a "free standing" balancing test in *Heller*, he implicitly recognized that early American legislatures were free to engage in a variety of forms of balancing exercises when they crafted specific laws limiting aspects of this right. *District of Columbia v. Heller*, 554 U.S. 570. The focus on history and tradition therefore directs judges to canvass the past for precisely these sorts of insights into previous generations decisions about balancing. On the idea of well-regulated liberty and Founding era conceptions of rights, see John J. Zubly, THE LAW OF LIBERTY (Philadelphia 1775). The corresponding modern legal concept would be "ordered liberty," see *Palko v. Connecticut* 302 U.S. 319 (1937) and for a more recent elaboration of the concept, see James E. Fleming & Linda C. McClain, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES 1 (2013).

last."[45]

29.    Although some gun rights scholars have argued that First Amendment jurisprudence should be the model for interpreting the Second Amendment, this was not how early American legislatures and jurists approached these legal questions.[46] Indeed, both as a matter of text and as a matter of early regulation the First and Second Amendments diverge in several important ways.

30.    Textually, the First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits diminishing the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[47] In Founding-era American English, the word "infringement" meant to "violate" or "destroy." The one clear reading of the text that does not make sense is to treat abridge as a synonym for infringe.

31.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by

---

[45] From George Washington to the United States Senate and House of Representatives, 8 January 1790," 4 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES, 543, 8 September 1789–15 January 1790, (ed. Dorothy Twohig, 1993).

[46] For a flawed effort to analogize the First and Second Amendment by a prominent gun rights activist, see David Kopel, *The First Amendment Guide to the Second Amendment,* 81 TENN. L. REV. 417 (2014). For critiques of this approach, see Gregory P. Magarian, *Speaking Truth to Firepower: How the First Amendment Destabilizes the Second*, 91 TEXAS L. REV. 49 (2012). Darrell A.H. Miller, *Analogies and Institutions in the First and Second Amendments: A Response to Professor Magarian*, TEXAS L. REV. 137-151 (2013).

[47] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation: "Princes who infringe the law of nations, commit as great a crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201. This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online,* National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

the common law. Liberty, according to Burn, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[48]

32.     Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[49] And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[50] Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[51] Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive."[52] And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[53] Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The two terms were clearly understood to be distinctive in Founding era thinking about rights.

33.     In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text. Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions provided that such regulations did not destroy the

---

[48] *Liberty,* A NEW LAW DICTIONARY (1792). *See also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020).

[49] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[50] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[51] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[52] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[53] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

underlying *right*.

34.    Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[54] As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution: "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[55] By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[56]

35.    In further evidence that the First and Second Amendments were conceived in different ways, many individuals who enjoyed robust First Amendment rights in the Founding era were outside of the scope of the Second Amendment's protections. The same was true for state constitutional analogues of the Second Amendment. The individual states also imposed loyalty oaths, disarming those who refused to take such oaths. No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties. Thus, some forms of prior

---

[54] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016). *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[55] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799) (text available in the Evans Early American Imprint Collection) (emphasis in original).

[56] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[57]

36.     The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty were not antithetical to one another. The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control. "The point of retaining natural rights," originalist scholar Jud Campbell reminds us, "was not to make certain aspects of natural liberty immune from governmental regulation. Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[58] Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[59]

37.     Without robust regulation of arms, ammunition, and accoutrements, it would have been impossible to implement the Second Amendment and its state analogues. Mustering the militia required keeping track of who had weapons and included the authority to inspect those

---

[57] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[58] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[59] Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic. This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing. On Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

weapons and fine individuals who failed to store them safely and keep them in good working order.[60]

38.    In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

39.    The legal concept of "police"—the power of the people, acting through their government, to enact and enforce laws to protect public health, safety, and welfare—was first conceptualized in Anglo-American law by Scottish moral and legal theorists in the eighteenth century.[61] The concept was elaborated by Sir William Blackstone in his influential *Commentaries on the Laws of England*. By the era of the American Revolution, the concept had become foundational to virtually every feature of Anglo-American law.[62] References to the right of the people to regulate their internal police were also included in many of the early state constitutions drafted after the American Revolution.[63] By the antebellum era, the concept of state police power had been further refined by leading jurists and legal theorists.

