UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| STEFANO GRANATA; CAMERON PROSPERI; THE GUN RUNNER, LLC; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and TERRENCE M. REIDY, in his official capacity as Secretary of the Executive Office of Public Safety and Security of the Commonwealth of Massachusetts, <br><br> Defendants. | CIVIL ACTION <br> NO. 1:21-cv-10960-DJC |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.................................................................................................... ii

INTRODUCTION ...............................................................................................................1

ARGUMENT .......................................................................................................................1

I.    Massachusetts Ban on the Commercial Sale of Many Modern Handguns Necessarily Implicates the Second Amendment's "Plain Text." .............................................................1

    A.  Whether a Law Ultimately "Infringes" the Second Amendment Cannot Be Determined from the Plain Text Alone. ..................................................................2

    B.  A Ban on Commercial Sale Is Not a "Presumptively Lawful" Regulation. ............5

II.    The Handgun Ban Is Inconsistent with Historical Regulations of the Second Amendment Right..................................................................................................................................8

III.    The State's Alternative Historical Justifications for the Roster Must Be Rejected. ..........12

    A.  Proving Laws Do Not Justify the Handgun Ban.......................................................14

    B.  Fire Safety Regulations Are Irrelevant. ...............................................................18

    C.  Trap Gun Laws Are Similarly Poor Analogies to the Handgun Ban. ...................19

    D.  Laws Restricting Firearm Access By Minors Are Also Unavailing. ....................20

CONCLUSION...................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*B&L Prods., Inc. v. Newsom,*
    104 F.4th 108 (9th Cir. 2024) ........................................................................2, 3

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ...............................................................................12

*District of Columbia v. Heller,*
    554 U.S. 570 (2008).....................1, 3, 4, 5, 6, 8, 9, 10, 14, 18, 19

*Duncan v. Becerra,*
    970 F.3d 1133 (9th Cir. 2020) ...............................................................12

*Duncan v. Bonta,*
    19 F.4th 1087 (9th Cir. 2021) ...............................................................12

*Duncan v. Bonta,*
    49 F.4th 1228 (Mem.) (2022) ...............................................................12

*Espinoza v. Mont. Dep't of Revenue,*
    591 U.S. 464 (2020) ...............................................................................16

*Frein v. Pa. State Police,*
    47 F.4th 247 (3d Cir. 2022) .....................................................................5

*Hanson v. District of Columbia,*
    120 F.4th 223 (D.C. Cir. 2024) .............................................................8, 9

*Hirschfeld v. BATFE,*
    14 F.4th 322 (4th Cir. 2021) .....................................................................6

*Hirschfeld v. BATFE,*
    5 F.4th 407 (4th Cir. 2021) .......................................................................6

*Ind. Harbor Belt R.R. v. Am. Cyanamid Co.,*
    916 F.2d 1174 (7th Cir. 1990) ...............................................................11

*Luis v. United States,*
    578 U.S. 5 (2016)......................................................................................4

*McCulloch v. Maryland,*
    17 U.S. 316 (1819)....................................................................................4

*New York State Rifle & Pistol Association v. Bruen,*
    597 U.S. 1 (2022)...............................1, 3, 4, 5, 8, 10, 11, 13, 14, 16

*Oakland Tactical Supply, LLC, v. Howell Twp.,*
    103 F.4th 1186 (6th Cir. 2024) .............................................................2, 3

*Ocean State Tactical, LLC v. Rhode Island,*
    95 F.4th 38 (1st Cir. 2024) ...............................................................12, 19

*Parker v. District of Columbia,*
    478 F.3d 370 (D.C. Cir. 2007)................................................................12

*People v. Yanna,*
824 N.W.2d 241 (Mich. Ct. App. 2012)................................................................12

*Reese v. BATFE,*
127 F.4th 583 (5th Cir. 2025) ...............................................................................4

*Renna v. Bonta,*
667 F. Supp. 3d 1048 (S.D. Cal. 2023) .................................................................7

*United States v. Rahimi,*
602 U.S. 680 (2024)................................................................................8, 13, 14

*United States v. Williams,*
113 F.4th 637 (6th Cir. 2024) ...............................................................................8

## Regulations, Rules and Laws

940 C.M.R. § 16.01.................................................................................................15

Fed. R. Evid. 201, 1972 Advisory Comm. Note ......................................................11

Mass. Gen. Laws ch. 140,
§ 129B ...................................................................................................................20
§ 131.....................................................................................................................20

## Other Authorities

*Glock advanced manufacturing*, Glock, https://perma.cc/N3PM-MW63
(last visited Mar. 6, 2025) ....................................................................................16

*How Glock became America's gun*, CBS News (Sept. 15, 2013),
https://perma.cc/J5E8-42UA ................................................................................11

Peter Alan Kasler, Glock: The New Wave in Combat Handguns (1992) ...........11

2 Benson J. Lossing, History of New York City (Google Books ed. 1884)...........19

*P320-M17*, Sig Sauer, https://perma.cc/S6RH-ARA6 (last visited Mar. 6, 2025)......................17

