UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STEFANO GRANATA, CAMERON PROSPERI, THE GUN RUNNER, LLC, and FIREARMS POLICY COALITION, INC.,

Plaintiffs,

v.

ANDREA JOY CAMPBELL, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE COMMONWEALTH OF MASSACHUSETTS, and TERRENCE M. REIDY, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE EXECUTIVE OFFICE OF PUBLIC SAFETY AND SECURITY OF THE COMMONWEALTH OF MASSACHUSETTS,

Defendants.

CIVIL ACTION
NO. 1:21-cv-10960-DJC

**DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendants Andrea Joy Campbell, in her official capacity, and Terrence M. Reidy, in his official capacity, submit this Notice of Supplemental Authority to apprise the Court of a recent decision of the First Circuit issued since the hearing on the parties' cross-motions for summary judgment on March 26, 2025.

In *Capen v. Campbell*, No. 24-1061, --- F.4th ---, 2025 WL 1135269 (1st Cir. Apr. 17, 2025) (slip op. attached as **Exhibit A**), the First Circuit affirmed the district court's denial of a preliminary injunction in a challenge to Massachusetts's prohibition on the sale and possession of assault weapons and large-capacity magazines. Of relevance to this matter, the First Circuit explained that *District of Columbia v. Heller*, 554 U.S. (2008), did not support plaintiffs' argument that "a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class." Slip op. at 29-30.

April 18, 2025

Respectfully submitted,

ATTORNEY GENERAL ANDREA JOY CAMPBELL, and SECRETARY TERRENCE M. REIDY,

By their attorneys,

*/s/ Phoebe Fischer-Groban*

Phoebe Fischer-Groban, BBO No. 687068
Grace Gohlke, BBO No. 704218
Assistant Attorneys General
Office of the Attorney General
Government Bureau
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2589
Phoebe.Fischer-Groban@mass.gov
Grace.Gohlke@mass.gov

**CERTIFICATE OF SERVICE**

I certify that this document filed through the CM/ECF system will be sent electronically to registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 18, 2025.

*/s/ Grace Gohlke*
Grace Gohlke
Assistant Attorney General

# EXHIBIT A

# United States Court of Appeals
## For the First Circuit

---

No. 24-1061

JOSEPH R. CAPEN; NATIONAL ASSOCIATION FOR GUN RIGHTS,

Plaintiffs, Appellants,

v.

ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

---

Before

Gelpí and Rikelman, Circuit Judges,
and Katzmann,* Judge.

---

Barry K. Arrington, with whom Arrington Law Firm was on brief, for appellants.

Erin E. Murphy, Lawrence G. Keane, Paul D. Clement, Matthew D. Rowen, Mariel A. Brookins, and Clement & Murphy, PLLC, on brief for National Shooting Sports Foundation, Inc., amicus curiae.

Grace Gohlke, Assistant Attorney General, with whom Andrea Joy Campbell, Attorney General, and Julie E. Green,

---

* Of the United States Court of International Trade, sitting by designation.

Assistant Attorney General, were on brief, for appellee.

Matthew J. Platkin, Attorney General of New Jersey, Jeremy M. Feigenbaum, Solicitor General, Angela Cai, Deputy Solicitor General, Christopher J. Ioannou, Deputy Attorney General, Rob Bonta, Attorney General of California, Philip J. Weiser, Attorney General of Colorado, William Tong, Attorney General of Connecticut, Kathleen Jennings, Attorney General of Delaware, Brian L. Schwalb, Attorney General for the District of Columbia, Anne E. Lopez, Attorney General of Hawai'i, Kwame Raoul, Attorney General of Illinois, Aaron M. Frey, Attorney General of Maine, Anthony G. Brown, Attorney General of Maryland, Dana Nessel, Attorney General of Michigan, Keith Ellison, Attorney General of Minnesota, Aaron D. Ford, Attorney General of Nevada, Letitia James, Attorney General of New York, Ellen F. Rosenblum, Attorney General of Oregon, Michelle A. Henry, Attorney General of Pennsylvania, Peter F. Neronha, Attorney General of Rhode Island, Charity R. Clark, Attorney General of Vermont, and Robert W. Ferguson, Attorney General of Washington, on brief for New Jersey, California, Colorado, Connecticut, Delaware, the District of Columbia, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New York, Oregon, Pennsylvania, Rhode Island, Vermont, and Washington, amici curiae.

Jennifer Loeb, Aaron R. Marcu, Brandt Henslee, Daniel Hodgkinson, Taylor Jachman, Freshfields Bruckhaus Deringer US LLP, Esther Sanchez-Gomez, Leigh Rome, William T. Clark, Giffords Law Center to Prevent Gun Violence, Douglas N. Letter, Shira Lauren Feldman, Brady Center to Prevent Gun Violence, Ciara Wren Malone, and March for Our Lives on brief for Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives, amici curiae.

---

April 17, 2025

---

**KATZMANN**, **Judge**. This appeal involves a constitutional challenge to a Massachusetts law that prohibits the sale, transfer, or possession of "an assault weapon or a large capacity feeding device." Mass. Gen. Laws ch. 140, § 131M (the "Massachusetts Ban," or the "Ban").

Appellant Joseph R. Capen is a Massachusetts resident who alleges that he would purchase items covered by the Ban "to keep in his home for self-defense and other lawful purposes" if not for the credible threat of prosecution under § 131M. Appellant the National Association for Gun Rights (the "Association") is a nonprofit organization whose members would also allegedly purchase items prohibited by the Massachusetts Ban for the same purposes if not for that threat.

