**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **STEFANO GRANATA, et al.,** | ) | |
| **Plaintiffs** | ) | |
| **v.** | ) | **Case No. 21-cv-10960-DJC** |
| **ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts, et al.,** | ) | |
| **Defendants.** | ) | |

**MEMORANDUM AND ORDER**

**CASPER, C.J.**                                                 **August 29, 2025**

## I.    Introduction

Plaintiffs Stefano Granata ("Granata") and Cameron Prosperi ("Prosperi") ("Individual Plaintiffs"), The Gunrunner, LLC (" The Gunrunner"), and Firearms Policy Coalition, Inc. ("FPC") (collectively, the "Granata Plaintiffs")[1] have filed this lawsuit against Defendants Andrea Joy Campbell, in her official capacity as Attorney General of the Commonwealth of Massachusetts ("AG Campbell"), and Terrence M. Reidy, in his official capacity as Secretary of the Executive Office of Public Safety and Security ("EOPSS") of the Commonwealth of Massachusetts ("Secretary Reidy") (collectively, "Defendants"), seeking permanent injunctive relief and a declaratory judgment that the challenged Massachusetts handgun laws and regulations violate the

---

[1] Two other individual Plaintiffs were voluntarily dismissed from this case by joint stipulation of the parties.  D. 52.

Second and Fourteenth Amendments to the U.S. Constitution facially and as applied. D. 34. Both parties have now moved for summary judgment, D. 61; D. 79. For the reasons stated below, the Court DENIES Plaintiffs' motion for summary judgment, D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

## II.    Standard of Review

To succeed on a facial constitutional challenge to state law, the moving party must demonstrate "that the statute lacks any 'plainly legitimate sweep.'" Hightower v. City of Boston, 693 F.3d 61, 77-78 (1st Cir. 2012) (quoting United States v. Stevens, 559 U.S. 460, 472 (2010)). To succeed on an as-applied challenge, the moving party must show that the challenged statute is unconstitutional as applied to the particular circumstances in his case. See id. at 71-72.

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) but must come forward with specific admissible facts showing that there is a genuine issue for trial. Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary

judgment, the court must consider each motion separately, drawing inferences against each movant in turn." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## III.    The Challenged Handgun Regulatory Scheme

The Massachusetts legislature has codified certain handgun safety requirements at Mass. Gen. L. c. 140, § 123(o).  The statutory requirements do not apply to private sellers, and instead apply only to licensed firearm dealers/retailers.  Id. (referring to the prohibitions of selling any such firearm to a firearm retailer or consumer by any "licensee"); see 501 C.M.R. § 7.02 (defining "licensee" as "a firearm dealer licensed in Massachusetts under [Mass. Gen. L.] c. 140, § 122"); see also 940 C.M.R. § 16.01 (defining "handgun purveyor" to exclude, among other categories, a "person or entity [that] transfers less than five handguns per year").

Accordingly, the regulatory scheme (between the statute and the applicable regulations) require that handguns lawfully sold by licensees within the Commonwealth, must, among other things:  (1) meet specified minimum melting points, tensile strength, and density; or pass a make and model performance test (940 C.M.R. §§ 16.01, 16.04(1) and (3); Mass. Gen. L. c. 140 § 123(o)); (2) not be prone to either repeated firing from a single trigger pull or explosion upon firing with standard ammunition (940 C.M.R. § 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (3) not be prone to accidental discharge (940 C.M.R. §§ 16.01, 16.04(2); Mass. Gen. L. c. 140 § 123(o)); (4) have a "safety device" that prevents unauthorized use of the firearm (940 C.M.R. § 16.05(1)); (5) have a tamper-resistant serial number (940 C.M.R. § 16.03); (6) have a mechanism that "effectively precludes an average five-year-old child from operating the handgun when it is ready to fire" (i.e., a form a childproofing), "such mechanisms shall include, but are not limited to: raising trigger resistance to at least a ten pound pull, altering the firing mechanism so that an average five year old child's hands are too small to operate the handgun, or requiring a series of multiple motions

in order to fire the handgun" (940 C.M.R. § 16.05(2)); and (7) for semi-automatic handguns, have either "a load indicator or a magazine safety disconnect" (940 C.M.R. § 16.05(3) and (4)).

The legislature also directed the Secretary of the EOPSS to "compile and publish a roster" of handguns that meet the § 123 requirements, known as the "Approved Firearms Roster." Mass. Gen. L. c. 140, § 131 ¾ (a); 501 C.M.R. § 7.01 *et seq*.[2]  To be listed on the Approved Firearms Roster, the Secretary must receive a final test report from an approved testing laboratory certifying that the handgun satisfies the Mass. Gen. L. c. 140, § 123(o) requirements.  501 C.M.R. § 7.03(1). The Approved Firearms Roster lists firearms that have meet the § 123(o) requirements, but because the Attorney General's regulations regarding childproofing, load indicators or magazine disconnect mechanisms, and tamper-resistant serial numbers have not been codified by the Legislature they are not tested for inclusion on the Approved Firearms Roster.  See Enforcement Notice #3: Attorney General's Handgun Safety Regulations.  It is unlawful for a licensed dealer/retailer to sell a firearm that is not so listed.  501 C.M.R. § 7.05.

## IV.    Factual Background

The Court draws the following undisputed facts from the parties' statement of undisputed facts and accompanying exhibits.  D. 65; D. 81-1; D. 93-1; D. 97; D. 98.

### A.    Parties

AG Campbell is responsible for promulgating and enforcing regulations found at 940 C.M.R. §§ 16.01-16.09.  D. 65 ¶ 1; D. 81-1 ¶ 1.  Secretary Reidy has promulgated the regulations found at 501 C.M.R. §§ 17.01-17.16.  Id.  AG Campbell and Secretary Reidy have the authority to cease enforcement of the handgun regulations challenged by Plaintiffs.  D. 65 ¶ 2; D. 81-1 ¶ 2.

---

[2]  See Enforcement Notice #3: Attorney General's Handgun Safety Regulations (940 C.M.R. 16.00), February 2002, https://perma.cc/XA22-QCJX.