40.    The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his discussion of

---

[60] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[61] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744, 1744 (Leonard W. Levy et al. eds., 1986).

[62] Santiago Legarre, *The Historical Background of the Police Power* 9 U. PA. J. CONST. L. 745 (2007).

[63] MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. XVII; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.

laws regulating gun powder in *Brown v. Maryland.*[64] The power to regulate firearms and gunpowder is therefore at the very core of the police power and inheres in both states and local municipalities. Nor was Marshall unique in highlighting the centrality of this idea to American law. Massachusetts judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[65]

41.    Applying the emerging paradigm of police power jurisprudence, courts accepted that limits on the right were constitutional if they promoted legitimate police power goals and did not negate the right. Individual states enjoyed broad latitude to regulate arms as long as they adhered to this framework. [66]

42.    Antebellum jurists understood how guns and gun powder were the quintessential

---

[64] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[65] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, see *Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[66] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

example of how police power regulation functioned. A clear consensus emerged that narrowing

the right to promote public safety was permissible provided that the right was not nullified. This

notion was central to virtually all antebellum police power jurisprudence.[67]

43.    The utility of the police power framework was that it prevented gun regulations

from becoming the legal equivalent of a fly trapped in amber. When faced with changes in

technology, consumer behavior, and faced with novel threats to public safety, states and

municipalities enacted laws to address these problems. In every instance apart from a few outlier

cases in the Slave South, courts upheld such limits on the unfettered exercise of the right to keep

and bear arms. The primary limit identified by courts in evaluating such laws was the threshold

question about abridgement: did the law negate the ability to act in self-defense.[68] In keeping

with the clear imperative hard-wired into the Second Amendment, states singled out weapons

that posed a particular danger for regulation or prohibition. When new technologies emerged or

consumer preferences resulted in particularly dangerous weapons proliferating states acted to

regulate them, as was the case with easily concealed weapons during the early nineteenth

century.[69] Responding in this fashion was entirely consistent with Founding-era conceptions of

ordered liberty and the Second Amendment.

**Laws Regulating Unusually Dangerous Weapons and the Concept of "Common Use"**

---

[67] *State v. Jumel*, 13 La. Ann. 399 (1858). This antebellum consensus was underscored during Reconstruction in a variety of cases, e.g. *State v. Wilburn*, 66 Tenn. 57 (1872). The revisions of post-Civil War constitutional provisions on arms bearing expressly granted authority to regulate arms to state legislatures, a move designed to highlight the jurisprudential consensus articulated in antebellum case law, on this point see Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021). On the continuity between antebellum police power jurisprudence and Reconstruction era law, see NOVAK, THE PEOPLE'S WELFARE, *supra* note 8.

[68] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[69] *E.g.,* 1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, § 2.

44.     In *Bruen*, Justice Kavanaugh's concurrence reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh cited the "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[70]

45.     Blackstone text does not use the phrase "dangerous and unusual." The correct transcription of the text ought to read "dangerous or unusual weapons." The *Heller* quote was a scrivener's error.[71] In *Rahimi* the majority opinion *sub silentio* corrected this scrivener's error, but courts have not yet acknowledged this indisputable historical fact.[72]

46.     The phrase "dangerous and unusual" is an example of hendiadys, a classical rhetorical structure much beloved by Shakespeare.[73] Macbeth's soliloquy declares that life is: "a tale Told by an idiot, full of sound and fury, Signifying nothing." This statement is best interpreted as claiming that life was full of furious sound, not sound plus fury. Treating Blackstone's expression as an example of hendiadys also makes sense given that contemporaries treated the two formulation of the common law prohibition "dangerous and unusual" and "dangerous or unusual" as synonymous in all of the legal treatises and popular constitutional

---

[70] *District of Columbia v. Heller*, 554 U.S. 570, 626−27 & n.26 (2008). Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012). It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VA. L. REV. 687 (2016).

[71] On scrivener's errors, see ANTONIN SCALIA & BRIAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 238 (2012); David Ryan Doerfler, *The Scrivener's Error* 110 NW. U. L. REV. 811 (2016); John David Ohlendorf, *Textualism And The Problem Of Scrivener's Error*, 64 ME. L. REV. 119, 155 (2011).