# INTRODUCTION

At its core, the State's argument in this case is precisely the sort of argument that the Supreme Court ruled out in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). The State claims repeatedly that its intrusion on the right to keep and bear arms is really very slight, since it has only banned some handguns, and even then it has only banned their commercial sale, not possession. When discussing historical analogues, it emphasizes that it believes it has good reason for choosing to ban these particular handguns, because they lack "safety features" that the State would prefer all firearms to have, and Plaintiffs can, and have, acquired other handguns anyway. These may have been valid arguments under the old interest-balancing regime, but they have no place here. Under the plain text of the Second Amendment, the right to "keep and bear arms" is obviously implicated by a law that bans acquiring certain arms through sale. That the law does not apply to all "arms" or all methods of acquiring them is simply irrelevant to the threshold textual question *Bruen* requires this Court to answer.

These features are not exonerating under the historical analysis either. Under *District of Columbia v. Heller*, that the State has banned arms that are categorically "in common use," is fatal to any historical argument. 554 U.S. 570, 570–72 (2008). Unsurprisingly then, the State has not found any historical tradition that would support the Ban. Indeed, in the way that the Handgun Ban forces consumers who wish to acquire one of the banned firearms in the unregulated secondary market, it almost the opposite of the "proving laws" on which the State rests most of its historical case.

# ARGUMENT

I. **Massachusetts Ban on the Commercial Sale of Many Modern Handguns Necessarily Implicates the Second Amendment's "Plain Text."**

As Plaintiffs explained in their opening brief, the "plain text" analysis in this case is very

1

simple. The plain text of the Second Amendment covers the right to both keep and bear handguns, and Massachusetts has, through the laws at issue here, destroyed the commercial market for many models of handgun which can be legally acquired, if at all in the Commonwealth, only through a secondary market of noncommercial sellers. It does not matter that Massachusetts has not banned *all* handguns, and has not conclusively closed the door on acquiring the handguns it has banned (by permitting the sale, by in-state sellers who sell less than five handguns a year, and who possess, in state, a handgun that cannot be bought from a dealer in state). *See* Pls.' Br. in Supp. of Mot. for Summ. J. 8–10, Doc. 62 (Jan. 6, 2025) ("Pls.' Br."). Because the State has restricted access to certain makes and models of handguns, the threshold textual question must be answered in the affirmative, and the Handgun Ban survive, if at all, only if the State can justify it by reference to history.

### A. Whether a Law Ultimately "Infringes" the Second Amendment Cannot Be Determined from the Plain Text Alone.

Massachusetts nevertheless claims that this law does not even *implicate* the Second Amendment because there are many models of handgun that the State does not (yet) ban, or because it has stopped short of a complete ban on the firearms it does not approve for commercial sale, noting that Plaintiffs have managed to acquire handguns (including some of the banned handguns) anyway and faulting Plaintiffs for failing to show that purchasing *additional* handguns, of the variety the State discriminates against, is "necessary to effectuate their Second Amendment rights." Defs.' Mem. in Supp. of Summ. J. 11, Doc. 80 (Feb. 5, 2025) ("State Br.") (quoting *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1198 (6th Cir. 2024), *cert. denied*, No. 24-178, 145 S. Ct. 603 (Mem.) (U.S. Nov. 25, 2024)). In so doing, the Commonwealth makes essentially two interrelated textual arguments: (1) that when an "ancillary" right—as Massachusetts characterizes the right to *acquire* a firearm to be—is involved, then there is no

infringement unless the law prevents something that is "necessary to serve [self-defense] purposes," *id*. at 10–11 (quoting *B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 118 (9th Cir. 2024)) (brackets in State Br.), and (2) in general, a regulation is not an "infringement" unless it totally prevents someone from exercising the right to keep and bear arms, *id*. at 12.

Neither move on the State's part suffices to take this case out of the textual ambit of the Second Amendment. As for the first, the claim that the "ancillary" right to *acquire* a firearm is entitled to a lesser protection, or a different analysis that permits this Court to weigh in on what is, and is not, "necessary" for its exercise, is contrary to *Bruen* and *Heller*, which were clear that *all* laws limiting the exercise of the right must be justified, *if at all*, by reference to history, *see Bruen*, 597 U.S. at 26, and that it is not for Courts to decide what is "necessary" for a citizen seeking to exercise his Second Amendment right, *see Heller*, 554 U.S. at 628–29. The State's contrary proposal, that the *Bruen* standard be applied only in cases where the law in question directly bears on "keeping" or "bearing" arms, while those that are just "one step removed" from those activities be given a pass unless they make exercising the right entirely impossible, would eviscerate the Second Amendment's protections. *See* State Br. 10. Under *Bruen*, New York cannot ban the carry of handguns for self-defense, but under the State's theory, it could ban holsters with which someone could carry a firearm in a "one step removed" attempt to discourage it all the same, as long as it leaves open the option to carry a handgun in a pocket or a bag. *Bruen* cannot be so easily evaded. The State's support for its theory of limited protection for "ancillary rights" (if *acquiring* a firearm can even be called that), is *B&L Productions* and *Oakland Tactical*, but both of those cases misread *Bruen* to suggest that "the Second Amendment does not speak to all restrictions that impact firearms in any way." *B&L Prods.*, 104 F.4th at 118; *see also Oakland Tactical*, 103 F.4th at 1196 (similar). But nothing in *Bruen* supports that conclusion. In the passage *B&L* relies upon

for support of this claim, Justice Kavanaugh merely reiterates that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626–27), but that is a statement about the Second Amendment's ultimate protection, not its *presumptive* textual scope. In other words, all that language means is that, after both the textual *and* historical analysis was run, not all weapons, and not all uses of them, will be protected—it does not at all suggest that some laws regulating firearms do not trigger scrutiny in the first place.