Appellants filed a complaint in the U.S. District Court for the District of Massachusetts on September 7, 2022, seeking a declaratory judgment that the Ban (1) on its face violates the Second Amendment of the U.S. Constitution or, in the alternative, (2) violates the Second Amendment "as applied to the extent [its] prohibitions apply to law-abiding adults seeking to acquire, use, transfer, or possess arms that are in common use by the American public for lawful purposes." The Complaint also includes a request for preliminary and permanent injunctions against the Ban's enforcement. Appellants filed a Motion for Preliminary Injunction

("PI Motion") on November 9, 2022. Defendant-Appellee,[1] the Attorney General of the Commonwealth of Massachusetts (the "Commonwealth"), opposed this motion.

The district court denied the PI Motion on December 21, 2023, concluding that Plaintiffs "cannot demonstrate a likelihood of success on the merits of their claims." Capen v. Campbell, 708 F. Supp. 3d 65, 70 (D. Mass. 2023). Appellants brought this interlocutory appeal from that order.

Because we conclude that Appellants are unlikely to succeed on the merits of their claims as presented, taking into account the record as was before the district court, and in light of intervening authority, we affirm the denial of the PI Motion.

## I.

### A. The Massachusetts Ban

Appellants broadly challenge three provisions of the Massachusetts Ban. Two are definitional provisions, and one is an enforcement provision. Overall, the Massachusetts Ban restricts items belonging to two categories: "assault weapons," a category that includes both handguns and "long" guns, and specific types of magazines called "large capacity feeding devices" ("LCMs"). The enforcement provision reads as follows:

---

[1] Appellants' Complaint initially named the Governor of Massachusetts as a separate Defendant. He was dismissed from this action by the parties' stipulation on October 28, 2022.

> No person shall sell, offer for sale, transfer or possess an assault weapon or a large capacity feeding device that was not otherwise lawfully possessed on September 13, 1994. Whoever not being licensed under the provisions of section 122 violates the provisions of this section shall be punished, for a first offense, by a fine of not less than $1,000 nor more than $10,000 or by imprisonment for not less than one year nor more than ten years, or by both such fine and imprisonment, and for a second offense, by a fine of not less than $5,000 nor more than $15,000 or by imprisonment for not less than five years nor more than 15 years, or by both such fine and imprisonment.

Mass. Gen. Laws ch. 140, § 131M. The statute meanwhile defines "[a]ssault weapon" as follows:

> "Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing in such section on September 13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12 . . . .

Id. § 121. The referenced federal statute, which has since lapsed, banned a large number of specific firearms -- some of which the Massachusetts Ban also enumerates. The federal statute further defined "semiautomatic assault weapon" as follows:

(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of --

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher;

(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of --

(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

(v) a semiautomatic version of an automatic firearm; and

(D) a semiautomatic shotgun that has at least 2 of --

(i) a folding or telescoping stock;

> (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
>
> (iii) a fixed magazine capacity in excess of 5 rounds; and
>
> (iv) an ability to accept a detachable magazine.

Pub. L. No. 103-322, § 110102, 108 Stat. 1796, 1996-98 (1994) (the "Federal Statute").

"Large capacity feeding device," finally, is defined by the Massachusetts Ban as follows:

> (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.

Mass. Gen. Laws ch. 140, § 121.

**B. The Second Amendment**

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." District of Columbia v. Heller, 554 U.S. 570, 635

(2008). But "[l]ike most rights, the right secured by the Second Amendment is not unlimited." Id. at 626. One such limitation is a "historical tradition of prohibiting the carrying of dangerous and unusual weapons" that were not "in common use" at the time the Second Amendment was drafted. Id. at 627 (internal quotation marks and citations omitted).

The U.S. Supreme Court elaborated on Heller in New York State Rifle & Pistol Association v. Bruen:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

597 U.S. 1, 24 (2022) (internal quotation marks and citation omitted). Under this approach, "the features that render regulations relevantly similar under the Second Amendment" include "how and why the regulations burden a law abiding citizen's right to armed self defense." Id. at 29. The Court also held that ascertaining "consisten[cy] with the Nation's historical tradition, id. at 24, may require "a more nuanced approach" in "cases implicating unprecedented societal concerns or dramatic technological changes," id. at 27.

The Court further explained the mode of historical inquiry required by Bruen in United States v. Rahimi:

> [I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. . . . The law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin.

602 U.S. 680, 692 (2024) (internal quotation marks and citations omitted). "Heller," the Court also held, "never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." Id. at 699.

As briefing progressed in this appeal, we issued an opinion applying Bruen's historical-tradition approach to a Rhode Island statute banning LCMs. See Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38 (1st Cir. 2024). We affirmed the district court's denial of a preliminary injunction, finding that the plaintiff-appellants there had not shown a sufficient likelihood of success on the merits of their LCM-specific claim. Id. at 41. In so holding, we noted that "[w]e do not consider in this opinion whether a state may ban semiautomatic weapons themselves." Id. at 49 n.15.

**C. Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council,

Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)). "In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). The first of these factors is a necessary condition: "If the movant fails to demonstrate a likelihood of success on the merits, the remaining elements are of little consequence." Akebia Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020) (citation omitted). Finally, "a court's conclusions as to the merits of the issues presented on preliminary injunction are to be understood as statements of probable outcomes." Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991).