Granata and Prosperi each hold a License to Carry Firearms ("LTCF").  D. 65 ¶ 7; D. 81-1 ¶ 7.  Granata and Prosperi also both wish to acquire several makes and models of firearms not on the Approved Firearms Roster or that do not satisfy the Attorney General's handgun sales regulations.  D. 65 ¶ 8; D. 81-1 ¶ 8.  Granata currently owns fourteen guns, including nine different handgun models.  D. 81-1 ¶ 9; D. 93-1 ¶ 9.  But for the Massachusetts handgun regulations, Granata would commercially purchase a Glock 19 Gen 5, two Sig Sauer handgun models, possibly other Sig Sauer, CZ and Smith & Wesson models, a Heckler & Koch handgun model and a Walther handgun model.  D. 81-1 ¶ 14; D. 93-1 ¶ 14.  Although the Glock would be Granata's preferred carry weapon and he would buy a fifth generation Glock, he is not aware of anyone who has one in Massachusetts and he has not yet tried to purchase one on the private market.  D. 81-1 ¶ 15; D. 93-1 ¶ 15.  Granata wishes to purchase the Sig Sauer models as collector's items; he does not intend to carry or shoot either gun.  D. 81-1 ¶ 16; D. 93-1 ¶ 16.

As of August 22, 2024, Prosperi owned fourteen firearms and nine different handgun models, all of which he purchased in Massachusetts.  D. 81-1 ¶ 10; D. 93-1 ¶ 10.  Prosperi possesses six different Glock handgun models that he has purchased in Massachusetts both in the private market and from retailers. D. 81-1 ¶ 19; D. 93-1 ¶ 19.  One of the Glock handgun models Prosperi possesses is the same Glock model that Granata wishes to purchase commercially.  D. 81-1 ¶ 20; D. 93-1 ¶ 20.  But for the Massachusetts handgun regulations, Prosperi has identified one or more of at least eight additional handgun models from CZ, Beretta and Atlas Gunworks, that he would purchase from retailers in Massachusetts if he could.  D. 81-1 ¶ 25; D. 93-1 ¶ 25.

The Gunrunner keeps about 300 handguns in stock at any given time, representing about thirty to thirty-five different models of handguns, from fifteen to twenty brands.  D. 81-1 ¶ 27; D. 93-1 ¶ 27.  The Gunrunner would like to make available for sale makes and models of handguns,

a subset of which do not appear on the Approved Firearms Roster and do not satisfy the Massachusetts sales regulations.  D. 65 ¶ 9; D. 81-1 ¶ 9.  "More often than not," customers who wish to purchase handgun models that cannot be sold by retailers instead purchase another handgun model that is authorized for commercial sale.  D. 81-1 ¶ 28; D. 93-1 ¶ 28.

FPC is a nonprofit organization incorporated under the laws of Delaware, whose essential purposes include defending and promoting people's rights under Second Amendment rights.   D. 65 ¶ 11; D. 81-1 ¶ 11.  FPC has members in Massachusetts, including Granata, Prosperi and the Gunrunner.  D. 65 ¶ 13; D. 81-1 ¶ 13.  FPC is suing on behalf of its members who wish to acquire one or more handguns from a licensed retailer, like the Gunrunner, that are not on the Approved Firearms Roster or do not satisfy the Massachusetts sale regulations.  D. 65 ¶ 14; D. 81-1 ¶ 14.

### B.    Firearms Market in Massachusetts

In Massachusetts, licensed retailers are prohibited from transferring handguns that do not appear on either the Approved Firearms Roster or the Formal Target Shooting Roster and that do not comply with the Massachusetts sales regulations.  D. 65 at 2; D. 81-1 at 2.  Handguns that are not on the Approved Firearms Roster or Formal Target Shooting Roster and that do not satisfy the Massachusetts sales regulations still may be sold or purchased in private sales.  See  D. 65 ¶ 15; D. 81-1 ¶ 15.

Between 2019 and 2024, approximately 113 firearms have been added to the Approved Firearms Roster.  D. 81-1 ¶ 1; D. 93-1 ¶ 1.  Of the semiautomatic handgun models on the Approved Firearms Roster, over 500 handguns also comply with the Attorney General's regulations.  D. 81-1 ¶ 2; D. 93-1 ¶ 2.  Of 1,160 models on the Approved Firearms Roster as of June 2024, at least 1,029 handgun models also comply with the Attorney General's regulations.  D. 97 ¶ 31; D. 98 ¶ 31.

In 2022, Massachusetts licensed dealers/retailers reported 72,502 handgun sales and 20,813 private sales of handguns were reported. D. 81-1 ¶¶ 5, 8; D. 93-1 ¶¶ 5, 8. In 2023, Massachusetts licensed dealers/retailers reported 67,652 handgun sales and 24,213 private sales of handguns were reported. D. 81-1 ¶¶ 4, 7; D. 93-1 ¶¶ 4, 7. In 2024, Massachusetts licensed dealers/retailers reported 76,409 handgun sales and 16,051 private sales of handguns were reported. D. 81-1 ¶¶ 3, 6; D. 93-1 ¶¶ 3,6. In 2024, Massachusetts licensed dealers/retailers reported 4,028 Glocks sold and 3,156 Glocks were reported as sold in private sales. D. 81-1 ¶ 30; D. 93-1 ¶ 30.

## V. Procedural History

Plaintiffs instituted this action against the former Massachusetts Attorney General and former EOPSS Secretary on June 8, 2021 before a different session of this Court (Zobel, J.).[3] D. 1. On May 19, 2022, the Court granted Defendants' motion to dismiss, D. 24; D. 25, and shortly thereafter the Granata Plaintiffs appealed, D. 26. The First Circuit later vacated the district court's judgment and remanded the matter for further proceedings on April 7, 2023 in light of the Supreme Court's decision in New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022). D. 32; D. 33. The Granata Plaintiffs then filed an amended complaint on September 21, 2023, D. 34, and Defendants filed an answer on November 20, 2023, D. 38. On December 7, 2023, this matter was reassigned to this session. D. 41. The Granata Plaintiffs have now moved for summary judgment, D. 61, and Defendants have cross moved for summary judgment, D. 79. The Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") and the Brady Center to Prevent Gun Violence ("Brady Center") filed an amicus brief. D. 88. The Court heard the parties on the pending motions

---

[3] AG Campbell and EOPSS Secretary Reidy were substituted pursuant to Fed. R. Civ. P. 25(d).

and took these matters under advisement.  D. 99.