[72] *United States v. Rahimi*, 144 S.Ct. 1889.

[73] G.T. Wright, *Hendiadys and Hamlet* 96 PMLA 168 (1981); Samuel L. Bray, "*Necessary AND Proper*" and "*Cruel AND Unusual*": *Hendiadys in the Constitution* 102 VA. L. REV. 687 (2016).

guides of the period. This equivalence only makes sense of the phrase is read as an example of this type of rhetorical form. [74]

47.    Many courts have considered the flip side of "dangerous and unusual" weapons to be weapons in "common use." But that concept rests on a misunderstanding of the Founding era regulation of arms. Indeed, the regulation of arms that were not common, but dangerous makes little historical sense. Only when weapons reached sufficient saturation did they pose a sufficient public safety threat to require action. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[75]

48.    The source of *Heller's* common use test was not Founding law, but rather a poorly documented and erroneous historical claim in *United States v. Miller,* a case that Justice Scalia disparaged for its inadequate research.[76] The assertion that all weapons in common use were protected by the Second Amendment and its state analogues was historically false. Only weapons necessary to maintain a well-regulated militia were given the highest level of constitutional protection. All other weapons enjoyed the same level of protection that any form of private property enjoyed. It is important to note that that this fact did not make the Second Amendment and its state analogues a second-class right. The right of private property was among the most esteemed rights in early American law. Indeed, it formed part of the core of

---

[74] *Cf.* 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49 (1803) with 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 135 (1716); Rees, Abraham, *The Cyclopaedia: Or, Universal Dictionary of Arts, Sciences, and Literature*, United Kingdom: S. F. Bradford, 1810 entry under "Peace." FRANCIS WHARTON, PRECEDENTS OF INDICTMENTS AND PLEAS, (1857) at 611; A COMPILATION OF THE PENAL CODE OF THE STATE OF GEORGIA (1850) at 23; HENRY POTTER, THE OFFICE AND DUTY OF A JUSTICE OF THE PEACE (1816) at 39.

[75] Spitzer*, supra* note 11.

[76] *District of Columbia v. Heller*, 554 U.S. 570 (2008), citing *United States v. Miller*, 307 U.S. 174, 179 (1939).

23

inalienable rights that social contract theorists, most famously John Locke, described in his trinity of life, liberty, and property.[77] The term inalienable itself derived from English property law.[78] Inalienable rights were not exempt from regulation, but they could not be "alienated," i.e. contracted away by individuals.[79] Thus, the claim that *Heller* requires that all weapons in common use must enjoy the same level of legal protection has no foundation in Founding era law.

49.     Guns and gun powder were treated as a form of property subject to the full range of police power authority.[80] Only a tiny percentage of guns in private hands were given constitutional protections beyond those enjoyed by most forms of property.[81]

50.     Specifically, in most states only militia weapons enjoyed the highest level of constitutional protection. Privately owned guns unconnected to militia service were treated as ordinary property, no different than other non-essential home furnishings or furniture. The table below lists the legal treatment of various types of arms in debt proceedings and sales of goods for tax arrears.

---

[77] Locke, John. *The Two Treatises of Civil Government (Hollis ed.)*. A. Millar et al., 1689. *Online Library of Liberty,* https://oll.libertyfund.org/titles/hollis-the-two-treatises-of-civil-government-hollis-ed.

[78] Nancy E. Johnson, *Political and Legal Thought*, in Frans De Bruyn, ed. THE CAMBRIDGE COMPANION TO EIGHTEENTH-CENTURY THOUGHT (2021).

[79] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).

[80] See Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 FORDHAM URB. L. J. 25, 38 (2023).