The State's theory of lesser protection for so-called "ancillary" rights is also contrary to fundamental principles of constitutional interpretation. Going back to *McCulloch v. Maryland*, the Supreme Court has consistently instructed that courts "must never forget that it is a *constitution* we are expounding" because a constitution, in order to be comprehended by the people, must not "partake of the prolixity of a legal code" but rather it should be assumed that "only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." 17 U.S. 316, 407 (1819) (emphasis in original). That the Framers, in stating that the Second Amendment protects "keeping" arms and did not separately mention "acquiring" them is, therefore, unsurprising, and the State is wrong to infer from that absence any lesser degree of protection for that "closely related right[.]" *Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring). And of course, "[t]he baleful implications of limiting the right at the outset by means of narrowing regulations not implied in the text are obvious; step by step, other limitations on sales could easily displace the right altogether." *Reese v. BATFE*, 127 F.4th 583, 590 (5th Cir. 2025).

The State's second argument—that a law "infringes" the Second Amendment only if it makes exercising the right impossible—fares no better. First, the State has not offered any support

for the idea that "infringe" should carry such a narrow meaning, and in fact, any government-imposed obstruction or hindrance to exercising Second Amendment rights is an "infringe[ment]" that can only be justified by historical tradition. *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022) (holding that the Second Amendment "forbids lesser violations that hinder a person's ability to hold on to his guns" (cleaned up)). To the extent that cases like *Oakland Tactical* or *B&L Productions* suggest that some laws might restrict firearms without "infringing" the right as a textual matter (and so triggering the *Bruen* analysis), they are wrong. *See* State Br. 11. Indeed, to speak of a law "infringing" the right as a *textual* matter is to misunderstand these precedents. In *Heller*, even as it held that D.C.'s law infringed the Second Amendment right, the word "infringe" was notably absent from the Supreme Court's otherwise exhaustive textual analysis of the right. *See* 554 U.S. at 579–600. That was because, although the language of the Amendment was broad, as *Bruen* would later make explicit, coverage by the plain text only means that an activity is *presumptively* protected (or conversely, that a regulation is *presumptively* an infringement). *See* 597 U.S. at 24. Working out whether the activity nevertheless can be regulated requires completing the entire analysis. Put another way, the State's attempt to carve out some laws impacting the right to keep and bear arms as not an "infringement" on a textual level must be rejected as inconsistent with *Bruen*, because *Bruen* makes clear that whether a law "infringes" the right is a legal conclusion, based on *text* and *history*. *See id.* at 79 (Kavanaugh, J., concurring) ("The Court employs and elaborates on the text, history, and tradition test that *Heller* and *McDonald* require for evaluating whether a government regulation infringes on the Second Amendment right.").

### B. A Ban on Commercial Sale Is Not a "Presumptively Lawful" Regulation.

In the alternative, the State argues that the Handgun Ban does not trigger Second Amendment scrutiny because is merely a "condition[] [or] qualification[] on the sale of arms,"

mentioned in *Heller* as a type of "presumptively lawful" regulation, which the State views as excusing the law from any form of Second Amendment scrutiny. State Br. 10 (quoting 554 U.S. at 626–27 & n.26). This is doubly wrong because (1) a *ban* on the commercial sale of certain firearms is not a condition or qualification on their commercial sale, and (2) even if a law can be categorized as a condition or qualification on the commercial sale of arms it *still* must be analyzed to determine whether its specific condition or qualification is ultimately constitutional under the *Bruen* test.

First, when *Heller* said that it viewed laws imposing "conditions and qualifications on the commercial sale of arms" as presumptively constitutional, it did not mean that any restriction, however severe, that could be phrased as a commercial sale "condition" was presumptively lawful 554 U.S. at 627. In *Hirschfeld v. BATFE*, the Fourth Circuit explained that a "condition or qualification" is "a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records," while a law that actually *bans* certain firearm transactions could not amount to a mere "condition or qualification," 5 F.4th 407, 416 (4th Cir. 2021), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021) (emphasis in original). The Handgun Ban falls into the latter camp.