**II.**

The district court denied Appellants' PI Motion on the ground that the Massachusetts Ban "comports with the requirements of the Second Amendment, and [that] therefore plaintiffs cannot demonstrate a likelihood of success on the merits of their claims." Capen, 708 F. Supp. 3d at 70. In so holding, the district court focused on the question of whether the Ban "is consistent with

this Nation's historical tradition of firearm regulation." Id. at 79 (quoting Bruen, 597 U.S. at 17). The relevant tradition, according to the district court, is "the tradition of regulating 'dangerous and unusual' weapons." Id.

The district court began by evaluating the Ban as applied to assault weapons. It first held that it would assume, without deciding, that the "weapons proscribed by the Act are bearable arms that fall somewhere within the compass of the Second Amendment." Id. at 81 (internal quotation marks and citation omitted). The district court went on to hold that the proscribed weapons are "dangerous and unusual," meaning that "they are unreasonably dangerous and unusual for ordinary citizens to use for lawful purposes, particularly self-defense." Id. at 85. The district court noted that "the design and features" of the Colt AR-15 -- a semiautomatic rifle that is one of the enumerated "assault weapons" subject to the Ban -- "make[] it an unreasonably dangerous and unusual weapon for ordinary self-defense purposes." Id. at 85-86. "[T]he intrinsic characteristics of assault weapons," the district court found, "make them poor self-defense weapons." Id. at 86. The district court also found that "[b]eyond their intrinsic characteristics, the injuries inflicted by assault weapons can be catastrophic, again far surpassing the destructive power of typical semiautomatic handguns." Id. While acknowledging that "an AR-15 could be useful in some self-defense scenarios,"

the district court noted that "so too could an open-bolt machine gun or an automatic grenade launcher, or indeed any firearm of any size, shape, or description." Id. at 87 (emphases omitted). The district court concluded that because assault weapons are dangerous and unusual, Massachusetts's ban on them comports with historical tradition -- and therefore, consistent with Bruen and Heller, passes constitutional muster. See id.

The district court reached a similar conclusion with respect to LCMs. Recognizing a lack of "specific guidance from the Supreme Court or the First Circuit" as to whether magazines are "arms" for constitutional purposes, id. at 89, the district court identified a historical tradition of bans on items similar to LCMs, id. at 90-91. The district court did not find that LCMs are dangerous and unusual, as it had with assault weapons, but found that there exists a constitutionally sufficient historical tradition in the form of restrictions that include founding-era bans on gunpowder and early-twentieth-century bans on magazines. See id.

Putting these conclusions about the Massachusetts Ban's likely constitutionality together, the district court denied the PI Motion on the sole ground that Appellants had failed to show a likelihood of success on the merits. Id. at 92. This timely appeal ensued.

**III.**

The Court of Appeals has statutory jurisdiction to hear this particular interlocutory appeal involving a federal question under 28 U.S.C. §§ 1292(a)(1) and 1331.

Our constitutional jurisdiction to hear this appeal requires a demonstration of standing. Under Article III, federal courts have jurisdiction only where a plaintiff establishes "the irreducible constitutional minimum of standing," which requires in turn that the plaintiff have suffered an "injury in fact." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992); see also United States v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992) ("The complainant must set forth reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing.").[2]

Capen himself appears to have made this showing. He alleges that "but for the credible threat of prosecution under the Challenged Laws, [he] would purchase the Banned Firearms and Banned

[2] While the Commonwealth contested Appellants' standing to sue in its Answer, arguing that Appellants did not establish an injury in fact in their complaint, the issue of standing is not presented on appeal. We discuss it here because we must "determine if we have jurisdiction, even though the parties did not originally contest our jurisdiction on appeal," In re Olympic Mills Corp., 477 F.3d 1, 6 (1st Cir. 2007), and because of the "plaintiff-by-plaintiff . . . analysis required by standing doctrine," Hochendoner v. Genzyme Corp., 823 F.3d 724, 733 (1st Cir. 2016).

Magazines to keep in his home for self-[]defense and other lawful purposes." That is enough for the purpose of this interlocutory appeal: "[A] plaintiff's standing to seek a preliminary injunction should be judged on the sufficiency of the allegations of the complaint . . . ." McBreairty v. Miller, 93 F.4th 513, 518 n.2 (1st Cir. 2024) (internal quotation marks and citation omitted).

The standing outlook is murkier for the Association, as Appellants' complaint does not name any specific Association member whose interests the Massachusetts Ban affects.[3] "[P]laintiffs claiming an organizational standing [must] identify members who have suffered the requisite harm." Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009). And "[t]his requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where all the members of the organization are affected by the challenged activity." Id. at 498-99; see also Draper v. Healey, 827 F.3d 1, 3 (1st Cir. 2016)

[3] The declaration submitted by the Association's president contains only the general statement that "members on whose behalf this action is brought are residents of the Commonwealth of Massachusetts and law-abiding citizens of the United States." And while counsel for Appellants stated at oral argument that Capen is himself an Association member, the record does not positively substantiate that assertion.

(Souter, J.) (citing the *Earth Island* naming requirement in finding that an organization lacked standing).

It would nevertheless be premature to dismiss the Association at this stage of the litigation. Appellants may be able to cure any jurisdictional defect in their pleadings after the disposition of this appeal. *See generally* Fed. R. Civ. P. 15; *see also* *Sierra Club* v. *Morton*, 405 U.S. 727, 735 n.8 (1972) (noting that its conclusion that the plaintiff lacked standing on appeal from the grant of a preliminary injunction did not, "of course, bar the [plaintiff] from seeking in the District Court to amend its complaint by a motion under Rule 15"). And in any event, "[i]f at least one plaintiff has standing, the suit may proceed." *Biden* v. *Nebraska*, 143 S. Ct. 2355, 2365 (2023).