## VI.    Discussion

### A.    The Supreme Court's Second Amendment Jurisprudence

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court held in <u>Heller</u> that the Second Amendment "protects the right to keep and bear arms for the purpose of self-defense," and held in <u>McDonald</u> that "the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in <u>Heller</u>."  <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742, 749, 791 (2010) (citing <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008)).  In <u>McDonald</u>, the Supreme Court reiterated that it "made it clear in <u>Heller</u> that [its] holding did not cast doubt on such longstanding regulatory measures as . . . 'laws imposing conditions and qualifications on the commercial sale of arms.'" <u>Id.</u> at 786 (quoting <u>Heller</u>, 554 U.S. at 626-27); <u>see</u> <u>United States v. Rahimi</u>, 602 U.S. 680, 699 (2024) (noting that "<u>Heller</u> never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home" and that "[the <u>Heller</u>] opinion stated that many such prohibitions [given as examples in <u>Heller</u>], are 'presumptively lawful'") (quoting <u>Heller</u>, 554 U.S. at 627 n.26); <u>see also</u> <u>Bruen</u>, 597 U.S. at 81 (Kavanaugh, J., concurring) (noting that the Supreme Court "identif[ied] these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive") (quoting <u>Heller</u>, 554 U.S. at 627 n.26).

In <u>Bruen</u>, the Supreme Court held that <u>Heller</u> and <u>McDonald</u> "do not support applying means-end scrutiny in the Second Amendment context" and ruled that "[i]nstead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  <u>Bruen</u>, 597 U.S. at 17, 19; <u>see</u> <u>United States v. Turner</u>, 124 F.4th 69, 75 (1st Cir. 2024) (recognizing that in <u>Bruen</u> "the Court explained that, to

overcome a properly preserved Second Amendment challenge to a restriction on firearm possession, the government bears the burden of demonstrating that the restriction at issue is 'consistent with the Nation's historical tradition of firearm regulation'") (quoting Bruen, 597 U.S. at 24). Bruen thus provided "the standard that courts must use to evaluate the constitutionality of regulations that burden an individual's Second Amendment right to bear arms: [i]f the regulation at issue burdens conduct that falls within the plain text of the Second Amendment, then it is unconstitutional unless the government can prove that its regulation is 'consistent with the Nation's historical tradition of firearm regulation.'" United States v. Crater, 93 F.4th 581, 588 (1st Cir. 2024) (quoting Bruen, 597 U.S. at 24).

As to the first step of Bruen, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Bruen, 597 U.S. at 17. The relevant inquiry for courts is "not simply whether the regulation [at issue] affects firearms in some way, but whether the regulation infringes the right to own and bear arms in the case of confrontation." Oakland Tactical Supply, LLC v. Howell Township, Michigan, 103 F.4th 1186, 1196 (6th Cir. 2024). "[I]n defining a plaintiff's proposed conduct, courts should look to the intersection of what the law at issue proscribes and what the plaintiff seeks to do." Id.; see Doe v. Bonta, 101 F.4th 633, 639 (9th Cir. 2024) (noting that the relevant proposed conduct is "what the plaintiffs wanted to do and what the challenged law prevented them from doing"); B&L Prods., Inc. v. Newsom, 104 F.4th 108, 117 & n.17 (9th Cir. 2024) (same).

With respect to the second step of Bruen, courts must ask whether "[t]he government [can] justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." Bruen 597 U.S. at 24. Cases "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to historical analysis,

including "analogical reasoning" to determine whether historical analogues are "relevantly similar." Bruen, 597 U.S. at 27-30; see Ocean State Tactical, LLC v. Rhode Island, 95 F.4th 38, 44 (1st Cir. 2024), cert. denied, No. 24-131, 2025 WL 1549866 (U.S. June 2, 2025). In evaluating whether the historical analogues are "relevantly similar," courts must compare "how and why the regulations burden a law-abiding citizen's right to armed self-defense." Bruen, 597 U.S. at 29. "Analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin.* So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." Bruen, 597 U.S. at 30 (emphasis in original); see Rahimi, 602 U.S. at 692 (explaining that "if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations . . . [t]he law must comport with the principles underlying the Second Amendment, but it need not be a dead ringer or a historical twin"). In Rahimi, the Supreme Court clarified the approach set forth in Bruen by noting that the appropriate analysis involves whether the challenged regulation is "'consistent with the principles that underpin our regulatory tradition,'" such that it is 'relevantly similar' to laws that our tradition is understood to permit." Rahimi, 602 U.S. at 692, 698 (concluding that a federal statute, which bars individuals determined by a court to be credible threats to another's physical safety from possessing a firearm, was "relevantly similar" to surety and going armed laws, two founding era regimes, because the statute, like the two regimes, "applies to individuals found to threaten the physical safety of another," "restricts gun use to mitigate demonstrated threats of physical violence, just as the [two regimes] do" and "does not broadly restrict arms use by the public generally") (quoting Bruen, 597 U.S. at 24, 29).

**B.    The Massachusetts Handgun Regulatory Scheme Is Not Covered by the Plain Text of the Second Amendment**

"[Bruen] first asks whether the proposed conduct affected by the challenged law is protected by 'the Second Amendment's plain text'" because "[a]s carefully detailed in Heller, the right covered by the Second Amendment's plain text is the right to possess and carry arms in case of confrontation." Oakland Tactical, 103 F.4th at 1195  (noting that in Bruen, "[r]ather than defining the proposed conduct at the high level of generality urged by Plaintiffs—i.e., 'carrying handguns'—the Court's definition incorporated the purpose and location of the plaintiffs' desired action") (quoting Bruen, 597 U.S. at 32).