[81] *Id.*

**Enhanced Legal Protections for Militia Arms in the Founding Era**

| State | Militia Arms Exempt from Seizure[82] | Private Guns Exempt from Seizure[83] |
|---|---|---|
| Connecticut | Yes | Yes |
| South Carolina | Yes | No |
| Virginia | Yes | No |
| Massachusetts | Yes | No |
| Pennsylvania | Yes | No |
| Delaware | Yes | No |
| New Jersey | Yes | No |
| New York | Yes | No |
| Maryland | Yes | Yes |
| North Carolina | Yes | No |
| New Hampshire | Yes | No |
| Georgia | Yes | No |
| Rhode Island | Yes | No |

[82] For examples of militia laws exempting military arms, see ROBERT WATKINS & GEORGE WATKINS, A DIGEST OF THE LAWS OF THE STATE OF GEORGIA: FROM ITS FIRST ESTABLISHMENT AS A BRITISH PROVINCE DOWN TO THE YEAR 1798, INCLUSIVE AND THE PRINCIPLE ACTS OF 1799, App'x no. XLIX, 816-17 (1800) ("And every citizen so enrolled, and providing himself with the arms, ammunition and accoutrements required, as aforesaid, shall hold the same exempted from all suits, distresses, executions or sales for debt or for the payment of taxes"); *accord* Acts and Laws of the State of Connecticut, in America, 432 (1784); 2 LAWS OF THE STATE OF DELAWARE FROM THE FOURTEENTH DAY OF OCTOBER, ONE THOUSAND SEVEN HUNDRED, TO THE EIGHTEENTH DAY OF AUGUST, ONE THOUSAND SEVEN HUNDRED AND NINETY-SEVEN 1137 (1797); 2 Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807, with the Constitutions of the United States of America, and of the Commonwealth, Prefixed, 587 (1793); 3 Laws of the State of New York Passed at the Sessions of the Legislature, ch. 166, 453 (1801); Henry Flanders & James Mitchell, The Statutes at Large of Pennsylvania from 1682 to 1801, app'x XXXIV, 458 (1793); Thomas Herty, A Digest of the Laws of Maryland, Laws of the District of Columbia, 173 (1804); Constitution and Laws of the State of New-Hampshire; Together with the Constitution of the United States, 258 (1805); WILLIAM PATERSON, LAWS OF THE STATE OF NEW-JERSEY 448 (1800); 2 FRANCOIS-XAVIER MARTIN, THE PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH-CAROLINA 1800 (1804); Public Laws of the State of Rhode-Island and Providence Plantations, 55 (1798-1813); JOHN FAUCHERARAUD GRIMKÉ, THE PUBLIC LAWS OF THE STATE OF SOUTH-CAROLINA 234 (1790); A Collection of All Such Acts of the General Assembly of Virginia, 290 (1792).

[83] In 1821, Pennsylvania passed an act "[t]o encourage domestic industry, and promote the comfort of the poor." The act sought to identify items essential to family life that ought to be exempt from seizure in debt proceedings. To aid them in formulating such a list the legislature compiled an "abstract of the provisions made by the acts of assembly in several of the states." Although virtually every state singled out militia arms for special enhanced legal protection only two states extended the same protection to non-militia weapons, JOHN PURDON, A DIGEST OF THE LAWS OF PENNSYLVANIA 271 (1824); An Act for Directing and Regulating the Levying and Serving of Executions, 1 PUBLIC STATUTE LAWS OF CONNECTICUT 280 (1808); 1 THE LAWS OF MARYLAND: 1692-1785 105 (1811).

25

51.     Indeed, the scope of government power to regulate, prohibit, and inspect gun powder has been among the most far reaching of any exercise of the police power throughout American history. [84] The many ordinances authorizing local government officials to search for gun powder illustrates the scope of this authority.[85] Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[86] New York city granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> [I]t shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever. [87]

52.     The market revolution, roughly the period between 1820s and 1850s, transformed gun culture by making a variety of weapons, including handguns, more common. These new handguns were not only cheaper, but more accurate and more easily concealed.[88] In response to the rise in inter-personal violence caused by the proliferation of these weapons, states enacted

---

[84] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[85] *Id*.

[86] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts p. 218.

[87] N.Y. Ordinance Ordained and Established by the Mayor, Aldermen and Commonality of the City of New-York, (1793).