*Hirschfeld* and *Reese* are both illuminating on this score. Like this case, both of those cases dealt with a law that blocks certain commercial transactions involving firearms (there, banning 18-to-20-year-olds from buying handguns from from licensed dealers), even as it left open the possibility that those blocked could acquire the firearms at issue on the secondary market or through a gift or other noncommercial transfer. *See, e.g.*, *id.* at 416 (noting that the law "operate[s] as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms" (emphasis in original)). That there were gaps in the regulatory scheme may have had relevance to the historical analysis, but it did not prevent the case from implicating

the plain text of the Second Amendment, or render the restriction a mere "condition" or "qualification" on the commercial sale of arms. So too here. While there are other handguns Massachusetts does not ban, and while there may be other ways to acquire handguns it has banned under the laws at issue here, it has enacted a functional prohibition on commercial transactions dealing with certain models of handgun; a prohibition, not a "condition," because there is no hoop through which a commercial dealer in Massachusetts could jump that would permit him to sell the Plaintiffs one of the restricted handguns. *See Renna v. Bonta*, 667 F. Supp. 3d 1048, 1064–65 (S.D. Cal. 2023).

Second, even if this Court accepts the State's characterization of its law as merely a "condition" on sale, that does not excuse the Handgun Ban from constitutional scrutiny. Such a rule would invite evasion and render the Second Amendment toothless. If the State's law were even more restrictive, but nevertheless phrased as a "condition or qualification," say, by prohibiting licensed dealers from selling anything but single shot handguns, or limiting commercial sales to those 65 years old or older, it would be obviously problematic for the Second Amendment to simply have *nothing* to say about such a regulation because of dicta from *Heller* recognizing a broad category of laws like it as "presumptively lawful." Rather, the only way to understand *Heller*'s dicta following *Bruen* is as a mere forecast that the Court believed that *when the analysis was done*, certain categories of laws would, broadly speaking, turn out to be constitutional. But *Bruen* was clear, the analysis has to be done all the same.

As a lesser form of the same argument, the State argues that, if the analysis is to be done, then Plaintiffs should bear the burden to "rebut the presumptive lawfulness" of its ban, State Br. 12, is no more faithful to *Bruen* and *Heller* than suggesting that its law is entirely immune from scrutiny. As just explained, *Heller*'s "presumptively lawful" language must be read in light of

*Bruen*, which came after and could not have been clearer that the government bears the burden of proving its law constitutional in *any* case that implicates the plain text of the Second Amendment. As the Sixth Circuit recently explained, the "presumptively lawful" regulations "weren't before the Court in *Heller* or *McDonald*. And while *Bruen* didn't overrule any aspect of *Heller*, it set forth a new analytical framework for courts to address Second Amendment challenges," such that even "longstanding" laws mentioned in *Heller* have to be analyzed according to the *Bruen* framework. *United States v. Williams*, 113 F.4th 637, 648 (6th Cir. 2024). This Court must therefore employ that framework to assess the Handgun Ban.

## II.   The Handgun Ban Is Inconsistent with Historical Regulations of the Second Amendment Right.

Given that the Handgun Ban regulates conduct falling within the plain text of the Second Amendment, it falls to Massachusetts to justify its regulation, which it must do, if at all, by identifying a tradition of "relevantly similar" historical regulations into which the Handgun Ban fits, meaning similar in terms of "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. As *United States v. Rahimi* has explained, that means that a modern regulation must be "consistent with the principles that underpin [the Nation's] regulatory tradition" and must "comport with the principles underlying the Second Amendment." 602 U.S. 680, 692 (2024). As Plaintiffs have explained, where the law in question seeks to tell law-abiding citizens what firearms they cannot lawfully acquire, the Supreme Court has already done the historical spadework and worked out the relevant historical tradition—after all, *Heller* addressed such a law. And *Heller* determined that the only historical principle supporting a ban on an arm is that "dangerous and unusual weapons" may be banned while those that are "in common use" are "protected" and "a complete prohibition of their use is invalid." 554 U.S. at 626–27, 629; *see also Hanson v. District of Columbia*, 120 F.4th 223, 258–59 (D.C. Cir. 2024) (Walker, J.,

dissenting) (identifying this as the third of *Heller*'s "four increasingly specific holdings"); Pls.' Br. 10–12. Under that standard, Massachusetts' Handgun Ban is self-evidently unconstitutional. *Heller* has already held that handguns are in common use and therefore protected. *See* 554 U.S. at 628– 29; *see also Hanson*, 120 F.4th at 259–60 (Walker, J., dissenting) (identifying this as the fourth of *Heller*'s holdings). And lest there be any doubt, the specific handguns targeted by the State here are, themselves, in common use. Pls.' Br. 13–14.

The State disputes the relevancy of "common use" in this case, arguing that it only applies in cases where the government bans "an entire class of 'arms.' " State Br. 14 (quoting *Heller*, 554 U.S. at 628). While it is true that *Heller* dealt with a ban on an entire class of arms, that fact was not determinative of the law's unconstitutionality. What mattered in *Heller* was that the firearms targeted by the District of Columbia's ban *belonged* to a category of firearms in common use, not that it affected the entire category. To begin with, *Heller* explained that the "common use" test was consistent with the historical tradition of members of the militia "bearing arms supplied by themselves *and of the kind* in common use at the time." 554 U.S. at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (emphasis added). In other words, while the individual weapons used by militiamen were protected, that protection stemmed from the fact that they were a common *kind* or *type* of weapon. *Heller* went on to state that "*the sorts* of weapons protected were those 'in common use at the time,' " *id.* at 627 (quoting *Miller*, 307 U.S. at 179) (emphasis added), indicating again, that under this rule, *categories* of firearms are "protected," *see also* Pls.' Br. 13, with an individual weapon's protected status hinging on whether it is part of a protected *category*. The State's reading is difficult to square with this language, because it would be meaningless for a type of arm to be categorically "protected" if that conclusion permitted the State to nevertheless choose specific firearms within the category and ban them. That argument has no limiting principle and