We review the district court's denial of a motion for preliminary injunction for abuse of discretion. *Santiago* v. *Mun. of Utuado*, 114 F.4th 25, 34 (1st Cir. 2024) (citing *Ocean State Tactical*, 95 F.4th at 42). We may affirm such a denial "on any basis supported by the record and the law." *Lydon* v. *Loc. 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014).

**IV.**

Appellants challenge the constitutionality of the provisions of the Massachusetts Ban that pertain to (1) assault weapons and (2) LCMs. We address each challenge in turn.

A.

We first address Appellants' demonstration of the likelihood of success on the merits of their challenge to the Massachusetts Ban's assault-weapon restrictions.

1.

We begin our analysis with three preliminary observations.

First, this case is similar to Ocean State Tactical in that we need only "consider whether [Massachusetts]'s ban is 'consistent with this Nation's historical tradition of firearm regulation' and thus permissible under the Second Amendment." 95 F.4th at 43 (quoting Bruen, 597 U.S. at 17). Our affirmative conclusion on this point will mean that Appellants are unlikely to succeed on the merits, whether or not "the Second Amendment's plain text covers" the use of assault weapons. Bruen, 597 U.S. at 17. Plain-text coverage establishes a presumption of protection under the Second Amendment, id., but Appellants' success on the merits is unlikely if the Ban is consistent with historical tradition. See Ocean State Tactical, 95 F.4th at 43. We focus our analysis accordingly.

Second, this case is also similar to Ocean State Tactical in that it "'implicat[es] unprecedented societal concerns'" and therefore "'may require a more nuanced approach' to historical analysis." Id. at 44 (quoting Bruen, 597 U.S. at 27). As in Ocean

State Tactical, "we find in the record no direct precedent for the contemporary and growing societal concern" of mass shootings that the Massachusetts Ban addresses. Id. And Appellants appear to concede that this finding -- which in Ocean State Tactical pertained to "today's semiautomatic weapons fitted with LCMs," id. -- applies to the record of this case as well.

Third, we follow the district court in focusing our analysis on the Massachusetts Ban's application to the Colt AR-15 rifle.[4] See Capen, 708 F. Supp. 3d at 81 & n.12. For one thing, as the district court observed, Appellants "have focused almost exclusively on the Act's prohibition of a particular model of semiautomatic rifle -- specifically, the Colt AR-15." Id. at 81. For another, as the Commonwealth pointed out at oral argument, Appellants seek a declaration that the Massachusetts Ban is unconstitutional "on [its] face." A facial challenge requires a challenging party "to 'establish that no set of circumstances exists under which the Act would be valid.'" Rahimi, 602 U.S. at 693 (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). If the Massachusetts Ban validly restricts at least one type of

---

[4] The AR-15 is a type of semiautomatic rifle, which alongside "semiautomatic pistols and shotguns, [is] capable of firing one shot per each pull of the trigger." "All AR-15 firearms are derivatives of the Armalite Rifle (AR) model 15, which was originally designed for the United States Military in the late 1950s." AR-15s are "lightweight, easily portable, accurate, high-capacity-capable, low recoil, and fast-firing."

Case 1:21-cv-10960-DJC Document 102 Filed 04/18/25 Page 22 of 40

weapon, Appellants cannot make that no-set-of-circumstances showing. We may therefore conclude our analysis if we hold that the Massachusetts Ban's specific restriction on the AR-15 is "'relevantly similar' to laws that our tradition is understood to permit." Rahimi, 602 U.S. at 692 (quoting Bruen, 597 U.S. at 29). If it is, the entirety of Appellant's facial challenge is unlikely to succeed. That in turn would mean that Appellants are not entitled to preliminary relief.

**2.**

We begin our "nuanced approach" by considering whether "'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation" to the Ban's AR-15 restriction. See Bruen, 597 U.S. at 27 (quoting Heller, 554 U.S. at 631); see also Rahimi, 602 U.S. at 692 ("[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."). The metric we employ in this comparability analysis is "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29. As we put it in Ocean State Tactical: "First, we consider the 'how,' comparing the 'burden on the right of armed self-defense' imposed by the new regulation to the burden imposed by historical regulations. Second, we turn to the 'why,' comparing

the justification for the modern regulation to the justification for historical regulations." 95 F.4th at 44-45 (quoting Bruen, 597 U.S. at 29).

**i.**

We start with "how": "To gauge how [the Massachusetts Ban] might burden the right of armed self-defense, we consider the extent to which [AR-15s] are actually used by civilians in self-defense." Id. at 45.[5]

We confine our inquiry to the record and conclude that the Massachusetts Ban's AR-15 restriction does not impose a heavy burden on civilian self-defense. For one thing, Appellants do not demonstrate a single instance where the AR-15 -- or any other banned weapon -- has actually been used in a self-defense scenario. They argued in their opening brief that because "the weapons banned by Massachusetts are owned by millions of Americans for lawful purposes[,] [t]hey are in common use" and therefore "cannot be banned." In Ocean State Tactical, however, we took a different approach to common use. We rejected a suggestion "that the constitutionality of arms regulations is to be determined based on the ownership rate of the weapons at issue, regardless