The Defendants argue that the Granata Plaintiffs' proposed conduct does not fall within the plain text of the Second Amendment because the Massachusetts handgun regulations do not infringe the Granata Plaintiffs' individual right to possess handguns in case of confrontation and because they are "presumptively lawful 'conditions and qualifications on the sale of arms' that do not meaningfully impair the [Granata Plaintiffs'] ability to access firearms.  D. 80-2 at 16 (quoting Heller, 554 U.S. at 626-27 & n.26).  As noted above, the Supreme Court has recognized that "laws imposing conditions and qualifications on the commercial sale of arms" are part of a non-exhaustive list of "presumptively lawful regulatory measures." Heller, 554 U.S. at 626-27 & n.26; see McDonald, 561 U.S. at 786; Bruen, 597 U.S. at 81 (Kavanaugh, J., concurring); Rahimi, 602 U.S. at 735 (Kavanaugh, J., concurring).  In picking up this tenet, some Circuits have adopted an "ancillary-rights" doctrine and employed a "meaningful-constraint on the right to acquire firearms" test "to determine whether the conduct at issue is presumptively protected by the Second Amendment" under the first step of the Bruen analysis. B&L Prods., 104 F.4th at 118; see United States v. Vlha, 142 F.4th 1194, 1198 (9th Cir. 2025).

11

The ancillary-rights doctrine is "based on the text of the Second Amendment, which [the Ninth Circuit has] interpreted as prohibiting 'meaningful constraints' on the right to possess firearms." Vlha, 142 F.4th at 1198 (citing B&L Prods., 104 F.4th at 118). Pursuant to the ancillary-rights doctrine, the Second Amendment protects some activities ancillary to the core possessory right, including the ability to acquire weapons . . . [b]ut [it] is limited in this context [and] it protects ancillary activities only if the regulation of such activities 'meaningfully constrain[s]' the core individual possessory right." Id.; see B&L Prods., 104 F.4th at 118 n.18. The Second, Fifth and Tenth Circuits also have adopted the Ninth Circuit's "meaningful-constraint test or something like it." Vlha, 142 F.4th at 1198; see Gazzola v. Hochul, 88 F.4th 186, 196-97 (2d Cir. 2023) (recognizing the Ninth Circuit's "meaningful constraint" test and concluding that "there [was] no evidence that [New York law] will impose such burdensome requirements on firearms dealers that they restrict protections conferred by the Second Amendment"); McRorey v. Garland, 99 F.4th 831, 839 (5th Cir. 2024) (affirming denial of challenge to expanded background checks for 18-to-20-year-old prospective firearms purchasers noting that "[t]he right to 'keep and bear' can implicate the right to purchase . . . [which] is why the [Supreme] Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping" but noting that "such an implication is not the same thing as being covered by the plain text of the amendment"); see also Rocky Mountain Gun Owners, 121 F.4th at 120 (agreeing with the Ninth Circuit that "[t]he most reasonable interpretation of th[e] passage [from Heller carving out 'presumptively lawful regulatory measures'] is that commercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the Bruen test").

The relevant proposed conduct here is "what the [Granata Plaintiffs] want[] to do and what the challenged [Massachusetts handgun regulations] prevent[] them from doing." See Doe, 101

F.4th at 640.  The Granata Plaintiffs assert that the proposed conduct is "possessing common handguns that Massachusetts has barred from sale."  D. 62 at 13.  The Massachusetts regulatory scheme at issue here, however, does not ban the possession of handguns by eligible individuals wishing to "keep and bear" these "[a]rms" in the Commonwealth.  See U.S. Const. amend. II. Rather, the Massachusetts handgun regulations apply to licensed dealers/retailers and require them to only sell handgun models from the Approved Firearms Roster that have met certain manufacturing standards and safety features to comply with the Attorney General's regulations. See Mass. Gen. L. c. 140 §§ 123(o), 131 ¾; 940 C.M.R. §§ 16.00 et seq.  Given that "[t]here is a longstanding distinction between the right to keep and bear arms and commercial regulation of firearms," Morehouse Enters., LLC v. BATFE, No. 22-cv-116, 2022 WL 3597299, at *8 (D.N.D. Aug. 23, 2022) (citing Heller, 554 U.S. at 626-27), and that the proposed conduct here involves the commercial sale by licensed dealers/retailers of certain handguns that do not comply with the Commonwealth's laws and regulations, the Court considers whether the Commonwealth's handgun regulatory scheme "meaningfully constrains the would-be purchasers from possessing firearms." Vlha, 142 F.4th at 1200.

The undisputed record here indicates that Granata and Prosperi have not been prevented from possessing handguns in Massachusetts and the Massachusetts handgun laws have not "meaningfully constrain[ed] [their] core possessory right," Vlha, 142 F.4th at 1198, as they both own various handguns suitable to keep and carry in the event of a confrontation.  D. 93-1 ¶¶ 9-10; see Draper v. Healey, 98 F. Supp. 3d 77, 85 (D. Mass. 2015), aff'd on other grounds, 827 F.3d 1 (1st Cir. 2016) (concluding the Second Amendment did not apply to requirement that firearms for sale possess a "load indicator" because it "in no way prevents citizens from obtaining a wide array of firearms").  Specifically, Granata owns fourteen firearms, including nine different handgun