[88] On the more violent nature of southern society, see RANDOLPH ROTH, AMERICAN HOMICIDE 15, 300, 352 (2009). Slavery contributed the violence in the region but there is a rich historical debate on how to best characterize the roots of southern violence. I. M Leonard & C.C. Leonard, *The Historiography of American Violence* 7 HOMICIDE STUDIES 99 (2003); Pieter Spierenburg, *American Homicide. What Does the Evidence Mean for Theories of Violence and Society?* 115 CRIME, HISTOIRE & SOCIÉTÉS / CRIME, HISTORY & SOCIETIES, 123 (2011).

new limits on public carry, In some, but certainly not all jurisdictions, challenges to these new laws produced the first state court decisions on the meaning and scope of state constitutional arms bearing provisions.[89] In some parts of the Slave South, an expansive libertarian view of the scope of the right to keep and bear arms emerged to justify whites arming themselves because of the violent nature of life in this region of the United States. But outside of the slave South, a more restrictive model gained ascendency. [90]

53.    By mid-century a strong consensus in American law had emerged on the broad scope of the police power.[91] Francis Lieber, a leading commentator on American politics and law in the nineteenth century, confidently described its role in Anglo-American law in lucid terms. The police power, he observed, "in the common acceptation of the word, in the United States and England," was "applied to the municipal and officers provided for maintaining order."[92]

54.    No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.[93] Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged.[94] This conception of law was familiar to most early American lawyers and judges who

---

[89] Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS 73 (2020)

[90] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L. J. F. 121 (2015)

[91] John L. Brooke, Patriarchal *Magistrates, Associated Improvers, and Monitoring Militias: Visions of Self--Government in the Early American Republic, 1760--1840,* in Peter Thompson and Peter S. Onuf, eds., STATE AND CITIZEN: BRITISH AMERICA AND THE EARLY UNITED STATES (2013).

[92] FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

[93] *United States v. Rahimi,* 144 S.Ct. 1889, 1925 (2024) *(*Barrett, J. concurring).

[94] In the extensive notes he added to James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power James Kent, 2 *Commentaries on American Law* 12 ed., Oliver Wendell Holmes, Jr., editor (Boston, 1873) at 340 note 2.

had been schooled in common law modes of thinking and analysis.[95] Throughout the long arc of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[96] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[97]

**State Police Power to Regulate Firearms During Reconstruction (1863-1877)**

55.     Some courts and scholars have puzzled over the proper time frame for analyzing the American tradition of regulation of firearms. Among the most important issues is the relevance of laws enacted after the Founding era and how they ought to figure into *Bruen* and *Rahimi's* framework. But this confusion over the relative weight to assign post ratification developments, including Reconstruction, evaporates when early American gun regulation is placed within the police power framework universally adopted by American jurists across the nineteenth century.[98] American jurists in the century after the adoption of the Second

---

[95] KUNAL M. PARKER, COMMON LAW, HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM (2013); MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005).

[96] William J. Novak, *A State of Legislatures* 40 POLITY 340 (2008).

[97] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847). For a clear example of the application of this doctrine to gun regulation, see *State* v. *Reid,* 1 Ala. 612, 612 (1840).

[98] *See, e.g., Williams v. City Council of Augusta*, 4 Ga. 509, 512 (1848). *See, e.g.,* FRANCIS LIEBER, ENCYCLOPAEDIA AMERICANA 214 (1832).

Amendment approached issues of regulation within the police power framework, which was developed by the Marshall Court and elaborated by dozens of jurists in individual states.[99] Although the problems governments confronted changed over the course of the nineteenth century, the underlying police power framework proved extremely flexible and enduring over the entire course of the nineteenth century.[100]

56.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms. These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty. Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle. This change reflected two profound transformations in American politics and law between 1776 and 1868. First, the judicial concept of police power gradually usurped the older notion of a police right, a Founding era formulation that was grounded in the idea of popular sovereignty. As a result, state constitutions after the Founding era no longer included positive affirmations of a police right. Secondly, as far as the right to bear arms was concerned the constitutional "mischief to be remedied" had changed as well.[101] Constitution writers in the era of the American Revolution feared powerful standing

---

[99] *Brown v. Maryland* 25 U.S. (12 Wheat.) 419, 442-43 (1827) 25 U.S.

[100] NOVAK, THE PEOPLE'S WELFARE, *supra* note 8.