would conceivably have permitted D.C. to replace its flat ban on handguns with a ban on all but its choice model. Indeed, this argument—that as long as *some* avenue to possess a common category of arm remains open, then the Second Amendment is unoffended—is the very same argument that D.C. made to the Supreme Court in *Heller*, which the Supreme Court definitively rejected, noting that it is "no answer" to the Constitution's enumeration of the right to keep and bear arms, for the government to justify a ban on some firearms "so long as the possession of other firearms (*i.e.*, long guns) is allowed." 554 U.S. at 629.

The State offers several other distinctions between this case and *Heller* to try and avoid the conclusion that because it has banned handguns, and handguns are in common use, its ban is unconstitutional. None hold water. It argues that "the regulations do not restrict possession in any way, only commercial sale," and "even the models of handgun that may not be sold commercially can be sold on the private market." State Br. 14. But as explained above, the fact that the State has framed its restrictions as "one step removed" from "keeping" or "bearing" arms is not constitutionally relevant. The State has taken on itself to Ban, at least through ordinary commercial channels, the acquisition of certain firearms, but because those firearms are of a type in common use, the State cannot do that absent a specific historical justification. Similarly, the State's objection that "the individual Plaintiffs here make no claim that they are unable to adequately arm themselves with handguns for self-defense" is utterly irrelevant. *Id*. at 15. The State's argument is precisely the sort of argument that may have had a place in the analysis under the old interest-balancing regime, but under *Bruen* it is never an answer to say that a law violates the Second Amendment only a little bit, or only for good reasons. *See Bruen*, 597 U.S. at 26.

Finally, the State takes aim at Plaintiffs' alternative argument: even if this Court does not accept that the banned firearms are protected because they belong to a category of arms that are

"in common use," even viewed more narrowly, the specific handguns banned by Massachusetts are, as a group, in common use. *See* Pls.' Br. 13–14. The State responds that Plaintiffs have failed to make an "evidentiary showing" that the specific handguns banned by Massachusetts are common, criticizing Plaintiffs for relying on "a single news article from 2020 about sales information, without any authentication of the underlying factual data." State Br. 15. But as Plaintiffs have explained, the real question is whether or not the handguns banned by the State are "dangerous and unusual." The State has offered no evidence or argument that they are, and it is the State's burden to do so. *See Bruen*, 597 U.S. at 24. It is indisputable that Glocks, the most prominent example of the State's banned firearms, are in common use (and have been for some time), and there are many publicly available sources that confirm that fact, *see, e.g.*, *How Glock became America's gun*, CBS News (Sept. 15, 2013), https://perma.cc/J5E8-42UA; Peter Alan Kasler, Glock: The New Wave in Combat Handguns 12 (1992) ("By the end of 1990 there were more than 300,000 Glock pistols in use throughout North America.").

It is of no relevance that Plaintiffs have cited news articles and books to support that fact. The number of Glock handguns or other handguns banned by Massachusetts that there are in the country is not an "adjudicative fact," to which the ordinary rules of evidence apply, but rather, a "legislative fact," or a fact with "relevance to legal reasoning … in the formulation of a legal principle or ruling by a judge or court." Fed. R. Evid. 201, 1972 Advisory Comm. Note. Such facts can be, and frequently are, established through reference to "books and other documents not prepared specially for litigation or refined in its fires." *Ind. Harbor Belt R.R. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990). As such, the Supreme Court has relied on similar evidence to find that handguns generally are common. In *Heller*, for example, the Court cited the decision below for that fact and the D.C. Circuit, in turn, supported that conclusion by citing directly to a

social science paper. *See Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 182–83 (1995)). Similarly, Justice Alito in *Caetano* quoted a Michigan Court of Appeals decision for the proposition that "hundreds of thousands of Tasers and stun guns have been sold to private citizens," *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (cleaned up), and that decision based its conclusion on a law review article which, in turn, relied on "a newspaper article from 1985," *People v. Yanna*, 824 N.W.2d 241, 245 n.5 (Mich. Ct. App. 2012). Other courts have done similarly when trying to determine whether a given arm (or magazine) is common. *See, e.g.*, *Duncan v. Becerra*, 970 F.3d 1133, 1142 (9th Cir. 2020), *vacated sub nom. on rehearing en banc*, *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *vacated and remanded in light of Bruen*, 49 F.4th 1228 (Mem.) (2022) ("One estimate based in part on government data shows that from 1990 to 2015, civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation."). This Court can do the same.