[5] As we further explained in Ocean State Tactical, "[d]epriving citizens of a device that is virtually never used in self-defense imposes less of a burden on that right than does banning a weapon that is, in fact, traditionally used in self-defense." Id. at 50. Appellants themselves acknowledge that this holding forecloses Appellants' arguments to the contrary.

of . . . usefulness for self-defense." 95 F.4th at 51. We noted that "[w]hile the Supreme Court has indeed identified a 'historical tradition of prohibiting the carrying of dangerous and unusual weapons,' it has not held that states may permissibly regulate only unusual weapons," or that "a weapon's prevalence in society (as opposed to, say, the degree of harm it causes) is the sole measure of whether it is 'unusual.'" Id. at 50-51 (quoting Bruen, 597 U.S. at 21). Appellants recognize in their reply that Ocean State Tactical forecloses their reliance on ownership statistics.

The Commonwealth's submissions, by contrast, affirmatively indicate that the AR-15 and other banned rifles offer limited self-defense utility. This, according to one of the Commonwealth's firearms experts, is because "[t]he need for the rifle to be aimed and fired with two hands, [and] the ability of the ammunition to easily penetrate common household construction materials negates any perceived advantage over a handgun."

**ii.**

We next compare the self-defense burden imposed by the Massachusetts Ban to the burdens imposed by historical regulations that the Commonwealth invokes as a "comparable tradition." Bruen, 597 U.S. at 27; see also Rahimi, 602 U.S. at 692. This tradition, the Commonwealth contends, is that "States have routinely regulated, and sometimes outright banned, specific weapons once it became clear that they posed a unique danger to public safety,

including mass deaths and violent crime unrelated to self-defense." The Commonwealth asserts that a number of historical regulations bear this out: eighteenth- and nineteenth-century bans on gunpowder, eighteenth- through twentieth-century bans on trap guns, nineteenth-century bans on long-bladed "Bowie" knives, pre-founding through twentieth-century bans on "clubs and other blunt instruments," and twentieth-century bans on sawed-off shotguns and automatic weapons ("machine guns").

We discussed a subset of these historical regulations in Ocean State Tactical. See 95 F.4th at 45-46. Examining Rhode Island's proposed analogues (the bans on Bowie knives, sawed-off shotguns, and machine guns), we concluded that "[i]n each instance, it seems reasonably clear that our historical tradition of regulating arms used for self-defense has tolerated burdens on the right that are certainly no less than the (at most) negligible burden of having to use more than one magazine to fire more than ten shots." Id. at 46; see also Bianchi, 111 F.4th at 466, 472 (first tracing historical "restrictions on carry, and, in some cases, outright bans on the possession of certain more dangerous weapons," and then describing Maryland's ban on assault weapons as "yet another chapter in this chronicle").

Our discussion in Ocean State Tactical about Rhode Island's LCM ban controls our assault weapon-oriented inquiry here. See 95 F.4th at 45-46. If there is any reason why it should

not apply with equal force to an analogy between (1) historical "bans" and "severe restrictions" on weapon types, id. at 46, and (2) the Massachusetts Ban's AR-15 restrictions, Appellants do not identify one in their post-Ocean State Tactical reply. So even if the self-defense burden of a limitation to devices other than assault weapons were greater than the "burden of having to use more than one magazine to fire more than ten shots," we have observed that it still "seems reasonably clear that our historical tradition of regulating arms used for self-defense has tolerated" burdens similar to those posed by an assault weapons ban. Id. We accordingly conclude that the Massachusetts Ban's AR-15 restriction does not place a historically anomalous burden on self-defense.

**iii.**

We next turn to the "why" element of the analogy that the Commonwealth draws between the Massachusetts Ban and historical regulations. See Rahimi, 602 U.S. at 692; cf. Ocean State Tactical, 95 F.4th at 46 ("At this step, Bruen directs us to consider the extent to which the justification for Rhode Island's LCM ban is analogous to justifications for the laws that form 'this Nation's historical tradition of firearm regulation.'" (quoting Bruen, 597 U.S. at 17)). The Commonwealth argues that the Massachusetts Ban is "justified by the same concern that has driven governmental regulation of specific weapons throughout history:

the State's responsibility to protect the public from the danger caused by weapons that create a particular public safety threat." This position finds support in the record, and also in our prior holdings in Ocean State Tactical.

We start with the Commonwealth's justification for the Massachusetts Ban as it applies to weapons like the AR-15. Then-Governor Mitt Romney, upon signing a permanent enactment of the Ban in 2004, stated that "[d]eadly assault weapons have no place in Massachusetts," and that "[t]hese guns are not made for recreation or self-defense. They are instruments of destruction with the sole purpose of hunting down and killing people." The press release that reported this statement described the 2004 enactment as "a move that will help keep the streets and neighborhoods of Massachusetts safe," and described the Ban itself as "a permanent assault weapons ban that forever makes it harder for criminals to get their hands on these dangerous guns." This, we have previously observed, is the Ban's "manifest purpose." Worman v. Healey, 922 F.3d 26, 39 (1st Cir. 2019), abrogated on other grounds by Bruen, 597 U.S. 1.