models, D. 93-1 ¶ 9; D. 82-14 at 48-49, and he rotates two of his handguns for concealed carry while the rest are for target shooting or kept as collector's items, D. 93-1 at 3; D. 82-14 at 24, 28, 33, 35-37, 41, 43, 46.  Although Granata wishes to purchase a fifth generation Glock to use as his preferred carry weapon and he is unaware of anyone in Massachusetts that has one, he has not tried to purchase the Glock in the private market.  See D. 93-1 ¶ 15; D. 82-14 at 60-61; see also D. 83-2 ¶ 14 (attesting that in 2024, 3,156 Glocks were reported as sold in private sales in Massachusetts). Granata has also stated that he does not intend to carry or shoot the Sig Sauer handgun models he wishes to purchase, which are not available for commercial sale, because he intends to have them as collector's items.  See D. 93-1 ¶ 16; D. 82-14 at 63-64.  Similarly, as of August 22, 2024, Prosperi owned fourteen firearms, including nine different models of handguns, all bought in Massachusetts.  D. 93-1 ¶ 10; D. 82-13 at 16, 19-20, 28-33, 57-58; see D. 82-2 at 12 n.13.  Prosperi possesses six different Glock handguns, purchased in Massachusetts from licensed dealers/retailers or the private market, and he carries seven of his handguns for self-defense, varying between them based on the weather and his ability to conceal the handgun with his clothing.  See D. 93-1 ¶¶ 19; D. 82-13 at 14-15, 18-22, 27-30.

Plaintiffs contend that the Massachusetts handgun regulations are not presumptively lawful as "conditions [or] qualifications on the sale of arms" because they are "a *de facto* ban on the acquisition and possession of handguns that lack required features," D. 62 at 16, like the ban in Heller, and, even assuming the regulations are conditions or qualifications, they "[still] must be analyzed to determine whether [the] specific condition or qualification is ultimately constitutional under the Bruen test," D. 92 at 10.  Unlike what amounted to a prohibition against an entire class of arms in Heller, 554 U.S. at 628 (concluding that the law "totally bans handgun possession in the home"), the Massachusetts handgun regulations at issue here impose safety standards and

conditions on the commercial sale of handguns by licensed dealers/retailers, which in turn render a subset of handguns eligible for private sales only, but not unpossessable. See Mass. Gen. L. c. § 123(o); 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1), 16.05(2), 16.05(3). Ultimately, the handguns that do not appear on the Approved Firearms Roster or that do appear but do not also meet the Attorney General's regulations can still be purchased from a person that is not a licensed dealer/retailer. Mass. Gen. L. c. § 123(o); 501 C.M.R. § 7.02; 940 C.M.R. § 16.01.

Neither Reese v. BATFE, 127 F.4th 583, 590 (5th Cir. 2025) nor Hirschfeld v. BAFTE, 5 F.4th 407, 416, vacated as moot, 14 F.4th 322 (4th Cir. 2021), cited by the Granata Plaintiffs, D. 92 at 10-11, compel a different conclusion. In Reese, the Court broadly defined the relevant proposed conduct as "commercial purchases" and concluded that statutory provisions prohibiting Federal Firearms Licensees ("FFLs") from selling handguns to eighteen-to-twenty-year-olds were covered by the text of the Second Amendment and were inconsistent with the Nation's historical tradition of firearm regulation. Reese, 127 F.4th at 590, 595-600. Unlike the challenged Massachusetts handgun regulatory scheme, the statutory provisions in Reese functioned as an "outright ban" on purchasing a handgun from the FFLs because they prohibited all individuals within the specified age range from making a purchase irrespective of any conditions or qualifications on the sale. Id. at 590 & n.2. In Hirschfeld, a case also involving laws prohibiting FFLs from selling handguns to eighteen-to-twenty-year-olds, the Court determined the laws were not presumptively lawful. Hirschfeld, 5 F.4th at 416-18, 441. There, the Court noted "the restrictions operat[ed] as a total ban on *buying* a gun from a licensed dealer that has met the required conditions and qualifications to sell arms" because "[t]here was nothing a law-abiding 18-to-20-year-old can do to buy a handgun from a licensed dealer except wait until she turns 21." Id. at 416 (emphasis in original). Such is not the case here, where, the Granata Plaintiffs can buy

choose to buy one of the hundreds of handguns that are on the Approved Firearms Roster and comply with the Attorney General's regulations. The Granata Plaintiffs also argue that the relevant inquiry for the Court is whether the restricted handguns are "in common use." D. 62 at 16. Specifically, the Granata Plaintiffs argue that the analysis of historical analogues to determine whether the Massachusetts handgun regulations are consistent with the historical tradition of firearm regulations (the second step of the <u>Bruen</u> analysis) is unnecessary because the handguns at issue are in common use and "a complete prohibition of their use is invalid." <u>Id.</u> at 15-19. Relying upon <u>Heller</u> and <u>Bruen</u>, the Granata Plaintiffs assert that "'the Second Amendment protects' arms that are 'in common use at the time' which are in turn "necessarily not 'dangerous and unusual.'" <u>Id.</u> at 15-16 (quoting <u>Bruen</u>, 597 U.S. at 47). Defendants, on the other hand, contend that the "common use" test is deficient and dispute the necessity of the inquiry "where a regulation does not prohibit, either explicitly or in practice, the possession or use of 'an entire class of arms.'" D. 80-2 at 19-20 (quoting <u>Heller</u>, 554 U.S. at 628); <u>see</u> <u>Bianchi v. Brown</u>, 111 F.4th 438, 460 (4th Cir. 2024) (noting that "[j]ust because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms"), <u>cert. denied sub nom.</u> <u>Snope v. Brown</u>, 605 U.S. __, 145 S. Ct. 1534 (2025).

In <u>Capen v. Campbell</u>, the First Circuit recently held that, unlike the "complete prohibition" in <u>Heller</u>, the Massachusetts law prohibiting the sale, transfer or possession of "an assault weapon or large capacity feeding device," Mass. Gen. L. c. 140 § 131M, "restricts only semiautomatic handguns that are either specifically enumerated or exhibit a combination of certain features." <u>Capen v. Campbell</u>, 134 F.4th 660, 674 (1st Cir. 2025). The Court rejected appellants' argument that "a law that bans certain handguns with certain features is equivalent for constitutional purposes to a law that bans all handguns as a class," noting that <u>Heller</u> does not support the

16

"sweeping proposition that any ban whose scope includes any handguns at all is unconstitutional."
Id.