[101] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and legislation had intended to remedy — continued to shape Anglo-American views of statutory construction, and legal interpretation more generally, well into the nineteenth century. For Blackstone's articulation of the rule, see 1 BLACKSTONE, at *61. The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822). For a modern scholarly discussion of the rule, *see* Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

armies and sought to entrench civilian control of the military. By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists. In place of these ancient fears, a new apprehension stalked Americans: the proliferation of especially dangerous weapons and the societal harms they caused.[102]

57.    The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the right codified in 1776, linking the right to bear arms inextricably with the states' broad police power to regulate conduct to promote health and public safety.[103] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[104] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[105] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. Thus,

---

[102] *See McDonald*, 561 U.S. at 767–68 for an elaboration of the significance of the elimination of language focused on militias from state arms bearing provisions.

[103] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[104] TEX. CONST. OF 1868, art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[105] Cornell, *supra* note 103, at 75–76.

millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority was at its apogee when regulating guns.[106]

58.     This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies. The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[107]

59.     Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a state's police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[108]

60.     Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not lose their police power authority to the federal government.

---

[106] *Id.*

[107] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[108] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance,* 53 BUFFALO L. REV. 1215 (2005).

The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[109] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good. [110]

61.    It would be difficult to understate the practical impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[111] Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[112]

62.    These legal changes responded to the unprecedented challenges guns posed to public safety in post-Civil War America. Developments in firearms technology made guns more reliable, cheaper, and far more lethal.

63.    Post-Civil War America experienced a variety of other changes that also led to greater social unrest and crime. Urbanization, immigration, racial strife, and labor unrest contributed to these problems.[113] Together, all of these factors led to rising levels of gun violence

---

[109] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[110] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[111] *See* Spitzer, *supra* note 11, at 59–61 tbl. 1.

[112] *Id.*

[113] RICHARD WHITE, THE REPUBLIC FOR WHICH IT STANDS: THE UNITED STATES DURING RECONSTRUCTION AND THE GILDED AGE, 1865-1896 (2017)

and gun accidents in the post–Civil War era.

64.    Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that the "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[114]

65.    In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[115] The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction. The Black Codes violated the Second Amendment, but the wave of firearms legislation passed by Republican-controlled state legislatures in the South were consciously crafted to honor the Second Amendment and protect individuals from gun violence.[116] Indeed, without such laws both Republicans and free persons would have been entirely at the mercy of terrorist violence by organizations such as the Ku Klux Klan. [117]

---

[114] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[115] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016).

[116] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005) (discussing Republican use of federal power to further their aims, including to enforce the Fourteenth Amendment).

[117] Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

66. Reconstruction-era laws reflected both the growing problem of gun violence, not a major issue in the Founding era, and the greater urbanization and population density of the nation in the decades after the Civil War.

67. The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but an expansion and continuation of antebellum practices. Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in police power regulations of guns. American states had regulated arms since the dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

**Applying the Police Power to New Problems: Age Limits as Exemplar**

68. One of the most dramatic expansions in regulation after the Civil War occurred in laws limiting minors from acquiring and using guns. Over ninety percent of the guns in circulation during the Founding era were long guns which were heavy and difficult to use. Given these facts it is not surprising that there were no laws to address a problem that did not yet exist, that is, accidents that could result from children's access to firearms.

69. The increase in gun violence and accidents involving minors drew notice by jurists, journalists, and physicians.[118] Journalists, religious and educational leaders, public health experts, and law enforcement all weighed in on this novel problem and expressed support for legislating to protect American youth from this growing danger.[119] Indeed, there was a pronounced increase in discussion of these types of concerns in the press following the Civil War, as the following table demonstrates.

---

[118] Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791–1868,* 108 MINN. L. REV. 3049 (2024).