Finally, the State argues that the First Circuit has already rejected "common use" as an indicator of constitutionally protected status for a firearm, State Br. 15, but as Plaintiffs explained in their opening brief, that conclusion was based on the First Circuit's additional, preliminary, finding that the banned magazines were exceptionally lethal and dangerous in the hands of criminals, *see Ocean State Tactical, LLC v. Rhode Island* ("*OST*"), 95 F.4th 38, 47 (1st Cir. 2024), and that rationale has no application here because the Supreme Court has already held that handguns cannot be banned because they are dangerous in the hands of criminals. Pls.' Br. 14–15.

## III.    The State's Alternative Historical Justifications for the Roster Must Be Rejected.

Even if the Court does not conclude that it is dispositive that the firearms banned by Massachusetts are categorically "in common use," that does not resolve the case in the State's

favor. Given that this case falls within the "plain text" of the Second Amendment, the default is protection, and Massachusetts must show a specific historical tradition that excuses its regulation; it has not done so.

As the Supreme Court made clear in *Rahimi*, when applying the *Bruen* analytical method of comparing the "how" and the "why" of modern and historical firearm regulations to determine whether a law, today, comports with the Second Amendment, the goal of the analysis is to determine the historical "principle[] that underpin[s] [an identified] regulatory tradition" and to then determine whether or not the modern law is justified according to the same principle. 602 U.S. at 692. Only when that is true is a modern law "relevantly similar" to a historical limitation on the right and, therefore, constitutional. However, in deriving such a principle, "a court must be careful not to read a principle at such a high level of generality that it waters down the right." *Id*. at 740 (Barrett, J., concurring). This is critical because drawing a principle at too high a level of generality risks essentially reintroducing the prior interest-balancing regime, wherein the State can justify its regulation if it at least nods in the direction of an important interest that has broadly been shared throughout history. That would violate both *Bruen*'s warning against courts "engag[ing] in independent means-end scrutiny under the guise of an analogical inquiry," 597 U.S. at 29 n.7, and *Rahimi*'s related caution that any historical principle must still "comport with the principles underlying the Second Amendment" itself, 602 U.S. at 692. As Justice Kavanaugh explained, "[h]istory, not policy, is the proper guide," *id*. at 717 (Kavanaugh, J., concurring), and if Courts are to actually be guided by history and not policy, the relevant historical principle must be fine grained, as it was, for instance in *Rahimi*, where the Court rejected the notion that Rahimi could be disarmed because he was not "responsible," remarking that such a rule would be unclear in application, *id*. at 701–02, and undoubtedly would have invited policy judgments by courts.

The State violates this principle right away in its historical analysis. It points to several different types of historical laws, which it lumps together as demonstrating a tradition of putting "laws in place to reduce the dangers posed by firearms and ammunition." State Br. 16. But this is a sky-high principle to claim to derive from the historical record and it is entirely inconsistent with the principles underlying the Second Amendment, which enshrines an individual right to own and to carry firearms. Indeed, for this reason, *Bruen* forbids any analysis that assumes firearms are inherently dangerous and requires courts to adopt the perspective of "a law-abiding citizen[]" when weighing how both historical and modern regulations burden the right. *See Bruen*, 597 U.S. at 29. *Heller* demonstrates this feature of the analysis, given that it concluded handguns were protected because they are the "quintessential self-defense weapon," 554 U.S. at 629, without giving any weight whatsoever to the fact that they are also "the overwhelmingly favorite weapon of armed criminals[,]" *id*. at 682 (Breyer, J., dissenting). Indeed, under the State's proffered historical principle, *Heller* itself was wrongly decided: It is no doubt true that the District of Columbia, in banning handguns, thought that doing so would "reduce the dangers posed by firearms and ammunition," State Br. 16, by reducing how many of them there were—but that "solution" to the problem did not respect the Second Amendment's overarching purpose of facilitating lawful firearm use, and so *could not* be a historical principle justifying banning firearms for law-abiding citizens. *See* Pls.' Br. 16.

In fact, the State has not identified any unified historical principle or tradition—it has identified several different ones. But none is a good fit for the Handgun Ban.

### A. Proving Laws Do Not Justify the Handgun Ban.

The Commonwealth places most of its emphasis on early American "proving" laws, the most important of which is an 1805 Massachusetts law requiring that all firearms manufactured in

the state be inspected and certified by a state-appointed "prover" of firearms. Add. 41–43; *see* State Br. 17–18. The "prover" would test the soundness of musket or pistol barrels by firing them twice, with different quantities of gunpowder, and if the "barrels shall stand the proof … and shall in no respect fail," then the prover would stamp the barrels to certify that they had passed and been approved for sale and use. Add. 41–42. Maine passed a very similar, though not as specific, law in 1821. *See* Add. 53. As a result of these protections, firearm purchasers in Maine and Massachusetts could be given a modicum of assurance that the firearms they were buying would be well-made and in good working order when they acquired them.