Appellants challenge the Commonwealth's justification on the substantive ground that "while mass shootings are undoubtedly tragic, they remain relatively rare," and that "[s]urely, in a nation of 330 million people, 928 deaths in 33 years cannot serve as the basis for depriving law-abiding citizens of the right to

possess arms that are owned by literally millions of their fellow citizens." This misses the mark. Even if we were to accept Appellants' implied premise that the loss of nearly one thousand lives is an insufficient basis for regulation, the question at this stage is not whether the concerns that justify the Ban are legitimate. Under *Bruen*, it is whether that justification is analogous to the "justification for historical regulations." *Ocean State Tactical*, 95 F.4th at 45. As Appellants themselves state one sentence earlier in their brief, "that a court believes that a statute advances a laudable policy goal is irrelevant to the Second Amendment analysis."

In any event, Appellants do not offer an alternative justification for the purpose of this analysis; they instead appear to argue that *Bruen* forecloses any comparison of the Ban's justification to the justifications underlying historical statutes. But as Appellants also appear to acknowledge, we interpreted *Bruen* differently in *Ocean State Tactical*. *See* 95 F.4th at 46. And *Rahimi* does not upset this interpretation: "[I]f laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." 602 U.S. at 692. As "newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point," *United States* v. *Rodríguez*, 527

F.3d 221, 224 (1st Cir. 2008), we will not revisit Ocean State Tactical's analytical framework here.

**iv.**

Still following Ocean State Tactical's lead, we next compare the Commonwealth's justification for the Ban "to the justifications for [the Ban's] historical analogues." Ocean State Tactical, 95 F.4th at 47. Here, too, Appellants do not meaningfully object to the Commonwealth's importation of the specific analogical reasoning of Ocean State Tactical. As in Ocean State Tactical,[6] we conclude that the historical restrictions cited by the Commonwealth reflect a common concern regarding "the State's responsibility to protect the public from the danger caused by weapons that create a particular public safety threat." We do not disturb our conclusion in Ocean State Tactical that historical restrictions on sawed-off shotguns are analogous to modern-day regulations to combat mass shootings because those guns' "popular[ity] with the mass shooters of their day" induced federal regulation. 95 F.4th at 47 (internal quotation marks omitted).

---

[6] Rhode Island justified its LCM ban in that case "as a reasoned response by its elected representatives to a societal concern: that the combination of modern semiautomatic firearms and LCMs have produced a growing and real threat to the State's citizens, including its children." Ocean State Tactical, 95 F.4th at 46. We do not see a significant difference between this justification and what the Commonwealth offers here. Nor do Appellants attempt to point one out. We accordingly apply to the present inquiry our conclusions in Ocean State Tactical as to the analogous nature of historical justifications for weapon regulation.

Nor do we disturb our conclusion that nineteenth-century legislators, in banning Bowie knives, "responded to a growing societal concern about violent crime by severely restricting the weapons favored by its perpetrators, even though those same weapons could conceivably be used for self-defense." Id. at 48. Nor, finally, do we disturb our inference that the Supreme Court in Heller excepted fully automatic weapons like M-16s from the Second Amendment's protection because "[t]hey are more dangerous, and no more useful for self-defense, than a normal handgun or rifle." Id. (citing Heller, 554 U.S. at 627). Putting these conclusions together, we hold that whatever burden the Massachusetts Ban might impose on self-defense rests on the same justification as has underpinned a tradition of weapon regulation throughout American history.

The Commonwealth urges -- and Appellants do not contest -- this simple application of Ocean State Tactical's analogical reasoning to the justification underlying the Massachusetts Ban. Under the heading, "The Knife, Club and Trap Gun Regulations were Not Analogous to the Commonwealth's Categorical Ban of Weapons in Common Use," Appellants state as follows:

> Next, the Commonwealth points to laws regulating the use of "trap guns," Bowie knives, and clubs. The Commonwealth notes that this Court accepted these laws as analogous in Ocean State Tactical. For the purpose of preserving their arguments,

> Plaintiffs incorporate their arguments to the contrary.

For the purpose of our review, at least, Appellants have thus abandoned any potential argument that Ocean State Tactical's LCM-specific holding as to analogous justifications does not control our AR-15-specific inquiry here. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

The record, meanwhile, confirms the applicability of Ocean State Tactical's LCM-focused analogical reasoning to the Commonwealth's justification for the Ban's assault-weapon restrictions. One expert reports that even without LCMs, "semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms." Even though assault weapons like AR-15s cause even more mass-shooting casualties when used in combination with LCMs, see Ocean State Tactical, 95 F.4th at 47, that extra danger does not negate the public safety threat that the weapons evidently pose when used with magazines of fewer than ten rounds. The AR-15's particular dangerousness in mass-shooting scenarios is not purely a function of magazine capacity. The AR-15 fires bullets at over 3,000 feet per second, leading to "cavitation, which is the capacity to destroy tissue beyond the direct pathway of the bullet." It does

so without imparting "[t]he excessive recoil of a hunting rifle," which "precludes rapid firing on target because of the obligatory motion of the gun and its impact on the shooter." "Thus, while providing ample bullet speed to inflict a lethal wound, the moderate energy of the AR 15 allows shooting on target literally as rapidly as the trigger can be pulled." According to the same expert report, "[t]he efficiency of the AR 15" is only "further compounded by large capacity ammunition magazines."