Here, the Granata Plaintiffs have not shown that the Massachusetts handgun regulations ban all handguns as a class. As of September 2024, the Approved Firearms Roster contained over 1,000 handgun models compliant with the requirements enumerated in Mass. Gen. L. c. 140 § 123 and included over thirty-five manufacturers. See D. 83-1 at 2-31. While not all the handguns on the Approved Firearms Roster comply with the Attorney General's regulations, thereby enabling them to be commercially sold by licensed dealers/retailers, over 500 of the semiautomatic handgun models on the Approved Firearms Roster do. See D. 93-1 ¶ 2; D. 84 ¶ 4 (attesting that of the 694 semiautomatic handguns on the Approved Firearms Roster, 562 satisfy the Attorney General's regulations). Between 2019 and 2024, approximately 113 firearms were added to the Approved Firearms Roster. D. 93-1 ¶ 1; D. 83-2 ¶ 7. Further, the undisputed evidence indicates licensed dealers/retailers reported 72,502 handgun sales in 2022, 67,652 handgun sales in 2023, and 76,409 handgun sales in 2024. D. 93-1 ¶¶ 3-5; D. 83-2 ¶¶ 8-10. With respect to private sales, 20,813 were reported in 2022, 24,213 in 2023 and 16,051 in 2024 respectively. D. 93-1 ¶¶ 6-8; D. 83-2 ¶¶ 11-13. It is also undisputed that both Granata and Prosperi have been able to purchase firearms in Massachusetts. D. 93-1 ¶ 9-10; D. 82-12 at 6-7; D. 82-11 at 5-7. Finally, it is uncontroverted that "[m]ore often than not," customers who wish to purchase handgun models that cannot be sold by licensed dealers/retailers, purchase another handgun model authorized for commercial sale. D. 93-1 ¶ 28; D. 82-10 at 41-42. The record shows that in 2023, for instance, the Gunrunner sold approximately 700 handguns, which were manufactured by approximately fifteen to thirty brands and which consisted of multiple models across each brand. D. 93-1 ¶ 23. Given this record, the Granata Plaintiffs have not shown that the Massachusetts handgun regulatory scheme regarding

the commercial sale of handguns by licensed dealers/retailers has "meaningfully constrained" their ability to possess handguns in Massachusetts and "restrict[ed] protections conferred by the Second Amendment." Gazzola, 88 F.4th at 197 (concluding that "on the record . . . there is no evidence that New Yorkers currently lack, or will lack under the challenged statutes, relatively easy access to sellers of firearms"); see B&L Prods., 104 F.4th at 119 (noting that "the record suggests that no individual's access to firearms would be limited").

For these reasons, the Court concludes that the Granata Plaintiffs' proposed conduct of purchasing certain handguns that do not comply with the Massachusetts handgun regulatory scheme from licensed dealers/retailers is not covered by the plain text of the Second Amendment under the first step of Bruen.

**C.      There are Historical Analogues for the Massachusetts Handgun Regulatory Scheme Consistent with the Nation's Historical Tradition of Firearm Regulation**

Even assuming *arguendo* that the regulatory scheme challenged here was covered by the plain text of the Second Amendment, Plaintiffs' claims would still fail under the second step of Bruen since there are historic analogues for these regulations. At this step of the Bruen analysis, the government bears the burden of demonstrating that the challenged handgun regulations are "consistent with the Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 24. When reviewing the government's historical sources, it is not this Court's job "to resolve historical questions in the abstract" but to "resolve *legal* questions" and to do so according to "the principle of party presentation." Id. at 30 n.6 (emphasis in original).

While the Supreme Court has indicated that "'founding-era historical precedent' is of primary importance for identifying a tradition of comparable regulation[,]" the Supreme Court "has also relied upon 'how the Second Amendment was interpreted immediately after its

18

ratification through the end of the 19th century[,]'" and "likewise left open the possibility that 'late-19th-century evidence' and '20th-century historical evidence' may have probative value if it does not 'contradict[] earlier evidence.'" Ocean State Tactical, 95 F.4th at 51 (quoting Bruen, 597 U.S. at 27 and Heller, 554 U.S. at 605); see Antonyuk v. James, 120 F.4th 941, 972-74 (2d Cir. 2024) (noting that "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis").  In Bruen, the Supreme Court did not weigh in on the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1869 when defining its scope," and it considered regulations from various periods both before and after the founding era since it concluded that "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." Bruen, 597 U.S. at 37-38; see D. 88 at 16 (discussing regulations from various time periods considered in Bruen); see also Ocean State Tactical, 95 F.4th at 52 (noting that 19th-century and 20th-century historical evidence can "provide insight as apt historical precursors").  Based on the pre-and-post founding era evidence that courts have considered when assessing historical analogues, which has been in compliance with Bruen's historical analysis, the Court considers the evidence of historical traditions presented by Defendants from the founding era and thereafter.

Here, the Defendants have presented four different categories of historical traditions to demonstrate that the Massachusetts handgun regulations are consistent with the historical tradition of regulating firearms for public safety.  These categories include: (1) firearm and gunpowder "proving" laws and practices; (2) firearm and gunpowder storage laws; (3) "trap gun" restrictions; and (4) laws to protect minors from firearms.  D. 80-2 at 23-34.  As indicated below, this case implicates "dramatic technological changes" in handguns that have significantly increased the risk

of accidents related to their use, which "may require a more nuanced approach." Bruen, 597 U.S. at 27. "The metric [the Court] employ[s] in this comparability analysis is 'how and why these regulations burden a law-abiding citizen's right to armed self-defense.'" Capen, 134 F.4th at 669. As the First Circuit has directed, "'[f]irst, we consider the "how," comparing the "burden on the right of armed self-defense" imposed "by the new regulation to the burden imposed by historical regulations." Second, we turn to the "why," comparing the justification for the modern regulation to the justification for historical regulations.'" Id. (quoting Ocean State Tactical, 95 F.4th at 44-45).