[119] *Id.*

| Number of Articles Mentioning Accidental Shootings of Children in the New York Times | |
| --- | --- |
| Year | Number of Articles |
| 1860s | 9 |
| 1870s | 28 |
| 1880s | 32 |
| 1890s | 41 |
| Data Based on Jennifer Carlson and Jessica Cobb, *From Play to Peril: A Historical Examination of Accidental Shootings involving Children* 98 SOCIAL SCIENCE QUARTERLY 397 (2017). | |

*Puck* magazine published a satirical cartoon in December of 1881 with the revealing title "A Dangerous American Institution—The Free and Untrammeled Revolver."[120]



70.    Two of the five panels depicted in the cartoon addressed the problem posed by the easy access young people had to "pocket pistols," a small, easily concealed revolver. In the lower

[120] Frederick Burr Opper's "A Dangerous American Institution-The Free and Untrammeled Revolver," from December 14th, 1881. The Ohio State University Billy Ireland Cartoon Library & Museum, originally published in PUCK, December 14, 1881.

left, a group of young men with pistols prominently protruding from their pants pockets stand about idly, smoking, and sporting their partially hidden guns. (Under American law, any gun partially concealed was treated as a concealed weapon.) In the upper right, a group of children clamor for pistols so they can emulate the exploits glorified in the sensationalist press and dime novels.

71.    To address the novel problems of the time, legislatures employed new regulatory strategies. The traditional common law tools of preserving the peace, most notably the use of sureties and recognizances, were eventually supplanted by new legal and administrative tools.

72.    The number of laws passed to deal with this problem increased dramatically over the course of the nineteenth century. After surveying hundreds of gun laws in the nineteenth century, political scientist Robert Spitzer concluded that "[n]umerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s." In fact, he found that, in the period between 1868 and 1899, restrictions on minors' access and use of arms were more common than limits on felons.[121]

73.    The regulation of firearms access for those under the legal age of majority was an area of the law in which the police power was at its greatest reach. The respected post-Civil War legal commentator Lewis Hochheimer, a leading authority on the status of minors, noted in his book *The Law Relating to the Custody of Infants* that "infants," a legal term of art that applied to all persons below the age of legal majority, were not entirely beyond the protection of the Bill of Rights. Nonetheless, Hochheimer was quick to point out that the need to protect those below the age of majority meant that some types of firearms regulations that were impermissible if applied to adults were perfectly legal when regulating infants. In this instance, the broad power to protect

---

[121]Spitzer, *supra* note 11.

the welfare of minors gave government extraordinary latitude in regulating their conduct. Hochheimer's comments echoed other commentators from the period who saw firearms regulation as the *locus classicus* of state police power authority.[122]

**Summary**

74.    States and localities have regulated gunpowder and arms since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

75.    The metric used by courts to adjudicate questions about the scope of permissible regulation has remained constant over the long arc of American history. To constitute an infringement of the right the law must burden the right of self-defense to such a degree that it effectively negates it. As long as laws stay within this well-established  threshold, they have been held to be constitutional as a valid exercise of the state's police power.

---

[122] See Lewis Hochheimer, *The Police Power*, 44 CENT. L.J. 158, 158, 161 (1897). Hochheimer defined the police power as "the inherent and plenary power of a State or government to prescribe regulations to preserve and promote the public safety, health and morals, and to prohibit all things hurtful to the comfort and welfare of society." *Id.* at 158. He noted that "[t]he constitutionality of statutes as to the care and protection of minors has been universally upheld," and that States may utilize their police power in regard to minors for purposes of care and "moral training."

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/16/24 at Redding, CT.

*Saul Cornell*

Saul Cornell

# EXHIBIT A

# Saul Cornell
Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| | Education | | | |
|---|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| | Teaching Experience | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
| --- |

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Book Publications |
| --- |

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University
 Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of
 Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition
 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-
 2008)

### Scholarly Articles, Book Chapters, and  Essays:

**"**History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme
 Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly*
 (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the
 Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause
 Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online
 (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

### Book  Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- <u>Stanford Law Review</u>
- <u>Yale Law Journal</u>

## **<u>Book Manuscript Reviewer:</u>**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

## **<u>Invited Lectures:</u>**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### Presentations:

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment"  "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
    SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control,"   To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network,* January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, American Quarterly (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Symposia

### US Supreme Court:

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).


**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

### State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746


Amicus Briefs:
Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022)  [ISLT and Gerrymandering]
Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]
Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]
Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## Law Review Symposia Organized

### Second Amendment:
 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev*. 487 (2004).
"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev*. 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev*. 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

### New Originalism:

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915 (2015).