These laws do not establish a principle that any regulation that "reduce[s] the dangers posed by firearms and ammunition" is constitutional, nor are they "relevantly similar" to Massachusetts' Handgun Ban. "Proving laws" were aimed at finding defective firearms, which might be dangerous to the user if their barrels failed. *See* Pls.' Br. 17–18 (noting that the concerns of the proving laws were akin to modern day products liability). They did not ban any types of or models of firearms, nor did they mandate that the firearm manufacturers alter how they constructed their firearms or insist upon the addition of other "safety features" required by the State. The Handgun Ban, however, does not care if a specific handgun passes a firing test and is in perfect working condition before it is sold, it is concerned with features the State requires manufacturers to include; a handgun could pass 100 firing tests and be in perfect working order; but it would still be banned if, for instance, it was a model that lacked a "[l]oad indicator" or "[m]agazine safety disconnect." 940 C.M.R. § 16.01.

There are other problems with analogizing to these proving laws. They applied only to manufacturers in their respective states, and did not prevent, for instance, someone from Massachusetts from purchasing any firearm he wished, untested by a prover, if it was made in New

Hampshire. *See* Add. 42. Furthermore, while Massachusetts was home to a very important firearm manufacturer, the federal Springfield Armory, the proving law did not apply to arms made by Springfield Armory at all. *See* Cornell Rep. ¶ 20, Doc. 82-3. The State attempts to wave away this issue, by noting that Springfield had "its own exacting quality control requirements," State Br. 21, but this rather proves how *unlike* these proving laws the Handgun Ban. Indeed, it is nearly their opposite. Just like Springfield Armory, firearm manufacturers today have their own exacting quality control processes to ensure that their firearms are reliable out of the box. *See Glock advanced manufacturing*, GLOCK, https://perma.cc/N3PM-MW63 (last visited Mar. 6, 2025). But the Handgun Ban perversely prevents purchasers of the banned firearms from having any such assurances. While purchasing a new Glock pistol from a licensed dealer carries with it assurances that the firearm has never been used, modified, stolen, or tampered with, and is accompanied by a manufacturer's warranty—significantly more robust protection than was offered even by the proving laws the State points to—a purchase on the secondary market lacks all of those things and leaves the purchaser in the same position as a Massachusettsian in 1806 who decided to go with an untested New Hampshire barrel for his firearm.

Even if the proving laws were relevantly similar to the Handgun Ban—and to be clear, they are not—two laws do not amount to a "well-established and representative" tradition of historical regulation. *Bruen*, 597 U.S. at 30; *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 480 (2020) (requiring a traditional limitation on the First Amendment to be "historic and substantial"). In order to bolster its case and attempt to remedy this deficiency, the State points to several other pieces of evidence it claims shows that these regulations were part of an enduring regulatory tradition, including: (1) government requirements for "proving" militia weapons in the Revolution and, later, the establishment of "federal standards" for firearms purchased by the United States

military, State Br. 18–19, (2) statements by George Washington both during the Revolution and after regarding his concern that members of the militia were serving with inadequate firearms, *id.*, (3) and state laws from the Founding era that required the "proving and inspection of gunpowder," *id.* at 20. These do not advance the State's case.

As for the first two, neither the fact that Washington was dissatisfied with the quality of arms available during the Revolution, nor the government's prescription of standards for the firearms it purchases are at all relevant. The Army does not bear arms in exercise of a constitutional right, and the government is of course free today as it was in the 1790s to set standards or specifications for firearms it wants to buy or use in the military; in doing so, it does not interfere in any way with the ability of individuals to make different decisions for themselves and does not restrict the sale of any firearms to civilian purchasers. The State anticipates this argument and claims that the distinction was less meaningful because "weapons were not strictly divided by military or civilian use" at the time. *Id*. at 20 n.27. This is a non sequitur—even if more arms were shared between the military and civilians at the Founding, that does not answer Plaintiffs' objection that the fact that the government chose to not to purchase certain firearms that could not stand up to its durability testing did not prevent a civilian purchase that firearm *anyway*. The two things therefore are not at all comparable in "how" they burdened the right. And the State's premise is wrong. There still are a large number of firearms that are purchased by the military and also available to and widely used by civilians. For example, the Sig Sauer P320 pistol is the civilian version of the military's standard issue sidearm, the M17/M18. *See P320-M17*, Sᴵɢ Sᴀᴜᴇʀ, https://perma.cc/S6RH-ARA6 (last visited Mar. 6, 2025). But the fact that the military chooses the M17 does not in any way limit civilian options at all.

Finally, the State's laws regarding the proving of gunpowder are, though similar to the

proving laws for firearm barrels passed in Massachusetts and Maine, no help to the State. Like the Massachusetts barrel proving law, and in an opposite way from the Handgun Ban, the gunpowder law aimed to protect consumers from latent defects in gunpowder "whose 'defects' may not be 'discovered until brought into actual use.' " State Br. 20 (quoting Add. 35). They did not, in any way, meaningfully restrict the availability of any firearms on the market. The State simply paints with too broad a brush when it claims that both the Handgun Ban and these proving laws were both "aimed to eliminate the dangers of weapons and gunpowder that were unfit for their intended purpose." *Id*. at 21. Unlike the proving laws, which weeded out defective products, the Handgun Ban is not aimed at firearms "unfit for their intended purpose," but firearms it wishes people would not choose. But as the Supreme Court has made clear, in this area it is the choices of the American people, not their state governments, that matters. *Heller*, 554 U.S. at 629.