The historical regulations the Commonwealth cites in this case are analogous to the Massachusetts Ban because of their shared justification as measures "to protect the public from the danger caused by weapons that create a particular public safety threat." This analogy does not break down at the level of how that threat -- mass killing -- is mechanically effectuated. See Rahimi, 602 U.S. at 691-92 ("[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers."); Bruen, 597 U.S. at 30 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin."). Nor, therefore, does a difference between how LCMs and AR-15s facilitate mass

killing mean that Ocean State Tactical's justification-oriented analogical reasoning is inapplicable to AR-15s.[7]

***

On both the "how" and the "why" metrics of Bruen and Rahimi's analogical inquiry, then, the Commonwealth has at least preliminarily demonstrated that the Massachusetts Ban (as it pertains to assault weapons like the AR-15) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Bruen, 597 U.S. at 19.

**3.**

Appellants also argue that the Massachusetts Ban is invalid for the separate reason that its restrictions on "certain" semiautomatic handguns are "glaringly unconstitutional." They note that the Supreme Court stated in Heller that "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family [fails] constitutional muster." 554 U.S. at 628-29 (cleaned up).

---

[7] We did note in Ocean State Tactical that founding-era gunpowder bans provide an "especially apt analogy to Rhode Island's LCM Ban" because they each require "citizens to break down the size of the containers (magazines) used to store and feed ammunition." Ocean State Tactical, 95 F.4th at 49. This precise analogy does not directly apply to the Massachusetts Ban's AR-15 restriction. The broader analogy we drew, however, was not limited to magazine restrictions: "[O]ur nation's historical tradition," we held, "recognizes the need to protect against the greater dangers posed by some weapons (as compared to, for example, handguns) as a sufficient justification for firearm regulation." Id. (footnote omitted).

This argument is unavailing. The Massachusetts Ban, unlike the "complete prohibition" on handgun possession at issue in Heller, id. at 629, restricts only semiautomatic handguns that are either specifically enumerated or exhibit a combination of certain features, see Mass. Gen. Laws ch. 140, §§ 121, 131M.

Appellants' implied premise is that a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class. But this conflates Heller's holding that a ban on all handguns is unconstitutional with a more sweeping proposition that any ban whose scope includes any handguns at all is unconstitutional. We do not read Heller to support this latter proposition. The Court noted in that opinion that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." Heller, 554 U.S. at 629. Appellants have not premised their PI motion on a similar showing here.

Nor do we agree with Appellants' suggestion that this premise is attributable to Ocean State Tactical. Appellants seize on our statement in that opinion that "the Supreme Court opined that handguns cannot be banned in part because they are 'the quintessential self-defense weapon.'" 95 F.4th at 48 (quoting Heller, 554 U.S. at 629). But this was a reference to Heller's total handgun ban, not an extension of Heller's holding to cover all bans that extend to some handguns.

In any event, our holding that the Appellants have failed to demonstrate a likelihood of success on the merits as to the AR-15 means that Appellants likely cannot establish the Massachusetts Ban's facial invalidity on some alternative handgun-related ground.[8] The validity of one application means that the Massachusetts Ban is not facially invalid. See Moody, 603 U.S. at 723 ("NetChoice chose to litigate these cases as facial challenges, and that decision comes at a cost."); Rahimi, 602 U.S.

---

[8] We further observe that Appellants do not specifically address whether the vast majority of the Ban's restrictions on distinct weapons and weapon types fall within the ambit of the Second Amendment. They do not address, for example, the constitutionality of the Massachusetts Ban's restrictions on UZIs, "all models" of the Avtomat Kalashnikov ("AK") weapon, or revolving cylinder shotguns. Nor do they address the potential constitutionality of the Ban's restrictions on rifles that feature (again, for example) all three of (1) a detachable magazine, (2) a flash suppressor, and (3) a grenade launcher. See Federal Statute § 110102(b), 108 Stat. at 1997.

We accordingly question whether Appellants have demonstrated the likely success of their facial challenge, even notwithstanding a hypothetical conclusion that the Ban's AR-15 restriction is invalid. See Bianchi v. Brown, 111 F.4th 438, 453 (4th Cir. 2024) (en banc) ("[A]ppellants have failed to show that each firearm regulated by the Maryland statute is within the ambit of the Second Amendment. And so the broad relief their facial challenge seeks is not ours to grant."); see also Moody v. NetChoice, LLC, 603 U.S. 707, 744 (2024) ("[F]acial challenges are disfavored, and neither parties nor courts can disregard the requisite inquiry into how a law works in all of its applications."); Rahimi, 602 U.S. at 701 (faulting the decision below for "focus[ing] on hypothetical scenarios where [a federal statute] might raise constitutional concerns" instead of "consider[ing] the circumstances in which [the statute] was most likely to be constitutional," and noting that "that error left the panel slaying a straw man" (citations and footnote omitted)).

at 693 ("[T]o prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications."); see also Bucklew v. Precythe, 587 U.S. 119, 138 (2019) ("A facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.").

Appellants suggested for the first time at oral argument that they assert a facial challenge to "the section of the statute that bans handguns." This type of partial facial challenge to a severable portion of a statute may be viable in theory: In the First Amendment context, at least, we have "proceed[ed]" to analyze the merits of a facial challenge that "t[ook] aim at only a portion of" a state statute. Project Veritas Action Fund v. Rollins, 982 F.3d 813, 826 (1st Cir. 2020). But "except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived." United States v. Pizarro-Berríos, 448 F.3d 1, 5 (1st Cir. 2006). Appellants' submissions from the very outset of litigation have expressly rejected a piecemeal approach to the Massachusetts Ban's validity in favor of a challenge to the Ban's prohibitions on the entire class of "Banned Firearms." Their complaint makes no reference to a handgun-specific portion of the Ban whose constitutional validity floats freely from that of other portions.