### 1.    Firearm and Gunpowder "Proving" Laws

Defendants submit that in the same way that the Massachusetts handgun regulations are aimed at ensuring the safe use of firearms sold commercially by imposing requirements on the commercial sale of firearms, so too were 19th century "proving" and inspection laws that required firearms and gunpowder to be "proved" prior to sale to prevent "collateral dangers of firearms," or accidental discharges, malfunctions, explosions and related safety risks. See D. 80-2 at 24; see D. 88 at 18. The "proving" process for a firearm entailed testing a weapon by firing it using "different levels of charges" to confirm that it would "withstand the pressure and wear of use" and then stamping the weapon with a "proof mark" to demonstrate it had passed the test. D. 88 at 19. Proving and the subsequent proving marks "ensur[ed] that firearms met certain safety standards before being sold and create[ed] a chain of custody to track how and when they were inspected." Id. at 20.

Defendants point to 1804 Mass. Acts 111 c. 81 § 35, a Massachusetts law enacted in 1805 that required an inspection of all firearms manufactured in the state before they could be sold.  <u>See</u> D. 80-1 at 41-43; D. 88 at 23-24.  The purpose of the law, or the "why" was to "ensure that the guns sold to the public were safe and suitable for use," D. 82-3 ¶ 20, and to prevent "the lives of the Citizens [from being] exposed" to unsafe firearms.  D. 80-1 at 41.  With respect to "how," the law indicated the process by which the appointed "provers" needed to "prove all Musket Barrels and Pistol barrels," the frequency, and the specific charge before marking the firearms with a stamp if they passed inspection.  <u>Id.</u>  Firearms that "burst or shall in any manner fail in the proving . . . [were deemed] unfit for use." <u>Id.</u> at 42.  Massachusetts amended its proving laws to include additional requirements in 1814, 1837 and 1859.  <u>See</u> D. 80-1 at 47-49; D. 82-3 ¶ 20 n.25; D. 88 at 25.  Similarly, Maine enacted a proving law in 1821.  D. 80-1 at 53; D. 88 at 25; <u>see</u> 1821 Me. L. 546, c. 162.  The evidence in the record indicates that concern with the quality of firearms brought by militia members, <u>see</u> D. 82-4 ¶ 18, spurred state laws and federal laws that continued the "Revolutionary tradition of colonial governing bodies requiring the 'proving' of militia weapons." <u>See</u> D. 80-2 at 24; D. 88 at 25-29; <u>see also</u> D. 82-1 ¶¶ 17-18, 20; D. 88 at 22-23.

A "dramatic technological change[]," <u>Bruen</u>, 597 U.S. at 27, since the colonial era is the "widespread availability of breechloading weapons and metallic cartridges in the mid-nineteenth century." <u>See</u> D. 82-4 ¶ 10.  Prior to that, firearms at the time were not "kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly." <u>Id.</u>  State laws were, therefore, enacted that required the proving and inspection of gunpowder.  <u>See</u> 1776 R.I. Pub. L. 25; 1776-77 N.J. L. 6-7 c. 6; 1820 N.H. L. 274 c. 25; 1794 P.A. L. 764 c. 337; D. 80-1 at 30-40, 50-52.  The purpose of these gunpowder laws, specifically the Pennsylvania law which required a specific device to prove the gunpowder, was to protect "the purchaser and consumer"

against "inferior" gunpowder with defects not readily discoverable otherwise.  See D. 80-1 at 35.

Similar to the Massachusetts proving law, a law regarding gunpowder proving dictated

requirements pertaining to the quality and composition of the gunpowder and restricted the sale of

uninspected or damaged gunpowder.  See 1808 Mass. Acts c. 52; D. 80-1 at 44-46.

The Massachusetts handgun regulatory scheme at issue in this case places requirements on

commercial sellers to sell firearms that comply with safety requirements in various forms to protect

the customer or user from inadvertent accidents (e.g., firing tests, density and melting point, drop

tests).  See 940 C.M.R. §§ 16.01, 16.04(2), 16.05(1)-(2); Mass. Gen. L. c. 140, § 123(o); D. 80-1

at 42, 46.  Thus, when comparing the "why" of the Massachusetts handgun regulatory regime to

the "why" of the historical "proving" laws, they are "relevantly similar" in that they include

requirements for firearms prior to sale to ensure safe usage by firearm owners and to minimize

harm due to malfunction to both the user and the public.  Bruen, 597 U.S. at 29.  Although the

Massachusetts handgun regulations imposes an addition to firearms via a load indicator or

magazine safety, see 940 C.M.R. § 16.05(3), as contended by the Granta Plaintiffs, the effect is

nonetheless the same–the prohibition on the sale of unfit firearms or condemned gunpower–while

reflecting the use of modern technology that addresses the same core safety concern present during

the founding and colonial era.  See Rahimi, 602 U.S. at 692.  Any "burden" here is similar to that

imposed by the firearm and gunpowder proving laws that similarly barred the sale of firearms and

gunpowder deemed "unfit."

Based on the uncontroverted evidence in the record, the Massachusetts handgun

regulations are "consistent with the principles that underpin our regulatory tradition" as

demonstrated by the firearm and gunpowder "proving" laws.  Rahimi, 602 U.S. at 681; see United

States v. Sharkey, 693 F. Supp. 3d 1004, 1007-09 (S.D. Iowa 2023) (analyzing proving laws of

Massachusetts and other states as a historical analogue and rejecting Second Amendment challenge).