### B. Fire Safety Regulations Are Irrelevant.

The State next turns for support to laws it describes as regulations "on the storage of weapons and gunpowder to minimize the risk of fire." State Br. 23. But these "fire-safety laws" are simply irrelevant to the scope of the Second Amendment's protections. *See Heller*, 554 U.S. at 632. Just as *Heller*'s conclusion that the government could not bar handguns did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents," neither do laws regulating the storage of gunpowder remotely suggest the validity of the Handgun Ban. *See id.* Indeed, such laws burdened the right to self-defense only incidentally, if at all, and not in the way the Handgun Ban does, since they did not prohibit the owner from keeping and bearing whatever type of firearm he wanted.

The State gets this remarkably backward when it acknowledges that *Heller* noted that gunpowder laws were a poor analogue because they did not "remotely burden the right of self-

defense," but treats that statement as an *endorsement* of its own analogy here because, it claims, the Handgun Ban *also* does not burden that right. State Br. 24 (quoting 554 U.S. at 632). As explained above, a law banning the sale of certain firearms *necessarily* burdens the right to armed self-defense by depriving Plaintiffs of a chosen tool for that purpose, and the State's protestation that Plaintiffs have other options has no place within the *Bruen* analysis. Rather, the language the State highlights here should have tipped it off that, notwithstanding the fact that *OST* relied on these restrictions, in part, in upholding Rhode Island's ban on so-called "large capacity magazines," 95 F.4th at 49, these fire-safety restrictions standing alone are a bad analogy for *any* case under the *Bruen* analysis, since they do not identify any tradition actually restricting the exercise of the right.

These laws are therefore utterly unlike each other in "how" they burden the Second Amendment right, which is fatal to the analogy. But the State's attempts to equate at least the "why" of the Handgun Ban and these storage laws as both "intended to reduce what might be called the collateral dangers of firearms[,]" fares no better. State Br. 24. Again, this only makes sense at an extremely high level of generality. The gunpowder storage laws were concerned with the risk of a catastrophic fire or explosion that could burn down entire sections of a largely wooden, and highly flammable city. *See, e.g.* 2 Benson J. Lossing, History of New York City 500–02 (Google Books ed. 1884) (noting that the Great New York City Fire of 1845 began in a whale oil store, but was greatly exacerbated when it reached a warehouse improperly storing "a great quantity of saltpetre," a key ingredient in black powder), which is nothing like the State's concern with accidental or negligent discharge a handgun.

### C. Trap Gun Laws Are Similarly Poor Analogies to the Handgun Ban.

The State next turns to laws restricting the setting of "trap guns," or firearms rigged to go

off if a "trap" (for example, a trip wire) is sprung. *See* State Br. 25. Again, these laws are nothing like the Handgun Ban, because they did not bar the purchase or possession of any type of firearm at all—rather, they targeted a particular negligent or reckless way of misusing a firearm and banned *that*. The State tries to equate this with the Handgun Ban by characterizing the Handgun Ban as targeting firearms that poses a risk of "unsuspectingly fir[ing] a bullet [the user] did not realize was in the chamber." *Id*. But there is a world of difference between a law prohibiting intentionally rigging a firearm to go off in a reckless manner and purchasing a common firearm that, by design, lacks one or more of the putative safety features in which the State puts stock. The State has not identified a single historical law that operates the way its own Handgun Ban does.

### D.  Laws Restricting Firearm Access By Minors Are Also Unavailing.

Finally, the State reaches for historical laws restricting minors from acquiring handguns and other types of weapons, claiming that they support the Ban, since some of the features of the Ban are ostensibly aimed at preventing a five-year-old from being able to operate a handgun. *See id*. at 27–28. But of course, Massachusetts already has laws banning children from acquiring firearms and handguns, exactly like these historical laws did. *See* MASS. GEN. LAWS ch. 140, §§ 129B, 131 (requiring a license to carry or firearm identification card to possess any firearms, and requiring an individual to be at least 15 years of age to acquire the lesser of these licenses). Again, the Handgun Ban targets ordinary, common firearms, and bans law-abiding adults from purchasing them in the commercial marketplace. Age restrictions on purchasing do nothing of the sort and are entirely irrelevant.

### CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment.

Dated: March 7, 2025

Respectfully submitted,

Richard C. Chambers, Jr., Esq.
(BBO# 651251)
Chambers Law Office

Jason A. Guida
(BBO# 667252)
Principe & Strasnick, P.C.

Raymond M. DiGuiseppe
(*Admitted Pro Hac Vice*)
The DiGuiseppe Law Firm, P.C.

/s/ David H. Thompson
David H. Thompson
(*Admitted Pro Hac Vice*)
Peter A. Patterson
(*Admitted Pro Hac Vice*)
William V. Bergstrom
(*Admitted Pro Hac Vice*)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
dthompson@cooperkirk.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 7, 2025.

/s/ David H. Thompson
David H. Thompson
(*Admitted Pro Hac Vice*)

*Attorney for Plaintiffs*