***

To sum up: A straightforward application of our prior holding in Ocean State Tactical supports the Commonwealth's demonstration that the Massachusetts Ban's AR-15 restriction "is consistent with the Nation's historical tradition of firearm regulation." See Bruen, 597 U.S. at 24; see also Rahimi, 602 U.S. at 691-92.[9] This means that Appellants have failed to demonstrate at this stage that the Ban is unconstitutional in all its applications. And because this failure means that Appellants cannot prevail on their facial challenge to the Ban, see Rahimi, 602 U.S. at 693, Appellants are unlikely to succeed on the merits[10]

---

[9] The Fourth Circuit reached a similar conclusion in Bianchi, holding that "Maryland's regulation of assault weapons is fully consistent with our nation's long and dynamic tradition of regulating excessively dangerous weapons whose demonstrable threat to public safety led legislatures to heed their constituents' calls for help." 111 F.4th at 472. So did a panel of the D.C. Circuit that addressed a challenge to ban on magazines with a capacity exceeding ten rounds. See Hanson v. District of Columbia, 120 F.4th 223, 242 (D.C. Cir. 2024). The majority of that panel held that "[b]ecause [LCMs] implicate unprecedented societal concerns and dramatic technological changes, the lack of a precise match does not preclude finding at this preliminary juncture an historical tradition analogous enough to pass constitutional muster." Id. (internal quotation marks omitted). Most recently, in Duncan v. Bonta, the Ninth Circuit held in the context of a challenge to an LCM ban that "even assuming that Plaintiffs' proposed conduct of possessing large-capacity magazines implicates the plain text of the Second Amendment, California's law fits within the Nation's tradition of regulating weapons." No. 23-55805, 2025 WL 867583, at *23 (9th Cir. Mar. 20, 2025) (en banc).

[10] Recall that our holding on this matter is to be understood only "as [a] statement[] of probable outcomes." Narragansett Indian

of their assault weapon-related claim. This in turn means that the district court did not abuse its discretion in denying Appellants' PI Motion as it pertains to that claim. See Akebia Therapeutics, 976 F.3d at 92; see also Santiago, 114 F.4th at 34.

**B.**

We turn next to Appellants' challenge to the Ban's LCM restrictions. The district court found that these restrictions "comport[] with the nation's historical tradition of weapons regulations" and that they "pose a minimal burden on the right to self-defense." Capen, 708 F. Supp. 3d at 92. The district court concluded that "Plaintiffs have therefore failed to establish a likelihood of success on the merits of their Second Amendment claim as to the prohibited magazines." Id.

We do not disturb this conclusion. We recently considered a challenge to an almost identically worded Rhode Island statute banning LCMs in Ocean State Tactical, 95 F.4th at 38. We concluded, in the similar context of an appeal from the district court's denial of preliminary relief, that the inquiry "call[ed] for" by Bruen "strongly points in the direction of finding that Rhode Island's LCM ban does not violate the Second Amendment." Id. at 52.

---

Tribe, 934 F.2d at 6 (citations omitted). Our affirmance of the denial of the PI Motion does not end the case; future developments in the record (and in the parties' arguments) may possibly warrant a different outcome beyond the preliminary-injunction stage.

As Appellants concede, Ocean State Tactical controls the outcome of their LCM-related challenge. Under the law-of-the-circuit doctrine, which is a court of appeals-specific application of stare decisis, "newly constituted panels in a multi-panel circuit are bound by prior panel decisions closely on point." Rodríguez, 527 F.3d at 224. The "hen's-teeth-rare" exceptions to this general rule include when "the holding of a previous panel is contradicted by subsequent controlling authority, such as a decision by the Supreme Court, an en banc decision of the originating court, or a statutory overruling." United States v. Barbosa, 896 F.3d 60, 74 (1st Cir. 2018) (citation omitted).

Ocean State Tactical's holding regarding LCMs falls under none of the exceptions listed in Barbosa. It pertained to a Rhode Island LCM prohibition that differs only very slightly in wording from the Massachusetts Ban's. See R.I. Gen. Laws § 11-47.1-3. To adopt divergent reasoning here would invite the type of disordered outcome that the law-of-the-circuit doctrine exists to combat: where "the finality of appellate decisions would be threatened and every decision, no matter how thoroughly researched or how well-reasoned, would be open to continuing intramural attacks." Barbosa, 896 F.3d at 74 (citation omitted).

Appellants themselves do not ask us to diverge from Ocean State Tactical's holding in gauging the likely success of their

challenge to the Massachusetts Ban's LCM restrictions. They seem to acknowledge in their reply -- which, unlike their opening brief, postdates Ocean State Tactical's issuance -- that Ocean State Tactical controls the disposition of the issue. Appellants "recognize that many of [their] arguments . . . are foreclosed" by the holding of Ocean State Tactical, and do not elsewhere attempt to distinguish that case's holding with respect to LCMs. We accordingly do not go beyond the briefing in search of a reason to second-guess the district court's likelihood-of-success conclusion with respect to the LCM-specific challenge. See Narragansett Indian Tribe, 934 F.2d at 6.

## V.

Appellants have failed to demonstrate that they are likely to succeed on the merits of either of their assault weapons- or LCM-related challenges. As this likelihood is indispensable to a showing that would require the district court to issue preliminary relief, see Akebia Therapeutics, 976 F.3d at 92, we conclude that the district court did not abuse its discretion in denying the PI Motion. We accordingly **affirm** the district court's order.