### 2.    *Firearm and Gunpowder Storage Laws*

Defendants also rely upon laws regarding the storage of gunpowder and weapons from the colonial period through the 19th century as historical analogues to the Massachusetts handgun regulations. See D. 80-2 at 30; D. 82-2 ¶¶15-16; D. 82-3 ¶ 17 & n.17. These city storage statutes and regulations were aimed at reducing the individual limits of gunpowder possession to minimize associated fire risks, including the accidental discharge of weapons, explosions and "accidental injury or death." D. 82-2 ¶ 56. The record here indicates that gunpowder regulations "stretched across the country." D. 82-2 at 9. In Ocean State Tactical, the First Circuit referenced the gunpowder storage laws, see 1771-72 Mass. Province Laws 167, c. 9.; D. 80-1 at 22-24, and noted they were enacted to address "risks posed" resulting from the ignition of gunpowder. Ocean State Tactical, 95 F.4th at 49, n.16. The Granata Plaintiffs assert that these regulations are not historical analogues to the Massachusetts handgun regulations because in Heller, the Supreme Court analyzed a Massachusetts colonial law requiring the storage of excess gunpowder in a "special container or on the top floor of the home," and determined these laws "did not clearly prohibit loaded weapons" and that those "fire-safety laws" did not burden the right of self-defense as much as a ban on handguns. D. 92 at 22-23; See Heller, 554 U.S. at 632. As noted, the Massachusetts handgun regulations do not constitute a ban on handguns and under the "nuanced approach" to historical analysis, it is appropriate to conclude that the historic laws' "why" of protecting users from unintended accidents and fire-related explosions is "relevantly similar" to the regulations' purpose of restricting the commercial sale to the public of handguns that are "prone to repeated firing based on a single pull of the trigger," explosion or accidental discharge, see, e.g., id. § 16.04(2); Mass. Gen. L. c. § 123(o). See Bruen, 597 U.S. at 27, 29. The Court concludes that

23

there is sufficient uncontroverted evidence in the record to conclude the firearm and gunpowder storage laws are a historical analogue for the Massachusetts handgun regulations.

### 3.    "Trap Gun" Restrictions

Defendants next point to restrictions on "trap gun," "spring gun" or "infernal machines" as another type of analogous historical tradition to the Massachusetts handgun regulations.  D. 80-2 at 31.  These types of firearms were "configured in a way to fire remotely, typically by rigging the firearm to be fired by a string or wire when tripped."  Id.; D. 82-2 ¶ 23.  In the late 17th century and early 18th century, colonial Plymouth and New Jersey enacted colonial laws that made the setting of trap guns unlawful, with other jurisdictions following suit over time by banning the activity or imposing criminal liability.  See D. 82-2 ¶¶ 24-27; D. 80-1 at 14-21.  Defendants argue that the "how" of these restrictions on trap guns and the Massachusetts handgun regulations are "relevantly similar" in that neither regulation banned an entire class of firearms and instead focused on regulating firearms that had been configured "in a certain way that rendered them unusually dangerous" while other firearms, like rifles or muskets, remained available to citizens.  D. 80-2 at 31.  With respect to the "why,"  the trap gun law restrictions served to protect "innocent people who might unsuspectingly trip the device," D. 82-2 ¶ 25, in the same way that the Massachusetts handgun regulations protect unsuspecting individuals who may drop a loaded handgun that discharges without the pull of the trigger.  The Granata Plaintiffs assert that "there is a world of a difference between a law prohibiting intentionally rigging a firearm to go off in a reckless manner" and one prohibiting the commercial sale of firearms that need to comply with manufacturing requirements.  See D. 92 at 24.  The common safety concern, however, addressed by both the Massachusetts safety regulations and the trap laws is that an unattended firearm, either with rigged features or lacking safety features such as a load indicator or childproof mechanism, would present

24

a danger to an unsuspecting person that handled the firearm.  See, e.g., 940 C.M.R. §§ 16.05(2), 16.05(3); see Rahimi, 602 U.S. at 692.  The uncontroverted record here shows that courts in the 19th and 20th century recognized that using trap guns to protect property, for example, was "using means dangerous to life" and that "[t]he preservation of human life and of limb and member from grievous harm, is of more importance to society than the protection of property."  D. 82-2 at ¶ 26.  Even when the trap guns were employed for the specific purpose of harming a potential burglar, the historic evidence suggests "the gun-setter could be held civilly or criminally liable."  Id. ¶ 27.  Thus, trap gun restrictions are a type of historic analogue "relevantly similar" to the Massachusetts handgun regulations.  Bruen, 597 U.S. at 29.

### 4.    Laws to Protect Minors from Firearms

Lastly, Defendants argue that laws protecting minors from harm caused by firearms are historical laws analogous to the Massachusetts handgun regulations.  D. 80-2 at 32-34.  The uncontroverted evidence in the record also suggests the same based on various laws aimed at banning the sale or furnishing of firearms to children under fifteen, see D. 80-1 at 54; State v. Callicut, 69 Tenn. 714, 716-17 (1878); Coleman v. State, 32 Ala. 581, 582-83 (1858).  Defendants rely upon these laws, D. 80-2 at 32, and also point to the historical regulation of toy pistols, id.; D. 82-2 ¶¶ 20-21.  The evidence in the record shows that toy pistols were heavily regulated in the 19th century because they were "miniaturized guns" capable of shooting blank rounds "though live rounds could easily be substituted."  D. 82-2 ¶ 20.  Given that the toy pistol functionally operated as a deadly weapon, see id. ¶ 21, toy pistol sales were restricted to prevent children from suffering fatal infections and injuries from projectiles, id. ¶ 22.  The evidence in the record supports the argument that "dramatic technological changes" have led to an increase of accidents involving children based on modern smaller and lighter designs, that are kept loaded.  See D. 82-3 ¶ 68; D.

82-4 ¶ 10; D. 82-5 ¶¶ 25-26.  The Massachusetts handgun regulatory scheme at issue here require that handguns sold by retailers have a "mechanism which effectively precludes an average five year old child from operating the handgun when it is ready to fire." See 940 C.M.R. § 16.05(2).  The purpose for the regulations is "relatively similar" to that of the historical evidence, which was to prevent children from accidently discharging a firearm given their ability to handle and operate the firearm.  As to the "how," the Massachusetts handgun regulations draw from the historical analogues presented while addressing the advancements in technology to prevent firearm accidents involving children.

Given this record and for the reasons discussed above, the Court concludes that the Defendants have sufficiently established that the Massachusetts handgun regulatory scheme is "consistent with the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.

## VII.  Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for summary judgment, D. 61, and ALLOWS Defendants' motion for summary judgment, D. 79.

**So Ordered.**

/s Denise J. Casper
Chief United States District Judge